# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

LEANNE TAN, an individual, on behalf of herself and all persons similarly situated,

Plaintiff,

v.

QUICK BOX, LLC, et al.,

Defendants.

Case No.: 3:20-cv-01082-H-DEB

**ORDER:**

**(1) GRANTING IN PART AND DENYING IN PART LA PURA DEFENDANTS' MOTION TO DISMISS**

[Doc. No. 25]

**(2) GRANTING IN PART AND DENYING IN PART KONNEKTIVE DEFENDANTS' MOTIONS TO DISMISS; AND**

[Doc. Nos. 29, 30, 31, 32, 33, 34.]

**(3) GRANTING IN PART AND DENYING IN PART QUICKBOX DEFENDANTS' MOTIONS TO DISMISS**

[Doc. Nos. 36, 37, 38, 39, 40.]

On June 12, 2020, Plaintiff Leanne Tan filed a class action complaint against alleged operators of online "celebrity free trial" scams alleging violations of various consumer protections laws. (Doc. No. 1, Compl.) On August 14, 2020, Defendants Beautiful Skin and Health SL, Inc., Coastal Beauty Care KV, Inc., Coastal Health & Body TML, Inc., Coastal Skin Care DC, Inc., Complete Beautiful Skin DT, Inc., Complete Dietary Health DT, Inc., DL Group, Inc., Diet and Beauty Enterprise JB, Inc., Dietary 8 Leaves TL, Inc., Dietary Care Group MK, Inc., Dietary Health DL, Inc., Dietary Health Management SL, Inc., Dietary Health Supplements ADN, Inc., Dietary Mind & Body AR, Inc., Dietary Pills TTH, Inc., Dietary Supplements 8 Leaves TL, Inc., Dietary Supplements NS, Inc., EM Strength & Wellness Products, Inc., EW Ideal Health Store, Inc., EW Radiant Skin Store, Inc., Fit Body Forever KZ, Inc., Fit Lifestyle Enterprise JD, Inc., Fit and Slim Body Olo, Inc., Fitness & Health Supplements PKL, Inc., Flawless Beauty Forever MC, Inc., Forever Beautiful Products KZ, Inc., Forever Beauty and Balance JL, Inc., Health & Body Care TN, Inc., Health & Skin Nutrition JLN, Inc., Health & Wellness Products EM, Inc., Health Enterprise AR, Inc., Health Enterprise LT, Inc., Health Skin and Beauty MAYA, Inc., Health Skin and Body JB, Inc., Health and Diet Products ISA, Inc., Health and Fitness Lifestyle JL, Inc., Healthy Beautiful Skin JD, Inc., Healthy Body & Balance CD, Inc., Healthy Fit Lifestyle DC, Inc., Healthy Leaves TL, Inc., Healthy Lifestyle Diet JL, Inc., Healthy Skin Group TQH, Inc., Healthy Skin Lifestyle JB, Inc., Healthy Supplements MAYA, Inc., Healthy and Slim TT, Inc., Ideal Skin & Health Care NA, Inc., Lasting Fitness & Beauty JLN, Inc., PKL Everlasting Beauty, Inc., Radiant Skin & Body Shop ATN, Inc., Remarkable Beauty TN, Inc., Remarkable Health Supply PO, Inc., Skin Beauty & Health JN, Inc., Skin Beauty Products ISA, Inc., Skin Beauty and Balance CD, Inc., Skin Care Enterprise TTH, Inc., Skin Care Group MK, Inc., Skin Products Rubio, Inc., Skin and Beauty NS, Inc., Strength & Fitness Lifestyle LT, Inc., Total Fitness & Health MC, Inc., Total Health Supply TUA, Inc., and Vibrant Face & Beauty Shop ATN, Inc. (collectively, the "La Pura Defendants") filed a motion to dismiss Plaintiff's complaint for failure to state

a claim and lack of subject matter jurisdiction. (Doc. No. 25.)[1] On September 7, 2020, Plaintiff filed her opposition. (Doc. No. 27.) On September 14, 2020, the La Pura Defendants filed their reply. (Doc. No. 35.)

On September 9, 2020, Defendants Konnektive Corporation, Konnektive LLC, Konnektive Rewards LLC, Kathryn Martorano, Matthew Martorano, and Martorano Holdings LLC (collectively, the "Konnektive Defendants") each filed a motion to dismiss Plaintiff's complaint for failure to state a claim and lack of personal jurisdiction. (Doc. Nos. 29–34.) On September 14, 2020, Defendants Quick Box, LLC, Quick Holdings, LLC, Stephen Adelé, James Martell, and Chad Biggins (collectively, the "QuickBox Defendants") each filed a motion to dismiss Plaintiff's complaint. (Doc. Nos. 36–40.) On October 26, 2020, Plaintiff filed her oppositions to the Konnektive Defendants' and the QuickBox Defendants' motions. (Doc. Nos. 49–59.) On November 16, 2020, the Konnektive Defendants and the QuickBox Defendants filed their replies. (Doc. Nos. 63–67, 73–78.) On December 7, 2020, the Court took the matter under submission. (Doc. No. 87.) For the reasons below, the Court (1) grants in part and denies in part the La Pura Defendants' motion to dismiss, (2) grants in part and denies in part the Konnektive Defendants' motions to dismiss, and (3) grants in part and denies in part the QuickBox Defendants' motions to dismiss.

///
///
///
///
///
///

---

[1]     Plaintiff also included entities Beauty and Balance LV, Inc., Diet Focus MG, Inc., Select Skin Products MV, Inc., and Skin Beauty Enterprise MG, Inc. as part of the "La Pura Defendants" in her complaint. (Doc. No. 1.) These entities did not join in the motion, and thus references to the "La Pura Defendants" in this Order exclude Beauty and Balance LV, Inc., Diet Focus MG, Inc., Select Skin Products MV, Inc., and Skin Beauty Enterprise MG, Inc.

**Background**

The following facts are taken from Plaintiff's class action complaint. This lawsuit involves an alleged fraudulent scheme in which the Defendants allegedly use fake celebrity endorsements and reviews and misrepresentations about price and limited availability, to induce consumers into purchasing beauty and skincare products. (Doc. No. 1 ¶¶ 8–12.) The Defendants allegedly advertise that the products are available as a "free trial," then subsequently bill consumers for the full price of the products as well as monthly subscription charges. (Id.) They allegedly make it difficult or impossible to return the products or receive a refund and operate "false front" websites to mislead banks and credit card companies investigating chargebacks. (Id.)

## I.    Plaintiff's Experience With La Pura

Plaintiff is a citizen of California. (Id. ¶ 13.) In January 2020, she received a text message purportedly from Amazon claiming she would receive a free "La Pura" cosmetics product if she completed an online survey. (Id. ¶ 112.) The advertisement claimed she would only pay a total of $4.94 for shipping and handling. (Id.) Plaintiff completed the survey and was taken to La Pura's website order page (which Plaintiff refers to as a "hidden" landing page). (Id. ¶ 113.) She completed her order, believing she would only be charged for the shipping of her free trial product. (Id. ¶ 114.) She then received a confirmation email from info@la-pura-skinproducts.com, which stated the order would appear on her credit card statement under three separate merchant accounts: (1) "beautifullyremarkableh," (2) "beautyhealthremarkable," and (3) "skincarehealthybeautygroup." (Id.) The email did not specify the products ordered or the amount to be charged; Plaintiff emailed La Pura's customer service to confirm she would only be charged $4.94 but did not receive a response. (Id. ¶ 114–15.) On January 26, 2020, Plaintiff's credit card was charged $88.46 by a merchant account titled "beautifullyremarkableh." (Id. ¶ 118.) On January 27, 2020, Plaintiff's credit card was charged $84.37 by a merchant account titled "beautyhealthremarkable." (Id. ¶ 119.) When Plaintiff discovered the charges, she called La Pura's customer service to obtain a refund;

the representative initially refused on the basis that Plaintiff had used the products. (Id. ¶ 120.) Plaintiff ultimately obtained a refund of only $120.97. (Id. ¶ 121.)

## II.   The Alleged Fraudulent Scheme

Plaintiff alleges Defendants' fraudulent scheme operates as follows. Consumers allegedly encounter an advertisement for a "free trial" of a La Pura product via text message or a third-party website, which "funnels" them to a landing page for the product. (Id. ¶¶ 124–25.) These landing pages are allegedly inaccessible to anyone who does not view the advertisements or are deleted after a few weeks or months to avoid detection. (Id. ¶ 126.) Because of this, Plaintiff states she is unable to provide the specific landing page that she viewed but provides two other known landing pages for La Pura products. (Id.) Plaintiff reached the landing page via a text message but alleges other victims of the scheme viewed "affiliate pages" with fake reviews, celebrity endorsements, and false claims about the effectiveness of the product. (Id. ¶¶ 127–34.) Once on the La Pura landing page, consumers are shown their final order, which allegedly states that all they will pay for their "free trial" product is shipping and handling, and are prompted to enter their credit card information. (Id. ¶¶ 142, 159.) On these pages, Plaintiff alleges that the terms and conditions of purchases are hidden or buried; consumers are not required to agree to the terms to complete the purchase. (Id. ¶¶ 137–42, 153.) The terms of service state that, rather than the product being a free trial for which the consumer need only pay shipping and handling, consumers will be billed $88.46 unless they cancel within fourteen (14) days of their order. (Id. ¶ 141.) Additionally, by making the initial order, consumers have unknowingly signed up for a continuing subscription of La Pura products, for which they will be billed $93.42 every 30 days. (Id.) Plaintiff alleges these hidden terms directly contradict what is displayed on the advertisement, the La Pura landing page, and the final order page, all of which say nothing about signing up for a subscription or the need to cancel within 14 days to avoid being billed. (Id. ¶¶ 142–43.)

After providing their credit card information and completing their purchase, consumers are subsequently billed for an additional $88.46. (Id. ¶ 143.) When consumers

seek to dispute the charge with their bank or credit card company, the Defendants allegedly present the investigators with a second website, which Plaintiff terms a "false front" website. (Id. ¶¶ 165–74.) These "false front" websites are visually similar to the landing pages consumers used to make their purchase, but the terms and conditions are clearly stated, thus deceiving the investigators into believing consumers agreed to the full terms of sale. (Id.) Additionally, the Defendants allegedly create multiple shell companies, each of whom signs up for a unique merchant account; these accounts are then rotated through customer billings with a "load balancing" software to prevent any individual account from being flagged for fraud due to high levels of chargebacks. (Id.)

Plaintiff alleges the named Defendants are involved in this scheme as follows. The La Pura Defendants are the marketers and/or branders of the La Pura products who allegedly operate the hidden landing pages viewed by consumers as well as the false front websites provided to banks and credit card companies. (Id. ¶ 10.) Plaintiff identifies "Total Health Supply TUA, Inc." and "Defendant DL Group, Inc." as the companies behind the merchant accounts that billed her credit card. (Id. ¶¶ 161–64.) The other 60 entities identified as being part of the "La Pura Defendants" share the same registered agent in Sacramento, CA; Plaintiff alleges they are shell entities used to apply for merchant accounts. (Id. ¶¶ 27–90, 161–65.) Plaintiff alleges "QuickBox Fulfillment," which is made up of the QuickBox Defendants, is a fulfillment company that allegedly provides generic "white label" products to the La Pura Defendants, assists with marketing and advertising, distributes the products to consumers, and handles returns when customers complain. (Id. ¶¶ 10, 224–232.) Plaintiff claims that the return address for the La Pura products listed on one of the identified La Pura landing pages, as well as on several of the identified "false front" websites, is the address of QuickBox's fulfillment center in Colorado. (Id. ¶¶ 226–29.) Finally, Plaintiff alleges the Konnektive Defendants make up a customer relationship management ("CRM") software company, who allegedly provides the specialized "load balancing" software to enable the use of multiple merchant accounts. (Id. ¶¶ 10, 300–07.) The load balancing software automatically spreads consumer purchases across dozens of

merchant accounts in order to prevent any one merchant account from being shut down due to excessive chargebacks and/or fraud claims, which ensures the fraudulent scheme can continue. (Id. ¶ 220.) Plaintiff alleges the source code on one of the La Pura landing pages demonstrates that its CRM software is from Konnektive. (Id. ¶¶ 302–06.)

## III.  Procedural History

Plaintiff's complaint seeks certification of a nationwide class and a California subclass. (Id. ¶¶ 352–65.) She alleges the following causes of action: (1) violation of California's Consumer Legal Remedies Act ("CLRA"); (2) violation of California's False Advertising Law ("FAL"); (3) violation of the unfair and fraudulent prongs of California's Unfair Competition Law ("UCL"); (4) violation of the unlawful prong of California's Unfair Competition Law; (5) violation of California's Automatic Renewal Law ("ARL"); (6) violation of the Electronic Fund Transfer Act ("EFTA"); (7) civil Racketeer Influenced and Corrupt Organizations ("RICO") Act violations; (8) violation of various state's consumer protection laws; (9) aiding and abetting; and (10) conspiracy. (Id. ¶¶ 366–570.)

The La Pura Defendants move to dismiss Plaintiff's complaint pursuant to: (i) Federal Rule of Civil Procedure 12(b)(1), for lack of subject matter jurisdiction, and (ii) Rule 12(b)(6), for failure to state a claim upon which relief can be granted, and for violating the requirements of Rules 8(a) and 9(b). (Doc. No. 25 at 2.) The Konnektive Defendants move to dismiss Plaintiff's complaint pursuant to: (i) Rule 12(b)(2), for lack of personal jurisdiction; (ii) Rule 8(a)(2), for failure to state a short and plain statement of the claim; (iii) Rule 12(b)(6), for failure to state a claim upon which relief can be granted; (iv) Rule 12(b)(1), for lack of standing under claim-specific state law requirements; and (v) Rule 9(b) for failure to plead claims grounded in fraud with sufficient particularity. (Doc. Nos. 29–34.) The QuickBox Defendants move to dismiss Plaintiff's complaint pursuant to: (i) Rule 12(b)(2), for lack of personal jurisdiction; (ii) Rule 8(a)(2), for failure to state a short and plain statement of the claim; (iii) Rule 12(b)(6), for failure to state a claim upon which relief can be granted; (iv) Rule 12(b)(1), for lack of standing under claim-

specific state law requirements; and, (v) Rule 9(b), for failure to plead claims grounded in fraud with sufficient particularity. (Doc. Nos. 36–40.)

### Discussion[2]

## I.   Whether the Court Has Personal Jurisdiction Over the Konnektive Defendants and QuickBox Defendants[3]

The Konnektive Defendants and QuickBox Defendants each move to dismiss Plaintiff's complaint on the ground that this Court does not have personal jurisdiction over them. (Doc. Nos. 29–34, 36–40.) Plaintiff does not contend that the Court has general jurisdiction over any of the QuickBox Defendants or Konnektive Defendants, thus, the Court limits its analysis to specific personal jurisdiction. (See Doc. Nos. 49–59.)[4]

Under Rule 12(b)(2), a plaintiff bears the burden of establishing personal jurisdiction. Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 800 (9th Cir. 2004). "This demonstration requires that the plaintiff 'make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss.'" Pebble Beach Co. v. Caddy, 453

---

[2]   There are a substantial number of motions to dismiss before the Court in this matter. (See Doc. Nos. 25, 29, 30, 31, 32, 33, 34, 36, 37, 38, 39, 40.) The motions submitted by the Konnektive Defendants and the QuickBox Defendants, respectively, contain sections that are nearly identical. As a result, throughout its Order the Court will cite to one brief from each group as a representative brief, unless it is necessary to cite to a specific argument made in one brief that is not made in the others.

[3]   Both the QuickBox and Konnektive Defendants make objections to the evidence attached to Plaintiff's oppositions to their motions to dismiss for lack of personal jurisdiction. Defendants' various evidentiary objections are sustained where valid and are otherwise overruled. The Court also notes that the QuickBox Defendants make their objections in separate filings, not as part of their replies. (See Doc. Nos. 68–72.) This is improper; to the extent parties have evidentiary objections, they should be raised in the applicable responsive briefing, not in separate filings that evade the page limits for briefing.

[4]   Plaintiff additionally argues that RICO's nationwide service provision provides a separate basis for personal jurisdiction over all of the Defendants. "For nationwide service to be imposed under section 1965(b), the court must have personal jurisdiction over at least one of the participants in the alleged multidistrict conspiracy and the plaintiff must show that there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators." Butcher's Union Local No. 498, United Food & Commercial Workers v. SDC Inv., Inc., 788 F.2d 535, 539 (9th Cir. 1986). The Court rejects Plaintiff's contention for two reasons: (1) Plaintiff has not made a sufficient showing that there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators, and (2) below, the Court dismisses, with leave to amend, Plaintiff's RICO claims.

F.3d 1151, 1154 (9th Cir. 2006) (quoting <u>Doe v. Unocal Corp.</u>, 248 F.3d 915, 922 (9th Cir. 2001)). "The parties may submit, and the court may consider, declarations and other evidence outside the pleadings in determining whether it has personal jurisdiction." <u>Kellman v. Whole Foods Mkt., Inc.</u>, 313 F. Supp. 3d 1031, 1042 (N.D. Cal. 2018) (citing <u>Unocal Corp.</u>, 248 F.3d at 922). "Where not directly controverted, plaintiff's version of the facts is taken as true for the purposes of a 12(b)(2) motion." <u>Unocal Corp.</u>, 248 F.3d at 922 (quoting <u>AT&T Co. v. Compagnie Bruxelles Lambert</u>, 94 F.3d 586, 588 (9th Cir. 1996)). "If the defendant adduces evidence controverting the allegations in the complaint, however, the plaintiff must 'come forward with facts, by affidavit or otherwise, supporting personal jurisdiction.'" <u>Platypus Wear, Inc. v. Bad Boy Europe Ltd.</u>, No. 16-CV-02751-BAS-DHB, 2018 WL 3706876, at *4 (S.D. Cal. Aug. 2, 2018) (citing <u>Scott v. Breeland</u>, 792 F.2d 925, 927 (9th Cir. 1986)); <u>see</u> <u>Mavrix Photo, Inc. v. Brand Techs., Inc.</u>, 647 F.3d 1218, 1223 (9th Cir. 2011). "Conflicts between [the] parties over statements contained in the affidavits must be resolved in the plaintiff's favor." <u>Schwarzenegger</u>, 374 F.3d at 800; <u>see</u> <u>Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.</u>, 328 F.3d 1122, 1129 (9th Cir. 2003) ("[C]onflicts between the facts contained in the parties' affidavits must be resolved in [plaintiff's] favor for purposes of deciding whether a prima facie case for personal jurisdiction exists.").

## A.    The Fiduciary Shield Doctrine

"Under the fiduciary shield doctrine, a person's mere association with a corporation that causes injury in the forum state is not sufficient in itself to permit that forum to assert jurisdiction over the person." <u>Davis v. Metro Prod.</u>, 885 F.2d 515, 520 (9th Cir. 1989). This means that "[t]he fact that a corporation is subject to jurisdiction in the forum state . . . does not necessarily confer jurisdiction over its individual officers." <u>Brown v. Gen. Steel Domestic Sales, LLC</u>, No. CV08-00779 MMM (SHX), 2008 WL 2128057, at *10 (C.D. Cal. May 19, 2008) (citing <u>Davis</u>, 885 F.2d at 520); <u>see</u> <u>Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.</u>, 972 F.3d 1101, 1109 (9th Cir. 2020) ("We do not impute a corporation's forum contacts to each of the corporation's employees."); <u>Moser</u>

v. Lifewatch Inc., No. 19-CV-831-WQH-BLM, 2020 WL 1849664, at *5 (S.D. Cal. Apr. 13, 2020) ("Personal jurisdiction over individual corporate officers may not be based on the court's jurisdiction over the corporation itself."); Tangiers Inv'rs, L.P. v. Americhip Int'l, Inc., No. 11CV339 JLS BGS, 2011 WL 3299099, at *2 (S.D. Cal. Aug. 1, 2011) ("Under the fiduciary shield doctrine, this Court's jurisdiction over Americhip, the corporation, does not directly translate into jurisdiction over Mouton, Americhip's one-time CEO and board member.").

However, "the fact that actions constituting sufficient contacts with the state were taken on behalf of the corporate employer will not shield the individual from being subjected to jurisdiction." Brown, 2008 WL 2128057, at *10; see Calder v. Jones, 465 U.S. 783, 789–90 (1984) ("Petitioners are correct that their contacts with California are not to be judged according to their employer's activities there. On the other hand, their status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum State must be assessed individually."); Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 781 n.13 (1984) ("[W]e today reject the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity."). "The Ninth Circuit has clearly stated that the fiduciary shield doctrine may not serve as 'jurisdictional limit' where sufficient contacts would otherwise exist to establish personal jurisdiction." Arcona, Inc. v. Farmacy Beauty, LLC, No. 2:17-CV-07058-ODW-JPR, 2018 WL 1441155, at *3 (C.D. Cal. Mar. 22, 2018); see Glob. Commodities Trading Grp., 972 F.3d at 1109 (rejecting contention that "a court may consider only the actions [defendants] took in an individual capacity on their own behalf" for purposes of personal jurisdiction"); Kukui Gardens Corp. v. Holco Capital Grp., Inc., 664 F. Supp. 2d 1103, 1112 (D. Haw. 2008) ("Calder established that the corporation's contacts as a whole may not be projected onto an individual employee as that individual's own contacts; instead, the individual employee's contacts with the forum state should be the focus of the examination. However . . . it is irrelevant whether those individual contacts were personal in nature, or while acting in an official capacity.").

3:20-cv-01082-H-DEB

It is evident from Supreme Court and Ninth Circuit precedent that under the fiduciary shield doctrine, courts cannot impute a corporation's contacts to its employees, but nor can employees hide behind their official positions to avoid personal jurisdiction for their own actions. Both principles are consistent with Calder's mandate that "[e]ach defendant's contacts with the forum State must be assessed individually." 465 U.S. at 789–90. There are two recognized exceptions to the fiduciary shield doctrine. "Because the corporate form serves as a shield for the individuals involved for purposes of liability as well as jurisdiction, many courts search for reasons to 'pierce the corporate veil' in jurisdictional contexts parallel to those used in liability contexts." Davis, 885 F.2d at 520. Thus, the fiduciary shield doctrine may be ignored in circumstances that give rise to grounds for piercing the corporate veil: "(1) where the corporation is the agent or alter ego of the individual defendant; or (2) by virtue of the individual's control of, and direct participation in the alleged activities." Mulato v. Wells Fargo Bank, N.A., 76 F. Supp. 3d 929, 945 (N.D. Cal. 2014); see Transgo, Inc. v. AJAC Transmission Parts Corp., 768 F.2d 1001, 1021 (9th Cir. 1985); Platypus Wear, Inc., 2018 WL 3706876, at *7.

Under the first exception, "[i]f a corporation is an alter ego of an individual or another corporation, then the district court may disregard the corporate form and exercise personal jurisdiction over the other individual or entity." ADO Fin., AG v. McDonnell Douglas Corp., 931 F. Supp. 711, 715 (C.D. Cal. 1996) (citing Certified Building Products, Inc. v. NLRB, 528 F.2d 968, 969 (9th Cir. 1976)). In other words, "where a corporation is the alter ego of the stockholders so as to justify disregard of the corporate entity[,] jurisdiction over the corporation will support jurisdiction over the stockholders." Flynt Distrib. Co. v. Harvey, 734 F.2d 1389, 1393 (9th Cir. 1984) (quoting Sheard v. Superior Court, 114 Cal. Rptr. 743, 745 (Cal. Ct. App. 1974)); see Platypus Wear, Inc., 2018 WL 3706876, at *8. "Because the facts relating to personal jurisdiction are intertwined with the merits of its claims, a plaintiff need only make a prima facie showing of alter ego liability." Platypus Wear, 2018 WL 3706876, at *8 (citing Data Disc, Inc. v. Sys. Tech. Assocs., Inc., 557 F.2d 1280, 1285 (9th Cir. 1977)).

"To apply the alter ego doctrine, the court must determine (1) that there is such unity of interest and ownership that the separate personalities of the corporation and the individuals no longer exist and (2) that failure to disregard the corporation would result in fraud or injustice." Flynt Distrib. Co., 734 F.2d at 1393; see Iconlab, Inc. v. Bausch Health Companies, Inc., 828 F. App'x 363, 364 (9th Cir. 2020); Conde v. Sensa, 259 F. Supp. 3d 1064, 1068 (S.D. Cal. 2017). "To determine whether there is a sufficient unity of interest and ownership to support alter ego liability, courts consider factors like: commingling of funds, failure to maintain minutes or adequate corporate records, identification of the equitable owners with the domination and control of the two entities, the use of the same office or business locations, the identical equitable ownership of the two entities, the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual, and failure to adequately capitalize a corporation." Apple Inc. v. Allan & Assocs. Ltd., 445 F. Supp. 3d 42, 52 (N.D. Cal. 2020) (citing Pac. Mar. Freight, Inc. v. Foster, No. 10-CV-0578-BTM-BLM, 2010 WL 3339432, at *6 (S.D. Cal. Aug. 24, 2010)).

Under the second exception, "a court may assert personal jurisdiction over an individual based upon 'the individual's control of, and direct participation in the alleged activities' of the corporation." Tangiers Inv'rs, 2011 WL 3299099, at *2 (quoting Wolf Designs, Inc. v. DHR & Co., 322 F. Supp. 2d 1065 (C.D. Cal. 2004)). "[A] corporate officer can be subject to jurisdiction based on his own sufficient individual contacts with the forum." Moser, 2020 WL 1849664, at *5 (quoting In re Boon Glob. Ltd., 923 F.3d 643, 652 (9th Cir. 2019)); see Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co., 173 F.3d 725, 734 (9th Cir. 1999) ("A corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf."); Roberts v. Obelisk, No. 18CV2898-LAB (BGS), 2019 WL 1902605, at *4 (S.D. Cal. Apr. 29, 2019) ("Individual [d]efendants cannot take advantage of the so-called 'fiduciary-shield doctrine' if their contacts with California would otherwise give rise to jurisdiction."). This results in

a straightforward application of the specific personal jurisdiction analysis; an individual's contacts with a forum are assessed without regard to whether the contacts arose out of the individual's personal or professional capacity. See Lewis v. Travertine, Inc., No. 2:17-cv-00016-CAS (JCx), 2017 WL 1511292, at *6 (C.D. Cal. Apr. 24, 2017) ("Accordingly, for purposes of specific jurisdiction, the Court's analysis is little altered by the fiduciary shield doctrine."); Leroy-Garcia v. Brave Arts Licensing, No. C 13-01181 LB, 2013 WL 4013869, at *7 (N.D. Cal. Aug. 5, 2013) ("[T]he proper inquiry is to look specifically at the minimum contacts of the individual regardless of whether that individual was acting within his or her official capacity.").[5] The Court now turns to the personal jurisdiction analysis.

### B.   Specific Personal Jurisdiction

"Personal jurisdiction over a nonresident defendant is tested by a two-part analysis. First, the exercise of jurisdiction must satisfy the requirements of the applicable state long-arm statute. Second, the exercise of jurisdiction must comport with federal due process." Dow Chemical Co. v. Calderon, 422 F.3d 827, 830 (9th Cir. 2005) (quoting Chan v. Society Expeditions, 39 F.3d 1398, 1404–05 (9th Cir. 1994)). Because no federal statute authorizes personal jurisdiction in this case, the Court applies the law of the state in which it sits to determine whether it has personal jurisdiction over Defendants. Fed. R. Civ. P. 4(k)(1)(A). "California's long-arm statute, Cal. Civ. Proc. Code § 410.10, is coextensive with federal

---

[5]      For the sake of clarity, the Court refers to these as exceptions to the fiduciary shield doctrine, but notes that this seems to be a misnomer. Neither "exception" represents a deviation from Calder's core holding, and neither allows the type of jurisdictional overreaching the fiduciary shield doctrine aims to prevent, namely, haling an employee into court solely by virtue of his or her position in a company. Under the "alter ego" exception, if an individual and corporation are found to be alter egos, then they are no longer considered to be two legally separate entities, but rather a "consolidated entity." See Ranza v. Nike, Inc., 793 F.3d 1059, 1072 (9th Cir. 2015). Thus, the shield need not be pierced, because for purposes of personal jurisdiction, the individual and the company are one and the same. Under the "control and participate" exception, an employee's own actions are assessed for minimum contacts with the forum state. This is simply the typical specific personal jurisdiction test; if an individual participated in conduct giving rise to jurisdiction in a forum state, the first two prongs (purposeful direction and "arising out of") are met. Whether that conduct was undertaken in a personal or official capacity is irrelevant. Again, the fiduciary shield need not be pierced, as jurisdiction is being exercised on the basis of the individual's own contacts with the forum, not the contacts of his or her corporation.

due process requirements, so the jurisdictional analyses under state law and federal due process are the same." <u>Mavrix Photo</u>, 647 F.3d at 1223 (quoting <u>Schwarzenegger</u>, 374 F.3d at 800–01). "Due process, in turn, requires that each party 'have certain minimum contacts' with the forum state 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" <u>In re Boon Glob. Ltd.</u>, 923 F.3d at 650 (quoting <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945)).

> Specific jurisdiction exists when all three elements of the following test are satisfied:
>
> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

<u>Picot v. Weston</u>, 780 F.3d 1206, 1211 (9th Cir. 2015) (citations omitted). The plaintiff bears the burden of satisfying the first two prongs; the burden then shifts to the defendant to demonstrate that the third prong is not satisfied. <u>CollegeSource, Inc. v. AcademyOne, Inc.</u>, 653 F.3d 1066, 1076 (9th Cir. 2011).

The form of the inquiry into the first prong of this test "depends on the nature of the claim at issue," and whether it sounds in contract or tort. <u>Picot</u>, 780 F.3d at 1212. Actions sounding in tort are assessed under the purposeful direction analysis. <u>See id.</u> Whether a defendant has purposefully directed his or her activities at the forum state requires application of another three-part test: "The defendant must have '(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.'" <u>Axiom Foods, Inc. v. Acerchem Int'l, Inc.</u>, 874 F.3d 1064, 1069 (9th Cir. 2017) (quoting <u>Washington Shoe Co. v. A-Z Sporting Goods Inc.</u>, 704 F.3d 668, 673 (9th Cir. 2012)). The primary inquiry of purposeful direction is "whether defendants have voluntarily derived some benefit from their interstate activities such that they 'will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts.'" <u>Glob. Commodities Trading Grp.</u>, 972 F.3d at 1107

(quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474–75 (1985)).

To satisfy the second prong of specific jurisdiction, that the claims "arise out" of forum-related activities, a "Plaintiff[] must show that [it] would not have suffered an injury 'but for' [the Defendant's] forum related conduct." Myers v. Bennett Law Offices, 238 F.3d 1068, 1075 (9th Cir. 2001); see also Menken v. Emm, 503 F.3d 1050, 1058 (9th Cir. 2007). Once a plaintiff has established the first two prongs, the burden shifts to the defendant to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Burger King Corp., 471 U.S. at 477. The Ninth Circuit applies a seven-part balancing test to determine whether a case satisfies the "fair play and substantial justice" element:

> (1) the extent of the defendants' purposeful injection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

Dole Food Co. v. Watts, 303 F.3d 1104, 1114 (9th Cir. 2002).

### C.   QuickBox Defendants

The Court first examines Plaintiff's allegation that the entity QuickBox Defendants (Quick Box, LLC and Quick Holdings, LLC) should be considered alter egos of one another for purposes of personal jurisdiction. Plaintiff alleges that Defendant Quick Holdings, LLC is "the owner of Quick Box LLC, and on information and belief, controls and directs Quick Box LLC's activities through its executives." (Doc. No. 1 ¶ 15.) These allegations are conclusory statements unsupported by any factual assertions regarding the extent or nature of Defendant Quick Holdings, LLC's control over Defendant Quick Box, LLC. Plaintiff asserts that Defendant Quick Holdings, LLC did not expressly deny this allegation in its submitted declaration, and thus the Court must take Plaintiff's allegation as true. (Doc. No. 59 at 7.) This is incorrect; Defendant Quick Holdings, LLC's declaration states that Quick Holdings, LLC is a holding company that owns Quick Box, LLC, and that

the two entities maintain separate bank accounts. (Doc. No. 37-1 Adelé Decl. ¶ 4.) Furthermore, the Court is under no obligation to take Plaintiff's conclusory and factually unsupported allegations as true. See Williams v. Yamaha Motor Co., 851 F.3d 1015, 1025 (9th Cir. 2017). The Court concludes that Plaintiff has not made a prima facie case that there is such unity of interest and ownership that the separate personalities of Quick Holdings, LLC and Quick Box, LLC no longer exist.[6] The Court will therefore analyze their contacts with California on an individual basis.

### 1.    Quick Box, LLC

Defendant Quick Box, LLC is a limited liability company organized in Colorado, with its principal place of business in Colorado. (Doc. Nos. 1 ¶ 14; 36-1 Adelé Decl. ¶ 3.) It argues that it is not subject to specific personal jurisdiction because: (1) Plaintiff cannot satisfy the second or third elements of the purposeful direction test, (2) Plaintiff's claims do not arise out of Quick Box, LLC's alleged California-related conduct, and (3) exercising jurisdiction over it would be unreasonable. (Doc. No. 36 at 7–14.)

The Court concludes Plaintiff has sufficiently alleged that Defendant Quick Box, LLC purposefully directed its activities toward California. Plaintiff alleges that Defendant Quick Box, LLC purposefully directed its activities toward California by shipping products to California residents, accepting and processing returns and complaints from California residents, and providing other fulfillment services for its clients in connection with California customers. (Doc. No. 1 ¶ 292.) First, for the purposes of the "intentional act" requirement, it matters only that the defendant intended to perform "an actual, physical act in the real world." Schwarzenegger, 374 F.3d at 806 (citations omitted). Here, Plaintiff alleges that Quick Box, LLC shipped the La Pura products to her and other members of the putative class. (Doc. No. 1 ¶¶ 227–29.) Defendant Quick Box, LLC does not deny

---

[6] Plaintiff provides caselaw regarding the "agency" theory of personal jurisdiction in her opposition to Defendant Quick Holdings, LLC's motion. (Doc. No. 59 at 9–10.) Because Plaintiff's conclusory allegations are clearly insufficient to support a prima facie case for personal jurisdiction over Defendant Quick Holdings, LLC under either an agency or an alter ego theory, the Court does not delve further into the agency theory.

Plaintiff's allegation that it was the fulfillment company that provided Plaintiff with the La Pura products, and impliedly concedes in its motion that Plaintiff has satisfied this prong. (Doc. No. 36 at 8.) Therefore, Defendant Quick Box, LLC committed an intentional act for the purposes of specific jurisdiction.

Second, Plaintiff has pled sufficient allegations that Defendant Quick Box, LLC expressly aimed its conduct at California. Plaintiff alleges that Defendant Quick Box, LLC knew the consumers it was shipping products to were California residents by virtue of their shipping addresses. (Doc. No. 1 ¶ 293.) She alleges the shipments were continuous and regular given the subscription service nature of the La Pura products, and that the shipments have been ongoing since at least early 2019. (Id.) Perhaps most significantly, Plaintiff also alleges that Defendant Quick Box, LLC specifically advertises to its clients that it is an ideal service to select for shipment and fulfillment services to California. (Id. ¶ 294.) She provides a QuickBox press release which states: "[w]ith nearly 70% of most consumer orders coming from California, Texas, Florida and New York making it very important to have one's business equidistant from those locations. Choosing a fulfillment center located in a place like Denver, Colorado [where Quick Box, LLC is located] allows businesses to get their orders to their customers in a matter or 3 to 4 business days or less." (Id.) Defendant Quick Box, LLC is also alleged to provide "full returns processing services" for its clients, such as the La Pura Defendants, which entails tracking the reasons for returns, managing inventory, and handling refunds and chargebacks. (Id. ¶¶ 268–70.) These allegations are largely uncontradicted by Defendant Quick Box, LLC's declaration.[7] Plaintiff also alleges Defendant Quick Box, LLC assists its clients with advertising and

---

[7]     (See Doc. No. 36-1 Adelé Decl. ¶ 5 ("Quick Box, LLC provides fulfillment services [which] may include product storage, boxing and placing shipping labels on products, facilitating shipment of products, product inventory tracking, and product return processing.").) Defendant Quick Box, LLC denies processing "consumer payments, consumer refunds, or chargebacks." (Id. ¶ 8.) Plaintiff provides excerpts from a 2019 QuickBox sales brochure describing how third-party fulfillment services, such as QuickBox, can assist with "returns/refunds and chargebacks." (Doc. No. 55-4 Ex. 5 at 4, 12.) At the motion to dismiss stage, the Court resolves this evidentiary conflict in Plaintiff's favor. See Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co., 284 F.3d 1114, 1119 (9th Cir. 2002).

marketing materials for the products it ships, such as by designing product labels and drafting proposed advertising copy for clients to adapt and use. (Id. ¶¶ 230, 240, 244–47.) This allegation is denied by Defendant Quick Box, LLC, who states it "does not provide online advertising, website development or operation . . . for its clients" and never interacted with any of the sixty-six (66) business entities identified in Plaintiff's complaint "to design, review or approve any advertising copy on any 'La Pura' website." (Doc. No. 36-1 Adelé Decl. ¶ 9.) In rebuttal, Plaintiff points to product sheets written by Defendant Quick Box, LLC that she alleges served as the basis for the product descriptions and advertisements used on the La Pura website, which utilize similar language. (Doc. No. 55 at 4; Ex. 9; Ex. 10; Ex. 11; Ex. 33.) She identifies multiple statements made on Defendant Quick Box, LLC's website referencing its product "label templates," "label design," and other label customization services. (Doc. No. 1 ¶¶ 251–56; Doc. No. 55 at 4.) She notes that in its promotional materials, Defendant Quick Box, LLC references its expertise and experience in marketing. (Doc. No. 55 at 4; Ex. 4; Ex. 12.) And finally, she points out that Defendant Quick Box, LLC's denial is limited to interactions with the sixty-six named entities and does not extend to the La Pura John Doe Defendants also referenced in the complaint. (Doc. No. 55 at 7.) At this stage, the Court takes Plaintiff's allegations as true and resolves evidentiary conflicts in Plaintiff's favor. See Schwarzenegger, 374 F.3d at 800; Glencore Grain Rotterdam, 284 F.3d at 1119.

Defendant Quick Box, LLC directs the Court to Adam v. Barone, a recent case from the Northern District of California involving similar allegations against a fulfillment company and its executive. (Doc. No. 36 at 5.)[8] In Adam, the district court granted the defendants' motions to dismiss for lack of personal jurisdiction on the grounds that plaintiff had failed to adequately plead the express aiming prong of purposeful direction. No. 20-

---

[8]     The QuickBox Defendants request that the Court take judicial notice of the Northern District's September 14, 2020 order in Adam v. Barone. (Doc. No. 36-2.) Plaintiff did not oppose the request for judicial notice. The Court grants Defendants' request to take judicial notice of the court document, as it is a matter of public record, which is generally subject to notice. Lee v. City of L.A., 250 F.3d 668, 688–89 (9th Cir. 2001).

CV-00761-EMC, 2020 WL 4584182, at *10 (N.D. Cal. Aug. 10, 2020). The court held plaintiff's primary argument – that defendants "had access to her ZIP code, which, according to her, meant they could foresee her suffering harm in California" – was insufficient to establish express aiming. Id. Contrary to Defendant Quick Box, LLC's assertion that Adam v. Barone governs the present case, the Court considers it to be distinguishable on two counts.

First, the Adam court noted that "the instant case identifies only a single transaction in California and does not allege facts to support a claim that [defendants] conducted extensive, repeated business in California." Id. In contrast, Plaintiff has alleged that Defendant Quick Box, LLC has been shipping La Pura products to consumers in California since at least early 2019. (Doc. No. 1 ¶ 293.) The Adam court even noted that "some Courts have found the express aiming prong is satisfied when defendants knowingly conduct regular business with individuals in the forum state and repeatedly ship goods into the forum." 2020 WL 4584182, at *10; see Oakley, Inc. v. Donofrio, No. SACV 12-02191-CJC(RNBx), 2013 WL 12126017, at *6 (C.D. Cal. June 14, 2013). In fact, the Court considers the present case to be more similar to those cited in Adam than Adam itself. In Oakley, the court found that defendants – who were alleged to have unlawfully sold Oakley products via eBay – had expressly aimed their activities toward California because they "all interacted with California consumers by accepting orders from those consumers through eBay and shipping products to consumers in California." 2013 WL 12126017, at *6. "While Defendants did not themselves operate eBay or specifically choose to sell to California customers, they did not passively place their items in the stream of commerce but rather exploited the benefits of the California market. They actively conducted transactions with California customers, . . . and shipped products into California." Id. This is analogous to Defendant Quick Box, LLC's role in the present case, and dispenses with its argument that it "only sends a product out for delivery to a consumer in California if and when Quick Box, LLC's client directs this." (Doc. No. 36-1 Adelé Decl. ¶ 7.)

Second, the <u>Adam</u> court concluded plaintiff had not adequately pled the "something more" necessary to satisfy the express aiming prong. "[F]oreign acts with foreseeable effects in the forum state alone cannot satisfy this prong without showing 'something more'—i.e., a showing that the defendant intentionally directed activities or targeted individuals in the forum state." <u>Adam</u>, 2020 WL 4584182, at *9 (citing <u>Pakootas v. Tech Cominco Metals, Ltd.</u>, 905 F.3d 565, 577 (9th Cir. 2018). The court held that "even if [defendants] knew that [plaintiff] would suffer harm in California by virtue of knowing her ZIP code and sending products to her in California, this knowledge alone does not satisfy the 'express aiming' prong absent a showing that they specifically directed their activities to California or intentionally targeted individuals in California." In the present matter, Plaintiff has made allegations and proffered exhibits regarding Defendant Quick Box, LLC's role in handling product returns and chargebacks, creating advertising copies and product labels, producing inventory reports, and other fulfillment services alleged to have been utilized in connection with the La Pura products received by Plaintiff. (Doc. No. 1 ¶¶ 230, 240, 244–47, 268–70.) She has also made the uncontroverted allegation that Defendant Quick Box, LLC specifically advertised to its clients that it is an ideal service for shipment and fulfillment services to California consumers. (<u>Id.</u> ¶ 294.) These allegations constitute "something more" showing that Defendant Quick Box, LLC specifically directed its shipping and fulfillment activities toward California. In sum, taking Plaintiff's allegations are true, and resolving evidentiary conflicts in Plaintiff's favor, the Court concludes that Plaintiff has pled enough at this stage to support the express aiming prong of purposeful direction.

As for the third prong of purposeful direction, Plaintiff must show that Defendant Quick Box, LLC "knew or should have known that the impact of its [conduct] would cause harm likely to be suffered in California." <u>Fighter's Mkt., Inc. v. Champion Courage LLC</u>, 207 F. Supp. 3d 1145, 1155 (S.D. Cal. 2016) (citing <u>Washington Shoe Co.</u>, 704 F.3d at 672–73). The Court concludes Plaintiff has adequately pled this prong by alleging that Defendant Quick Box, LLC knew its shipments were going to California consumers by

virtue of the California shipping addresses. (Doc. No. 1 ¶¶ 293, 296.) The Court assumes the truth of Plaintiff's allegations and resolves factual conflicts in Plaintiff's favor at this stage of the proceedings. As such, the Court concludes that Plaintiff has made a prima facie showing that Defendant Quick Box, LLC committed intentional acts, that the acts were targeted at Plaintiff and other consumers in California, and that it knew that economic loss could be suffered in California. See Dole Food Co., 303 F.3d at 1111.

Next, the Court concludes Plaintiff has sufficiently alleged that her claims arise out of Defendant Quick Box, LLC's California-related activities. See Myers, 238 F.3d at 1075. Plaintiff's injuries arise out of her experience with a product that was shipped to her by Defendant Quick Box, LLC. Defendant's argument that by shipping the product, it actually helped Plaintiff rather than injure her, is inapposite; Plaintiff has alleged that shipping the La Pura product was a necessary part of the alleged fraudulent scheme to avoid detection, as well as to enable repeated charges for continued shipments of unwanted products. (Doc. No. 55 at 13.) Having found that Plaintiff has met her burden of satisfying the first two prongs of the specific personal jurisdiction analysis, the Court turns to whether Defendant Quick Box, LLC has adequately demonstrated that exercising jurisdiction over it would be unreasonable. The Court concludes it has not. Defendant Quick Box, LLC argues that its contacts with California are "happenstance" and it has not purposefully interjected itself into California, that it would be a serious financial burden to defend itself in California, and that all of its operations and employees are located in Colorado, making Colorado an alternative, more efficient forum. (Doc. No. 36 at 12–13.) After reviewing the Dole Food Co. factors, the Court concludes Defendant Quick Box, LLC has not met its burden to present a compelling case that exercising personal jurisdiction in this case would be unreasonable. See Burger King Corp., 471 U.S. at 477. Thus, the Court concludes that Plaintiff has made a prima facie showing that this Court has personal jurisdiction over Defendant Quick Box, LLC. See Pebble Beach, 453 F.3d at 1154–55. Accordingly, the Court denies Defendant Quick Box, LLC's motion to dismiss for lack of personal jurisdiction.

### 2.      Quick Holdings, LLC

Defendant Quick Holdings, LLC is a limited liability company organized in Colorado, with its principal place of business in Colorado. (Doc. No. 1 ¶ 15.) The sole allegation specific to Quick Holdings, LLC in Plaintiff's complaint is that it is "the owner of Quick Box LLC, and on information and belief, controls and directs Quick Box LLC's activities through its executives." (Id. ¶ 15.) This allegation was insufficient to support a conclusion that Quick Box, LLC and Quick Holdings, LLC are alter egos, and it is similarly insufficient to support a conclusion that the Court has personal jurisdiction over Quick Holdings, LLC. Therefore, the Court grants Defendant Quick Holdings, LLC's motion to dismiss for lack of personal jurisdiction.[9]

### 3.      Stephen Adelé, Chad Biggins, and James Martell

Defendant Stephen Adelé, a resident of Colorado, is the Chief Executive Officer of Quick Box, LLC. (Doc. Nos. 1 ¶ 16; 38-1 Adelé Decl. ¶¶ 1–2.) Defendant Chad Biggins, a resident of Georgia, was the Chief Operating Officer of Quick Box, LLC until December 2019. (Doc. Nos. 1 ¶ 17; 40-1 Biggins Decl. ¶¶ 1–2). Defendant James Martell, a resident of Colorado, is Vice President of Sales of Quick Box, LLC. (Doc. Nos. 1 ¶ 18; 39-1 Martell Decl. ¶¶ 1–2.) All three argue that the fiduciary shield doctrine prevents the Court from exercising jurisdiction over them based on actions taken in their official capacity as executives of Quick Box, LLC, and that instead the Court's analysis is limited to their personal contacts with California. (Doc. Nos. 38 at 8–9; 39 at 7–8; 40 at 7–8.). As discussed above, this is incorrect. See supra Section I.A. Plaintiff contends that Defendants Adelé, Biggins, and Martell directly controlled and participated in the alleged misconduct directed at California. (Id.) Under this "exception" to the fiduciary shield doctrine, the Court examines Defendants Adelé, Biggins, and Martell's own individual contacts with California, whether conducted in a personal or official capacity, to determine if they are

---

[9]      Because the Court dismiss Quick Holdings, LLC from this action for lack of personal jurisdiction, for the remainder of this Order, "the QuickBox Defendants" refers to Quick Box, LLC, Stephen Adelé, Chad Biggins, and James Martell only.

sufficient to warrant the exercise of jurisdiction over them in connection with forum-related claims. See Brown, 2008 WL 2128057, at *10 (citing Davis, 885 F.2d at 520).

Plaintiff alleges that because Defendants Adelé, Biggins, and Martell were personally involved in Defendant Quick Box, LLC's shipping and fulfillment services purposefully directed at California, their actions also constitute purposeful direction toward California. Plaintiff alleges Defendants Adelé, Biggins, and Martell directed QuickBox's relationships with clients like the La Pura Defendants, and assisted those clients by providing them with a variety of fulfillment services, such as advertising and marketing templates. (Doc. No. 1 ¶ 298.)[10] Plaintiff alleges Defendant Adelé was involved in QuickBox's specific targeting of the California market, and notes that he provided the statement about the benefit of choosing a centrally located fulfillment service for the previously discussed QuickBox press release. (Id. ¶ 294.) In that press release, Defendant Adelé also provides detail on how QuickBox excels at three back-end metrics for shipment and fulfillment services, i.e., time-to-home, back orders and inventory, and return processing time. (Id.) She also alleges he uses his background in sales and marketing to assist in QuickBox's marketing services. (Id. ¶ 282.) Plaintiff alleges Defendant Biggins is one of the co-founders of QuickBox Fulfillment (originally named "2Chads Fulfillment"). (Id. ¶ 274.) She alleges he was involved in the creation of QuickBox's skincare "white label" program, which the La Pura Defendants allegedly used. (Id. ¶ 280.) She alleges QuickBox uses his marketing experience in promotional materials to customers, and that he was involved in the creation of sample marketing language that was provided to La Pura. (Id.) Finally, Plaintiff alleges Defendant Martell, who is the Vice President of Sales for QuickBox, directly assists QuickBox's clients, like the La Pura Defendants. (Id. ¶ 18.)

---

[10]    Similar to Defendant Quick Box, LLC, all three individual QuickBox Defendants deny having any "personal or professional dealings with any of the sixty-six (66) business entities" identified in Plaintiff's complaint as part of the La Pura Defendants. (Doc. Nos. 38-1 Adelé Decl. ¶ 4; 39-1 Martell Decl. ¶ 3; 40-1 Biggins Decl. ¶ 3.) Plaintiff has alleged additional John Doe individuals and entities also make up the La Pura Defendants, and at this stage, the Court takes Plaintiff's allegations as true and resolves evidentiary conflicts in Plaintiff's favor. See Schwarzenegger, 374 F.3d at 800.

She alleges QuickBox references his marketing experience in promotional materials to potential clients. (Id.) Because the Court assumes the truth of Plaintiff's allegations and resolves factual conflicts in Plaintiff's favor at this stage of the proceedings, the Court concludes Plaintiff has pled sufficient allegations to make a prima facie showing that Defendants Adelé, Biggins, and Martell committed intentional acts, that the acts were targeted at Plaintiff and other consumers in California, and that they knew that economic loss could be suffered in California. See Dole Food Co., 303 F.3d at 1111. Plaintiff has made a prima facie showing that their contacts with California are not random, and that they have voluntarily derived some benefit from their interstate activities. See Glob. Commodities Trading Grp., 972 F.3d at 1107.

Next, the Court concludes Plaintiff has sufficiently alleged that her claims arise out of Defendants Adelé, Biggins, and Martell's California-related activities. Plaintiff's injury arose out of her experience with products that were shipped to her by Defendant Quick Box, LLC. Defendants Adelé, Biggins, and Martell directly controlled and participated in Defendant Quick Box, LLC's shipping and fulfillment services targeted at California consumers; as a result of these services, Plaintiff – a California consumer – suffered an injury. See Myers, 238 F.3d at 1075. Having found that Plaintiff has met her burden of satisfying the first two prongs of the specific personal jurisdiction analysis at this stage, the Court turns to whether Defendants Adelé, Martell, and Biggins have adequately demonstrated that exercising jurisdiction over them would be unreasonable. The Court concludes they have not. Defendants Adelé, Martell, and Biggins contend they have not personally interjected themselves into California, that it would be financially burdensome to litigate in California, and that the documents in witnesses are in Colorado, making Colorado an alternative, more efficient forum. (Doc. Nos. 38 at 13–14; 39 at 13–14; 40 at 13–14.) After reviewing the Dole Food Co. factors, the Court concludes Defendants Adelé, Martell, and Biggins have not met their burden to present a compelling case that exercising personal jurisdiction in this case would be unreasonable. See Burger King Corp., 471 U.S. at 477. In sum, the Court concludes Plaintiff has made sufficient allegations to support

personal jurisdiction over the three individual QuickBox Defendants at this stage of the proceedings. Accordingly, the Court denies Defendants Adelé, Martell, and Biggins' motions to dismiss for lack of personal jurisdiction.

### D. Konnektive Defendants

As with the QuickBox Defendants, the Court first addresses Plaintiff's allegation that the Konnektive Defendants (Konnektive Corporation, Konnektive LLC, Konnektive Rewards LLC, Kathryn Martorano, Matthew Martorano, and Martorano Holdings LLC) are alter egos of one another, and therefore the contacts of one can be imputed to the others for personal jurisdiction. (Doc. No. 1 ¶ 343.) The complaint alleges that the Konnektive Defendants do not follow corporate formalities, that all of the entities operate primarily out of Georgia, and that all of the entities commingle assets and resources. (Id.)

The Konnektive Defendants argue that Plaintiff's alter ego contention is based purely on "information and belief" allegations and offer several declarations seeking to controvert Plaintiff's allegations. (Doc. Nos. 31 at 23–24; 33 at 9.)[11] Defendant Matthew Martorano states that he is the sole member of Konnektive LLC, Konnektive Rewards LLC, and Martorano Holdings LLC, and that he does not own any shares or other interest in Konnektive Corporation. (Doc. No. 33-1 M. Martorano Decl. ¶¶ 2, 4.) He states his personal assets are not commingled or shared with any of those four entities, and that he maintains separate bank accounts from all of them. (Id. ¶ 4.) Defendant Kathryn Martorano similarly declares that she is the sole owner of Konnektive Corporation, that she does not own any interest in Konnektive LLC, Konnektive Rewards LLC, or Martorano Holdings LLC, and that her personal assets are not commingled or shared with any of the four entities. (Doc. No. 29-1 K. Martorano Decl. ¶¶ 2, 4–5.) She states that Konnektive Corporation solely exists to support Konnektive LLC, and that she assists in issuing

---

[11] The Konnektive Defendants also contend that Plaintiff does not identify which of them is the alter ego versus the shell defendant. (Doc. Nos. 31 at 2; 33 at 2.) This is immaterial to alter ego jurisdiction, which treats the entities and individuals as a "consolidated entity" and a "single enterprise." See Ranza, 793 F.3d at 1072.

invoices to Konnektive LLC's clients. (Id. ¶ 3.) Declarations submitted on behalf of the entity Konnektive Defendants state that all four entities follow corporate formalities, do not commingle funds or assets with one another, do not share bank accounts or financial books with one another, and are not parents and/or subsidiaries of each other. (Doc. Nos. 30-1 ¶¶ 21–22, 24; 31-1 ¶¶ 20–21, 23; 32-1 ¶¶ 19–20, 22; 34-1 ¶¶ 19–20, 22.)

In rebuttal, Plaintiff offers a verified complaint from a lawsuit filed in Georgia state court in 2018 against Konnektive Corporation, Konnektive LLC, Konnektive Rewards LLC, and Matthew Martorano by Jared Hall, the former Chief Technical Officer of Konnektive Corporation. (Doc. No. 53-6 Ex. 21.) "A verified complaint can, if based on personal knowledge, serve as the equivalent of an affidavit for purposes of a motion to dismiss for lack of personal jurisdiction." Klian v. Crawford, No. CV 12-02373 MMM (JEMx), 2012 WL 12878721, at *2 n.30 (C.D. Cal. June 6, 2012) (citing Silverstein v. Experienced Internet.com, Inc., No. C 05-0160 PVT, 2005 WL 1629935, *3 (N.D. Cal. July 11, 2005)); see Lew v. Kona Hosp., 754 F.2d 1420, 1423 (9th Cir. 1985). The verified complaint states that there is "no legal separateness" between Konnektive Corporation, Konnektive LLC, and Konnektive Rewards LLC because the LLCs use Konnektive Corporation's assets to operate their business, (Doc. No. 53-6 Ex. 21 ¶ 2–3), that the current corporate structure of the Konnektive Defendants exists only to avoid paying taxes, (id. ¶¶ 22, 35–36), that Konnektive Corporation rerouted money it owned to Konnektive LLC, (id. ¶¶ 25–26, 30, 43), that employees of Konnektive Corporation performed services for Konnektive LLC while being paid by Corporation, (id. ¶ 29), that the companies ignored formalities in distributions to shareholders, (id. ¶¶ 27–28), that intellectual property assets were transferred between companies without regard to who paid for them, (id. ¶¶ 45–46), that Matthew Martorano used corporate assets for his personal expenses, (id. ¶ 48–53, 78–79), and that Konnektive Corporation, Konnektive LLC, and Konnektive Rewards LLC in fact all operate out of the same Georgia offices, (id. ¶ 80).

The Konnektive Defendants make several objections to Plaintiff's use of the Georgia complaint, all of which are unavailing. (Doc. Nos. 33 at 25; 77 at 4.) First, the case on

which they rely, In re Connetics Corp. Sec. Litig., is irrelevant to the case at hand, as it does not involve a plaintiff seeking to use a verified complaint as evidence to support personal jurisdiction. 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008). Second, contrary to Defendants' assertion, Plaintiff has demonstrated that the Georgia complaint is verified. Plaintiff Jared Hall swore to the truth of the complaint's facts under oath before a notary public. (Doc. No. 53 at 8; 53-6 Ex. 21 at 94.) Under Georgia law, this subjected him to penalty of perjury. See Dearing v. State, 532 S.E.2d 751, 754 (Ga. Ct. App. 2000) (holding "verifications signed under oath before a [] notary public" were executed under penalty of perjury); see also Finch v. State, 756 S.E.2d 265, 266 (Ga. Ct. App. 2014). The fact that the verification omits the phrase "under penalty of perjury" does not render it inadmissible, as "[federal] [c]ourts have treated complaints as verified that do not strictly conform to the[] requirements [of 28 U.S.C. § 1746], so long as the plaintiff states under penalty of perjury that the contents of the complaint are true and correct." Klian, 2012 WL 12878721, at *2 n.30 (citing Schroeder v. McDonald, 55 F.3d 454, 460 n.10 (9th Cir. 1995)). Finally, Defendants state without any further argument or evidence that it "is not the situation here" that the plaintiff has personal knowledge. (Doc. No. 77 at 4.) From this conclusory statement, it is unclear whether Defendants are referring to Plaintiff Tan or Jared Hall, the plaintiff in the Georgia lawsuit. Either way, it is irrelevant. Plaintiff Tan did not file, sign, or swear to the truth of the Georgia complaint; she does not need to have personal knowledge of the allegations therein. And there is no indication – much less a showing by Defendants – that the Georgia complaint was not based on Plaintiff Jared Hall's personal knowledge.

Because the Court assumes the truth of Plaintiff's allegations and resolves factual conflicts in Plaintiff's favor at this stage of the proceedings, the Court concludes Plaintiff has alleged sufficient facts and offered sufficient conflicting evidence to make a prima facie showing that the separate personalities of Defendants Konnektive Corporation, Konnektive LLC, Konnektive Rewards LLC, and Matthew Martorano do not exist, and rather they are alter egos. See Schwarzenegger, 374 F.3d at 800; Fighter's Mkt., 207 F.

Supp. 3d at 1149 n.3. The Court also concludes that Plaintiff has made a prima facie showing that failure to find alter ego liability would result in injustice.[12]

However, the Court concludes Plaintiff has not made a prima facie showing that Defendants Martorano Holdings LLC and Kathryn Martorano are also part of the "consolidated entity." See Ranza, 793 F.3d at 1072. Plaintiff alleges in the complaint that "on information and belief," Defendant Martorano Holdings LLC does not follow corporate formalities along with the other entities, commingles its assets with the other entities, and assists with the scheme by transferring and holding assets gained from the alleged unlawful activities. (Doc. No. 1 ¶¶ 343, 345.) These conclusory allegations are insufficient for a prima facie showing, especially considering Defendant Martorano Holdings LLC has submitted a conflicting declaration. (Doc. No. 34-1 ¶¶ 20–22.) Plaintiff's evidence regarding the Georgia lawsuit is immaterial to Defendant Martorano Holdings LLC, as it was not named in the lawsuit or referenced in the Georgia plaintiff's verified complaint. Plaintiff does make specific factual allegations regarding Defendant Kathryn Martorano's direct control over and involvement with the development of Konnektive's CRM software. (Doc. No. 1 ¶¶ 318–19.) But those allegations do not establish any of the factors relevant to the alter ego doctrine analysis, i.e., commingling of funds, undercapitalization, etc. Plaintiff's allegations on those factors are conclusory and contradicted by Defendant Kathryn Martorano's declaration. Again, Plaintiff's evidence regarding the Georgia lawsuit is immaterial as Defendant Kathryn Martorano was not a party to the Georgia lawsuit.

In summary, the Court concludes that Plaintiff has alleged sufficient facts to make a prima facie showing that Defendants Konnektive Corporation, Konnektive LLC, Konnektive Rewards LLC, and Matthew Martorano constitute a "consolidated entity," and

---

[12] For the second prong, Plaintiff alleges it would be "inequitable not to treat these entities/individuals as alter egos of one another because their corporate structure is a sham designed to avoid paying taxes, frustrate creditors, avoid document discovery requests, and force creditors to pursue the Defendants in a jurisdiction (Puerto Rico) where their connections are in fact minimal." (Doc. No. 1 ¶ 343.)

therefore the contacts of one can be imputed to the others for purposes of personal jurisdiction. See Flynt Distrib. Co., 734 F.2d at 1393. The Court also concludes Plaintiff has not alleged sufficient facts at this stage to support the allegation that Martorano Holdings LLC and Kathryn Martorano are part of the "consolidated entity," and thus will not treat them as alter egos for purposes of personal jurisdiction. Having determined the appropriate analytical scope for each of the Konnektive Defendants, the Court now turns to the personal jurisdiction analysis itself.

### 1. Konnektive LLC, Konnektive Rewards LLC, Konnektive Corporation, and Matthew Martorano

The Court first analyzes the contacts of the "consolidated entity" of Konnektive LLC, Konnektive Rewards LLC, Konnektive Corporation, and Matthew Martorano (the "Konnektive Entity"). Konnektive LLC is a limited liability company organized under the laws of Puerto Rico. (Doc. No. 31-1 M. Martorano Decl. ¶ 3.) Konnektive LLC develops and licenses customer relationship management software ("CRM software"). (Id. ¶ 4.) Konnektive Corporation is a Georgia corporation. (Doc. No. 30-1 K. Martorano Decl. ¶ 3.) Its primary business is to provide sales support, account management, and software development services for Konnektive LLC. (Id. ¶ 5.) Konnektive Rewards LLC is a limited liability company organized under the laws of Puerto Rico. (Doc. No. 32-1 M. Martorano Decl. ¶ 3.) Matthew Martorano is a resident of San Juan, Puerto Rico. (Doc. No. 33-1 M. Martorano Decl. ¶ 2.)

Plaintiff argues Konnektive's CRM software, which she alleges was licensed to and utilized by the La Pura Defendants, serves as the basis for personal jurisdiction over the Konnektive Entity. (Doc. No. 1 ¶¶ 346–51.)[13] She alleges that Konnektive's CRM software

---

[13]    The Konnektive Entity states it has never "contracted with or otherwise formed any business relationship with any of the sixty-six (66) business entities identified as the 'La Pura Defendants.'" (Doc. Nos. 30-1 K. Martorano Decl. ¶ 20; 31-1 M. Martorano Decl. ¶ 19; 32-1 M. Martorano Decl. ¶ 18; 33-1 M. Martorano Decl. ¶ 6.) In opposition, Plaintiff notes that the declarations do not deny transacting with the Doe Defendants referenced in Plaintiff's complaint. (Doc. No. 53 at 2.) Additionally, she alleges and submits exhibits showing that the La Pura websites utilized the Konnektive CRM software. (Doc. Nos. 1 ¶¶ 302–06; 53 at 2, Ex. 3, Ex. 4, Ex. 5.) The Court concludes Plaintiff has sufficiently created a factual

is used on the La Pura Defendants' websites to rotate through the various merchant accounts used to bill customers, thus avoiding any one merchant ID from being flagged for too many chargebacks and/or investigations from financial institutions. (Id. ¶ 301.) This "load balancer" feature allows users to set caps on the number of chargebacks for each merchant ID, as well as a monthly cap on the amount of money that is charged to each merchant ID. (Id. ¶¶ 330–32.) Plaintiff alleges Konnektive's CRM software is provided as "Software as a Service" ("SaaS"), which means the software is centrally hosted by Konnektive, who licenses it to clients ("subscribers") on a subscription basis. (Doc. No. 53 Ex. 2.)[14] According to Konnektive's standard End User License Agreement, Konnektive provides services such as "customization/integration, user identification and password change management, data import/export, monitoring, technical support, maintenance, training, backup and recovery and change management" for its subscribers. (Id.) Subscriber data, which includes "information input into the Software interface by Subscriber" and "user behavior on Subscriber's website," is "stored on Konnektive's servers." (Id.) The captured data includes "personally identifiable information [] collected, used, processed, stored, or generated as the result of the use of the Services," including customer names, addresses, telephone numbers, and credit card information. (Id.) Plaintiff alleges that every time a California consumer enters his or her shipping address and credit card information to make a purchase on the La Pura website, the Konnektive CRM software selects which merchant ID to use to bill the consumer based on the number of chargebacks associated with a particular ID, and gathers and transmits data about that consumer's purchase in and out of California. (Doc. Nos. 1 ¶¶ 346–47; 53 at 9–10.) She alleges that since the Konnektive CRM software gathers and stores data about consumers, including their addresses, the Konnektive Entity knew their software was being used to target California

---

conflict with regards to this issue, and thus resolves the conflict in Plaintiff's favor at the motion to dismiss stage. See Schwarzenegger, 374 F.3d at 800.

[14]      The Konnektive Entity's declarations do not contradict Plaintiff's allegations regarding the manner in which its software operates. (See Doc. Nos. 30-1; 31-1; 32-1; 33-1.)

residents. (Id.) She alleges that the manner in which the Konnektive CRM software operates – Software as a Service – is significant. (Doc. No. 53 at 1–2.) Rather than being a one-time download by a user, when the Konnektive Entity licenses a subscription to its CRM software to a client, the Konnektive Entity continues to host, operate, and manage the client's use of the software, gathers and stores data related to the client's use of the software, and generally actively facilitates and provides ongoing services to its clients in connection with its software. (Id.) According to Konnektive's website, the Konnektive CRM software "becomes the hub of your business, running and managing all of your sales transactions, customer service, product fulfillment management, sales tracking, and more." (Doc. No. 53-4 Ex. 7.) Plaintiff alleges this functionality results in the Konnektive Entity having continuous, ongoing, and known contacts with California consumers. (Doc. No. 1 ¶ 348.) The Court concludes Plaintiff has pled sufficient allegations to support purposeful direction toward California by the Konnektive Entity at this time. The Konnektive Entity's software and associated services being used to collect data on California consumers and bill California consumers for purchases constitutes an intentional act that was expressly aimed at California, and that the Konnektive Entity knew or should have known would cause harm likely to be suffered in California. See Axiom Foods, 874 F.3d at 1069; Fighter's Mkt., 207 F. Supp. 3d at 1155. These allegations are sufficient at this time to show that the Konnektive Entity voluntarily derived some benefit from their interstate activities. See Glob. Commodities Trading Grp., 972 F.3d at 1107.

Next, the Court concludes Plaintiff has sufficiently alleged that her claims arise out of the Konnektive Entity's California-related activities. See Myers, 238 F.3d at 1075. Plaintiff's injuries arose when she purchased a product on a website integrated with the Konnektive CRM software and was billed by merchant accounts rotated by the Konnektive software. Plaintiff has also alleged that but for the load balancing software rotating the merchant accounts and enabling the alleged fraudulent scheme to escape detection and avoid investigation by financial institutions, she would not have been injured. (Doc. No. 1 ¶ 347.) Having found that Plaintiff has met her burden of satisfying the first two prongs of

the specific personal jurisdiction analysis, the Court turns to whether the Konnektive Entity has adequately demonstrated that exercising jurisdiction over it would be unreasonable. The Court concludes it has not. The Konnektive Entity argues the burden on it to litigate in California is substantial, and that documents and witnesses reside in an alternative, more efficient forum. (Doc. No. 33 at 10.) After reviewing the Dole Food Co. factors, the Court concludes the Konnektive Entity has not met its burden to present a compelling case that exercising personal jurisdiction in this case would be unreasonable. See Burger King Corp., 471 U.S. at 477. In sum, the Court concludes Plaintiff has made a prima facie showing of personal jurisdiction over Konnektive LLC, Konnektive Rewards LLC, Konnektive Corporation, and Matthew Martorano. See Pebble Beach, 453 F.3d at 1154–55. Accordingly, the Court denies Defendants Konnektive LLC, Konnektive Rewards LLC, Konnektive Corporation, and Matthew Martorano's motions to dismiss for lack of personal jurisdiction.

### 2.     Martonaro Holdings LLC

Defendant Martorano Holdings LLC is a Puerto Rico limited liability company. (Doc. No. 34-1 ¶ 3.) The sole allegations specific to Defendant Martorano Holdings LLC in Plaintiff's complaint are that "on information and belief," it does not follow corporate formalities along with the other entities, commingles its assets with the other entities, and assists with the scheme by transferring and holding assets gained from the alleged unlawful activities. (Doc. No. 1 ¶¶ 343, 345.) These allegations were insufficient to support a conclusion that Martorano Holdings LLC was part of the "consolidated entity" and thus an alter ego of the other Konnektive Defendants, and are similarly insufficient to support a conclusion that the Court has personal jurisdiction over Martorano Holdings LLC. Therefore, the Court grants Defendant Martorano Holdings LLC's motion to dismiss for lack of personal jurisdiction.[15]

---

[15]     Because the Court dismisses Martorano Holdings LLC from this action for lack of personal jurisdiction, for the remainder of this Order, "the Konnektive Defendants" refers to Konnektive

1

### 3.   Kathryn Martorano

Defendant Kathryn Martorano, a resident of Georgia, is the sole owner of Konnektive Corporation. (Doc. No. 29-1 K. Martorano Decl. ¶¶ 1–2.) She argues that the fiduciary shield doctrine "excludes from the jurisdictional analysis an individual's contacts performed in the course of official corporate duties." (Doc. No. 78 at 3.) As discussed above, this is incorrect. See supra Section I.A. Plaintiff contends that Defendant Kathryn Martorano directly controlled and participated in the alleged misconduct directed at California. (Id.) Under this "exception" to the fiduciary shield doctrine, the Court examines Defendant Kathryn Martorano's own individual contacts with California, whether conducted in a personal or official capacity, to determine if they are sufficient to warrant the exercise of jurisdiction over them in connection with forum-related claims. See Brown, 2008 WL 2128057, at *10 (citing Davis, 885 F.2d at 520). The Court has already concluded that Plaintiff has sufficiently pled a prima facie case for exercising jurisdiction over the Konnektive Entity. Thus, the remaining question is whether Defendant Kathryn Martorano directly participated in and/or controlled the conduct giving rise to personal jurisdiction over the Konnektive Entity. The Court concludes that Plaintiff has pled sufficient allegations to make a showing of this as well.

Plaintiff alleges Defendant Kathryn Martorano is a direct and active participant in the development and operation of the Konnektive CRM software. (Doc. No. 1 ¶ 319.) She alleges Defendant Kathryn Martorano assisted with the development of Konnektive's specialized software with load balancing functionality and is involved with the sale and operation of the software for Konnektive's clients. (Id. ¶ 537.) Plaintiff alleges she provides assistance to Konnektive's clients, such as the La Pura Defendants, with the technical aspects of the Konnektive CRM software implementation. (Id. ¶ 319.)[16] Plaintiff notes that

---

Corporation, Konnektive LLC, Konnektive Rewards LLC, Matthew Martorano, and Kathryn Martorano only.

[16]   Like the Konnektive Entity, Defendant Kathryn Martorano denies having any "personal or professional dealings with any of the purported 'shell entities'" identified in Plaintiff's complaint. (Doc.

Konnektive has previously touted Defendant Kathryn Martorano's experience in "information technology, as well as accounting and online billing systems" and has claimed that she focuses "primarily on client implementations, building business requirements, and project management." (Id.) Because the Court assumes the truth of Plaintiff's allegations and resolves factual conflicts in Plaintiff's favor at this stage of the proceedings, the Court considers these allegations to be sufficient for a prima facie showing of Defendant Kathryn Martorano's personal involvement in Konnektive's software services. Thus, the Court concludes Plaintiff has pled sufficient allegations to make a prima facie showing that Defendant Kathryn Martorano directly controlled and participated in the alleged activities purposefully directed at California. See Dole Food Co., 303 F.3d at 1111.

Next, the Court concludes Plaintiff has sufficiently alleged that her claims arise out of Defendant Kathryn Martorano's California-related activities. See Myers, 238 F.3d at 1075. Plaintiff's injuries arose when she purchased a product on a website integrated with the Konnektive CRM software and was billed by merchant accounts rotated by the Konnektive CRM software. Plaintiff has sufficiently alleged that Defendant Kathryn Martorano was directly involved in the development and operation of the Konnektive CRM software. (Doc. No. 1 ¶ 319.) Having found that Plaintiff has met her burden of satisfying the first two prongs of the specific personal jurisdiction analysis at this stage, the Court turns to whether Defendant Kathryn Martorano has adequately demonstrated that exercising jurisdiction over her would be unreasonable. The Court concludes she has not. Defendant Kathryn Martorano argues the burden on her to litigate in California is substantial, and that documents and witnesses reside in an alternative, more efficient forum. (Doc. No. 29 at 10.) After reviewing the Dole Food Co. factors, the Court concludes Defendant Kathryn Martorano has not met her burden to present a compelling case that exercising personal jurisdiction in this case would be unreasonable. In sum, the Court

---

No. 29-1 K. Martorano Decl. ¶ 6.) For the same reasons stated above, (see n.13), the Court concludes Plaintiff has sufficiently created a factual conflict with regards to this issue, and thus resolves the conflict in Plaintiff's favor at the motion to dismiss stage. See Schwarzenegger, 374 F.3d at 800.

concludes Plaintiff has pled sufficient allegations to support personal jurisdiction over Defendant Kathryn Martorano at this stage of the proceedings. Accordingly, the Court denies Defendant Kathryn Martorano's motion to dismiss for lack of personal jurisdiction.

## II.   Whether the Court Has Subject Matter Jurisdiction Over Plaintiff's Claims

The United States Constitution "limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" Lujan v. Defs. of Wildlife, 504 U.S. 555, 559 (1992). Rule 12(b)(1) allows for dismissal where there is a "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). "Article III of the Constitution requires that a plaintiff have standing to assert claims in federal court." Jones v. Micron Tech. Inc., 400 F. Supp. 3d 897, 906 (N.D. Cal. 2019) (citing Lujan, 504 U.S. at 560). "Challenges to Article III standing implicate a court's subject matter jurisdiction and therefore are properly raised under Federal Rule of Civil Procedure 12(b)(1)." Id. (citing White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000)). A Rule 12(b)(1) motion can be a facial or a factual challenge to jurisdiction. Thornhill Publishing Co. v. General Tel. & Elec. Corp., 594 F.2d 730, 733 (9th Cir. 1979). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004). In considering a facial challenge, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in the plaintiff's favor in determining "whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." Leite v. Crane Co., 749 F.3d 1117, 1121 (9th Cir. 2014). "In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint" and "need not presume the truthfulness of the plaintiff's allegations." Safe Air for Everyone, 373 F.3d at 1039.

### A.   Whether There Is A Settlement Agreement Between Plaintiff and the La Pura Defendants

The La Pura Defendants argue that this Court does not have subject matter jurisdiction over Plaintiff's claims because during her January 26, 2020 call with La Pura's

customer service she "agreed to accept a 70% refund and to retain the La Pura product in exchange for resolving her dispute." (Doc. No. 25 at 6.) They argue this constituted Plaintiff accepting a settlement offer, which resolved the dispute, eliminated any actionable case or controversy, and deprived her of the concrete injury required for Article III standing. (Id. at 5–7.) Plaintiff vehemently challenges the characterization of her interaction with the La Pura customer service representative as a "settlement." (Doc. No. 27 at 1–2.) She contends there was no mutual consent, identifiable parties, definite terms, or consideration, and therefore there is no enforceable agreement. (Id.) The Court agrees with Plaintiff.

If "the parties' settlement agreement has resolved all facets of their dispute," there is no "live case or controversy" for a court to decide. Jones v. McDaniel, 717 F.3d 1062, 1067 (9th Cir. 2013) (quoting Gator.com Corp. v. L.L. Bean, Inc., 398 F.3d 1125, 1131–32 (9th Cir. 2005) (en banc)). "A settlement agreement is a contract, and the legal principles which apply to contracts generally apply to settlement contracts." Monster Energy Co. v. Schechter, 444 P.3d 97, 102 (Cal. 2019); see also Ovchinnikov v. Contech Const. Prod., Inc., 364 F. App'x 351, 352 (9th Cir. 2010) ("The construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally." (citations omitted)). "An essential element of any contract is consent." Weddington Prods., Inc. v. Flick, 71 Cal. Rptr. 2d 265, 276 (Cal. Ct. App. 1998) (citing Cal. Civ. Code § 1550). "The consent must be mutual." Id. (citing Cal. Civ. Code § 1565). "Consent is not mutual, unless the parties all agree upon the same thing in the same sense." Id. (quoting Cal. Civ. Code § 1580). "The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe." Monster Energy, 444 P.3d at 102 (citation omitted). "Accordingly, the primary focus in determining the existence of mutual consent is upon the acts of the parties involved." Id. "If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then

there is no mutual consent to contract and no contract formation." <u>Weddington Prods.</u>, 71 Cal. Rptr. 2d at 277.

It is obvious from Plaintiff's conduct during and subsequent to the January 26, 2020 call with La Pura's customer service that there was no mutual consent between the purported settling parties. Throughout the call, Plaintiff repeatedly raised concerns about Defendants' conduct, objected to the representative's initial offer to refund her only 50%, and ultimately gave up arguing for an additional refund, instead saying she would "file it in court." (Doc. No. 27 at 3–4.) The day after the conversation, she contacted and retained a law firm seeking to pursue the lawsuit she had threatened on the call. (<u>Id.</u> at 6.) At no point during the conversation did either party suggest that by receiving a 70% refund and keeping the products, Plaintiff would be releasing any potential legal claims against La Pura. (Doc. No. 25 at 4–5.) To the contrary, Plaintiff ended the call by stating that she would seek relief "in court." Plaintiff's words and acts would not lead a reasonable person to believe that she was agreeing to waive her right to file a lawsuit in exchange for the 70% refund. <u>See</u> <u>Monster Energy</u>, 444 P.3d at 102.

The La Pura Defendants rely on <u>Guzman v. Visalia Cmty. Bank</u> to argue that Plaintiff's "grumbling about filing a lawsuit" does not invalidate her acceptance of the settlement agreement. (Doc. No. 35 at 1.) Defendants omit the significant next sentence in <u>Guzman</u>: "grumbling" may not necessarily invalidate an acceptance, but "it must appear that the 'grumble' does not go so far as to make it doubtful that the expression is really one of assent." <u>Guzman v. Visalia Cmty. Bank</u>, 84 Cal. Rptr. 2d 581, 584 (Cal. Ct. App. 1999). That cannot be said to be the case here, as Plaintiff's explicit declaration of her intention to file a lawsuit belies any suggestion that she expressed assent to a settlement agreement in which she gave up her right to sue. <u>See</u> <u>Netbula, LLC v. BindView Dev. Corp.</u>, 516 F. Supp. 2d 1137, 1156 (N.D. Cal. 2007) (holding that plaintiff's conduct subsequent to the alleged settlement agreement – which included sending emails with threats to sue – did "not resemble the actions of someone who believed the parties had mutually assented to sufficiently definite terms.").

Because the Court concludes the mutual consent necessary for formation of a legally binding settlement agreement was not present, it does not need to address the other arguments made by the parties on this issue. The January 26, 2020 call did not constitute a settlement agreement between the parties, therefore there is a live case or controversy. Accordingly, the Court denies the La Pura Defendants' motion to dismiss for lack of subject matter jurisdiction over Plaintiff's case.

### B. Whether Plaintiff Has Standing to Bring Claims Under Other States' Consumer Protection Laws

For her eighth cause of action, Plaintiff brings claims under the consumer protection laws of all fifty states and the District of Columbia. (Doc. No. 1 ¶¶ 545–55.) The La Pura, Konnektive, and QuickBox Defendants contend that Plaintiff, a resident of California, does not allege she engaged in the transaction at issue or was injured in any state other than California, and therefore lacks standing to bring claims for violations of other states' consumer protection laws. (Doc. Nos. 25 at 19–20; 31 at 22; 36 at 23.) Plaintiff contends that Defendants had the threshold burden of conducting a choice-of-law analysis, and that this issue is more appropriately resolved at the class certification stage. (Doc. Nos. 27 at 23–24; 51 at 24–25; 55 at 31.)[17] The Court agrees with Defendants that Plaintiff lacks standing.

"The overwhelming majority of courts have held that Article III standing for state law claims is necessarily lacking when no plaintiff is alleged to have purchased a product within the relevant state." In re Packaged Seafood Prod. Antitrust Litig., 242 F. Supp. 3d 1033, 1095 (S.D. Cal. 2017); see, e.g., Micron Tech. Inc., 400 F. Supp. 3d at 910; Pardini v. Unilever United States, Inc., 961 F. Supp. 2d 1048, 1061 (N.D. Cal. 2013); Granfield v. NVIDIA Corp., No. C 11-05403 JW, 2012 WL 2847575, at *4 (N.D. Cal. July 11, 2012).

---

[17]     Plaintiff argues the threshold question is "whether California law can be applied nationwide" and charges that Defendants have failed to meet their threshold burden of conducting a choice-of-law analysis. (Id.) Plaintiff is incorrect. The threshold question, as noted by Defendants, is whether she has standing to assert claims under the laws of states where she does not reside. The potential application of California's laws to a nationwide class under a subsequent choice-of-law analysis is irrelevant to that determination.

"This is because injury in fact is not established." In re Packaged Seafood Prod., 242 F. Supp. 3d at 1095. "In the absence of a named Plaintiff who has purchased a product within the relevant state—even if there are sufficient allegations of injury under other States' or federal law—there can be no determination that an interest was harmed that was legally protected under the relevant state's laws." Id. "Thus, '[w]here . . . a representative plaintiff is lacking for a particular state, all claims based on that state's laws are subject to dismissal.'" Pardini, 961 F. Supp. 2d at 1061 (quoting Granfield, 2012 WL 2847575, at *4); see Mazza v. American Honda Motor Co., Inc., 666 F.3d 581, 594 (9th Cir. 2012) ("[E]ach class member's consumer protection claim should be governed by the consumer protection laws of the jurisdiction in which the transaction took place.")

Plaintiff argues that the adoption of the "class certification" approach in Melendres v. Arpaio, 784 F.3d 1254, 1261–62 (9th Cir. 2015), means that this "is a class certification issue, not a standing issue." (Doc. No. 27 at 24.) Melendres does not stand for the broad proposition Plaintiff asserts, nor does it dictate the outcome of this issue. The class certification approach adopted in Melendres "holds that once the named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded, and the court proceeds to consider whether the Rule 23(a) prerequisites for class certification have been met." Melendres, 784 F.3d at 1262. "Under the class certification approach, therefore, 'any issues regarding the relationship between the class representative and the passive class members—such as dissimilarity in injuries suffered—are relevant only to class certification, not to standing.'" Id. Importantly, this analysis requires that a named plaintiff first have Article III standing for the relevant claims. See In re Packaged Seafood Prod., 242 F. Supp. 3d at 1096; see also DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006) (Article III must be measured claim-by-claim); Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co., No. 13-CV-01180-BLF, 2014 WL 4774611, at *4 (N.D. Cal. Sept. 22, 2014) ("[A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim."). Thus, Melendres does not stand for the proposition that this Court must delay its consideration of standing

until the class certification stage. See Goldstein v. Gen. Motors LLC, 445 F. Supp. 3d 1000, 1020–21 (S.D. Cal. 2020); Micron Tech. Inc., 400 F. Supp. 3d at 910 ("In Melendres's wake, multiple opinions issuing from district courts in the Ninth Circuit, at the pleading stage of a putative class action, have dismissed sister state claims based on the named plaintiff's standing."). Additionally, Melendres is factually distinct from the present case, as it "did not confront a situation where named plaintiffs brought claims under the laws of multiple states where they did not reside and where they were not injured." Micron Tech. Inc., 400 F. Supp. 3d at 909.

In sum, Plaintiff must show she has standing for each claim she raises, and Plaintiff does not have standing to bring claims under the laws of states where she has alleged no injury, residence, or other pertinent connection. See Pardini, 961 F. Supp. 2d at 1061; see also In re Packaged Seafood Prod., 242 F. Supp. 3d at 1096–97. Therefore, the Court grants the La Pura, Konnektive, and QuickBox Defendants' motions to dismiss Plaintiff's claims under non-California state laws for lack of standing.

## III.   Whether the Konnektive Defendants Are Immune From Liability Under the Communications Decency Act

The Konnektive Defendants contend that they are immune from liability under all of Plaintiff's claims under Section 230(c)(1) of the Communications Decency Act ("CDA"). (Doc. No. 31 at 12–13.) The CDA states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," and expressly preempts any state law to the contrary. 47 U.S.C. §§ 230(c)(1), (e)(3). "Immunity from liability exists for '(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider.'" Dyroff v. Ultimate Software Grp., Inc., 934 F.3d 1093, 1097 (9th Cir. 2019) (quoting Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1100 (9th Cir. 2009)). "This grant of immunity applies only if the interactive computer service provider is not also an 'information content provider,' which is defined as someone who is 'responsible,

in whole or in part, for the creation or development of" the offending content." <u>Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC</u>, 521 F.3d 1157, 1162 (9th Cir. 2008) (citing 47 U.S.C. § 230(f)(3)).

The Court concludes Plaintiff has sufficiently pled that the Konnektive Defendants are not immune from liability under the CDA. Even assuming that the Konnektive Defendants qualify as an "interactive computer service," they are not entitled to CDA immunity.[18] Plaintiff alleges that rather than being a passive transmitter of information provided by others, the Konnektive Defendants were actively engaged and involved in the development of the alleged unlawful content. (Doc. No. 51 at 16–17.) She alleges that every time a customer made a purchase on the La Pura websites, the Konnektive software selected which merchant ID ("MID") to bill the customer with based on which MID was most likely to be flagged for fraud. (<u>Id.</u>) She alleges this load balancing software is critical to the fraudulent scheme, as without it the fraudulent transactions would be discovered by banks and credit card companies and the merchant accounts would be shut down. (<u>Id.</u>; Doc. No. 1 ¶¶ 328–34, 341.) She also alleges that the Konnektive Defendants' load balancing software is designed to enable its clients to commit unlawful and fraudulent conduct of the type she alleges and identifies a warning on the Konnektive website to that effect. (Doc. No. 1 ¶¶ 336–37.)

"[A] website does not become a developer of content when it provides neutral tools that a user exploits." <u>Dyroff</u>, 934 F.3d at 1099; <u>see</u> <u>Kimzey</u>, 836 F.3d at 1270 (holding Yelp's "star-rating system is best characterized as the kind of 'neutral tool' operating on 'voluntary inputs' that . . . did not amount to content development.") But "a website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct." <u>Roommates</u>, 521 F.3d at

---

[18]      "The prototypical service qualifying for [CDA] immunity is an online messaging board (or bulletin board) on which Internet subscribers post comments and respond to comments posted by others." <u>Dyroff</u>, 934 F.3d at 1097 (quoting <u>Kimzey v. Yelp! Inc.</u>, 836 F.3d 1263, 1266 (9th Cir. 2016)). In contrast, here, Plaintiff alleges that the Konnektive Defendants provide back-end CRM software that enables "load balancing" across various merchant accounts. (Doc. No. 1 ¶¶ 300–01.)

1168 (noting "Roommate does not merely provide a framework that could be utilized for proper or improper purposes; rather, Roommate's work in developing the discriminatory questions, discriminatory answers and discriminatory search mechanism is directly related to the alleged illegality of the site."); see Opperman v. Path, Inc., 87 F. Supp. 3d 1018, 1044 (N.D. Cal 2014) (holding no CDA immunity where "allegations target conduct that goes . . . beyond providing 'neutral tools to carry out what may be unlawful or illicit' conduct."). The term "development" is interpreted "as referring not merely to augmenting the content generally, but to materially contributing to its alleged unlawfulness." Id. at 1167–68. Given Plaintiff's allegations regarding the functionality of Konnektive's CRM software and the role it plays in the alleged fraudulent scheme, Plaintiff has sufficiently alleged that the Konnektive Defendants are not merely providing "neutral tools" that others exploit for their own unlawful purposes, but rather are materially contributing to the alleged unlawful conduct. See Dyroff, 934 F.3d at 1099; Roommates, 521 F.3d at 1168. The Court thus denies the Konnektive Defendants' motions to dismiss on the grounds they are immune from liability under the CDA.

## IV.   Whether Plaintiff's Complaint Satisfies Rule 12(b)(6)

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Rule 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and

1 construe the pleadings in the light most favorable to the nonmoving party." <u>Manzarek v.</u>
2 <u>St. Paul Fire & Marine Ins. Co.</u>, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, courts
3 do not "accept as true allegations that are merely conclusory, unwarranted deductions of
4 fact, or unreasonable inferences." <u>In re Gilead Scis. Secs. Litig.</u>, 536 F.3d 1049, 1055 (9th
5 Cir. 2008) (quoting <u>Sprewell v. Golden State Warriors</u>, 266 F.3d 979, 988 (9th Cir. 2001)).
6 The Court also need not accept as true allegations that contradict matters properly subject
7 to judicial notice or allegations contradicting the exhibits attached to the complaint.
8 <u>Sprewell</u>, 266 F.3d at 988.

9    Where a motion to dismiss is granted, "leave to amend should be granted 'unless the
10 court determines that the allegation of other facts consistent with the challenged pleading
11 could not possibly cure the deficiency.'" <u>DeSoto v. Yellow Freight Sys., Inc.</u>, 957 F.2d
12 655, 658 (9th Cir. 1992) (quoting <u>Schreiber Distrib. Co. v. Serv-Well Furniture Co.</u>, 806
13 F.2d 1393, 1401 (9th Cir. 1986)). In other words, where leave to amend would be futile,
14 the Court may deny leave to amend. <u>See</u> <u>DeSoto</u>, 957 F.2d at 658; <u>Schreiber</u>, 806 F.2d at
15 1401.

16    **A.    Whether the Complaint Violates Rule 8(a)**

17    The La Pura Defendants contend that Plaintiff's complaint is excessively long and
18 unnecessarily complex, and that it would be unfair and unreasonable for Defendants to
19 have to understand or respond to it. (Doc. No. 25 at 8–9.) The Konnektive Defendants
20 similarly contend that the complaint is "gross over-pleading" with irrelevant and improper
21 material. (Doc. Nos. 31 at 11–12.) Finally, the QuickBox Defendants argue that the
22 complaint lacks simplicity, conciseness, and clarity. (Doc. No. 36 at 15.) Plaintiff
23 challenges this characterization of the complaint, arguing that it is not unorganized,
24 conclusory, or difficult to understand. (Doc. No. 27 at 13.) She also contends that the Ninth
25 Circuit has rejected the length of a complaint as an independent ground for dismissal under
26 Rule 8(a). (<u>Id.</u>) The Court agrees with Plaintiff.

27    The general rule is that "verbosity or length is not by itself a basis for dismissing a
28 complaint based on Rule 8(a)." <u>Hearns v. San Bernardino Police Dep't</u>, 530 F.3d 1124,

1131 (9th Cir. 2008). Rule 8(a) may be violated by "a pleading that was needlessly long, or a complaint that was highly repetitious, or confused, or consisted of incomprehensible rambling." Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1059 (9th Cir. 2011). Previous complaints dismissed under Rule 8(a) have been described by courts as "argumentative, prolix, replete with redundancy, and largely irrelevant," McHenry v. Renne, 84 F.3d 1172, 1177–80 (9th Cir. 1996), "confusing and conclusory," Hatch v. Reliance Ins. Co., 758 F.2d 409, 415 (9th Cir. 1985), "verbose, confusing and almost entirely conclusory," Nevijel v. North Coast Life Ins. Co., 651 F.2d 671, 674 (9th Cir. 1981), and "confusing, distracting, ambiguous, and unintelligible," Schmidt v. Herrmann, 614 F.2d 1221, 1224 (9th Cir. 1980). The important inquiry is whether the complaint is intelligible and logically organized, and sufficiently informs defendants of the allegations and claims made against them; lengthiness alone is insufficient to give rise to dismissal under Rule 8(a). See Hearns, 530 F.3d at 1131–32 (holding that while the complaint "contain[ed] excessive detail," it was "intelligible and clearly delineate[d] the claims and the Defendants against whom the claims are made" and thus did not violate Rule 8(a)).

The La Pura Defendants rely on the Ninth Circuit's holding in Cafasso for the proposition that "extraordinarily long" complaints may be dismissed for failure to violate Rule 8(a). (Doc. No. 35 at 2.) In Cafasso, the Ninth Circuit upheld the district court's decision to deny the plaintiff leave to amend her complaint, as plaintiff's proposed amended complaint was 733 pages long. 637 F.3d at 1058. Putting aside the fact that length alone is insufficient grounds for dismissal under Rule 8(a), Plaintiff's 159-page complaint is a far cry from the complaint at issue in Cafasso. Conceding that the length of Plaintiff's complaint "by itself, may not be a cause for dismissal," the La Pura Defendants also argue that the complaint is "confusing and replete with irrelevant materials," and that "it remains unclear which Defendant is accused of doing what." (Doc. No. 35 at 3.) On the contrary, while admittedly lengthy, Plaintiff's complaint is well-organized and intelligible. Its complexity is due to the complexity, nature, and extent of the underlying fraudulent scheme alleged, and its length is due in part to the sheer number of defendants involved; as Plaintiff

notes, 16 pages of the complaint is simply listing the numerous shell companies allegedly operated by the La Pura Defendants. (Doc. No. 27 at 14.) Accordingly, the Court denies the La Pura, the Konnektive, and the QuickBox Defendants' motions to dismiss Plaintiff's complaint on the basis of violating Rule 8(a).

### B.    Whether the Complaint States Claims for Aiding and Abetting and Civil Conspiracy

For her ninth and tenth causes of action, Plaintiff alleges claims for aiding and abetting and civil conspiracy, respectively, against all Defendants. (Doc. No. 1 ¶¶ 556–70.) The La Pura, Konnektive, and QuickBox Defendants argue that California does not recognize civil conspiracy and aiding and abetting as independent, free-standing causes of action. (Doc. Nos. 25 at 20; 31 at 22–23; 36 at 18–19.) Defendants are correct. "Under California law, there is no separate and distinct tort cause of action for civil conspiracy." Nat. Alternatives Int'l, Inc. v. Allmax Nutrition, Inc., 258 F. Supp. 3d 1170, 1187 (S.D. Cal. 2017) (quoting Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc., 122 F.3d 1211, 1228 (9th Cir. 1997)); see Montoya v. Countrywide Bank, F.S.B., No. C09-00641JW, 2009 WL 1813973, at *12 (N.D. Cal. June 25, 2009) ("Civil conspiracy, aiding and abetting, . . . are not independent claims."). Rather, they are legal doctrines that impose indirect liability on individuals who may not have actually committed the underlying tort themselves. See Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 869 P.2d 454, 457 (Cal. 1994); Newton v. Am. Debt Servs., Inc., No. C-11-3228 EMC, 2013 WL 5592620, at *4 (N.D. Cal. Oct. 10, 2013).

Although the complaint pleads conspiracy and aiding and abetting as separate causes of action, Plaintiff argues in its opposition briefs that the Court should construe the allegations as theories of indirect liability. (Doc. No. 55 at 24–25.) The Court declines to do so. The current complaint pleads them as independent causes of action, not as theories of liability, and the Court declines to make Plaintiff's arguments as to how each element of conspiracy and aiding and abetting has been sufficiently alleged for her. Allegations regarding the manner in which Defendants aided and abetted and/or conspired to engage

in unfair competition, false advertising, and the other alleged misconduct should be pled with respect to each substantive cause of action, not in a conclusory manner as a standalone cause of action. (See Doc. No. 1 ¶ 566 ("All of the Defendants (collectively, 'the Conspirators') formed a conspiracy to commit the tortious and unlawful conduct described herein.".) As the complaint is currently pled, it would be inappropriate for the Court to engage in a comprehensive analysis of whether conspiracy or aiding and abetting has been sufficiently alleged as a theory of liability. Should Plaintiff amend her complaint to allege the manner in which Defendants aided and abetted and/or conspired to commit each of the underlying torts, an analysis of their respective indirect liabilities would be appropriate.[19] In sum, the Court concludes that civil conspiracy and aiding and abetting cannot be pled as individual, standalone causes of action, and to that extent, grants the motions to dismiss Plaintiff's ninth and tenth causes of action with prejudice. The Court also grants Plaintiff leave to amend her complaint to replead civil conspiracy and aiding and abetting as theories by which any or all of the Defendants may be held indirectly liable for violations of her substantive causes of action.

### C.    Whether the Complaint States a Claim Under RICO

As her seventh cause of action, Plaintiff alleges all Defendants have violated RICO, and conspired to commit RICO violations. (Doc. No. 1 ¶¶ 515–19 (citing 18 U.S.C. §§ 1962(c), 1962(d)).) To maintain a civil RICO claim, a plaintiff must allege that the defendant engaged in: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity and, additionally, must establish that (5) the defendant caused injury to plaintiff's business or property." Black v. Corvel Enter. Comp Inc., 756 F. App'x 706, 708 (9th Cir. 2018) (citing 18 U.S.C. §§ 1962(c), 1964(c)). The La Pura Defendants argue that Plaintiff's complaint fails to adequately identify and allege a RICO enterprise or

---

[19]     "[I]n a situation . . . with different actors playing different parts, it is not enough to 'lump' together the dissimilar defendants and assert that 'everyone did everything.'" United States ex rel. Anita Silingo v. WellPoint, Inc., 904 F.3d 667, 677 (9th Cir. 2018) (quoting Destfino v. Reiswig, 630 F.3d 952, 958 (9th Cir. 2011)).

predicate RICO acts. (Doc. No. 25 at 15–17.) They argue Plaintiff has failed to "explain the ways in which decisions were made in the enterprise and the hierarchy of the alleged actors in the enterprise." (Id. at 16.) Similarly, the QuickBox Defendants and the Konnektive Defendants contend that Plaintiff has failed to allege facts establishing that the 87 named defendants functioned as a continuing unit or engaged in activities beyond their usual business operations, and therefore has not plausibly pled the existence of an association-in-fact enterprise, much less sub-enterprises. (Doc. Nos. 31 at 19–20; 36 at 20–21.) They contend that Plaintiff's allegations regarding predicate acts of racketeering activity, a pattern of activity, and causation are also inadequate to state a RICO claim. (Doc. Nos. 31 at 20–22; 36 at 25–27.) The Court agrees with Defendants that Plaintiff has not plausibly pled her RICO claims.

For purposes of a civil RICO claim, an "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). To adequately plead an associated-in-fact RICO enterprise, a plaintiff must: (1) "describe a group of persons associated together for a common purpose of engaging in a course of conduct," (2) provide "evidence of an ongoing organization, formal or informal," and (3) provide "evidence that the various associates function as a continuing unit." Odom v. Microsoft Corp., 486 F.3d 541, 549 (9th Cir. 2007) (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)); see Boyle v. United States, 556 U.S. 938, 946 (2009) ("[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."). "[A]n associated-in-fact enterprise under RICO does not require any particular organizational structure."[20] Odom, 486 F.3d at

---

[20]    The Court notes that Defendants incorrectly assert that Plaintiff must plead "the hierarchy of the enterprise" or "a decision-making framework." (See Doc. No. 31 at 19). RICO does not require this. See, e.g., Boyle, 556 U.S at 946; Odom, 486 F.3d at 551.

551 (overruling <u>Chang v. Chen</u>, 80 F.3d 1293 (9th Cir. 1996)); <u>see</u> <u>Boyle</u>, 556 U.S. at 948 ("Such a group need not have a hierarchical structure or a 'chain of command.'"). However, "[s]imply characterizing routine commercial dealing as a RICO enterprise is not enough." <u>Gardner v. Starkist Co.</u>, 418 F. Supp. 3d 443, 461 (N.D. Cal. 2019); <u>see</u> <u>Shaw v. Nissan N. Amer., Inc.</u>, 220 F. Supp. 3d 1046, 1054 (C.D. Cal. 2016) ("[C]ourts have overwhelmingly rejected attempts to characterize routine commercial relationships as RICO enterprises."); <u>Gomez v. Guthy–Renker, LLC</u>, No. 14-cv-01425-JGB, 2015 WL 4270042, at *11 (C.D. Cal. Jul. 13, 2015) ("RICO liability must be predicated on a relationship more substantial than a routine contract between a service provider and its client."). Plaintiffs must "do '[s]omething more' to 'render [their] allegations plausible within the meaning of <u>Iqbal</u> and <u>Twombly</u>.'" <u>Eclectic Properties East, LLC v. Marcus & Millichap Co.</u>, 751 F.3d 990, 999 (9th Cir. 2014) (quoting <u>In re Century Aluminum Co. Sec. Litig.</u>, 729 F.3d 1104, 1108 (9th Cir. 2013)).

"'Racketeering activity, the fourth element, requires predicate acts,' often – as here – mail and wire fraud." <u>Monterey Bay Military Hous., LLC v. Ambac Assurance Corp.</u>, No. 17-CV-04992-BLF, 2019 WL 4888693, at *12 (N.D. Cal. Oct. 3, 2019) (quoting <u>Eclectic Properties</u>, 751 F.3d at 997). "Where, as here, the racketeering activity alleged is fraud, . . . the heightened pleading requirements of Rule 9(b) apply to the predicate acts." <u>Shaw</u>, 220 F. Supp. 3d at 1053; <u>see</u> <u>Doan v. Singh</u>, 617 F. App'x 684, 685 (9th Cir. 2015) ("RICO fraud allegations are subject to the heightened pleading standard of Rule 9(b)."). "In the RICO context, a Plaintiff must 'detail with particularity the time, place, and manner of each act of fraud, plus the role of each defendant in each scheme.'" <u>Shaw</u>, 220 F. Supp. 3d at 1053 (citing <u>Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.</u>, 940 F.2d 397, 405 (9th Cir. 1991)). "The mail and wire fraud statutes are identical except for the particular method used to disseminate the fraud, and contain three elements: (A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud." <u>Monterey Bay</u>, 2019 WL 4888693, at *12 (quoting <u>Eclectic Properties</u>, 751 F.3d at 997). "The intent to defraud may be inferred from a

defendant's statements and conduct." <u>Eclectic Properties</u>, 751 F.3d at 997 (quoting <u>United States v. Peters</u>, 962 F.2d 1410, 1414 (9th Cir. 1992)). "In the absence of direct evidence of intent, the party asserting fraud must first prove 'the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension,' and then, 'by examining the scheme itself' the court may infer a defendant's specific intent to defraud." <u>Id.</u> (quoting <u>United States v. Green</u>, 745 F.2d 1205, 1207 (9th Cir. 1984)). "When companies engage in [] transactions that are facially legitimate . . . a significant level of factual specificity is required to allow a court to infer reasonably that such conduct is plausibly part of a fraudulent scheme." <u>Id.</u> at 997–98.

Plaintiff alleges the existence of: (1) an associated-in-fact "Overall Enterprise," made up of "all the Defendants," (Doc. No. 1 ¶ 521), (2) an associated-in-fact "La Pura Enterprise," made up of all the La Pura Defendants, including the named entities as well as the John Doe Defendants, (<u>id.</u> ¶ 523), (3) an associated-in-fact "QuickBox Enterprise" made up of Quick Box LLC and Quick Holdings LLC, (<u>id.</u> ¶ 525), and (4) an associated-in-fact "Konnektive Enterprise," made up of Konnektive LLC, Konnektive Corporation, Martorano Holdings LLC, and Konnektive Rewards LLC, (<u>id.</u> ¶ 527). She alleges that Defendants operated the Overall Enterprise through multiple related acts of mail fraud, wire fraud, and bank fraud, and makes similar allegations regarding the operation of the three sub-enterprises. (<u>Id.</u> ¶¶ 521–28.) She alleges the predicate acts had a "common purpose to defraud victims purchasing the La Pura 'free trial' products," and that "[e]ach sale to a victim of the La Pura scam constitutes bank fraud, wire fraud, and mail fraud." (<u>Id.</u> ¶¶ 532–34.) The predicate acts of mail fraud were allegedly committed when Defendants "shipp[ed] products through the mail system to unwitting victims of the scheme with the intent to fraudulently bill them for those products." (<u>Id.</u> ¶ 435.) The predicate acts of wire fraud were allegedly committed when the "Defendants transmitted written communications by means of wire as part of their scheme to defraud, in particular through Internet advertisements, their websites, through telephone communications with consumers . . . and through telephone or Internet communications to banks and credit card

companies." (Id. ¶ 428.) Finally, the predicate acts of bank fraud were allegedly committed when Defendants fraudulently obtained money that was under the custody or control of Plaintiff's financial institution through the use of "false front" websites. (Id. ¶ 420.) Plaintiff alleges "the enterprise was operating at least of mid-2018," but then later states "its inception [was] in or about February 2019." (Id. ¶¶ 532, 536–38.) She alleges that "[o]n information and belief, the Doe Defendants behind the La Pura Enterprise consulted with the QuickBox Defendants and the Konnektive Defendants on a routine basis." (Id. ¶ 538.) She alleges the predicate acts affected interstate commerce, and that the Defendants' RICO violations were the but-for cause and proximate cause of her concrete financial injury. (Id. ¶¶ 540–43.)

The Court concludes Plaintiff has not pled sufficient specific facts that move her RICO allegations from the realm of the possible to the plausible. See Shaw, 220 F. Supp. 3d at 1057; see also Doan, 617 F. App'x at 686 (rejecting RICO claim because it was not clear from plaintiffs' allegations "what exactly each individual did, when they did it, or how they functioned together as a continuing unit."). This case is similar to Gardner v. Starkist Co., where the court found plaintiffs had sufficiently stated claims for violations of California's consumer protection and false advertising laws but had failed to state a civil RICO claim. 418 F. Supp. 3d at 460. The plaintiffs alleged the enterprise was made up of entities "that ha[d] all conducted business with StarKist," and that "the purpose of the enterprise was to fraudulently market, advertise, and label StarKist tuna products as sustainably sourced and dolphin-safe in order to deceive consumers and retailers." Id. They alleged that Starkist and its co-conspirators "concocted a scheme . . . to falsely represent [to the public], in various pieces of mail, through wires, and on the Internet, that StarKist tuna products were dolphin-safe." Id. The court agreed with defendants that plaintiffs had "merely identif[ied] a number of entities StarKist allegedly engage[d] in business with and conclusorily state[d] that each of them 'knew' StarKist would falsely label its tuna as dolphin-safe." Id. at 461. The court noted that "describ[ing] the business interactions between StarKist and RICO Co-conspirators and then assert[ing] that these business

interactions were done fraudulently and that the co-conspirators knew that StarKist was fraudulently advertising its tuna as dolphin-safe" was insufficient to plausibly allege the existence of a RICO enterprise. Id. at 461–62.

Other courts have dismissed complaints containing allegations of ordinary business transactions for failing to plausibly allege RICO violations. In Shaw, the court held that plaintiffs' complaint "only demonstrate[d] that the parties 'are associated in a manner directly related to their own primary business activities.'" 220 F. Supp. 3d at 1057 (citing In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig., 826 F. Supp. 2d 1180, 1202 (C.D. Cal. 2011)). The court distinguished plaintiff's complaint from other cases where complaints "include[] pages of references to specific communications [that] show[] the defendants acting as an enterprise and engag[ing] in a collaborative scheme to defraud." Id. at 1056. Similarly, in In re Jamster Mktg. Litig., the court held the plaintiffs "f[e]ll short of providing the particularized allegations required by Rule 9(b)." No. 05CV0819 JM(CAB), 2009 WL 1456632, at *6 (S.D. Cal. May 22, 2009). The court concluded that unlike prior cases involving allegations that defendants "actively worked together in an indispensable and integrated manner to mutually engage in wrongful acts," plaintiffs' complaint "fail[ed] to establish that Wireless Providers and Content Providers acted with a common purpose to accomplish the alleged fraudulent scheme." Id. (citing Odom, 486 F.3d 541). It noted that "[t]he challenge for Plaintiffs is to set forth sufficient allegations to distinguish ordinary business conduct from fraudulent conduct." Id. at *5. Generally, whether a RICO claim survives a motion to dismiss depends in part on if it is supported by specific factual allegations that enable courts to rule out the innocent explanation in favor of plaintiff's fraudulent scheme hypothesis. See Eclectic Properties, 751 F.3d at 998–99 (rejecting RICO claim when "[a]ll of the facts Plaintiffs have presented are consistent with both their theory of liability and this innocent alternative"); In re Outlaw Lab., LP Litig., No. 18-CV-840-GPC-BGS, 2020 WL 5552558, at *15 (S.D. Cal. Sept. 16, 2020) (distinguishing case at hand – which involved demand letters sent solely for fraudulent purposes – from cases in which "allegations or facts did not provide a basis from

which to find the RICO members acted in concert to do anything more than perform routine commercial activities"); In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig., 295 F. Supp. 3d 927, 981 (N.D. Cal. 2018) (noting that the device identified by plaintiffs as fraudulent "plausibly had only a deceitful purpose" and thus was "not developed by accident or as part of routine business dealings").

Here, Plaintiff's allegations are conclusory and insufficient to plausibly establish a RICO claim. Plaintiff identifies business transactions between the Defendants which, if carried out with a common purpose and as part of a continuing unit, could constitute a RICO enterprise. She identifies actions taken by the Defendants which, if carried out with the requisite fraudulent intent, could constitute predicate acts. But Plaintiff fails to plead sufficient allegations, much less with the requisite particularity,[21] that Defendants possessed the knowledge, intent, coordination, longevity, etc. to allow the Court to reasonably infer that their facially legitimate conduct constitutes a RICO violation. See Eclectic Properties, 751 F.3d at 997–98; In re Jamster Mktg. Litig., 2009 WL 1456632, at *5. Because Plaintiff has failed to state a claim for a violation of RICO under § 1962(c), the Court concludes that her RICO conspiracy claim must also fail.[22] In sum, the Court grants the La Pura, the QuickBox, and the Konnektive Defendants motions to dismiss Plaintiff's RICO cause of action.

### D. Whether the Complaint States a Claim Under California's CLRA, FAL, and UCL – Unfair/Fraudulent Prongs

As her first, second, and third causes of action, Plaintiff brings claims under several of California's consumer protection laws. (Doc. No. 1 ¶¶ 366–407.) The Consumer Legal

---

[21]    For example, the complaint's reference to a "common purpose" fails to identify which of the four enterprises alleged by Plaintiff had defrauding consumers as its common purpose, or if that allegation applies to all four. (Doc. No. 1 ¶ 534.) In general, it is unclear from the complaint which of the four alleged enterprises conducted what activities and engaged in which misconduct.

[22]    See Religious Tech. Ctr. v. Wollersheim, 971 F.2d 364, 367 n.8 (9th Cir. 1992) ("Because we find that [plaintiff] has failed to allege the requisite substantive elements of RICO, the conspiracy cause of action cannot stand.").

3:20-cv-01082-H-DEB

Remedies Act provides a cause of action to consumers who suffer any damage as a result of "unfair methods of competition and unfair or deceptive acts or practices." Cal. Civ. Code §§ 1770(a), 1780(a). The CLRA is intended to "be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices." Cal. Civ. Code § 1760. California's False Advertising Law makes it unlawful to engage in "untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17500. California's Unfair Competition Law generally prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. "[A] plaintiff may proceed under the UCL on three possible theories. First, 'unlawful' conduct that violates another law is independently actionable under Section 17200. Alternatively, a plaintiff may plead the defendants' conduct is 'unfair' within the meaning of the several standards developed by the courts. Finally, a plaintiff may challenge 'fraudulent' conduct by showing that 'members of the public are likely to be deceived' by the challenged business acts or practices." Stewart v. Screen Gems-EMI Music, Inc., 81 F. Supp. 3d 938, 967 (N.D. Cal. 2015) (internal citations omitted).

"[C]laims under these California statutes [CLRA, FAL, and UCL] are governed by the 'reasonable consumer' test." Williams v. Gerber Prod. Co., 552 F.3d 934, 938 (9th Cir. 2008) (citing Freeman v. Time, Inc., 68 F.3d 285, 289 (9th Cir. 1995)). Under this test, "conduct is deceptive or misleading if it is likely to deceive an ordinary consumer." Peviani v. Nat. Balance, Inc., 774 F. Supp. 2d 1066, 1070 (S.D. Cal. 2011) (citing Gerber Prod., 552 F.3d at 938). "The California Supreme Court has recognized 'that these laws prohibit not only advertising which is false, but also advertising which . . . is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'" Gerber Prod., 552 F.3d at 938 (quoting Kasky v. Nike, Inc., 45 P.3d 243, 250 (Cal. 2002) (internal quotations omitted)). Additionally, actual reliance is required to have standing to sue under the CLRA, FAL, and UCL. See Peviani, 774 F. Supp. 2d at 1070 (citing Kwikset Corp. v. Sup. Ct., 246 P.3d 877, 888 (Cal. 2011)); In re Ferrero Litig., 794

F. Supp. 2d 1107, 1111 (S.D. Cal. 2011).

Rule 9(b)'s heightened pleading standard applies to UCL, FAL, and CLRA causes of actions where, as here, they are "grounded in fraud" or "sound in fraud." See Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009); Elias v. Hewlett-Packard Co., 903 F. Supp. 2d 843, 853 (N.D. Cal. 2012). "Rule 9(b) demands that the circumstances constituting the alleged fraud 'be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.'" Kearns, 567 F.3d at 1124 (citing Bly–Magee v. California, 236 F.3d 1014, 1019 (9th Cir. 2001)). "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997)). "[A] plaintiff must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false." Peviani, 774 F. Supp. 2d at 1071 (quoting Vess, 317 F.3d at 1106). "Plaintiff must state the 'time, place, and specific content of the false representations.'" Millennium Dental Techs. Inc. v. Terry, No. SA CV 18-0348-DOC (KESx), 2018 WL 5094965, at *8 (C.D. Cal. July 16, 2018) (quoting Schreiber, 806 F.2d at 140). For claims involving omissions, "plaintiff must describe the content of the omission and where the omitted information should or could have been revealed, as well as provide representative samples of advertisements, offers, or other representations that plaintiff relied on to make her purchase and that failed to include the allegedly omitted information." Marolda v. Symantec Corp., 672 F. Supp. 2d 992, 1002 (N.D. Cal. 2009).

The Court concludes that Plaintiff's allegations satisfy Rule 9(b)'s heightened pleading requirements. Plaintiff alleges that on January 10, 2020, she completed an order for a "free trial" of a La Pura skincare product on La Pura's landing page. (Doc. No. 1 ¶¶ 112–13.) She alleges that when she completed her order, in reliance on statements published on Defendants' advertisements and website, she believed she would only pay a total of $4.94 for the La Pura product. (Id. ¶¶ 13, 112–14.) Plaintiff asserts that Defendants

misled customers through misrepresentations and omissions regarding reviews and endorsements of the La Pura products, (id. ¶¶ 185–86), the limited supply of the product, (id. ¶¶ 194–96), the "free trial" nature of the product, (id. ¶¶ 187–93), and the existence of "false front" websites, (id. ¶¶ 197–206). Plaintiff explains how the statements found in advertisements and on La Pura's landing pages are false or misleading: the pictured and quoted celebrities have not in fact endorsed the La Pura products in question, (id. ¶¶ 128–29), there is not actually a limited supply of La Pura remaining, (id. ¶¶ 132, 148–51, 154), and contrary to the claim that consumers will only "pay a small shipping fee," they actually are charged the full price of the product and signed up for a monthly subscription of the product, (id. ¶¶ 131, 142–43, 158–59). She provides numerous screenshots of the advertisements and websites displaying the alleged misrepresentations. (Id. ¶¶ 127, 129–33, 136–39, 142, 152, 156.) She alleges that all consumers who purchased a product from the La Pura website – including her – were subjected to similar or identical representations, and reasonably relied on them in making their purchase decisions. (Id. ¶¶ 134, 185, 188, 193, 196.) These allegations are sufficient to place Defendants on notice of the circumstances constituting the alleged fraudulent scheme. See Loomis v. Slendertone Distribution, Inc., 420 F. Supp. 3d 1046, 1079 (S.D. Cal. 2019); Peviani, 774 F. Supp. 2d at 1071.

Defendants argue that the complaint does not identify the specific representations or omissions in the text message, online survey, or advertisement. (Doc. No. 25 at 11.) They argue the complaint does not identify what sales website Plaintiff viewed, or what that sales website stated or omitted. (Id.) They argue the complaint includes webpages, pictures, and ads that Plaintiff does not allege to have actually seen much less relied upon. (Doc. Nos. 31 at 1; 36 at 16.) Contrary to Defendants' assertions, Plaintiff's complaint does identify the specific misrepresentations upon which she relied in making her purchase, i.e., that she would only pay a total of $4.94 for her purchase of the La Pura skincare product, among other statements described above. (Doc. No. 1 ¶ 13, 114.) And while Defendants are correct that Plaintiff's complaint does not specify the exact landing pages or advertisements that

she viewed, she provides multiple examples of La Pura advertisements and websites containing the alleged misrepresentations and omissions regarding reviews, endorsements, effectiveness, limited supply, price, etc. (Id. ¶¶ 129–33, 136, 144–52, 155–56.) She alleges the advertisements and websites she viewed when making her purchase made similar or identical misrepresentations and omissions, and that other consumers purchasing La Pura products must have been exposed to them as well. (Id. ¶¶ 134, 185, 188, 193, 196.) That is sufficient to satisfy Rule 9(b). See In re Oreck Corp. Halo Vacuum & Air Purifiers Mktg. & Sales Practices Litig., No. ML 12-2317 CAS JEMX, 2012 WL 6062047, at *15 (C.D. Cal. Dec. 3, 2012) ("It suffices for plaintiffs to provide examples of advertisements similar to those they saw as long as all the advertisements convey the core allegedly fraudulent message."); Marolda, 672 F. Supp. 2d at 1002. Additionally, and importantly, Plaintiff alleges that her inability to provide the exact URL and advertisements she viewed is by Defendants' design. (Doc. No. 1 ¶¶ 126, 134.) She alleges Defendants deliberately delete or otherwise make the landing pages inaccessible to avoid detection (and as part of their alleged fraudulent scheme to mislead banks and credit card companies). (Id. ¶¶ 9, 166–69.) It would be unfair to allow Defendants to avoid liability for false advertising by simply eliminating any trace of the false advertisements from view after successfully inducing consumers into purchasing products.

The La Pura Defendants also argue Plaintiff failed to identify who published the text message, online survey, or advertisement, who published the sales website, who she entered into a transaction with, or who is in possession of her money. (Doc. No. 25 at 11–14.) They assert that Plaintiff has improperly "lumped" the La Pura Defendants. (Id.) "Even under the more rigid pleading standard of Federal Rule of Civil Procedure 9 . . . the pleader is not required to allege facts that are 'peculiarly within the opposing party's knowledge,' and allegations 'based on information and belief may suffice,' 'so long as the allegations are accompanied by a statement of facts upon which the belief is founded.'" Nayab v. Capital One Bank (USA), N.A., 942 F.3d 480, 493–94 (9th Cir. 2019) (quoting Wool v. Tandem Computers Inc., 818 F.2d 1433, 1439 (9th Cir. 1987), overruled on other grounds);

see <u>PAX Water Techs., Inc. v. Medora Corp.</u>, No. LA CV18-09143 JAK (AGRx), 2019 WL 4390567, at *9 (C.D. Cal. Aug. 5, 2019) (holding "allegations [regarding specific defendants] are sufficient when read together with the allegations regarding dissemination through a website as well as the content of the alleged misrepresentation."); <u>Ronches v. Dickerson Employee Benefits, Inc.</u>, No. CV 09-04279 MMM (PJWx), 2009 WL 10669571, at *24 (C.D. Cal. Oct. 30, 2009) ("Rule 9(b)'s particularity requirement is relaxed in instances of corporate fraud where the facts supporting the allegations of fraud lie exclusively within defendant's possession."). Additionally, "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegations when suing more than one defendant and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." <u>United States v. Corinthian Colleges</u>, 655 F.3d 984, 997–98 (9th Cir. 2011) (quoting <u>Swartz v. KPMG LLP</u>, 476 F.3d 756, 764–65 (9th Cir. 2007)). "There is no flaw in a pleading, however, where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." <u>United States v. United Healthcare Ins. Co.</u>, 848 F.3d 1161, 1184 (9th Cir. 2016); see <u>United States ex rel. Anita Silingo</u>, 904 F.3d at 677 ("[A] complaint need not distinguish between defendants that had the exact same role in a fraud.").

Plaintiff argues that the individuals behind these shell companies, and behind the text message, websites, etc. are currently unknown to Plaintiff and are "exclusively known to Defendants," and thus she has met her pleading burden. (Doc. Nos. 1 ¶ 91; 27 at 16.) She argues that under Ninth Circuit precedent, it was not improper for her to group the La Pura Defendants. (Doc. No. 27 at 17.) She alleges that the La Pura Defendants operate a host of shell companies, which are used to operate the landing pages and false front websites, and to apply for various merchant accounts for the purpose of billing consumers and evading detection by financial institutions. (Doc. No. 1 ¶¶ 25–90, 208–20.) She identifies the two entities, Total Health Supply TUA Inc. and DL Group Inc., that billed her for the La Pura products. (Doc. Nos. 1 ¶¶ 162–64; 27 at 19.) She notes that all of the

identified La Pura entities – including Total Health Supply TUA Inc. and DL Group Inc. – have the same registered agent, Elinor Spector, located in Sacramento, CA. (Doc. No. 1 ¶¶ 25–90.) She alleges all of their merchant accounts are being used by the same individual or group of individuals. (Id. ¶ 221.) She argues that the La Pura Defendants are all alleged to have engaged in the same fraudulent conduct, namely, operating advertisements and websites to sell products to consumers, making misrepresentations and omissions to consumers, and signing up for merchant accounts to defraud financial institutions. (Doc. No. 27 at 18.) These allegations are sufficient to satisfy 9(b). See In re Chrysler-Dodge-Jeep Litig., 295 F. Supp. 3d at 990 ("[A]t this early stage in the proceedings, Plaintiffs have essentially been forced to lump the Bosch companies because the Bosch Defendants have chosen to operate a specific way."). Thus, the Court rejects Defendants' arguments regarding Plaintiff's group pleading.

The Court also concludes that Plaintiff has sufficiently alleged reliance and injury in fact. In her complaint, Plaintiff alleges that she suffered an economic injury because she would not have completed the purchase absent the misrepresentations about the endorsements, effectiveness, price, etc. (Doc. No. 1 ¶¶ 193, 196, 387–88, 404.) This economic injury for lost money is "a classic form of injury in fact." Kwikset, 246 P.3d at 886. Plaintiff further alleges that she suffered this injury in fact when she purchased the La Pura product after reading and reasonably relying on the false and misleading statements contained in the advertisements and on the La Pura landing site. (Doc. No. 1 ¶¶ 193, 196, 371, 387, 404.) These allegations are sufficient to properly plead reliance. See Laster v. T–Mobile USA, Inc., 407 F. Supp. 2d 1181, 1194 (S.D. Cal. 2005) (stating that reliance requires that the plaintiff allege that she actually saw and read the deceptive statements).

The La Pura Defendants contend that Plaintiff cannot maintain a claim under the CLRA, FAL, or UCL because she cannot allege she suffered an economic injury since she accepted a pre-litigation settlement offer of a 70% refund. (Doc. No. 25 at 12–15.) The Court has already rejected the contention that there is a legally enforceable settlement agreement between Plaintiff and the La Pura Defendants, and likewise rejects this

argument. (See supra Section II.A). The Konnektive and QuickBox Defendants argue Plaintiff fails to plausibly allege that she relied on or suffered any injury as a result of any misrepresentation made by them personally, and argue Plaintiff thus fails to establish standing to bring a claim under the CLRA, FAL, or UCL against them. (Doc. Nos. 31 at 13–16; 36 at 22.) As explained above, the Court has already granted Plaintiff leave to amend her complaint to address and plead theories of indirect liability. In sum, the Court declines to dismiss Plaintiff's CLRA, FAL, and UCL claims.

### E.   Whether the Complaint States a Claim Under California's Unfair Competition Law – Unlawful Prong

Under the "unlawful" prong of California's Unfair Competition Law, Plaintiff alleges Defendants violated the CLRA, FAL, California's Automatic Renewal Law, the Electronic Funds Transfer Act, the Sherman Food, Drug, & Cosmetic Law, the Food, Drug, and Cosmetic Act, the Federal Trade Commission Act, federal law regarding negative option marketing on the Internet, various Federal Trade Commission regulations, and have committed bank fraud, wire fraud, and mail fraud. (Doc. No. 1 ¶¶ 408–91.)

"An action brought under the 'unlawful' prong of [the UCL] 'borrows' violations of other laws when committed pursuant to business activity." Loomis, 420 F. Supp. 3d at 1085 (citing Farmers Ins. Exchange v. Superior Court, 826 P.2d 730, 734 (Cal. 1992)). It "is essentially an incorporation-by-reference provision." Obesity Research Inst., LLC v. Fiber Research Int'l, LLC, 165 F. Supp. 3d 937, 952–53 (S.D. Cal. 2016); see Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Telephone Co., 973 P.2d 527, 539–40 (Cal. 1999) ("By proscribing any unlawful business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the [UCL] makes independently actionable."). "Violation of almost any federal, state, or local law may serve as the basis for a UCL claim." Plascencia v. Lending 1st Mortg., 583 F. Supp. 2d 1090, 1098 (N.D. Cal. 2008) (citing Saunders v. Super. Ct., 33 Cal. Rptr. 2d 438, 441 (Cal. Ct. App. 1994)).

Plaintiff can succeed on this prong only if she pled sufficient facts to support another violation. See Aleksick v. 7–Eleven, Inc., 140 Cal. Rptr. 3d 796, 801 (Cal. Ct. App. 2012).

3:20-cv-01082-H-DEB

The Court has already declined to dismiss Plaintiff's FAL and CLRA causes of action. The La Pura Defendants do not explicitly address the unlawful prong. The QuickBox Defendants and the Konnektive Defendants again argue Plaintiff has failed to adequately plead that she has standing to assert an unlawful prong UCL claim against them. (Doc. Nos. 31 at 17; 36 at 24.) They argue she has not pled facts as to the alleged unlawful conduct of the Konnektive Defendants and QuickBox Defendants. (Id.) As explained above, the Court has already granted Plaintiff leave to amend her complaint to address and plead theories of indirect liability. In sum, the Court declines to dismiss Plaintiff's unlawful prong UCL claim. See Loomis, 420 F. Supp. 3d at 1085.

### F.   Whether the Complaint States a Claim Under California's Automatic Renewal Law

Plaintiff alleges the Defendants violated several provisions of California's Automatic Renewal Law ("ARL"). Cal. Bus. & Prof. Code §§ 17600, et seq. The La Pura, Konnektive, and QuickBox Defendants argue that this claim should be dismissed because the ARL does not create a private right of action. (Doc. Nos. 25 at 18; 31 at 18; 36 at 22–23.) Plaintiff argues there is a split of authority on the issue. (Doc. No. 27 at 22; 51 at 20; 55 at 30.) Plaintiff is incorrect. The Ninth Circuit has held that "there is no private cause of action under the ARL." Johnson v. Pluralsight, LLC, 728 F. App'x 674, 677 (9th Cir. 2018). Accordingly, the Court grants with prejudice the La Pura, Konnektive, and QuickBox Defendants' motions to dismiss Plaintiff's ARL claim as an independent cause of action.[23]

///

///

///

---

[23]      Plaintiff correctly notes that "[a] consumer who has been harmed by a violation of the Automatic Renewal Law may bring a claim pursuant to other consumer protection statutes, including California's FAL, UCL, and CLRA. Arnold v. Hearst Magazine Media, Inc., No. 19-CV-1969-WQH-MDD, 2020 WL 3469367, at *7 (S.D. Cal. June 25, 2020). The Court's dismissal of Plaintiff's standalone ARL claim has no bearing on her ability to plead an ARL violation as part of her other causes of action.

### G.   Whether the Complaint States a Claim Under the Electronic Fund Transfer Act

Plaintiff alleges that pursuant to 15 U.S.C. § 1693m(a), the Defendants are civilly liable for violating Section 907(a) of the Electronic Fund Transfer Act ("EFTA"), which states that "[a] preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing." 15 U.S.C.A. § 1693e; Doc. No. 1 ¶¶ 511–12. The La Pura, Konnektive, and QuickBox Defendants contend that the Ninth Circuit has held that the EFTA does not apply to credit-based transactions, and that Plaintiff used her credit card for the transaction at issue. (Doc. Nos. 25 at 18–19; 31 at 18; 36 at 23.) See Sanford v. MemberWorks, Inc., 625 F.3d 550, 560 (9th Cir. 2010). Plaintiff does not dispute that the Ninth Circuit's decision in Sanford is controlling and binding on this Court. Accordingly, the Court grants with prejudice the La Pura, Konnektive, and QuickBox Defendants' motions to dismiss Plaintiff's EFTA claim.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

3:20-cv-01082-H-DEB

1

## Conclusion

2

For the reasons above, the Court **GRANTS** Defendants Martorano Holdings LLC

3 and Quick Holdings, LLC's 12(b)(2) motions to dismiss for lack of personal jurisdiction.

4 The Court **DENIES** Defendants Quick Box, LLC, Stephen Adelé, Chad Biggins, James

5 Martell, Konnektive LLC, Konnektive Rewards LLC, Konnektive Corporation, Matthew

6 Martorano, and Kathryn Martorano's 12(b)(2) motions to dismiss for lack of personal

7 jurisdiction. The Court **DENIES** the La Pura Defendants' 12(b)(1) motion to dismiss for

8 lack of a case or controversy. The Court **DENIES** the Konnektive Defendants' motions to

9 dismiss under the Communication Decency Act. The Court **DENIES** the La Pura,

10 Konnektive, and QuickBox Defendants' motions to dismiss Plaintiff's complaint for

11 failure to comply with Federal Rule of Civil Procedure 8. The Court declines to dismiss

12 Plaintiff's CLRA, FAL, and UCL claims. The Court dismisses Plaintiff's civil conspiracy,

13 aiding and abetting, RICO, ARL, EFTA, and non-California state consumer protection law

14 claims. Dismissal is with leave to amend, except as otherwise stated above, but only if the

15 Amended Complaint cures the defects identified by the Court in this Order. Plaintiff may

16 file an Amended Complaint consistent with the above analysis within thirty (30) days of

17 the date on which this Order is electronically docketed.[24]

18     **IT IS SO ORDERED.**

19 DATED: December 8, 2020

20                    _____

20                    MARILYN L. HUFF, District Judge

21                    UNITED STATES DISTRICT COURT

22

23

24

25

26

---

27 [24]    The Court notes that the briefing for the present motions contained voluminous, repetitive, and identical sections. Thus, in an effort to streamline and refine the briefing in this action, the page limit for

28 any future motions in this action is applied to each group of defendants, i.e., the Konnektive Defendants and the QuickBox Defendants, rather than each individual defendant, absent further order of the Court.