# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEANNE TAN, an individual, on behalf of herself and all persons similarly situated,<br><br>                      Plaintiff,<br><br>v.<br><br>QUICK BOX, LLC, et al.,<br><br>                  Defendants. | Case No.: 3:20-cv-01082-H-DEB<br><br>**ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS PLAINTIFF'S CLRA, FAL, UCL, AND RICO CLAIMS, AND GRANTING DEFENDANTS' MOTIONS TO DISMISS PLAINTIFF'S NON-CALIFORNIA CONSUMER PROTECTION STATE LAW CLAIMS**<br><br>[Doc. Nos. 94, 98, 99.] |

On January 7, 2021, Plaintiff Leanne Tan filed her First Amended Complaint ("FAC") against alleged operators of online "celebrity free trial" scams alleging violations of various consumer protections laws. (Doc. No. 89.) On January 21, 2021, Defendants Beautiful Skin and Health SL, Inc., Coastal Beauty Care KV, Inc., Coastal Health & Body TML, Inc., Coastal Skin Care DC, Inc., Complete Beautiful Skin DT, Inc., Complete Dietary Health DT, Inc., DL Group, Inc., Diet and Beauty Enterprise JB, Inc., Dietary 8

Leaves TL, Inc., Dietary Care Group MK, Inc., Dietary Health DL, Inc., Dietary Health Management SL, Inc., Dietary Health Supplements ADN, Inc., Dietary Mind & Body AR, Inc., Dietary Pills TTH, Inc., Dietary Supplements 8 Leaves TL, Inc., Dietary Supplements NS, Inc., EM Strength & Wellness Products, Inc., EW Ideal Health Store, Inc., EW Radiant Skin Store, Inc., Fit Body Forever KZ, Inc., Fit Lifestyle Enterprise JD, Inc., Fit and Slim Body Olo, Inc., Fitness & Health Supplements PKL, Inc., Flawless Beauty Forever MC, Inc., Forever Beautiful Products KZ, Inc., Forever Beauty and Balance JL, Inc., Health & Body Care TN, Inc., Health & Skin Nutrition JLN, Inc., Health & Wellness Products EM, Inc., Health Enterprise AR, Inc., Health Enterprise LT, Inc., Health Skin and Beauty MAYA, Inc., Health Skin and Body JB, Inc., Health and Diet Products ISA, Inc., Health and Fitness Lifestyle JL, Inc., Healthy Beautiful Skin JD, Inc., Healthy Body & Balance CD, Inc., Healthy Fit Lifestyle DC, Inc., Healthy Leaves TL, Inc., Healthy Lifestyle Diet JL, Inc., Healthy Skin Group TQH, Inc., Healthy Skin Lifestyle JB, Inc., Healthy Supplements MAYA, Inc., Healthy and Slim TT, Inc., Ideal Skin & Health Care NA, Inc., Lasting Fitness & Beauty JLN, Inc., PKL Everlasting Beauty, Inc., Radiant Skin & Body Shop ATN, Inc., Remarkable Beauty TN, Inc., Remarkable Health Supply PO, Inc., Skin Beauty & Health JN, Inc., Skin Beauty Products ISA, Inc., Skin Beauty and Balance CD, Inc., Skin Care Enterprise TTH, Inc., Skin Care Group MK, Inc., Skin Products Rubio, Inc., Skin and Beauty NS, Inc., Strength & Fitness Lifestyle LT, Inc., Total Fitness & Health MC, Inc., Total Health Supply TUA, Inc., and Vibrant Face & Beauty Shop ATN, Inc. (collectively, the "La Pura Defendants") filed a motion to dismiss Plaintiff's FAC. (Doc. No. 94.)[1] On February 12, 2021, Plaintiff filed her opposition. (Doc. No. 100.) On February 22, 2021, the La Pura Defendants filed their reply. (Doc. No. 103.)

---

[1]      Plaintiff also included entities Beauty and Balance LV, Inc., Diet Focus MG, Inc., Select Skin Products MV, Inc., and Skin Beauty Enterprise MG, Inc. as part of the "La Pura Defendants" in her FAC. (Doc. No. 89.) These entities have not yet appeared in the action. On November 9, 2020, Plaintiff filed a motion for entry of default against them for their failure to respond to the original complaint, (Doc. No. 61), and on November 12, 2020, the Clerk entered default against them, (Doc. No. 62). In this Order, references to the "La Pura Defendants" exclude Beauty and Balance LV, Inc., Diet Focus MG, Inc., Select Skin Products MV, Inc., and Skin Beauty Enterprise MG, Inc.

On February 11, 2021, Defendants Quick Box, LLC, Stephen Adelé, James Martell, and Chad Biggins (collectively, the "Quick Box Defendants") filed a motion to dismiss Plaintiff's FAC, (Doc. No. 98), and Defendants Konnektive Corporation, Konnektive LLC, Konnektive Rewards LLC, Kathryn Martorano, and Matthew Martorano (collectively, the "Konnektive Defendants") filed a motion to dismiss Plaintiff's FAC, (Doc. No. 99). On March 8, 2021, Plaintiff filed her oppositions to the Quick Box and Konnektive Defendants' motions. (Doc. Nos. 106, 107.) On March 15, 2021, the Konnektive and Quick Box Defendants filed their replies. (Doc. Nos. 112, 113.) On March 29, 2021, the Court took the matter under submission. (Doc. No. 117.)[2] For the following reasons, the Court denies in part and grants in part the La Pura Defendants, Quick Box Defendants, and Konnektive Defendants' motions to dismiss.

## Background

The following facts are taken from Plaintiff's First Amended Complaint ("FAC"). This lawsuit involves an alleged fraudulent scheme in which the Defendants allegedly use fake celebrity endorsements and reviews and misrepresentations about price and limited availability, to induce consumers into purchasing beauty and skincare products. (Doc. No.

---

[2]    On March 31, 2021, the Konnektive Defendants filed a request for supplemental briefing. (Doc. No. 128.) On the same day, Plaintiff filed her opposition to the request. (Doc. No. 129.) The Court denies the Konnektive Defendants' request for several reasons. First, to the extent pertinent and significant legal authorities have been issued after the parties' briefing has been submitted, filing a short notice of supplemental authority is sufficient to apprise the Court without the need for supplemental briefing. See Fed. R. App. P. 28(j) (stating that notices of supplemental authority must not exceed 350 words). Second, three of the cases cited by the Konnektive Defendants are not new authority; they existed before Plaintiff even filed her FAC and could have been cited in the original briefing. The only cited case that was issued subsequent to the close of briefing is based on Texas law and Texas underlying causes of action, not California law or California causes of action. Finally, the Court has reviewed the authorities cited, and they are not relevant to the analysis below. The Konnektive Defendants' attempt to challenge Plaintiff's use of indirect theories of liability for violations of the Unfair Competition Law is erroneous: "numerous California courts [] have expressly found that aiding-and-abetting liability exists for UCL claims." Newton v. Am. Debt Servs., Inc., 75 F. Supp. 3d 1048, 1064 (N.D. Cal. 2014) (citing authorities); see People v. Toomey, 203 Cal. Rptr. 642, 651 (Cal. Ct. App. 1984) ("[I]f the evidence establishes defendant's participation in the unlawful practices, either directly or by aiding and abetting the principal, liability under [the UCL] can be imposed.").

89 ¶¶ 8–12.) The Defendants allegedly advertise that the products are available as a "free trial," then subsequently bill consumers for the full price of the products as well as monthly subscription charges. (Id.) They allegedly make it difficult or impossible to return the products or receive a refund and operate "false front" websites to mislead banks and credit card companies investigating chargebacks. (Id.)

## I.     Plaintiff's Experience With La Pura

Plaintiff is a citizen of California. (Id. ¶ 13.) In January 2020, she received a text message purportedly from Amazon claiming she would receive a free "La Pura" cosmetics product if she completed an online survey. (Id. ¶ 110.) The advertisement claimed she would only pay a total of $4.94 for shipping and handling. (Id.) Plaintiff completed the survey and was taken to La Pura's website order page (which Plaintiff refers to as a "hidden" landing page). (Id. ¶ 111.) She completed her order, believing she would only be charged for the shipping of her free trial product. (Id. ¶ 112.) She then received a confirmation email from info@la-pura-skinproducts.com, which stated the order would appear on her credit card statement under three separate merchant accounts: (1) "beautifullyremarkableh," (2) "beautyhealthremarkable," and (3) "skincarehealthybeautygroup." (Id.) The email did not specify the products ordered or the amount to be charged; Plaintiff emailed La Pura's customer service to confirm she would only be charged $4.94 but did not receive a response. (Id. ¶¶ 112–13.) On January 26, 2020, Plaintiff's credit card was charged $88.46 by a merchant account titled "beautifullyremarkableh." (Id. ¶ 116.) On January 27, 2020, Plaintiff's credit card was charged $84.37 by a merchant account titled "beautyhealthremarkable." (Id. ¶ 117.) When Plaintiff discovered the charges, she called La Pura's customer service to obtain a refund; the representative initially refused on the basis that Plaintiff had used the products. (Id. ¶ 118.) Plaintiff ultimately obtained a refund of only $120.97. (Id. ¶ 119.)

## II.    The Alleged Fraudulent Scheme

Plaintiff alleges Defendants' fraudulent scheme operates as follows. Consumers allegedly encounter an advertisement for a "free trial" of a La Pura product via text message

or a third-party website, which "funnels" them to a landing page for the product. (Id. ¶¶ 122–23.) These landing pages are allegedly inaccessible to anyone who does not view the advertisements or are deleted after a few weeks or months to avoid detection. (Id. ¶ 124.) Because of this, Plaintiff states she is unable to provide the specific landing page that she viewed but provides two other known landing pages for La Pura products. (Id.) Plaintiff reached the landing page via a text message but alleges other victims of the scheme viewed "affiliate pages" with fake reviews, celebrity endorsements, and false claims about the effectiveness of the product. (Id. ¶¶ 125–32.) Once on the La Pura landing page, consumers are shown their final order, which allegedly states that all they will pay for their "free trial" product is shipping and handling, and are prompted to enter their credit card information. (Id. ¶¶ 140, 157.) On these pages, Plaintiff alleges that the terms and conditions of purchases are hidden or buried; consumers are not required to agree to the terms to complete the purchase. (Id. ¶¶ 135–40, 153.) The terms of service state that, rather than the product being a free trial for which the consumer need only pay shipping and handling, consumers will be billed $88.46 unless they cancel within fourteen (14) days of their order. (Id. ¶ 139.) Additionally, by making the initial order, consumers have unknowingly signed up for a continuing subscription of La Pura products, for which they will be billed $93.42 every 30 days. (Id.) Plaintiff alleges these hidden terms directly contradict what is displayed on the advertisement, the La Pura landing page, and the final order page, all of which say nothing about signing up for a subscription or the need to cancel within 14 days to avoid being billed. (Id. ¶¶ 140–41.)

After providing their credit card information and completing their purchase, consumers are subsequently billed for an additional $88.46. (Id. ¶ 141.) When consumers seek to dispute the charge with their bank or credit card company, the Defendants allegedly present the investigators with a second website, which Plaintiff terms a "false front" website. (Id. ¶¶ 163–72.) These "false front" websites are visually similar to the landing pages consumers used to make their purchase, but the terms and conditions are clearly stated, thus deceiving the investigators into believing consumers agreed to the full terms of

sale. (Id.) Additionally, the Defendants allegedly create multiple shell companies, each of whom signs up for a unique merchant account; these accounts are then rotated through customer billings with a "load balancing" software to prevent any individual account from being flagged for fraud due to high levels of chargebacks. (Id.)

Plaintiff alleges the named Defendants are involved in this scheme as follows. The La Pura Defendants are the marketers and/or branders of the La Pura products who allegedly operate the hidden landing pages viewed by consumers as well as the false front websites provided to banks and credit card companies. (Id. ¶ 10.) Plaintiff identifies "Total Health Supply TUA, Inc." and "Defendant DL Group, Inc." as the companies behind the merchant accounts that billed her credit card. (Id. ¶¶ 159–62.) The other 60 entities identified as being part of the "La Pura Defendants" share the same registered agent in Sacramento, CA; Plaintiff alleges they are shell entities used to apply for merchant accounts. (Id. ¶¶ 25–88, 159–63.) Plaintiff alleges "Quick Box Fulfillment," which is made up of the Quick Box Defendants, is a fulfillment company that allegedly provides generic "white label" products to the La Pura Defendants, assists with marketing and advertising, distributes the products to consumers, and handles returns when customers complain. (Id. ¶¶ 10, 222–30.) Plaintiff claims that the return address for the La Pura products listed on one of the identified La Pura landing pages, as well as on several of the identified "false front" websites, is the address of Quick Box's fulfillment center in Colorado. (Id. ¶¶ 224–27.) Finally, Plaintiff alleges the Konnektive Defendants make up a customer relationship management ("CRM") software company, who allegedly provides the specialized "load balancing" software to enable the use of multiple merchant accounts. (Id. ¶¶ 10, 298–305.) The load balancing software automatically spreads consumer purchases across dozens of merchant accounts in order to prevent any one merchant account from being shut down due to excessive chargebacks and/or fraud claims, which ensures the fraudulent scheme can continue. (Id. ¶ 218.) Plaintiff alleges the source code on one of the La Pura landing pages demonstrates that its CRM software is from Konnektive. (Id. ¶¶ 300–04.)

### III.   Procedural History

The Court's previous Order on Plaintiff's original complaint granted in part and denied in part the Defendants' motions to dismiss, and granted Plaintiff leave to amend most of her claims. (Doc. No. 88.) Plaintiff's FAC seeks certification of a nationwide class and a California subclass. (Doc. No. 89 ¶¶ 349–62.) She alleges the following causes of action: (1) violation of California's Consumer Legal Remedies Act ("CLRA"); (2) violation of California's False Advertising Law ("FAL"); (3) violation of the unfair and fraudulent prongs of California's Unfair Competition Law ("UCL"); (4) violation of the unlawful prong of California's Unfair Competition Law; (5) civil Racketeer Influenced and Corrupt Organizations ("RICO") Act violations; and (6) violation of various state's consumer protection laws. (Id. ¶¶ 363–908.)

The La Pura Defendants move to dismiss Plaintiff's FAC pursuant to Rule 12(b)(6) for failure to state a claim. (Doc. No. 94.) The Quick Box Defendants move to dismiss Plaintiff's FAC pursuant to: (i) Rule 12(b)(1), for lack of standing under claim-specific state law requirements; (ii) Rule 12(b)(6), for failure to state a claim; and (v) Rule 9(b), for failure to plead fraud claims with sufficient particularity. (Doc. No. 98.)[3] The Konnektive Defendants move to dismiss Plaintiff's FAC pursuant to Rule 12(b)(6) for failure to state a claim. (Doc. No. 99.)[4]

---

[3]     Defendants Adelé, Biggins, and Martell also move to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction. (Id.) The Court already concluded it has personal jurisdiction over Defendants Adelé, Biggins, and Martell in its prior Order. (Doc. No. 88 at 22–25.) Defendants Adelé, Biggins, and Martell did not file a timely motion for reconsideration of personal jurisdiction pursuant to Rule 59(e) or Rule 60 of the Federal Rules of Civil Procedure. See Local Rule 7.1; Taylor v. Knapp, 871 F.2d 803, 805 (9th Cir. 1989); Christopher v. Reaching Fourth Ministries, No. 17-cv-00726-BAS-BLM, 2018 WL 2267186, at *1 (S.D. Cal. May 17, 2018). Nor did they made an argument for why this "extraordinary remedy" should be used in this matter. See Kona Enters., Inc. v. Estate of Bishop, 229 F.3d 877, 890 (9th Cir. 2000). Accordingly, the Court denies Defendants Adelé, Biggins, and Martell's Rule 12(b)(2) motion.

[4]     The Konnektive Defendants also move to strike Plaintiff's FAC because Plaintiff originally neglected to file a redlined copy of its pleading in accordance with Local Rule 15.1(c). (Id. at 1.) Plaintiff has subsequently filed the requisite redlined copy, (Doc. No. 101), thus the Court denies the Konnektive Defendants' motion to strike as moot.

## Discussion

### I.   Legal Standards

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Rule 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." Manzarek v. St. Paul Fire & Marine Ins. Co., 519 F.3d 1025, 1031 (9th Cir. 2008); see Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc., 911 F.2d 242, 245 (9th Cir. 1990) ("It is well-established that questions of fact cannot be resolved or determined on a motion to dismiss for failure to state a claim upon which relief can be granted."). "The standard at this stage of the litigation is not that plaintiff's explanation must be true or even probable. The factual allegations of the complaint need only 'plausibly suggest an entitlement to relief.'" Starr v. Baca, 652 F.3d 1202, 1216–17 (9th Cir. 2011) (citing Iqbal, 556 U.S. at 681). Nonetheless, courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." In re Gilead Scis. Secs. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001)).

"Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil

3:20-cv-01082-H-DEB

Procedure." <u>Khoja v. Orexigen Therapeutics, Inc.</u>, 899 F.3d 988, 998 (9th Cir. 2018) (citing <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 688 (9th Cir. 2001)). A court must normally convert a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment if it "considers evidence outside the pleadings. . . . A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." <u>United States v. Ritchie</u>, 342 F.3d 903, 907–08 (9th Cir. 2003); <u>see</u> <u>In re NVIDIA Corp. Sec. Litig.</u>, 768 F.3d 1046, 1051 (9th Cir. 2014).

Where a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" <u>DeSoto v. Yellow Freight Sys., Inc.</u>, 957 F.2d 655, 658 (9th Cir. 1992) (quoting <u>Schreiber Distrib. Co. v. Serv-Well Furniture Co.</u>, 806 F.2d 1393, 1401 (9th Cir. 1986)). In other words, where leave to amend would be futile, the Court may deny leave to amend. <u>See</u> <u>DeSoto</u>, 957 F.2d at 658.

## II.   Analysis

### A.   Alter Ego Liability

As an initial matter, the La Pura Defendants and the Konnektive Defendants each move to dismiss Plaintiff's claims against them to the extent they are premised under a theory of alter ego liability. (Doc. Nos. 94 at 14; 99 at 21.) "Ordinarily, a corporation is regarded as a legal entity, separate and distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations." <u>Sonora Diamond Corp. v. Superior Court</u>, 99 Cal. Rptr. 2d 824, 836 (Cal. Ct. App. 2000). "The alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests." <u>Gerritsen v. Warner Bros. Entm't Inc.</u>, 116 F. Supp. 3d 1104, 1135–36 (C.D. Cal. 2015) (citing <u>Mesler v. Bragg Management Co.</u>, 702 P.2d 601, 606 (Cal. 1985)). "A corporate identity may be disregarded—the 'corporate veil' pierced—where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation." <u>Sonora</u>

Diamond Corp., 99 Cal. Rptr. 2d at 836 (citing Roman Catholic Archbishop v. Superior Court, 93 Cal. Rptr. 338, 341 (Cal. Ct. App. 1971)). California courts have stated that "[t]he purpose behind the alter ego doctrine is to prevent defendants who are the alter egos of a sham corporation from escaping personal liability for its debts." Hennessey's Tavern, Inc. v. Am. Air Filter Co., 251 Cal. Rptr. 859, 862 (Cal. Ct. App. 1988) (citing Hiehle v. Torrance Millworks, Inc., 272 P.2d 780, 783–84 (Cal. 1954)).

"Generally, alter ego liability is reserved for the parent-subsidiary relationship." Conde v. Sensa, 259 F. Supp. 3d 1064, 1072 (S.D. Cal. 2017) (citing Las Palmas Assocs. v. Las Palmas Ctr. Assocs., 1 Cal. Rptr. 2d 301, 318 (Cal. Ct. App. 1991)). However, California courts have recognized a "single-enterprise rule" where liability can be found between sister or affiliated companies. Conde, 259 F. Supp. 3d at 1072; see Stewart v. Screen Gems-EMI Music, Inc., 81 F. Supp. 3d 938, 961 (N.D. Cal. 2015); City of Dana Point v. New Method Wellness, Inc., 252 Cal. Rptr. 3d 541, 545 (Cal. Ct. App. 2019) ("The [single-enterprise rule] applies where one of the corporations is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct of another corporation." (internal quotations and citations omitted)). Under this rule, "the court [constructs] for purposes of imposing liability an entity unknown to any secretary of state comprising assets and liabilities of two or more legal personalities; endow[s] that entity with the assets of both, and charge[s] it with the liabilities of one or both." Las Palmas Assocs., 1 Cal. Rptr. 2d at 318.

To apply the alter ego doctrine, courts must determine that "(1) such a unity of interest and ownership exists that the personalities of the corporation and individual are no longer separate, and (2) an inequitable result will follow if the acts are treated as those of the corporation alone." Sandoval v. Ali, 34 F. Supp. 3d 1031, 1040 (N.D. Cal. 2014) (citing RRX Indus., Inc. v. Lab–Con, Inc., 772 F.2d 543, 545–46 (9th Cir. 1985)); see Conde, 259 F. Supp. 3d at 1068. To determine whether there is a sufficient unity of interest and ownership to support alter ego liability, courts consider factors like: "commingling of funds, failure to maintain minutes or adequate corporate records, identification of the

1   equitable owners with the domination and control of the two entities, the use of the same

2   office or business locations, the identical equitable ownership of the two entities, the use

3   of a corporation as a mere shell, instrumentality or conduit for a single venture or the

4   business of an individual, and the failure to adequately capitalize a corporation." Pac. Mar.

5   Freight, Inc. v. Foster, No. 10-cv-0578-BTM-BLM, 2010 WL 3339432, at *6 (S.D. Cal.

6   Aug. 24, 2010) (citing Assoc. Vendors, Inc. v. Oakland Meat Co., 26 Cal. Rptr. 806, 813–

7   15 (Cal. Ct. App. 1962)).

8     "Alter ego is an extreme remedy, sparingly used." Sonora Diamond Corp., 99 Cal.

9   Rptr. 2d at 836. Courts look to "all the circumstances to determine whether the doctrine

10  should be applied." Id. "Conclusory allegations of 'alter ego' status are insufficient to state

11  a claim. Rather, a plaintiff must allege specifically both of the elements of alter ego

12  liability, as well as facts supporting each." Sandoval, 34 F. Supp. 3d at 1040 (quoting

13  Neilson v. Union Bank of Cal., N.A., 290 F. Supp. 2d 1101, 1116 (C.D. Cal. 2003)). At the

14  12(b)(6) motion to dismiss stage, "the court must decide whether the plaintiffs' allegations,

15  if true, could support a plausible claim of alter-ego liability." Estate of Miller v. Cty. of

16  Sutter, No. 2:20-cv-00577-KJM-DMC, 2020 WL 6392565, at *8 (E.D. Cal. Oct. 30, 2020)

17  (citing Iqbal, 556 U.S. at 678–79).

18      **1.**  **La Pura Defendants**

19    Plaintiff alleges that the La Pura Defendants do not follow corporate formalities and

20  are liable for one another's actions as alter egos. (Doc. No. 89 ¶ 219.) She alleges that each

21  La Pura Defendant, in addition to unknown John Doe Defendants, is a shell company used

22  to apply for hundreds of merchant accounts and operate hundreds of websites in order to

23  perpetrate an alleged fraudulent scheme. (Id. ¶¶ 206–08.) The shell companies allegedly

24  commingle assets and resources without regard for corporate formalities, for example, by

25  sharing merchant accounts, CRM software, websites, etc. (Id. ¶¶ 219, 417.) In the FAC,

26  Plaintiff refers to a report created by a receiver appointed in a case brought by the Federal

27  Trade Commission, which describes a fraudulent scheme where defendants opened "sales

28  pages" for consumers to view and "bank pages" for financial institutions to view and hired

individuals to act as "straw persons" to apply for thousands of merchant accounts and act as owners of the shell entities. (<u>Id.</u> ¶¶ 213–18.) She alleges the La Pura Defendants operate their scheme the same way, and that a John Doe Defendant has formed these shell companies, hired front people to open merchant accounts in their names, and created associated websites. (<u>Id.</u>) She alleges that the "front people" are not the true owners and executives of the shell companies, but rather that a common John Doe(s) actually runs all of them as a single enterprise. (<u>Id.</u> ¶¶ 89, 219.) She notes that the merchant accounts of two purportedly separate companies – Total Health Supply TUA and DL Group – were listed in the email she received from La Pura. (<u>Id.</u> ¶¶ 112, 159–62.) She notes that many of the websites created by these purportedly separate companies all use variations of the name "La Pura." (<u>Id.</u> ¶ 163, 208, Ex. 2.) Plaintiff alleges that all of the companies use the same registered agent in Sacramento (Elinor Spector), and make their filings in concert during certain periods. (<u>Id.</u> ¶¶ 23–88, 219.) She also alleges that the shell companies are named according to a naming scheme in which the initials of the "front person" are included at the end; for example, Dietary Supplements 8 Leaves TL, Inc. (nominally owned by Tony Le), (<u>id.</u> ¶ 864), Diet Focus MG, Inc. (nominally owned by Maria Garcia), (<u>id.</u> ¶ 865), Health & Body Care TN, Inc. (nominally owned by Tran Ngo), (<u>id.</u> ¶ 867), and Forever Beauty and Balance JL, Inc. (nominally owed by Jennifer Le), (<u>id.</u> ¶ 868). Finally, Plaintiff alleges it would be "inequitable not to treat these entities/individuals as alter egos of one another because the corporate structure is a sham designed to avoid paying taxes, frustrate creditors, avoid document discovery, and hide assets." (<u>Id.</u> ¶ 89.)

The La Pura Defendants summarily argue that Plaintiff's alter ego allegations are conclusory and lack factual detail. (Doc. No. 94 at 13–14.) Plaintiff makes two arguments in rebuttal: (1) because this is their second motion to dismiss, the La Pura Defendants are barred by Rule 12(g)(2) from raising an objection to Plaintiff's alter ego allegations for the

first time,[5] and (2) Plaintiff's alter ego allegations are adequately pled. (Doc. No. 100 at 1–6.) The Court need not decide the Rule 12(g)(2) issue, as the outcome is the same: the Court concludes that Plaintiff has pled sufficient allegations to support a plausible claim of alter ego liability among the La Pura Defendants. At this stage in the proceedings, the Court accepts Plaintiff's allegations of fact as true. See Iqbal, 556 U.S. at 678. Plaintiff's allegations regarding the pooling and sharing of resources between the numerous shell companies, the commonalities in their naming, registered agents, websites, etc., and the nature and structure of the alleged fraudulent scheme are sufficient to give rise to a reasonable inference of such a unity of interest and ownership between the La Pura Defendants that the entities' separate personalities do not in reality exist and that an inequitable result would lie if the Court allowed them to escape liability through the use of their separate forms. See Sandoval, 34 F. Supp. 3d at 1040. As such, the FAC's allegations are sufficient to support a plausible claim of alter ego liability under the single-enterprise rule against the La Pura Defendants. See Estate of Miller, 2020 WL 6392565, at *8; Las Palmas Assocs., 235 Cal. App. 3d at 1249.

### 2.   Konnektive Defendants

Plaintiff alleges that Defendants Konnektive Corporation, Konnektive LLC, Konnektive Rewards LLC, Kathryn Martorano, and Matthew Martorano are liable for one another's actions as alter egos. (Doc. No. 89 ¶ 341.) In its prior Order, the Court concluded that Plaintiff had sufficiently alleged that Defendants Konnektive Corporation, Konnektive LLC, Konnektive Rewards LLC, and Matthew Martorano were alter egos for purposes of personal jurisdiction. (Doc. No. 88 at 28–29.) The FAC alleges that the Konnektive Defendants do not follow corporate formalities, that all of the entities operate primarily out of Georgia, and that all of the entities commingle assets and resources. (Doc. No. 89 ¶ 341.)

---

[5]   Federal Rule of Civil Procedure 12(g)(2) provides: "Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Plaintiff's alter ego allegations regarding the La Pura Defendants remain unchanged from the original complaint to the FAC. (Compare Doc. No. 1 ¶ 221 to Doc. No. 89 ¶ 219.)

The FAC refers to a verified complaint from a lawsuit filed in Georgia state court in 2018 against Konnektive Corporation, Konnektive LLC, Konnektive Rewards LLC, and Matthew Martorano by Jared Hall, the former Chief Technical Officer of Konnektive Corporation. (Id.) The Georgia verified complaint alleges, among other things, that the Konnektive companies use employees across their corporate entities without regard to which company is actually formally employing them, that the vast majority of employees actually reside in Georgia, that the corporate entities improperly commingle money and assets between them, that Matthew Martorano used corporate assets for his personal expenses, and that the corporate structure of the Konnektive Defendants is intended to avoid paying taxes. (Id.) Plaintiff alleges that all of the Georgia complaint's allegations are true and sufficient to support such a unity of interest and ownership between Konnektive Corporation, Konnektive LLC, Konnektive Rewards LLC, and Matthew Martorano that the entities' separate personalities do not in reality exist and that an inequitable result would lie if the Court allowed them to escape liability through the use of their separate forms. See Sandoval, 34 F. Supp. 3d at 1040. The Court agrees, and notes that the Konnektive Defendants' motion to dismiss primarily focuses on the FAC's alter ego allegations against Kathryn Martorano, who was not named in the Georgia complaint. (Doc. No. 99 at 21–22.) The FAC alleges Kathryn Martorano "has a role controlling operations for all of the Konnektive entities despite them being nominally separate, and operates them from Roswell, Georgia as a single entity along with her husband." (Doc. No. 89 ¶ 341.) Because alter ego liability is often a factual issue better suited to summary judgment, the Court concludes these allegations are sufficient to survive the motion to dismiss. As such, the Court concludes that Plaintiff has pled sufficient facts to state a plausible theory of alter ego liability against Defendants Konnektive Corporation, Konnektive LLC, Konnektive Rewards LLC, Kathryn Martorano, and Matthew Martorano. See Conde, 259 F. Supp. 3d at 1071–72; Sandoval, 34 F. Supp. 3d at 1040.

3:20-cv-01082-H-DEB

## B.     Plaintiff's CLRA, FAL, and UCL Claims

The Consumer Legal Remedies Act provides a cause of action to consumers who suffer "any damage" as a result of "unfair methods of competition and unfair or deceptive acts or practices." Cal. Civ. Code §§ 1770(a), 1780(a).[6] The CLRA is intended to "be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices." Cal. Civ. Code § 1760. California's False Advertising Law prohibits any "unfair, deceptive, untrue or misleading advertising." Williams v. Gerber Prod. Co., 552 F.3d 934, 938 (9th Cir. 2008) (quoting Cal. Bus. & Prof. Code § 17500). California's Unfair Competition Law generally prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. "[A] plaintiff may proceed under the UCL on three possible theories. First, 'unlawful' conduct that violates another law is independently actionable under Section 17200. Alternatively, a plaintiff may plead the defendants' conduct is 'unfair' within the meaning of the several standards developed by the courts. Finally, a plaintiff may challenge 'fraudulent' conduct by showing that 'members of the public are likely to be deceived' by the challenged business acts or practices." Stewart, 81 F. Supp. 3d at 967 (internal citations omitted). "Because the statute is written in the disjunctive, it is violated where a defendant's act or practice violates any of the foregoing prongs." Davis v. HSBC Bank Nevada, N.A., 691 F.3d 1152, 1168 (9th Cir. 2012). Additionally, "[a]ny violation of the [FAL] . . . necessarily violates the [UCL]."

---

[6]     Plaintiff alleges Defendants violated several CLRA provisions: § 1770(a)(2) ("Misrepresenting the source, sponsorship, approval, or certification of goods or services."); § 1770(a)(3) ("Misrepresenting the affiliation, connection, or association with, or certification by, another."); § 1770(a)(5) ("Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have.); § 1770(a)(7) ("Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."); § 1770(a)(9) ("Advertising goods or services with intent not to sell them as advertised."); § 1770(a)(13) ("Making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions."). (Doc. No. 89 ¶ 366.)

Moore v. Mars Petcare US, Inc., 966 F.3d 1007, 1016 (9th Cir. 2020) (internal quotation marks omitted) (citing Gerber Prod., 552 F.3d at 938).

"Whether a business practice is deceptive or misleading 'under these California statutes [CLRA, FAL, and UCL] [is] governed by the 'reasonable consumer' test.'" Moore, 966 F.3d at 1017 (citing Gerber Prod., 552 F.3d at 938). Under this test, "conduct is deceptive or misleading if it is likely to deceive an ordinary consumer." Peviani v. Nat. Balance, Inc., 774 F. Supp. 2d 1066, 1070 (S.D. Cal. 2011) (citing Gerber Prod., 552 F.3d at 938). "The California Supreme Court has recognized 'that these laws prohibit not only advertising which is false, but also advertising which . . . is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'" Gerber Prod., 552 F.3d at 938 (quoting Kasky v. Nike, Inc., 45 P.3d 243, 250 (Cal. 2002)).

To satisfy the standing requirements of the UCL and FAL, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that that economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim." Van Patten v. Vertical Fitness Grp., LLC, 847 F.3d 1037, 1048 (9th Cir. 2017) (quoting Kwikset Corp. v. Superior Court, 246 P.3d 877, 885 (Cal. 2011)). Accordingly, "a plaintiff must allege actual reliance in order to have standing to pursue UCL and FAL claims." Moore, 966 F.3d at 1020 (citing Hinojos v. Kohl's Corp., 718 F.3d 1098, 1103–04 (9th Cir. 2013)); see Peviani, 774 F. Supp. 2d at 1070; In re Ferrero Litig., 794 F. Supp. 2d 1107, 1111 (S.D. Cal. 2011). "[A]ny plaintiff who has standing under the UCL's and FAL's 'lost money or property' requirement will, a fortiori, have suffered 'any damage' for purposes of establishing CLRA standing." Moore, 966 F.3d at 1020 (citing Hinojos, 718 F.3d at 1108).

Finally, Rule 9(b)'s heightened pleading standard applies to UCL, FAL, and CLRA causes of actions where, as here, they are "grounded in fraud" or "sound in fraud." See Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009); Elias v. Hewlett-Packard Co., 903 F. Supp. 2d 843, 853 (N.D. Cal. 2012). "Rule 9(b) demands that the circumstances

constituting the alleged fraud 'be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.'" <u>Kearns</u>, 567 F.3d at 1124 (citing <u>Bly–Magee v. California</u>, 236 F.3d 1014, 1019 (9th Cir. 2001)). There is substantial overlap in the requirements of the CLRA, UCL, and FAL; as such, when the cause of action under each is premised on the same allegedly misleading acts, a plaintiff who plausibly and with sufficient particularity pleads (1) misleading or deceptive advertising, as judged by the reasonable consumer test, (2) actual reliance, and (3) economic injury has likely stated a claim under all three statutes, assuming other statute-specific requirements are met. <u>See</u> <u>Moore</u>, 966 F.3d at 1016 n.7.

In its prior Order, the Court concluded Plaintiff's complaint had stated claims for violations of the CLRA, FAL, and the unfair, fraudulent, and unlawful prongs of the UCL. (Doc. No. 88 at 54–60.) Plaintiff provided multiple examples of the misleading and deceptive advertising she viewed throughout her experience in the La Pura "sales funnel." (<u>Id.</u>; <u>see</u> Doc. No. 89 ¶¶ 125, 127–31, 134–37, 140, 142, 144, 147–150, 152–54.) She identified misrepresentations and omissions regarding reviews and endorsements of the La Pura products, results consumers can expect by using the products, the limited supply of the product, the "free trial" nature of the product, and the existence of "false front" websites and load balancing software. (<u>Id.</u>; <u>see</u> Doc. No. 89 ¶¶ 183–204.) Plaintiff alleged how the statements found in advertisements and on La Pura's landing pages would be false or misleading to a reasonable consumer: the pictured and quoted celebrities have not in fact endorsed the La Pura products in question, there is not actually a limited supply of La Pura remaining, the product does not produce the skin effects it claims, and contrary to the claim that consumers will only "pay a small shipping fee," they actually are charged the full price of the product and signed up for a monthly subscription of the product. (<u>Id.</u>; <u>see</u> Doc. No. 89 ¶¶ 126–30, 140–41, 145–49, 152, 156–57.) She also alleged how the failure to disclose to customers that they are viewing a different website than the one that would be shown to their financial institution should they seek a chargeback or investigation, or to disclose that the charges to their credit card would be spread out across different rotated merchant

accounts in violation of credit card terms and conditions would be misleading and deceptive to a reasonable consumer. (Id.; see Doc. No. 89 ¶¶ 168–73, 195–204.) She alleged that she provided her credit card information and completed her order for a "free trial" of a La Pura skincare product in reliance on the statements published on these advertisements and website. (Id.; see Doc. No. 89 ¶¶ 13, 110–12, 132, 183, 186, 191, 194.) She alleged she suffered an economic injury in that she was overcharged for the products, never received a full refund, and would not have completed her purchase in the first place if not for the misrepresentations about the endorsements, effectiveness, price, etc. of the products, and the omissions about the subscription service, false front websites, and other details of the fraudulent scheme. (Id.; see Doc. No. 89 ¶¶ 191, 194, 461–62, 555.) She alleged that all consumers who purchased a product from the La Pura website – including her – were subjected to similar or identical representations, and reasonably relied on them in making their purchase decisions. (Id.; see Doc. No. 89 ¶¶ 132, 183, 186, 191, 194, 368, 461, 555.)

The Court concluded these allegations were sufficient to place Defendants on notice of the circumstances constituting the alleged fraudulent scheme, and to plausibly state claims under the CLRA, FAL, and UCL. (Id.) The Court declined to dismiss Plaintiff's CLRA, FAL, and UCL claims, and gave Plaintiff leave to amend her complaint to re-plead her theories of indirect liability (aiding and abetting and conspiracy). (Id. at 46, 59.) Thus, the issue of whether Plaintiff's allegations are sufficient to state claims under the CLRA, FAL, and UCL and to meet Rule 9(b)'s standard has already been decided by this Court. The remaining issue for the Court to decide is whether, under a direct or indirect theory of liability, Plaintiff's FAC states a claim for violations of the CLRA, FAL, and UCL against any or all of the Defendants.

### 1.    La Pura Defendants

As an initial matter, the Court notes that the La Pura Defendants separate themselves into "Total Health Supply TUA, Inc." and the "Moving Defendants" in their motion to dismiss. (Doc. No. 94 at 1–2.) While the Moving Defendants move to dismiss Plaintiff's

claims against them for (1) conspiracy to violate and (2) aiding and abetting violations of the CLRA, FAL, and UCL, Total Health Supply TUA does not move to dismiss any of the CLRA, FAL, and UCL claims against it. (Id. at 2.) The La Pura Defendants presumably make this distinction because Plaintiff specifically identifies Defendant Total Health Supply TUA as the entity that billed her credit card using the merchant accounts "beautifullyremarkableh" and "beautyhealthremarkable." (Doc. No. 89 ¶¶ 116–17, 160–61.) However, as Plaintiff notes, the FAC also identifies Defendant DL Group, Inc. as being the owner of the third merchant account listed in the confirmation email she received from La Pura, "skincarehealthybeautygroup," yet DL Group is grouped as part of the "Moving Defendants" in the motion to dismiss. (Id. ¶¶ 112, 162.) The Court need not address the issue because it has already concluded that the FAC sufficiently states a claim for alter ego liability against the La Pura Defendants. Thus, the La Pura Defendants' distinction between Total Health Supply TUA and the "Moving Defendants" is irrelevant; Plaintiff has sufficiently and plausibly alleged a basis by which to hold the "Moving Defendants" liable for the actions of Total Health Supply TUA. As such, the Court will assess whether Plaintiff has stated claims under the CLRA, FAL, and UCL against the La Pura Defendants as a group.

The Court concludes that Plaintiff has stated a claim for the La Pura Defendants' direct liability under the CLRA, FAL, and UCL. Plaintiff alleges the La Pura Defendants created the advertisements containing the false statements about the price, endorsements, limited supply, effectiveness, and free-trial nature of the La Pura products. (Id. ¶¶ 122–57, 183–204, 369, 465, 559.) She alleges they created and operated both the landing pages viewed by consumers, such as try-la-puraskincare.com/lm/ and try-la-pura-skincare.com/l3/, as well as the "false fronts" containing full disclosures shown to financial institutions. (Id. ¶¶ 158–82, 207–16, 369, 465, 559.) She alleges they have opened hundreds of merchant accounts and spread charges to different consumers across the merchant accounts through the use of a load balancing software in order to avoid detection by financial institutions. (Id. ¶¶ 158–82, 217–18, 369, 465, 559.) She alleges the La Pura

Defendants, specifically Defendant Total Health Supply TUA, billed her credit card for $172.83, despite the representation that she would only be billed $4.94 for shipping, and the failure to disclose she would be signed up for a recurring subscription service by placing her order. (Id. ¶¶ 110–11, 116–17, 160–61.) These allegations are certainly sufficient to state a plausible claim for relief against the La Pura Defendants under the CLRA, FAL, and UCL.

The La Pura Defendants claim that Plaintiff has not alleged that the "Moving Defendants" directly violated the CLRA, UCL, or FAL, and thus focus their arguments primarily on the allegations regarding indirect theories of liability. (Doc. No. 94 at 6, 9.) This argument fails for two reasons: (1) it is incorrect, as the FAC alleges all of the La Pura Defendants are directly liable under the CLRA, UCL, and FAL, (Doc. No. 89 ¶¶ 369, 465, 559, 729), and (2) the Court has already dispensed with the La Pura Defendants' attempt to distinguish between Defendant Total Health Supply TUA and the rest of the alleged shell companies. The remainder of the La Pura Defendants' motion can essentially be boiled down to a challenge to the plausibility of Plaintiff's allegations, a suggestion that their conduct can be innocently explained, and a characterization of Plaintiff's allegations as "conclusory." (Doc. No. 94 at 6, 9.) But Plaintiff has pled numerous factual details to support her allegations that the La Pura Defendants "are shell companies; that they use their false front websites to obtain merchant accounts; that they use their merchant accounts to distribute consumer charges to reduce chargeback levels; and that they hide their identities, use each other's services as a single unit, and do not engage in legitimate business." (Id. at 9.) In sum, the Court denies the La Pura Defendants' motion to dismiss Plaintiff's CLRA, UCL, and FAL claims against them.[7]

---

[7]      Plaintiff alleges the La Pura Defendants violated several state and federal laws and regulations as part of her UCL "unlawful" prong claim. (Doc. No. 89 ¶¶ 637–728.) "An action brought under the 'unlawful' prong of [the UCL] 'borrows' violations of other laws when committed pursuant to business activity." Loomis v. Slendertone Distribution, Inc., 420 F. Supp. 3d 1046, 1085 (S.D. Cal. 2019). "Violation of almost any federal, state, or local law may serve as the basis for a UCL claim," including the CLRA and FAL. Plascencia v. Lending 1st Mortg., 583 F. Supp. 2d 1090, 1098 (N.D. Cal. 2008). Because the Court concludes that Plaintiff has stated claims under the CLRA and FAL against the La Pura

1

### 2.      Quick Box Defendants

2       Plaintiff alleges that the Quick Box Defendants are directly liable for violations of

3   the CLRA, FAL, and UCL, (Doc. No. 89 ¶¶ 370, 466, 560, 730), aided and abetted the La

4   Pura Defendants' violations of the CLRA, FAL, and UCL, (id. ¶¶ 375–94, 471–89, 566–

5   84, 736–54), and conspired with the La Pura Defendants to violate the CLRA, FAL, and

6   UCL, (id. ¶¶ 420–31, 515–26, 610–21, 780–91). The Quick Box Defendants argue Plaintiff

7   has not stated a claim against any of them, under any of the theories, under any of the

8   statutes. (Doc. No. 98 at 7–14.) For the reasons below, the Court concludes that Plaintiff

9   has stated plausible claims for relief under the CLRA, FAL, and UCL against each of the

10  Quick Box Defendants under an aiding and abetting theory of liability.

11      In order to plead a claim for aiding and abetting an intentional tort, a plaintiff "must

12  plead facts that make it plausible that defendants either '(a) [knew] the other's conduct

13  constitute[d] a breach of duty and [gave] substantial assistance or encouragement to the

14  other to so act or (b) [gave] substantial assistance to the other in accomplishing a tortious

15  result and the person's own conduct, separately considered, constitute[d] a breach of duty

16  to the third person.'" Bradshaw v. SLM Corp., 652 F. App'x 593, 594 (9th Cir. 2016)

17  (citing Casey v. U.S. Bank Nat'l Ass'n, 26 Cal. Rptr. 3d 401, 405 (Cal. Ct. App. 2005));

18  see Decarlo v. Costco Wholesale Corp., No. 14cv00202 JAH-BLM, 2020 WL 1332539, at

19  *5 (S.D. Cal. Mar. 23, 2020) ("Liability may be imposed on those who aid and abet

20  another's violation of the UCL if the individual knows the other's conduct constitutes a

21  violation and gives substantial assistance or encouragement to the other to so act."").

22  Plaintiff pleads both theories of aiding and abetting against the Quick Box Defendants; the

23  Court focuses its analysis on the first theory.

24      The first element, knowledge, requires a plaintiff to "plead sufficient facts to permit

25  a 'reasonable inference' that [the defendant] knew of the 'specific wrongful act[s]' of fraud

26

27

28  Defendants, it need not address the other alleged grounds for violations of the "unlawful" prong of the
    UCL at this time.

by the [principal(s)] at the relevant time." <u>Bradshaw</u>, 652 F. App'x at 594; <u>see</u> <u>Casey</u>, 26 Cal. Rptr. 3d at 407, 411 (holding that the complaint must allege the defendant's "actual knowledge of the specific primary wrong the defendant substantially assisted" to adequately plead aiding and abetting fraud). "General allegations that [a defendant] knew that [the principal] engaged 'in a criminal and wrongful enterprise' are 'too generic to satisfy the requirements of actual knowledge of a specific primary violation' under California law, nor do conclusory allegations of 'actual knowledge' suffice." <u>Id.</u> (citing <u>Casey</u>, 26 Cal. Rptr. 3d at 412). Under Rule 9(b), while fraud must be pled with specificity, "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. Pro. 9(b). But while "this obviates the necessity of pleading detailed facts supporting allegations of knowledge, it does not relieve a pleader of the burden of alleging the nature of the knowledge a defendant purportedly possessed. In the case of an aider and abettor under California law, this must be actual knowledge of the primary violation." <u>Neilson</u>, 290 F. Supp. 2d at 1119 (citing <u>Howard v. Superior Court</u>, 3 Cal. Rptr. 2d 575, 576–77 (Cal. Ct. App. 1992)). Courts have found that a defendant's "decision to ignore suspicious activity or red flags is sufficient to demonstrate actual knowledge" for aiding and abetting liability. <u>In re Woodbridge Invs. Litig.</u>, No. CV 18-103-DMG (MRWX), 2020 WL 4529739, at *7 (C.D. Cal. Aug. 5, 2020); <u>see</u> <u>In re First All. Mortg. Co.</u>, 471 F.3d 977, 999 (9th Cir. 2006) (noting that coming "upon red flags which were seemingly ignored was enough to establish actual knowledge under the California aiding and abetting standard"). Courts have also considered allegations concerning a defendant's knowledge and familiarity with the structure and operation of an alleged fraudulent scheme to be relevant to the actual knowledge inquiry. <u>See</u> <u>Gonzales v. Lloyds TSB Bank, PLC</u>, 532 F. Supp. 2d 1200, 1208 (C.D. Cal. 2006) ("In further support of their allegation that Defendant had knowledge of the Ponzi scheme, Plaintiffs allege that Defendant knew the hallmark characteristics of a Ponzi scheme, and identified these characteristics in the Midland Entities' accounts."). The second element, substantial assistance, "requires that the defendant's actions be a 'substantial factor' in causing the

plaintiff's injury." <u>Facebook, Inc. v. MaxBounty, Inc.</u>, 274 F.R.D. 279, 285 (N.D. Cal. 2011) (quoting <u>Impac Warehouse Lending Group v. Credit Suisse First Boston LLC</u>, 270 Fed. Appx. 570, 572 (9th Cir. 2008)). "[O]rdinary business transactions" can satisfy the substantial assistance element of an aiding and abetting claim "if the [defendant] actually knew those transactions were assisting the [principal] in committing a specific tort. Knowledge is the crucial element." <u>In re First All. Mortg. Co.</u>, 471 F.3d at 993 (quoting <u>Casey</u>, 26 Cal. Rptr. 3d at 406).

Plaintiff alleges Quick Box, LLC had actual knowledge of the CLRA, FAL, and UCL violations involving the La Pura products. (Doc. No. 89 ¶ 377.)[8] Plaintiff alleges Quick Box, LLC knew of the La Pura Defendants' violations of the CLRA, FAL, and UCL because it managed returns, handled customer complaints, and processed refunds and chargebacks for the La Pura products. (<u>Id.</u> ¶¶ 266–69, 375.) Plaintiff alleges these activities necessitated knowledge of the La Pura Defendants' tortious conduct, as the complaints would detail the nature of the wrongful activity, i.e., that customers were being overcharged for and shipped products they never ordered, and Quick Box, LLC seemingly ignored those red flags. <u>Id.</u>; <u>see</u> <u>In re First All. Mortg. Co.</u>, 471 F.3d at 999. Additionally, Plaintiff alleges Quick Box, LLC knew about the misleading and deceptive advertising employed on the La Pura websites because it allegedly helped write it. (<u>Id.</u> ¶¶ 242–54, 377–78.) She alleges Quick Box, LLC assists its clients with advertising and marketing materials for the products it ships, such as by designing product labels and drafting proposed advertising copy for clients to adapt and use. (<u>Id.</u>) She alleges that product sheets and advertising copy written by Quick Box, LLC served as the basis for the product descriptions and advertisements used on the La Pura website. (<u>Id.</u>) She alleges the claims made in Quick Box, LLC's advertising copy and ultimately used on the La Pura website, such as that the

---

[8]     Plaintiff alleges the same conduct gives rise to aiding and abetting liability under all three statutes, and as a result pleads specific allegations in her CLRA cause of action, and then incorporates those facts and allegations by reference in her FAL and UCL causes of action. (<u>See, e.g.</u>, Doc. No. 89 ¶ 472.) As such, the Court cites to the allegations in the CLRA cause of action with the understanding they are applicable to the FAL and UCL causes of action as well.

product reduces the appearance of fine lines and wrinkles, are false. (Id. ¶¶ 145, 242–54.)

Finally, Plaintiff alleges Quick Box, LLC has an extensive history in helping run "free trial scams," and has in several ways structured its business model around supporting clients like the La Pura Defendants. (Id. ¶¶ 375–76.) She alleges Quick Box, LLC has been sued previously over its shipping and fulfillment services for another client running a "free trial scam" similar to the one alleged here: customers accepted online offers for purportedly free samples, were told they would only pay a small shipping fee, and ultimately were charged for and sent hundreds of dollars of unwanted products. (Id. ¶¶ 375, 231–34.) She alleges Quick Box, LLC merged with a company called Private Label Campaigns ("PLC") in July 2017, and incorporated several aspects of its operations into its own business, including designing free trial offers, running advertising campaigns, maintaining an affiliate network, maintaining a database of prior customers, assisting in merchant processing, obtaining media funding for advertising, creating websites, and writing advertising copy for its clients. (Id. ¶ 376.)[9] She alleges that because of its extensive experience and familiarity with scams of this nature and its broad involvement in its clients' businesses, Quick Box, LLC had actual knowledge of the La Pura Defendants' misleading and deceptive conduct, and in fact sought out companies engaging in such conduct as prospective clients. (Id. ¶¶ 265, 376.)

---

[9]     The Quick Box Defendants deny that Private Label Campaigns merged with Quick Box, LLC and submit a declaration from James Martell to support their denial. (Doc. No. 98-3 Martell Decl. ¶ 2.) But the Court cannot consider extraneous declarations on a Rule 12(b)(6) motion to dismiss unless an exception applies, which it does not. See Lee, 250 F.3d at 688–89. They also ask the Court to take judicial notice of PLC's statement of dissolution that was filed with the Colorado Secretary of State. (Doc. No. 112 at 1 n.1). The Court denies this request, as it does not consider the document to be relevant to the issue of whether PLC merged with Quick Box, LLC; PLC's purported legal dissolution does not prove that its business, employees, etc. were not integrated with another company. Plaintiff points to a LinkedIn profile of a former PLC employee who now works for Quick Box that states that PLC "merged with QuickBox." (Doc. No. 89 ¶ 289.) Plaintiff also notes that in July 2017, the alleged time of the merger, PLC's website referred to "our 100,000 square-foot fulfillment center in Denver": Plaintiff alleges the website was referring to Quick Box, LLC's Denver-based fulfillment center. (Id. ¶ 376.) These factual allegations, which the Court takes as true at the motion to dismiss stage, are sufficient to support a reasonable inference that Quick Box, LLC merged with PLC, and in doing so adopted aspects of the PLC business that were then used for clients such as the La Pura Defendants.

As for the individual Quick Box Defendants, Plaintiff alleges Stephen Adelé, Chad Biggins, and James Martell had actual knowledge of the La Pura Defendants' CLRA, FAL, and UCL violations because they supervised and controlled Quick Box, LLC's activities, and were involved in the creation of the La Pura products, websites, and marketing materials. (Id. ¶¶ 382, 387, 392.) She alleges Adelé, Biggins, and Martell each had prior experience running or participating in free trial scams, knew the elements and hallmark characteristics of such schemes, and knew the La Pura Defendants were operating such a scheme. Id. ¶¶ 381, 386, 391; see Gonzales, 532 F. Supp. 2d at 1208. The Court concludes these allegations are sufficient to state a cause of action against the Quick Box Defendants. See Bradshaw, 652 F. App'x at 594. Defendants' arguments as to knowledge are better suited to a motion for summary judgment when the record is more fully developed.

For the second element, Plaintiff alleges Quick Box, LLC gave substantial assistance and encouragement to the La Pura Defendants in numerous ways, such as by: writing and providing advertising copy and product sheets to be used in La Pura advertisements and on the La Pura websites; handling customer returns, complaints, and refunds; providing software integration and other website-related services; providing advice on how to market the La Pura products and generally run the alleged free trial scam, based on its past experiences with similar schemes; and continuously shipping the La Pura products to consumers like Plaintiff. (Doc. No. 89 ¶ 378.) Plaintiff alleges Stephen Adelé substantially assisted the La Pura Defendants by directly participating, controlling, and supervising Quick Box, LLC's interactions with and services provided to the La Pura Defendants. (Id. ¶¶ 380, 383.) Plaintiff alleges Chad Biggins substantially assisted the La Pura Defendants by providing advice on how to market and run the free trial scam based on his past experience and creating the sample advertising copy and marketing language. (Id. ¶¶ 385, 388.) Finally, Plaintiff alleges James Martell substantially assisted the La Pura Defendants by supervising and operating the alleged "turn-key" free trial scam aspects of Quick Box, LLC's business inherited from his company PLC, and providing advice on how to purchase affiliate advertising, manage advertising campaigns, and generally run the free trial scam

based on his past experience. (Id. ¶¶ 390, 393.) All three individuals are also alleged to have set Quick Box, LLC's policies and supervised the activities and services that are alleged to constitute its substantial assistance of the La Pura Defendants. (Id. ¶¶ 383, 388, 393.) The Court concludes these allegations sufficiently plead that the Quick Box Defendants' actions were a substantial factor in causing Plaintiff's injury. See Facebook, Inc., 274 F.R.D. at 285.

The Quick Box Defendants contend that at most the FAC's allegations reflect that they "did not take action to stop the La Pura Defendants' alleged scam," which would not constitute substantial assistance. (Doc. No. 98 at 11.) The Court disagrees with this characterization; Plaintiff's allegations demonstrate numerous affirmative actions undertaken by the Quick Box Defendants in assistance of the La Pura scam. They also argue that because they shipped Plaintiff the products after she had already submitted her credit card in reliance on the deceptive and misleading advertising, their actions cannot have been a substantial factor in causing her injury. (Id.) This argument fails for several reasons. Plaintiff correctly notes that the Quick Box Defendants are alleged to have performed acts of substantial assistance prior to the actual transaction, such as by writing the allegedly misleading advertising copy and providing marketing and operating advice. (Doc. No. 89 ¶ 378.) Furthermore, Plaintiff plausibly alleges that the actual act of shipping products constituted substantial assistance by helping to avoid detection of the fraudulent scheme. (Id.) If consumers never received a product at all, it would be more difficult for Defendants to argue to credit card companies investigating chargebacks that consumers had willingly signed up to be charged monthly for zero products. Whereas if consumers did receive actual products, the false explanation given to credit card companies, supported by the "false front" websites with clearly disclosed terms and conditions, would be much more believable. The Quick Box Defendants also argue that they cannot have provided advice to the La Pura Defendants on the marketing of the La Pura products and on how to run the scam because they "did not even interact" with the La Pura Defendants. (Doc. No. 98 at 5–6.) This argument is based on declarations submitted by Defendants Adelé,

Biggins, and Martell with their motion to dismiss. (Doc. Nos. 98-1, 98-2, 98-3.) Because the declarations were not attached to the complaint, are not referenced in the complaint, and are not properly subject to judicial notice, the Court declines to consider them. Defendants' arguments are better suited to summary judgment when the record is more fully developed.

The Quick Box Defendants make a number of other arguments as to why the Plaintiff has purportedly failed to state a claim against them under the CLRA, FAL, and UCL, all of which are unavailing. First, citing to <u>Levitt v. Yelp!</u>, they argue Plaintiff is using general allegations about past misconduct by others to support her claims, and urge the Court to reject Plaintiff's purported unreasonable inferences and strained theory of liability. (Doc. No. 98 at 7–8 (citing 765 F.3d 1123 (9th Cir. 2014).) Plaintiff notes that the alleged past misconduct is not by "others," but by 2Chads Fulfillment, which she alleges Quick Box, LLC was named formerly, and by the individual Defendants themselves. (Doc. No. 106 at 2–3.) She argues that their reading of <u>Levitt</u> is incorrect, and that it is perfectly acceptable to use allegations regarding past misconduct as the basis for inferences that the same misconduct has continued into the future. (<u>Id.</u> (citing <u>Nat'l Council of La Raza v. Cegavske</u>, 800 F.3d 1032, 1043–44 (9th Cir. 2015).) The Court agrees with Plaintiff, and does not consider <u>Levitt</u> to be analogous to the present case. Next, the Quick Box Defendants argue Plaintiff lacks standing to sue them for direct violations of the CLRA, FAL, and UCL because she cannot plead she actually relied on or suffered an injury as a result of their deceptive or misleading conduct. (Doc. No. 98 at 8–9.) Because the Court has already concluded Plaintiff adequately pled the reliance and injury elements of her CLRA, FAL, and UCL claims, and concludes Plaintiff has stated a claim against the Quick Box Defendants under an aiding and abetting theory, this argument is not persuasive to the Court. <u>See</u> <u>Casey</u>, 26 Cal. Rptr. 3d at 406–07. The same can be said for the Quick Box Defendants' arguments regarding the CLRA's requirement for a transaction and the FAL and UCL's requirements regarding restitution. (Doc. No. 98 at 9.) Defendants' arguments regarding Plaintiff's theory of direct liability against them are better suited to summary

judgment when the record is more fully developed.

In sum, the Court concludes the FAC's allegations are sufficient to state a claim against the Quick Box Defendants for violations of the CLRA, FAL, and UCL under an aiding and abetting theory of liability. As such, the Court denies Defendants Quick Box, LLC, Stephen Adelé, Chad Biggins, and James Martell's motion to dismiss Plaintiff's CLRA, UCL, and FAL claims against them.[10]

### 3. Konnektive Defendants

Plaintiff alleges that the Konnektive Defendants aided and abetted the La Pura Defendants' violations of the CLRA, FAL, and UCL, (Doc. No. 89 ¶¶ 395–414, 490–509, 585–604, 755–74), and conspired with the La Pura Defendants to violate the CLRA, FAL, and UCL, (id. ¶¶ 432–46, 527–41, 622–36, 792–806). She also alleges Defendants Konnektive LLC, Konnektive Corporation, Matthew Martorano, and Kathryn Martorano are directly liable for violations of the UCL. (Id. ¶¶ 561, 731.) The Konnektive Defendants argue Plaintiff has not stated a claim against any of them, under any of the theories, under any of the statutes. (Doc. No. 99 at 17–21.) For the reasons below, the Court concludes that Plaintiff has stated plausible claims for relief under the CLRA, FAL, and UCL against each of the Konnektive Defendants under an aiding and abetting theory of liability. The Court also again focuses its analysis on the first theory of aiding and abetting, which requires Plaintiff to sufficiently plead (1) actual knowledge and (2) substantial assistance. See Bradshaw, 652 F. App'x at 594.

Plaintiff alleges the Konnektive Defendants had actual knowledge of the CLRA, FAL, and UCL violations involving the La Pura products. (Doc. No. 89 ¶¶ 395, 399, 403, 407, 411.)[11] She alleges they had prior experience helping other clients run free trial scams,

---

[10]    Plaintiff alleges the Quick Box Defendants violated several state and federal laws and regulations as part of her UCL "unlawful" prong claim. (Id. ¶¶ 637–728.) Because the Court concludes that Plaintiff has stated claims under the CLRA and FAL against the Quick Box Defendants, it does not need to address the other alleged grounds for violations of the "unlawful" prong of the UCL at this time.

[11]    As with the Quick Box Defendants, Plaintiff alleges the same conduct gives rise to aiding and abetting liability under all three statutes, and as a result pleads specific allegations in her CLRA cause of

knew the elements and hallmark characteristics of such schemes, and knew the La Pura Defendants were operating such a scheme. Id. ¶¶ 317–24, 395, 399, 403, 407, 411; see Gonzales, 532 F. Supp. 2d at 1208. She alleges the design, implementation, and utilization of the Konnektive load balancing software necessitated the Konnektive Defendants' knowledge of the entire La Pura scheme. (Id. ¶¶ 309–10, 395, 399, 403, 407, 411.) She alleges they knew their software was designed and being used for rotating merchant accounts to avoid detection of a scheme to defraud consumers, and knew how the rest of the La Pura scheme operated. (Id.) She alleges the Konnektive Defendants provided coaching services to the La Pura Defendants on how to apply for, manage, and rotate merchant accounts, as well as designing and implementing advertisements, and specifically alleges they participated in a months-long onboarding process with the La Pura Defendants. (Id.) The Court concludes these allegations are sufficient to state a cause of action against the Konnektive Defendants. See Bradshaw, 652 F. App'x at 594.

For the second element, Plaintiff alleges the Konnektive Defendants gave substantial assistance and encouragement to the La Pura Defendants in numerous ways, such as by: advising the La Pura Defendants on how to use the Konnektive software in their scam and coaching them on how to operate the scam generally; licensing, providing access to, and helping operate the Konnektive load balancing software functionality; processing bank and credit card transactions; and advising them on how to apply for, manage, and use multiple merchant accounts. (Doc. No. 89 ¶¶ 326–40, 397, 401, 405, 409, 413.) Plaintiff alleges that her injuries would not have occurred if not for these activities, as the merchant accounts would have been flagged for fraud and the scam detected. (Id. ¶¶ 397, 401, 405, 409, 413.) The Court concludes these allegations sufficiently plead that the Konnektive Defendants' actions were a substantial factor in causing Plaintiff's injury. See Facebook, Inc., 274

---

action, and then incorporates those facts and allegations by reference in her FAL and UCL causes of action. (See, e.g., Doc. No. 89 ¶ 490.) As such, the Court cites to the allegations in the CLRA cause of action with the understanding they are applicable to the FAL and UCL causes of action as well.

F.R.D. at 285.

The Konnektive Defendants rely on <u>In re Century Aluminum Co. Sec. Litig.</u>, to argue that Plaintiff's allegations also support an innocent explanation: that the Konnektive Defendants licensed a legitimate, commercial software to the La Pura Defendants for lawful use only, and did not aid and abet any fraud committed by the La Pura Defendants. (Doc. No. 99 at 18–19 (citing 729 F.3d 1104 (9th Cir. 2013).) Under <u>In re Century Aluminum</u>, "[w]hen faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation." 729 F.3d at 1108 (citing <u>Iqbal</u>, 556 U.S. at 678). But <u>In re Century Aluminum</u> does not control this issue, as Plaintiff has offered "something more," i.e., "facts tending to exclude the possibility that the alternative explanation is true." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 554). She alleges that the Konnektive Defendants have specifically advertised their ability to help companies who had been "shut down" by helping them "get real merchant accounts" and providing "chargeback mitigation." (Doc. No. 89 ¶ 310.) She notes that Konnektive's website and press materials make several references to "load balancers" and merchant account managing. (<u>Id.</u> ¶¶ 326, 331–33.) On information and belief, she provides a screenshot of Konnektive's CRM software and alleges it shows the load balancer, and how it enables a user to exercise granular control over each Merchant ID, including by setting caps on the number of chargebacks for each individual ID. (<u>Id.</u> ¶¶ 327–30.) She notes that load balancing, defined as "distribution of Transactions between or among Merchant ID numbers in order to avoid minimum thresholds," is expressly prohibited by VISA and Mastercard. (<u>Id.</u> ¶ 860.) She argues there is no legitimate reason to be rotating hundreds of merchant accounts and employing chargeback caps and points out that the Konnektive Defendants have not offered a potential lawful purpose for their load balancing software. (Doc. No. 107 at 20–21.) Defendants' arguments are better suited to a motion for summary judgment when the record is more fully developed.

In sum, the Court concludes the FAC's allegations are sufficient to state a claim

against the Konnektive Defendants for violations of the CLRA, FAL, and UCL under an aiding and abetting theory of liability. As such, the Court denies Defendants Konnektive Corporation, Konnektive LLC, Konnektive Rewards LLC, Kathryn Martorano, and Matthew Martorano's motion to dismiss Plaintiff's CLRA, UCL, and FAL claims against them.[12]

## C. Plaintiff's RICO Claims

In its prior Order, the Court dismissed Plaintiff's RICO claims against Defendants with leave to amend. (Doc. No. 88 at 52.) The Court concluded that the allegations in the original complaint were insufficient to plausibly establish a RICO claim, and noted that Plaintiff had not sufficiently pleaded that Defendants possessed the requisite common purpose, fraudulent intent, knowledge, and other elements to allow the Court to reasonably infer that their facially legitimate conduct constituted a RICO violation. (Id.) In the FAC, Plaintiff has significantly amended her RICO allegations. She alleges Defendants have violated section 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). She also alleges they have violated section 1962(d), which makes it unlawful "to conspire to violate any of the provisions of subsection (a), (b), or (c)." Id. § 1962(d).

To maintain a civil RICO claim, a plaintiff must allege that the defendant engaged in: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity and, additionally, must establish that (5) the defendant caused injury to plaintiff's business or property." Black v. Corvel Enter. Comp Inc., 756 F. App'x 706, 708 (9th Cir. 2018) (citing 18 U.S.C. §§ 1962(c), 1964(c)). Plaintiff alleges the existence of an associated-in-fact

---

[12]     Plaintiff alleges the Konnektive Defendants violated several state and federal laws and regulations as part of her UCL "unlawful" prong claim. (Doc. No. 89 ¶¶ 637–728.) Because the Court concludes that Plaintiff has stated claims under the CLRA and FAL against the Konnektive Defendants, it need not address the other alleged grounds for violations of the "unlawful" prong of the UCL at this time.

"Overall Enterprise," made up of all the Defendants. (Doc. No. 89 ¶¶ 840–50.)[13] She alleges that Defendants operated the Overall Enterprise through multiple related predicate acts of mail fraud, wire fraud, and bank fraud over a period of several years. (Id. ¶¶ 841, 851–88, 891.) She alleges the predicate acts affected interstate commerce, and that the Defendants' RICO violations were the but-for cause and proximate cause of her concrete financial injury. (Id. ¶¶ 889–90, 892–94.) The La Pura Defendants argue Plaintiff has failed to plausibly allege the existence of an enterprise or any racketeering activity by them. (Doc. No. 94 at 9–13.) The Quick Box Defendants contend that the FAC fails to allege sufficient facts to satisfy the conduct, enterprise, pattern of racketeering activity, and causation requirements of a RICO claim. (Doc. No. 98 at 15–20.) The Konnektive Defendants argue the FAC fails to plausibly allege an enterprise, that the Konnektive Defendants committed at least two predicate acts, and that their conduct was the proximate cause of her injury. (Doc. No. 99 at 8–17.) The Court addresses each requirement in turn.

### 1. Enterprise

For purposes of a civil RICO claim, an "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." Boyle v. U.S., 556 U.S. 938, 946 (2009); see Odom v. Microsoft Corp., 486 F.3d 541, 549 (9th Cir. 2007). "Such an enterprise . . . is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." Id. at 945. "An association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue

---

[13]   Plaintiff also alleges the existence of three additional sub-enterprises (the La Pura Enterprise, the Quick Box Enterprise, and the Konnektive Enterprise). (Id. ¶¶ 813–39.) Because the Court concludes that Plaintiff has sufficiently pled a RICO claim based on the Overall Enterprise, it need not address the other alleged enterprises at this time.

the enterprise's purpose." Id. "[A]n associated-in-fact enterprise under RICO does not require any particular organizational structure." Odom, 486 F.3d at 551; see Boyle, 556 U.S. at 948 ("Such a group need not have a hierarchical structure or a 'chain of command.'"). However, "[s]imply characterizing routine commercial dealing as a RICO enterprise is not enough." Gardner v. Starkist Co., 418 F. Supp. 3d 443, 461 (N.D. Cal. 2019); see Shaw v. Nissan N. Amer., Inc., 220 F. Supp. 3d 1046, 1054 (C.D. Cal. 2016) ("[C]ourts have overwhelmingly rejected attempts to characterize routine commercial relationships as RICO enterprises."). Plaintiffs must "do '[s]omething more' to 'render [their] allegations plausible within the meaning of Iqbal and Twombly.'" Eclectic Properties East, LLC v. Marcus & Millichap Co., 751 F.3d 990, 999 (9th Cir. 2014) (quoting In re Century Aluminum, 729 F.3d at 1108).

Plaintiff alleges the common purpose of the Overall Enterprise was to defraud victims purchasing the La Pura products, and that each member benefited financially from doing so. (Doc. No. 89 ¶ 842.) She alleges the enterprise has been in existence since at least April 2018, when the first La Pura shell company was allegedly registered in Delaware, and functioned as a continuing unit until at least the date the original complaint was filed in June 2020. (Id. ¶¶ 840, 849.) She alleges that all the members worked together in an indispensable and integrated manner to carry out the fraudulent scheme: the La Pura Defendants created the landing pages, advertisements, false fronts, and other aspects of the "sales funnel" containing the deceptive and misleading advertising; the Quick Box Defendants labeled and shipped the products, helped write the advertisements, and received and managed refunds, complaints, and chargebacks from customers; and the Konnektive Defendants provided the load balancing software to rotate merchant accounts, and assisted with applying for merchant accounts. (Id. ¶¶ 415, 843–46.) She alleges their coordinated activities were necessary to successfully complete the fraudulent consumer transactions and to avoid detection from financial institutions. (Id.) She alleges the La Pura Defendants contracted with the Quick Box Defendants and the Konnektive Defendants to provide these services, and that each member aided the others in carrying out their roles. (Id.) She alleges

each member of the Overall Enterprise knew that the enterprise extended beyond their individual roles and carried out their activities and operations with the intent to further the fraudulent scheme. (Id. ¶ 848.)

The La Pura, Quick Box, and Konnektive Defendants contend that Plaintiff's allegations demonstrate nothing more than commercial relationships pursuant to routine business contracts between them, and that she has failed to plausibly plead the existence of an enterprise. (Doc. Nos. 94 at 10–12; 98 at 16–17; 99 at 8–9.) The Court disagrees. The FAC sets forth sufficient allegations to distinguish ordinary business conduct from fraudulent conduct. See In re Jamster Mktg. Litig., No. 05cv0819 JM(CAB), 2009 WL 1456632, at *5 (S.D. Cal. May 22, 2009). Plaintiff has set forth numerous examples of instruments and conduct that plausibly have only a deceitful purpose and thus likely were not developed by accident or as part of routine business dealings. See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig., 295 F. Supp. 3d 927, 981 (N.D. Cal. 2018). For example, Plaintiff alleges that the numerous shell companies that make up the La Pura Defendants are owned by "front people" who do not actually control the actions of the companies; she suggests that the initials at the end of the company names refer to this front person. (Doc. No. 89 ¶¶ 815–16, 864–68.) She alleges the La Pura Defendants use these individuals, who are not on the MATCH list of individuals forbidden from having merchant accounts, to apply for the merchant accounts associated with each shell company. (Id. ¶ 815.) She argues there is no legitimate reason to have front people apply for merchant accounts, to use multiple merchant accounts and shell companies to sell the same or similar products, or to operate two versions of a website (one with the terms and conditions disclosed, and one without). (Id. ¶¶ 815–16.) She similarly alleges that the load balancing software operated by the Konnektive Defendants has only a deceitful purpose, because it rotates merchant accounts and sets chargeback thresholds on individual merchant accounts to avoid fraud detection by credit card companies, in violation of their rules and terms of service. (Id. ¶¶ 835, 860.) She has also alleged that the nature of the services provided by the Quick Box Defendants and the Konnektive Defendants

necessitated knowledge of and direct participation in the fraudulent aspects of the scheme, meaning their conduct could not be that of a routine service provider. (Id. ¶¶ 825–28, 835–36.) She has explained how the nature of the fraudulent scheme necessitated coordination, integration, and shared purpose between all of the enterprise members, making it less plausible that each member was independently carrying out its own business activities. See Shaw, 220 F. Supp. 3d at 1057 (rejecting RICO claim and noting the instances where each party appeared to act an independent manner, such as by reaching independent conclusions). And significantly, she alleges that all of the Defendants' activities were undertaken with common fraudulent intent: to mislead, deceive, and overcharge customers purchasing La Pura products, on a repeated and continuous basis. (Doc. No. 89 ¶¶ 818, 825, 828, 833, 835, 848.) These allegations and others in the FAC go beyond connecting Defendants to each other by way of normal commercial dealings. The Court concludes Plaintiff has plausibly pled the existence of an association-in-fact enterprise among the Defendants.

### 2.   Predicate Acts and Pattern of Racketeering Activity

"'[R]acketeering activity' is any act indictable under several provisions of Title 18 of the United States Code." Turner v. Cook, 362 F.3d 1219, 1229 (9th Cir. 2004) (citing 18 U.S.C. § 1961(1)). "In order to establish a pattern of racketeering activity, a plaintiff must allege at least two related predicate acts occurring within a ten-year time period that 'amount to or pose a threat of continued criminal activity.'" Campos v. Failla, No. 15-cv-790-BAS(JLB), 2016 WL 1241545, at *7 (S.D. Cal. Mar. 30, 2016) (citing H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239–40 (1989)). "Where, as here, the racketeering activity alleged is fraud, . . . the heightened pleading requirements of Rule 9(b) apply to the predicate acts." Shaw, 220 F. Supp. 3d at 1053; see Doan v. Singh, 617 F. App'x 684, 685 (9th Cir. 2015) ("RICO fraud allegations are subject to the heightened pleading standard of Rule 9(b)."). "In the RICO context, a Plaintiff must 'detail with particularity the time, place, and manner of each act of fraud, plus the role of each defendant in each scheme.'" Shaw, 220 F. Supp. 3d at 1053 (citing Lancaster Cmty. Hosp. v. Antelope Valley Hosp.

Dist., 940 F.2d 397, 405 (9th Cir. 1991)). Further, where a plaintiff alleges RICO claims against multiple defendants, the "plaintiff must allege at least two predicate acts by each defendant." In re WellPoint, Inc. Out-of-Network UCR Rates Litig., 865 F. Supp. 2d 1002, 1035 (C.D. Cal. 2011).

Plaintiff alleges the La Pura Defendants committed predicate acts of wire fraud, (Doc. No. 89 ¶¶ 856, 870), bank fraud, (id. ¶ 861), and mail fraud, (id. ¶ 857). She alleges each of the Quick Box Defendants committed predicate acts of mail fraud, (id. ¶ 857), and conspired to commit wire fraud, (id. ¶¶ 856, 870). Finally, she alleges each of the Konnektive Defendants committed predicate acts of bank fraud, (id. ¶ 861), and wire fraud, (id. ¶¶ 856, 859, 870). It is a violation of the bank fraud statute to knowingly "defraud a financial institution," or "obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344. "The mail and wire fraud statutes are identical except for the particular method used to disseminate the fraud, and contain three elements: (A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud." Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp., No. 17-cv-04992-BLF, 2019 WL 4888693, at *12 (N.D. Cal. Oct. 3, 2019) (quoting Eclectic Properties, 751 F.3d at 997). "The gravamen of the offense is the scheme to defraud, and any 'mailing that is incident to an essential part of the scheme satisfies the mailing element,' even if the mailing itself 'contain[s] no false information.'" In re Outlaw Lab'y, LP Litig., No. 18-cv-840-GPC-BGS, 2020 WL 1953584, at *6 (S.D. Cal. Apr. 23, 2020) (quoting Schmuck v. United States, 489 U.S. 705, 712, 715 (1989)). Additionally, a defendant "need not personally have mailed the letter or made the telephone call; the offense [of mail or wire fraud] may be established where one acts with the knowledge that the prohibited actions will follow in the ordinary course of business or where the prohibited acts can reasonably be foreseen." Shinde v. Nithyananda Found., No. EDCV 13-363, 2015 WL 12732434, at *9 (C.D. Cal. Feb. 23, 2015) (citing United States v. Lothian, 976 F.2d

1257, 1262 (9th Cir. 1992)). "The intent to defraud may be inferred from a defendant's statements and conduct." Eclectic Properties, 751 F.3d at 997 (quoting United States v. Peters, 962 F.2d 1410, 1414 (9th Cir. 1992)). "In the absence of direct evidence of intent, the party asserting fraud must first prove 'the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension,' and then, 'by examining the scheme itself' the court may infer a defendant's specific intent to defraud." Id. (quoting United States v. Green, 745 F.2d 1205, 1207 (9th Cir. 1984)). "When companies engage in [] transactions that are facially legitimate . . . a significant level of factual specificity is required to allow a court to infer reasonably that such conduct is plausibly part of a fraudulent scheme." Id. at 997–98.

Plaintiff alleges that the sale and shipment of La Pura products to her involved the commission of several predicate acts by each Defendant. She alleges the Defendants formed a scheme to defraud consumers using deceptive and misleading advertising in order to obtain their credit card information and repeatedly bill them for products they did not order. (Doc. No. 89 ¶ 854.) She alleges each Defendant had the specific intent to defraud consumers to earn a continuous stream of money from the recurring subscription billings, and that each Defendant was a knowing participant in the fraudulent scheme. (Id. ¶¶ 848, 856, 858, 870, 891.) She alleges the Defendants used the United States mails and wires in furtherance of the fraudulent scheme in several ways. She alleges the (1) text message she received, which falsely claimed to be from Amazon, and (2) the La Pura landing page website she visited, which contained numerous false statements about the products' endorsements, limited supply, effectiveness, actual price, subscription service, etc. were both transmitted via United States wire and thus each constitute a separate predicate act of wire fraud. (Id. ¶¶ 855–56.) She alleges the shipment of La Pura products to her from Quick Box, LLC's Colorado fulfillment center constitutes a predicate act of mail fraud. (Id. ¶¶ 857–58.) She alleges the use and operation of the Konnektive load balancing software to rotate between three separate merchant accounts and ultimately bill her credit card from two different merchant accounts constitutes predicate acts of wire fraud. (Id. ¶¶ 859–61.)

3:20-cv-01082-H-DEB

She alleges the creation and use of "false front" websites in order to apply for and obtain merchant accounts constitutes predicates acts of wire fraud. (Id. ¶¶ 862–70.) Finally, she alleges the La Pura Defendants and the Konnektive Defendants committed predicate acts of bank fraud through the use and operation of the Konnektive load balancing software. (Id. ¶¶ 859–61.) She alleges they knowingly defrauded a financial institution, Plaintiff's credit union, by deceiving it as to the true entities behind the merchant accounts being used to charge her credit card, and by evading rules regarding chargebacks and fraud detection tactics. (Id.) She also alleges they used those fraudulent and false means to obtain the credit union's money or credits. (Id.)

In addition to the predicate acts involved in her La Pura transaction, Plaintiff also alleges that her experience with La Pura was part of a pattern of related transactions and shipments to other consumers that occurred from at least early 2019. (Id. ¶¶ 871–88.) She states that she is unable to fully plead details of those predicate acts because the facts are largely within the possession of Defendants, but provides several representative examples of customers describing their experience with La Pura products in Better Business Bureau ("BBB") complaints, and alleges those experiences each involved the commission of several predicate acts by the Defendants. (Id.) For example, in a complaint posted on June 13, 2019, a customer stated they were told on a La Pura website they'd receive a free trial of a La Pura product, and that they only had to pay for shipping. (Id. ¶¶ 873–74.) Instead, they were charged on four separate occasions and signed up for a monthly subscription. (Id.) They also stated they experienced a skin reaction after trying the product. (Id.) Plaintiff alleges this transaction involved predicate acts substantially identical to those committed against her: wire fraud (the La Pura website and the four credit card charges), mail fraud (shipment of the La Pura product), and bank fraud (the use of the load balancer for the four credit card charges). (Id.) Plaintiff provides similar details for seven other BBB complaints posted about La Pura and alleges there are likely many more instances. (Id. ¶¶ 875–88.) She alleges all of these predicate acts, including those involved in her own transaction, are related, in that they have the same participants, purpose, structure, and

method of commission, and they were all done in furtherance of the same scheme to defraud. (Id. ¶¶ 890–91.) She alleges the predicate acts are not isolated or sporadic and pose a threat of continued racketeering activity. (Id. ¶¶ 850, 890.)

The Court concludes the FAC sufficiently and plausibly pleads a pattern of racketeering activity by the Defendants. Plaintiff has pled the time, place, and manner of multiple predicate acts committed by each Defendant, plus the role of each Defendant in the scheme, with sufficient particularity to give Defendants "notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007). She has pled that the predicate acts are related and amount to or pose a threat of continued criminal activity, and thus constitute a pattern of racketeering activity. See Turner, 362 F.3d at 1229. The La Pura Defendants contend Plaintiff has not plausibly alleged that the "Moving Defendants" engaged in any predicate acts or any conduct beyond facially legitimate transactions. (Doc. No. 94 at 12–13.) As the Court has already dispensed with the distinction between the Moving Defendants and Defendant Total Health Supply TUA and concluded that Plaintiff's predicate act allegations are plausibly and sufficiently pled, this argument is unsuccessful.

Dismissing her allegations regarding the BBB complaints as implausible, the Quick Box Defendants argue Plaintiff has only identified one transaction where they shipped a La Pura product to her, and thus has failed to show they each committed two predicate acts. (Doc. No. 98 at 18.) The Court disagrees; although the exact locations and identities of the consumers behind the BBB complaints are unknown to Plaintiff, the transactions and shipments are clearly similar enough to Plaintiff's own experience to put Defendants on notice of the fraudulent conduct they are alleged to have committed. The BBB complaints were also posted during the time period (April 2018 – June 2020) when Quick Box is alleged to have been providing shipping and fulfilment services for the La Pura Defendants. (Doc. No. 89 ¶ 822.) Relying on United States v. Phillips, the Quick Box Defendants also contend that the shipment to Plaintiff, or any other La Pura customer, cannot constitute a

predicate act of mail fraud because the success of the fraudulent scheme purportedly did not depend in any way on the use of the mails. (Doc. No. 98 at 18–19 (citing 704 F.3d 754, 763 (9th Cir. 2012).) Phillips, which involved a defendant who used fraudulently obtained funds to purchase a watch via the United States mails, is not analogous to the case at hand, which involves a mailing that is alleged to have been an essential part of the fraudulent scheme itself, not simply a byproduct of the scheme. "It is well settled that mailings sent in the midst of [an ongoing] scheme, including those designed to avoid detection or responsibility, fall within the [mail fraud] statute." United States v. Tanke, 743 F.3d 1296, 1301 (9th Cir. 2014).

The Konnektive Defendants contend that the FAC's allegations are boilerplate and fail to allege either specific predicate acts actually committed by the Konnektive Defendants or the specific roles the Konnektive Defendants had in the alleged enterprise. (Doc. No. 99 at 10–12.) The Court disagrees. Plaintiff's allegations of fraud are "specific enough to give defendants notice of the particular misconduct so that they can defend against the charge." Vess v. Ciba–Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003). The Konnektive Defendants also challenge Plaintiff's use of their load balancing software as the basis for her allegations of predicate acts of wire fraud and bank fraud. (Doc. No. 99 at 12–15.) They argue that "load balancing" is prohibited by their Acceptable Use Policy, and therefore their software cannot have been used to rotate the La Pura Defendants' merchant accounts in furtherance of the fraudulent scheme. (Id.) But there are ample allegations to support Plaintiff's claim that the Konnektive Defendants do operate load balancing software, and that the software was in fact used to rotate La Pura merchant accounts. In the FAC, Plaintiff notes that Konnektive's website and press materials make several references to its "load balancers" and merchant account managing services. (Doc. No. 89 ¶¶ 326, 331–33.) She also provides a screenshot allegedly of Konnektive's CRM software and alleges it shows the load balancer, and how it enables a user to exercise granular control over each Merchant ID. (Id. ¶¶ 327–30.) The Konnektive Defendants argue that the FAC's screenshots depict a Konnektive dashboard that was used for a

different client and campaign and was not used for the La Pura products. (Doc. No. 99 at 5, 13.) But even if the Konnektive software depicted in the FAC is not exactly the same as the software used for the La Pura Defendants, that denial does not contradict Plaintiff's assertion that the Konnektive Defendants do in fact own and operate a load balancing software, and in fact supports the inference that they do. The Konnektive Defendants ask the Court to take judicial notice of a screenshot of the Konnektive CRM software, which they allege is the Konnektive dashboard for Plaintiff's La Pura transactions. (Doc. No. 99 at 13–14.) The Court denies the request; as Plaintiff points out, consideration of a document is only appropriate if (1) the authenticity is not contested, and (2) the complaint necessarily relies on it. See Lee, 250 F.3d at 688. Neither requirement is satisfied here. Defendants' arguments are better suited to a motion for summary judgment when the record is more fully developed. Finally, the Konnektive Defendants' claim that load balancing is "prohibited" by their Acceptable Use Policy is misleading; the language of the policy is better characterized as a "warning" rather than a prohibition. The Policy does state that the software "may be used for lawful purposes only," but then states that "Load Balancing is prohibited by the card schemes and banks and will lead to termination of your merchant facilities if discovered." (Doc. No. 89 ¶ 336.) And as Plaintiff points out, the Konnektive Defendants have not put forth an explanation for how a load balancing software could be used for a lawful, non-fraudulent purpose. In sum, the Court concludes Plaintiff has plausibly and sufficiently alleged the predicate acts and pattern of racketeering elements of her RICO claim.

### 3. Conduct

Next, "[i]n order to 'participate, directly or indirectly, in the conduct of [an] enterprise's affairs,' one must have some part in directing those affairs." Reves v. Ernst & Young, 507 U.S. 170, 179 (1993) (quoting 18 U.S.C. § 1962(c)). This requirement does not limit RICO liability "to those with primary responsibility for the enterprise's affairs," nor does it require a participant to exercise "significant control over or within an enterprise." Id. But while "RICO liability is not limited to those with a formal position in

the enterprise . . . some part in directing the enterprise's affairs is required." Id. "'[S]imply performing services for the enterprise' or failing to stop illegal activity, is not sufficient." In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig., No. MDL 2672 CRB (JSC), 2017 WL 4890594, at *16 (N.D. Cal. Oct. 30, 2017) (quoting Walter v. Drayson, 538 F.3d 1244, 1248–49 (9th Cir. 2008)). "In the Ninth Circuit, to assess whether a defendant had a sufficient role in operation or management to meet the standard of § 1962(c) [and Reves], courts consider whether the defendant (1) gave or took directions; (2) occupied a position in the 'chain of command' through which the affairs of the enterprise are conducted; (3) knowingly implemented decisions of upper management; or (4) was indispensable to achievement of the enterprise's goal in that the defendant's position is 'vital' to the mission's success." In re Outlaw Lab'y, LP Litig., 2020 WL 1953584, at *10 (citing Walter, 538 F.3d at 1249).

The Quick Box Defendants argue that Plaintiff's allegations regarding their alleged involvement in the enterprise only amount to "simply performing services for the enterprise," and do not rise to the level of direction required to constitute conduct under RICO. (Doc. No. 98 at 15–16.) Plaintiff argues she has pled allegations that Defendants Quick Box, LLC, Stephen Adelé, Chad Biggins, and James Martell directly conducted the affairs of the enterprise, occupied positions in the chain of command, and knowingly implemented the decisions of the La Pura Defendants, to the extent they would be considered upper management. (Doc. No. 106 at 13–14.) The Court agrees with Plaintiff and concludes she has sufficiently pled this element. Defendants' arguments are better suited to a motion for summary judgment when the record is more fully developed.

### 4.   Causation

The Quick Box Defendants and the Konnektive Defendants argue Plaintiff is unable to prove causation. (Doc. Nos. 98 at 19–20; 99 at 15–16.) "RICO standing is limited to plaintiffs who have suffered (1) an injury to 'business or property,' that is (2) 'by reason of' a RICO violation." City & Cty. of San Francisco v. Purdue Pharma L.P., No. 3:18-cv-07591-CRB, 2020 WL 5816488, at *17 (N.D. Cal. Sept. 30, 2020) (quoting 18 U.S.C.

§ 1964(c)). "The Supreme Court has held that the 'by reason of' language in 18 U.S.C. § 1964(c) requires a civil RICO plaintiff 'to show that a RICO predicate offense not only was a but for cause of his injury, but was the proximate cause as well.'" In re Chrysler-Dodge-Jeep, 295 F. Supp. 3d at 965 (quoting Hemi Grp., LLC v. City of N.Y., 559 U.S. 1, 9 (2010) (internal quotation marks omitted)); see Canyon Cty. v. Syngenta Seeds, Inc., 519 F.3d 969, 981 (9th Cir. 2008). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006)). "[T]he proximate-cause requirement generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd., 943 F.3d 1243, 1248–49 (9th Cir. 2019) (quoting Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 133 (2014)).

The Court concludes Plaintiff has sufficiently pled the causation element of her RICO claim against Defendants. Plaintiff has alleged she was injured by an ongoing fraudulent scheme, and that her original transaction on the La Pura website was only one part of it. Plaintiff has pled that a key element of the fraudulent scheme was to sign consumers up for recurring subscription payments for products, such that they would be continuously billed for products they never ordered or expected to receive. (Doc. No. 89 ¶¶ 139–40, 157.) Plaintiff alleged her credit card was billed on two separate occasions and would have continued to be billed had she not reached out to La Pura and ultimately canceled her credit card. (Id. ¶¶ 116–17.) Additionally, Plaintiff has pled the Quick Box Defendants' shipment of products and the Konnektive Defendants' load balancing of merchant accounts were crucial to making the transactions appear facially legitimate to financial institutions, thereby avoiding detection of the scheme. (Id. ¶¶ 378, 397.) The case cited by Defendants, Mitsui O.S.K. Lines, Ltd. v. SeaMaster Logistics, Inc., is not analogous; it involved acts that were "inconsequential," did not "consummate the purpose of the enterprise," "were not important to the Defendants' scheme," and "were not necessarily illegal." No. 10-cv-05591-SC, 2015 WL 5782349, at *6 (N.D. Cal. Oct. 5,

2015). Unlike <u>Mitsui</u>, there is a close link between Defendants' alleged predicate acts of mail fraud and wire fraud and Plaintiff's injury.

In sum, the Court concludes that Plaintiff has plausibly, and with sufficient particularity, pled that the La Pura, Quick Box, and Konnektive Defendants engaged in the conduct of an enterprise through a pattern of racketeering activity, and that their conduct caused injury to her business or property. <u>See</u> <u>Black</u>, 756 F. App'x at 708. Defendants' arguments are better suited to a motion for summary judgment when the record is more fully developed. Accordingly, the Court denies the La Pura, Quick Box, and Konnektive Defendants' motions to dismiss Plaintiff's RICO claim.[14]

### D.    Plaintiff's Non-California Consumer Protection State Law Claims

Finally, the La Pura, Quick Box, and Konnektive Defendants move to dismiss Plaintiff's sixth cause of action, which asserts Defendants have violated various states' consumer protection statutes. (Doc. No. 89 ¶¶ 898–908.) Defendants correctly point out that the Court dismissed this cause of action in Plaintiff's original complaint, and that Plaintiff has not fixed the defect with this claim – that she is a resident of California and was injured in California, and therefore has no standing to bring claims under the laws of other states – in her FAC. (Doc. Nos. 94 at 14; 98 at 20–21; 99 at 22–23.) Plaintiff states the claim is only included in the FAC to preserve error and avoid waiver of her original arguments. (Doc. No. 100 at 25.) As such, for the reasons outlined in its prior Order, (Doc. No. 88 at 38–40), the Court grants the La Pura, Quick Box, and Konnektive Defendants' motions to dismiss Plaintiff's claims under non-California state laws.

---

[14]     The Quick Box and Konnektive Defendants also challenge Plaintiff's RICO conspiracy claim against them. To establish a RICO conspiracy, Plaintiffs must allege either (1) "an agreement that is a substantive violation of RICO," or (2) "that the defendants agreed to commit, or participated in, a violation of two predicate offenses." <u>Howard v. Am. Online Inc.</u>, 208 F.3d 741, 751 (9th Cir. 2000) (citing 18 U.S.C. § 1962(d)). The Quick Box and Konnektive Defendants' arguments for dismissal of Plaintiff's RICO conspiracy claim are the same as their arguments for dismissal of Plaintiff's § 1962(c) claim. (<u>See</u> Doc. Nos. 98 at 20; 99 at 17.) The Court concluded those arguments were unpersuasive in the § 1962(c) context. The Court accordingly denies Defendants' motions to dismiss Plaintiff's § 1962(d) RICO conspiracy claim.

## <u>Conclusion</u>

For the reasons above, the Court denies the La Pura, Konnektive, and Quick Box Defendants' motions to dismiss Plaintiff's first amended complaint for failure to state claims under the CLRA, FAL, UCL, and RICO. Additionally, the Court dismisses Plaintiff's non-California state consumer protection law claims.

**IT IS SO ORDERED.**

DATED: April 7, 2021

_____

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

45

3:20-cv-01082-H-DEB