UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEANNE TAN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>QUICK BOX, LLC, et al.,<br><br>Defendants. | Case No.: 20-cv-1082-LL-DDL<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL** |

## I.

## **BACKGROUND**

On July 3, 2025, Judge Lopez issued an Order granting Plaintiff Leanne Tan's motion for final approval of her settlement with defendants Konnektive LLC, Converging Resources Corporation, Konnektive Rewards LLC, Matthew Martorano, and Kathryn Martorano (collectively "Konnektive"). Dkt. No. 512. The Order provides, in relevant part:

> Plaintiff's settlement agreement with Konnektive is signed and dated August 2024. ECF No. 492-4. In consideration for class members releasing their claims against it, Konnektive agreed to pay either $2,000,000 or $5,000,000 into a common fund for the same distribution

as in [the Quick Box defendants'] fund. *See id.* The amount depends on the agreed-to bench trial before Magistrate Judge Leshner: if he finds that Plaintiff proved any of her Consumer Legal Remedies Act ("CLRA") claims against Konnektive by a preponderance of the evidence and that no affirmative defense applies, Konnektive shall pay $5,000,000; conversely, if Plaintiff does not prove any CLRA claim or Konnektive is otherwise found not liable due to one of its defenses, Konnektive shall only pay $2,000,000 into the common fund. *See id.* at 15–16.

*Id.* at 3-4.

Plaintiff and Konnektive thereafter consented to the undersigned's jurisdiction to decide "all disputes regarding settlement terms arising during the documentation thereof not resolved by the parties themselves" and "all disputes arising out of the terms of the settlement agreement once completed." Dkt. No. 518.

From October 24-27, 2025, the undersigned presided over a bench trial on Plaintiff's CLRA claim. Thereafter, the parties submitted post-trial briefing and proposed findings of fact. Dkt. Nos. 542, 543, 545, 546.

## II.
## DISCUSSION

### A.  Plaintiff's CLRA Claim Against Rocket Management Group

#### 1.  Legal Standards

The elements of Plaintiff's cause of action against Rocket Management Group ("RMG") under the Consumer Legal Remedies Act are as follows:

1. That Class members purchased La Pura products for personal, family or household use.

2. That RMG did one or more of the following: (a) misrepresented the source, sponsorship, approval or certification of the La Pura Products,

(b) misrepresented that the La Pura products had sponsorship, approval, characteristics, ingredients, uses, benefits, or quantifies that they did not have; or (c) misrepresented the La Pura Products with the intent not to sell them as advertised.

3. That the class was harmed; and

4. That the class's harm resulted from RMG's conduct.

See CACI 4700; Cal. Civil Code § 1770.[1]

### 2. **Factual Findings**

Plaintiff received a text message branded as an Amazon advertisement with a link that directed her to a La Pura website. That website did not have any terms and conditions, nor did it mention a subscription. Plaintiff ordered a "free" La Pura skin care product through the website, for which she expected to be billed only $4.97 for shipping. However, she was charged over $22.00 for her initial purchase, and two weeks later she was charged approximately $80.00 twice more. Plaintiff complained and was given a partial refund of these additional charges.

Alan Kulvete received an email purportedly from Costco that linked to the La Pura website. The website represented "free" La Pura products with the customer paying only for shipping. Kulvete ordered La Pura products believing he would only be charged $4.97 for shipping one La Pura product and $3.97 for an additional La Pura product after his checkout from the La Pura website. Kulvete did not expect to be signing up for a subscription to the La Pura product; however, he was charged for additional La Pura products two weeks after his initial purchase.

/ / /

---

[1] The Court agrees with Konnective that Plaintiff's First Amended Complaint does not allege a CLRA violation based on an unconscionable provision in the terms of sale under Civil Code § 1770(a)(19) and thus does not consider that CLRA theory of liability. See Dkt. No. 89 at 117-118.

1   RMG operated a website that sold skin care products branded as La Pura. Plaintiff purchased her La Pura product through RMG's website.  Kiet Lieu is RMG's principal.  At his deposition, Lieu repeatedly invoked the Fifth Amendment in response to questions concerning his involvement with RMG and the La Pura websites.

RMG was a customer of CodeClouds, which developed roughly 100 websites for RMG.  The websites created by CodeClouds for RMG included "bank pages" and "offer pages."  Banks require a company to have an approved "bank page" before the bank issues a company a merchant ID, as described below.  The banks require that terms and conditions and disclosure of a subscription exist on the "bank page."  An "offer page" is the website on which that the merchant actually intended for customers to purchase products

Various "bank pages" that CodeClouds created for RMG included terms and conditions concerning a subscription. However, the La Pura website that Tan purchased from had an "offer page" that did not have any disclosures of a subscription nor any conspicuous terms and conditions that a consumer had to accept as a condition to the sale.

### 3.  Conclusion

Plaintiff established by a preponderance of the evidence her CLRA claim against RMG.  Plaintiff purchased La Pura products for her personal use.  RMG misrepresented that the La Pura Products were "free" and did not disclose that Plaintiff would be enrolled in a subscription to purchase additional products. RMG's conduct harmed Plaintiff and the class because they were charged for products they did not order.

/ / /
/ / /
/ / /
/ / /

B. **Konnektive's Liability**

Plaintiff contends that Konnektive aided and abetted RMG's CLRA violation and conspired with RMG to violate the CLRA.

   1. **Legal standards**

"Liability may be imposed on one who aids and abets the commission of an intentional tort if the person [] knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act . . ." *Casey v. U.S. Bank Nat. Assn.*, 127 Cal. App. 4th 1138, 1144 (2005). "California courts have long held that liability for aiding and abetting depends on proof the defendant had actual knowledge of the specific primary wrong the defendant substantially assisted." *Id.* at 1145. Thus, "aiding and abetting liability under California law, as applied by the California state courts, requires a finding of actual knowledge, not specific intent." *In re First All. Mortg. Co.*, 471 F.3d 977, 993 (9th Cir. 2006). *See* CACI 3610.

In addition to actual knowledge of the "specific primary wrong," the aider and abettor must "give[] substantial assistance or encouragement to the other to so act . . ." *Casey*, 127 Cal. App. 4th at 1144. "[E]ven 'ordinary business transactions' a bank performs for a customer can satisfy the substantial assistance element of an aiding and abetting claim if the bank actually knew those transactions were assisting the customer in committing a specific tort." *Id.* at 1145. "Knowledge is the crucial element." *Id. See also In re First All. Mortg. Co.*, 471 F.3d at 995 (affirming jury verdict for plaintiff on aiding and abetting theory where "Lehman satisfied all of First Alliance's financing needs and, after other investment banks stopped doing business with First Alliance, kept First Alliance in business, knowing that its financial difficulties stemmed directly and indirectly from litigation over its dubious lending practices").

A similar principle applies to a conspiracy claim under California law. *See, e.g., Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1584 (1995) ("to

hold a defendant liable for joining an ongoing conspiracy to commit a tort, there must be evidence that the joiner had actual knowledge of the scheme to commit the tort"). *See* CACI 3600.

### 2. Factual Findings

A merchant that accepts debit and credit cards for the purchase of its goods utilizes the services of a "payment processor" to connect the merchant to a bank so the merchant can process card transactions. The payment processor provides the merchant with a "merchant ID" (also known as a "MID"), a numerical ID that is used for the card transactions. A merchant can have one or more MIDs.

Konnektive provides customer relationship management ("CRM") software to merchants. The services provided by Konnektive include a feature that allows the merchant to distribute credit and debit card transactions across multiple MIDs. A merchant accesses this feature through a system called GT Pay that is controlled by Konnektive. Plaintiff calls this feature a "load balancer," and Konnektive calls it a "transaction router." The purpose of this feature is to spread transactions across multiple MIDs so any chargebacks for consumer purchases do not all go the same MID and thereby reduce the likelihood that the bank will shut down that MID due to an excessive number of chargebacks.

RMG was a Konnektive client and had multiple MIDs for processing card transactions. Konnektive's CRM software allowed it to see its customers' chargeback rates. RMG's chargebacks were 8.3 percent of sales, which was an indicator that RMG was engaged in fraudulent activity.

### 3. Conclusion

To prevail on the aiding and abetting theory of liability, Plaintiff must establish that Konnektive had actual knowledge of RMG's "specific primary wrong" (*i.e.*, the free trial scheme) and provided substantial assistance. *Casey*, 127 Cal. App. 4th at 1144. *See also In re First All. Mortg. Co.*, 471 F.3d at 993; CACI 3610. Plaintiff has not met her burden.

The evidence shows that Konnektive's CRM software allowed merchants to spread transactions across multiple MIDs. Whether one calls it "load balancer" or a "transaction router," the feature's functionality could be used by merchants engaged in fraudulent activity to perpetuate that activity by allowing them to minimize the number of chargebacks on each MID and evade scrutiny by the payment processor and the bank. And *Casey* makes clear that "even 'ordinary business transactions' a bank performs for a customer can satisfy the substantial assistance element of an aiding and abetting claim if the bank actually knew those transactions were assisting the customer in committing a specific tort." *Casey*, 127 Cal. App. 4th at 1145.

Assuming *arguendo* that Konnektive's CRM substantially assisted RMG in perpetuating its free trial scheme (a point Konnektive contests), Plaintiff must establish that Konnektive knew about the free trial scheme. *Id.* at 1144. It is unclear whether or how the load balancing functionality served any legitimate business purpose, and the evidence showed this functionality could be used to perpetrate fraud as discussed above. Moreover, Konnektive's decision to move the load balancing functionality to the separate GT Pay platform in 2018 is circumstantial evidence that Konnektive knew merchants were using the functionality to evade chargeback thresholds imposed by the banks. However, the evidence presented by Plaintiff did not establish by a preponderance of the evidence that Konnektive had actual knowledge of RMG's free trial scheme.

The testimony of Konnektive's principals was evasive and unconvincing in certain respects. It strains credulity that Matthew and Kathryn Martorano were unable to recognize their son's recorded voice. Kathryn Martorano's answers to questions about her ability to hire and fire employees were evasive. And Matthew Martorano's testimony that Konnektive's software offered a "transaction router" function but not a "load balancer" function was unconvincing. Plaintiff correctly points out that the principle of *falsus in uno, falsus in omnibus* allows a trier of fact

"to decide that a witness who has lied about one material fact must be disbelieved as to all facts." *Hughes v. Rodriguez*, 31 F.4th 1211, 1219 n. 2 (9th Cir. 2022). However, considering the totality of the evidence adduced at trial, the Court cannot conclude that any false testimony by Matthew or Kathryn Martorano warrants a determination that the entirety of their testimony was false and that Konnektive had actual knowledge of RMG's free trial scheme. Plaintiff's failure to establish Konnektive's knowledge of the free trial scheme is fatal to both the aiding and abetting and conspiracy theories of liability. *See Casey*, 127 Cal. App. 4th at 1144; *Kidron*, 40 Cal. App. 4th at 1584.

## III.
## CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiff has not proved her CLRA claims against Konnektive by a preponderance of the evidence.

**IT IS SO ORDERED.**

Dated: January 5, 2026.

_____
Hon. David D. Leshner
United States Magistrate Judge